## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**REBECCA BRYANT,**

        **Plaintiff,**

    **v.**

**CITY OF CINCINNATI FIRE
DEPARTMENT, et al.,**

      **Defendants.**

**Case No. 1:24-cv-119**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Defendants City of Cincinnati, Harold Wright, and Damonte Brown all move to dismiss Plaintiff Rebecca Bryant's Amended Complaint. (Doc. 11[1]; Doc. 12; Doc. 13). Bryant is a firefighter in the Cincinnati Fire Department (CFD), which is a division within the municipality of Defendant City of Cincinnati. (Am. Compl., Doc. 3, #24). Defendant Wright was a former Lieutenant at CFD; Defendant Brown is still a firefighter there. (*Id.* at #24–25). Bryant sued Defendants based on a series of serious allegations—accusations of rape, sexual assault, and/or sexually harassing comments—that she makes against Defendants Wright, Brown, and other CFD employees, as well as based on CFD's alleged response to her complaints about those incidents and how CFD has handled its allegedly hostile-work-environment culture. (*Id.* at #26–31). For the reasons explained below, the Court **GRANTS IN PART AND**

---

[1] Defendant City has not moved to dismiss Counts III or IV of the Complaint, so while the City has labeled its motion a motion to dismiss, (*See* Doc. 11), Bryant correctly points out that it is really a partial motion to dismiss. (Doc. 16, #225). The City seems to admit as much in its motion. (*See* Doc. 11, #105 (stating that "*many* of [Bryant's] claims should be dismissed," but not all of them (emphasis added))).

**DENIES IN PART** City of Cincinnati's Motion to Dismiss (Doc. 11), Defendant Harold Wright's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 12), and Defendant Damonte Brown's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 13).

## BACKGROUND

At the motion to dismiss stage, the Court must accept a complaint's well-pleaded factual allegations as true. And, in this case, the allegations detail an unsettling (to put it lightly) account of Bryant's hiring process at and employment with the Cincinnati Fire Department. Bryant discusses four key categories of events in her Amended Complaint: (1) Defendant Wright's pre-employment rape of, and harassment directed against, her; (2) a non-party CFD employee's sexually harassing comments to her (and potentially other employees' harassing workplace comments); (3) Defendant Brown's sexual assault against her; and (4) CFD's handling of her reports about the events that she was experiencing and its treatment of her after she made those reports.

First, the allegations concerning Defendant Wright. In the fall of 2018, Bryant applied to be a firefighter at CFD. (Doc. 3, #26). At the time, Wright oversaw the department's recruiting. (*Id.*). Throughout the hiring process, Wright frequently communicated with Bryant. (*Id.*). At one point, he allegedly told her that CFD would not move forward with her application, but that he was "vouching for her throughout the process." (*Id.*). Based on these representations, Bryant "felt indebted" to Wright

and "that she owed her employment opportunity" to him.[2] (*Id.*). On December 8, 2018, Wright allegedly invited Bryant to his home, where she says he raped her. (*Id.*). He continued to communicate with her after the fact with "persistent invitations to recreate the events that led to the initial assault" until at least September 14, 2019. (Doc. 8-3, #71).[3] A few months after the alleged rape, on February 9, 2019, Bryant

---

[2] Put more bluntly, Bryant told City investigators that "Mr. Wright relayed he was 'basically the reason she got the job.'" (Doc. 8-3, #62).

[3] This preliminary finding does not come from the Complaint, but rather from an investigation report the City filed as an attachment to an affidavit in support of its motion to dismiss. (Doc. 8). In total, that affidavit attaches four documents: Bryant's complaints against Brown and Wright, (Docs. 8-1, 8-2), and the City's investigation reports regarding those complaints, (Docs. 8-3, 8-4). While "a court should typically limit itself to the well-pleaded allegations within the complaint's four corners" in considering a motion to dismiss, that rule has exceptions. *Blackwell v. Nocerini*, 123 F.4th 479, 486 (6th Cir. 2024). Specifically, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to [a] defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017) (quotation omitted). Additionally, the Sixth Circuit has "taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001). So for example "when affidavits do nothing more than verify the complaint, and when they add nothing new, but, in effect, reiterate the contents of the complaint itself, they are not truly materials outside the pleading." *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997) (cleaned up).

The documents the City attaches are close calls, but the Court considers them here for several reasons. First, neither party has either objected to their use or disputes their authenticity. (*See* Doc. 16, #231; Doc. 17, #371–72). Second, Bryant at least tacitly references the documents in her Complaint. (*See* Doc. 3, #30 ("The City did not substantiate Plaintiff's claims against Defendant Brown."), 31 ("… after Plaintiff's complaint against Defendant Wright was substantiated."), 37 (discussing the Bryant's complaints (or Chief's Reports))). Third, to the extent the Court relies on these documents, it is primarily relying on Bryant's own statements within them. That is, these are just additional documents recording Bryant's own earlier allegations. It would put form over substance for the Court to ignore Bryant's earlier allegations in assessing plausibility, only to turn around to allow her to amend her Complaint to specifically include those allegations.

So the Court will consider those documents, and, in particular, Bryant's allegations in those documents, in assessing plausibility. That said, the Court treats any statements taken from these attachments like any other allegations at the motion-to-dismiss stage—the Court considers them true for now, but certainly does not find that they are in fact true.

was accepted into the recruit class and began her employment with CFD. (Doc. 3, #26; Doc. 11-1, #123).

Second, the sexually harassing comments. Bryant alleges that on June 21, 2021, Ervin Mitchell, a CFD employee who is a non-party, told her "that there was no place for women in the workplace." (Doc. 3, #26). Bryant says she reported Mitchell for these comments and was told that an investigation was conducted. (*Id.* at #27). But she never heard back about her report or the results of the investigation. (*Id.*). Bryant also references a report from an outside organization—Women Helping Women—that partnered with the City to conduct a "two-year gender study across all City departments," including CFD. (*See id.* at #26 (referencing Doc. 15-1, #152)).[4] The group's report asserts, among other things, that "using language derogatory to women … happens everyday [sic]" according to at least one study participant. (Doc. 15-1, #154).

Third, the allegations concerning Defendant Brown. One night in August of 2022, Bryant alleges that Brown sexually assaulted and attempted to rape her. (Doc. 3, #27). Bryant says this happened after an "assignment party" attended by CFD employees[5]— Brown allegedly asked Bryant to drive him back to his car and that's when the assault occurred. (*Id.*).

---

[4] While Bryant failed to attach the report to her Complaint (even though she said it was "attached hereto as Exhibit C," (Doc. 3, #26)), her reference to the report in the Complaint essentially incorporates the report, allowing the Court to consider it in assessing plausibility. *See Blackwell*, 123 F.4th 479, 487.

[5] Assignment parties are "not a city-sanctioned event or function" but "a tradition that employees associate[] with the Fire Department." (Doc. 8-4, #96 n.1).

Fourth, the City's handling of Bryant's reports and its post-reporting treatment of her. Specifically, Bryant accuses CFD of not properly maintaining reports, not properly investigating reports, and retaliating against her. On October 10, 2022, she submitted reports, also known as Form-47s, (Doc. 8, #53), regarding Wright's and Brown's conduct.[6] (Doc. 3, #27; Docs. 8-1, 8-2). Later, Bryant says that she made public records requests "specifically request[ing] investigation materials, discipline, and any and all other information related to Defendants Wright and Brown, as well as Mitchell." (Doc. 3, #27). She says that several responsive documents were missing from the productions in response to those requests, including her reports concerning Wright and Mitchell, as well as documents concerning a previous report of sexual harassment against Wright by another female firefighter named Meghan McQuiddy. (*Id.*). Bryant claims that CFD does not properly document, review, or address reports and that there is a culture where harassment claims are not adequately addressed.[7] (*Id.* at #28).

On top of mishandling reports, Bryant alleges that the accompanying investigations were improperly conducted. She says Falencia Frazier, a Lieutenant at CFD, participated in the interviews for the investigations, made inappropriate

---

[6] Bryant's report concerning Wright's conduct came almost four years after the night she alleges he raped her. In her Form-47, Wright wrote that she understood "that it can be hard to grasp why I am bringing this up years later; fear is the biggest and most honest answer that I can give." (Doc. 8-1, #56).

[7] The Women Helping Women report also stated that "[t]hemes also arose addressing the ineffectiveness of the current chain of command reporting structure that creates conditions where complaints and reports are not properly documented, reviewed, or addressed and where relationships and status determine the outcomes." (Doc. 15-1, #154).

comments during them ("about Plaintiff's breast size"), and asked leading questions. (*Id.* at #28–29). Most seriously, Bryant alleges that Frazier is a close personal friend of Defendant Wright and that Frazier tipped Wright off to retire before CFD could discipline him. (*Id.* at #29). Bryant says Wright retired in good standing, maintained his pension, and avoided potential termination as a result.[8] (*Id.*). Because of these events, Bryant now argues these were "sham investigations." (Doc. 16, #227, 232).

As for retaliation and disparate treatment, Bryant avers that the City required her to work "during the pendency of the investigation, forcing her to use her PTO hours" and that the City did not pay her approximately one-hundred hours of pay after it misrepresented her remaining PTO. (Doc. 3, #28). She also says that "the City permitted Defendant Brown to work in [her] district and on [her] schedule," "attempted to reassign and change [her] schedule in favor of employees who did not complain of sexual assault and harassment," and "failed to keep [her] complaints confidential." (*Id.* at #30). All in all, Bryant claims that the City did not "take appropriate steps to ensure [her] safety and wellbeing." (*Id.*). She says that she was diagnosed with post-traumatic stress disorder because of these events. (*Id.*).

On June 7, 2023, Bryant dual-filed a charge of discrimination with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity

---

[8] The City's Investigation Report recommendation following the investigation into Wright was as follows: "The recommended action is that CFD take appropriate corrective action in accordance with the labor management agreement, Administrative Regulations, and Human Resources Policies and Procedures. Additionally, the paid Administrative Leave ordered by the previous administration should be ended. Effective immediately, given the seriousness of the misconduct, Mr. Wright should be called in for a short due process hearing and placed on unpaid leave pursuant to HRP&P 5.2.4 and section 32.14 of the labor management agreement pending a formal disciplinary hearing." (Doc. 8-3, #72).

Commission (EEOC). (Doc. 11-1, #123–31). OCRC issued Bryant a Notice of Right to Sue on January 16, 2023,[9] (Doc. 3-1); the EEOC followed suit, over a year later, on February 14, 2024, (Doc. 3-2). Bryant then filed an eleven-count Complaint on March 11, 2024.[10] (Doc. 1). She has since amended that Complaint, and now raises thirteen alleged violations of either federal or state law in connection with the above-described events. (Doc. 3, #31–45). She directs nine of those claims against Defendant City of Cincinnati: sex harassment in violation of Title VII and Ohio law (Counts I and II); unlawful retaliation in violation of Title VII and Ohio law (Counts III and IV); intentional infliction of emotional distress (Count V); negligent retention, hiring, or supervision (Count VI); civil recovery for a criminal act (Count VII); a § 1983 claim for denial of equal protection (Count X); and one for denial of substantive due process (Count XII). (*Id.* at #31–45). She also includes Defendants Wright and Brown in the intentional infliction of emotional distress claim (Count V), and then also raises four more claims against them: civil recovery for a criminal act (Counts VIII (Wright) and IX (Brown)); a § 1983 claim for denial of equal protection (Count XI); and one for denial of substantive due process (Count XIII). (*Id.* at #35–45). Based on these claims, Bryant seeks compensatory and punitive damages, injunctive relief, pre- and post-judgment interest, costs, and attorneys' fees. (*Id.* at #45).

---

[9] While Plaintiff asserts that OCRC issued this Right to Sue on January 16, 2024, (*See* Doc. 3, #25), the "[d]ate mailed" listed on the Notice of Right to Sue is January 11, 2024. (Doc. 3-1, #47).

[10] And, thus, within her ninety-day window to bring suit. *Page v. Metro. Sewer Dist. of Louisville & Jefferson Cnty.*, 84 F. App'x 583, 584 (6th Cir. 2003) ("Before filing a Title VII claim, a plaintiff must receive a right-to-sue letter from the EEOC and then file suit within ninety days after receiving the right-to-sue letter.").

Defendant City moved to dismiss most of the claims against it on June 18, 2024. (Doc. 11). Defendants Wright and Brown moved to dismiss all of the claims against them on June 24, 2024. (Docs. 12, 13). Bryant responded, (Doc. 16), and Defendants have replied. (Docs. 17, 18). These motions are now ripe for review.

## LEGAL STANDARD

Courts are myopic by design at the motion to dismiss stage—the focus is the complaint, and the inquiry goes solely to plausibility. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up). But that grace extends only so far. The Court cannot accept "naked assertions," legal conclusions, or "formulaic recitation[s] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). And while well-pleaded allegations are accepted as true for purposes of deciding the motion, should the case go forward they remain just that—allegations.

A court analyzing a motion to dismiss generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). But if "a document

is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); *Blackwell v. Nocerini*, 123 F.4th 479, 487 (6th Cir. 2024) (explaining how courts handle central-to-the-claim exhibits versus public records); *see also* Fed. R. Civ. P. 10(c). These "written instruments are records falling within a narrowly defined class of legally significant documents on which a party's action or defense is based." *Anderson v. ABF Freight Sys., Inc.*, No. 1:23-cv-278, 2024 WL 51255, at *9 (S.D. Ohio Jan. 4, 2024) (cleaned up). "[T]hey often create or define legal rights or obligations, or define or reflect a change in legal relationships." *Id.* (cleaned up). For example, "EEOC charges and related documents, including right to sue letters, are public records of which the Court may take judicial notice in ruling on a motion to dismiss without having to covert the motion into one for summary judgment." *Kovac v. Superior Dairy, Inc.*, 930 F. Supp. 2d 857, 862–63 (N.D. Ohio 2013). "Even so, a court will not credit a document attached to a motion to dismiss [or other briefing] that is not integral to or referenced in the complaint, or is otherwise unlike quintessential examples of written instruments—for example, when the exhibit is unsigned and undated (i.e., lacks self-verifying qualities)." *Washington v. City of Cincinnati*, No. 1:23-cv-230, 2024 WL 474403, at *2 (S.D. Ohio Feb. 7, 2024) (cleaned up).

## LAW AND ANALYSIS

The Court takes the counts pertaining to each Defendant in turn, starting with the claims directed against Defendant the City of Cincinnati.

### A. Counts Concerning Defendant City of Cincinnati.

#### 1. Counts I & II: Sexual Harassment Claims under Title VII and Ohio Law.

Bryant contends that the City subjected her to a hostile work environment on account of her sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and Ohio Revised Code § 4112.02(A). (Doc 3, #31–33). She says that the City was aware of the hostile environment—created by Wright, Brown, and others, including Mitchell—and did not take sufficient steps to prevent it or to remedy it. (*Id.*).

For hostile-work-environment claims, "at the motion-to-dismiss stage, a plaintiff is not required to plead facts establishing a prima facie case as required under *McDonnell Douglas*." *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir. 2024). Nonetheless, Bryant "must allege that her 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).[11] In assessing the severity or pervasiveness of alleged

---

[11] It is somewhat puzzling that in *Ogbonna-McGruder*, while stating that *McDonnell Douglas* is not a pleading standard, the Sixth Circuit nonetheless suggested that a plaintiff must plausibly allege that she experienced "objectively and subjectively severe and pervasive" harassment—i.e., a prong of the prima facie case—in order to proceed beyond a motion to dismiss. 91 F.4th at 840–41; *see also Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885–86 (6th Cir. 2008) (explaining the prima facie elements of a hostile-work-environment claim). Be that

harassment, the Court considers the totality of the circumstances—namely "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's performance." *Id.* at 840–41 (cleaned up) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). Bryant must also allege that she is a member of a protected class and that the harassment was based on that membership.[12] *Id.* at 839.

Hostile work environments "are based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115. Further, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. That is, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court." *Id.* However, this "continuing-violation doctrine … cannot render timely a discrete act of discrimination (such as termination) that is cognizable in its own right apart from any hostile work environment." *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1015–16 (6th Cir. 2022). For example, the Supreme Court

---

as it may, the Sixth Circuit has again reiterated that "[a] plaintiff does not have to allege specific facts establishing a prima facie case of discrimination in their complaint." *Savel v. MetroHealth Sys.*, 964 F.4th 932, 943 (6th Cir. 2024). Reading that together with *Ogbonna-McGruder*, the Court understands the Sixth Circuit to be saying that a plaintiff need not allege facts relating to the *other* elements of a prima facie case for a hostile-work-environment claim.

[12] "Harassment is based on sex when an employee is 'exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)). Here that means that "but for [Bryant's] sex, she would have not been harassed in the way that she was." *Id.* (cleaned up).

has pointed to "easy to identify" "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114. In contrast to these discrete acts, an act that merely contributes to a hostile-work-environment claim, "may not be actionable on its own." *Id.* at 115.

These guiding principles apply equally to Bryant's federal law and Ohio law claims. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (quoting *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000)) ("Ohio courts have held that federal caselaw interpreting Title VII of the Civil Rights Act of 1964 (Title VII) 'is generally applicable' to cases involving sexual harassment claims under state law."). So the Court handles both claims at the same time and, where applicable, notes any differences between the two.

The City argues that these claims should be dismissed for three reasons. First, regarding the Title VII claim, it argues that Bryant did not timely file a charge with the EEOC. (Doc. 11, #106–07). Second, the City argues that, at least for the allegations relating to Defendant Wright, Bryant was not yet an employee, so she could not have suffered from a hostile work environment, nor could the City have altered her conditions of employment. (*Id.* at #107–08). Third, the City says that it acted promptly when it learned about each of Bryant's allegations—insulating it from liability because it did not "manifest indifference or unreasonableness." (*Id.* at #108–110 (cleaned up) (quoting *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021)).

a.    Timeliness[13]

The City first argues that Bryant failed to timely file a charge with the EEOC. (Doc. 11, #106–07). Under 42 U.S.C. § 2000e-5(e)(1), and because Ohio is a deferral state, Bryant had 300 days to file a charge with the EEOC after the allegedly discriminatory act occurred. *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001).[14] Since Bryant dual-filed her charge with the EEOC and the OCRC on June 7, 2023, that means that Bryant must base her claim on discriminatory conduct that occurred on or after August 11, 2022. But, according to the City, much of the conduct here, and in particular Wright's alleged rape of Bryant on December 8, 2018, and Mitchell's alleged sexually harassing comments, on or about June 21, 2022, happened before that date. (Doc. 11, #107). Thus, the City argues that Bryant has not stated a viable hostile environment claim.

The principal problem with the City's argument is that it misperceives Bryant's claim. She explicitly claims a "hostile work environment because of her sex." (Doc. 3, #31–32). Such claims, as noted above, are based on the "cumulative effect" of separate incidents, and can be brought anytime within 300 days after the most recent incident that forms part of the same hostile work environment. *Morgan*, 536 U.S. at 115–18. Here, Bryant essentially alleges that CFD is rife with sexually harassing

---

[13] The City concedes that Bryant's state discrimination claim is likely timely. (Doc. 17, #367). So this section, while potentially impacting Bryant's state claim, is directed at her federal claim.

[14] The City erroneously cites to 29 U.S.C. § 626(d)(2), an ADEA provision, in its motion. (Doc. 11, #106). While "[t]he same 300-day time limit for filing a charge with the EEOC applies in age discrimination cases brought under the ADEA" as in Title VII suits, Bryant's claims concern sex discrimination, not age discrimination. *Amini*, 259 F.3d at 498–99.

conduct—she specifically points to inappropriate sexual contact by those in positions of authority and co-workers, failure to police such conduct when it is reported, and retaliation against those who make such reports. For example, she alleges that she reported Wright's alleged rape, and Brown's alleged sexual harassment, on October 10, 2022, and that the City responded inappropriately—i.e., by wrongly clearing Brown of the allegations based on a sham investigation, and then forcing Bryant to continue working with him. (Doc. 3, #27–30). The Court, of course, takes no position on the ultimate truth of those allegations. But for present purposes, the Court must treat them as true. And on that understanding, Bryant has alleged conduct within the 300 days before she filed her EEOC complaint that relates back to the earlier alleged sexually inappropriate conduct, such that they are all part of the same (timely) claim.

The City seeks to avoid that result by claiming that the earlier actions—or at least some of them, like Wright's alleged rape—were "discrete acts," which in turn, the City goes on, means that Bryant cannot rely on them as part of a hostile-work-environment claim. (Doc. 17, #368–69). As support for that, the City points to *Ogbonna-McGruder*. (*Id.*). But there are two problems with that argument. First, it overreads *Ogbonna-McGruder*. True, the court there drew what seems to be a line in the sand between "discrete discriminatory acts" and "'repeated conduct' [that] create[s] a hostile work environment." *Ogbonna-McGruder*, 91 F.4th at 840 (quoting *Morgan*, 536 U.S. at 114–15). As to the former, the Sixth Circuit said that discrete acts "cannot properly be characterized as part of a continuing hostile work

14

environment." *Id.* (quoting *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 783 (6th Cir. 2005)). But to the extent that is so,[15] there is a limit as to how far one can run with that reasoning. The discrete acts to which the Sixth Circuit was referring in *Ogbonna-McGruder* were adverse-employment decisions, such as hiring, firing, failing to promote, demoting, suspending, etc. *Id.* That is, the Sixth Circuit was saying that those employment decisions (e.g., a failure to promote), if actionable in themselves, cannot also be used to support a hostile workplace claim. *See id.* Even taking that as true, the conduct here—rape or sexual harassment by colleagues or supervisors—is not an adverse-employment decision. Sure, such conduct may affect the terms or conditions of a person's employment (which is why it can support a hostile-work-environment claim), but it is not an employment decision in the workplace akin to hiring, firing, or the like.

---

[15] The Sixth Circuit in *Ogbonna-McGruder* largely relied on *Morgan* as the support for the rule it announced. *See* 91 F.4th at 839–40. But *Morgan* merely held that including discrete adverse-employment decisions that occurred outside the statutory period as among the discriminatory acts that support a hostile-work-environment claim would not resurrect Title VII liability against the employer for those adverse-employment decisions. 536 U.S. at 122. *Morgan* did not adopt a bright-line rule that such adverse-employment decisions could not be included in the litany of acts that created the hostile work environment. Moreover, any such bright-line rule strikes the Court as problematic. Essentially, it means that a potential plaintiff who is facing a series of negative interactions at work, and who believes that those interactions are the result of discrimination, must assess each such interaction to decide whether it is individually actionable, and if so, pursue a claim on fear of otherwise permanently losing any ability to rely on it as part of a hostile-work-environment claim to impose Title VII liability against her employer. And as a practical matter, it seems odd that a series of discriminatory adverse-employment actions (e.g., failing to promote an employee on four separate occasions over two years), while individually actionable, could not also serve as evidence of a hostile work environment more generally. As noted above, though, here it does not matter because, even under *Ogbonna-McGruder*'s reading of *Morgan*, Bryant's claim is timely.

Second, even if some of the conduct (perhaps most notably the alleged rape) was a "discrete act," plenty of the other things she alleges in her Amended Complaint were not "discrete acts" as *Ogbonna-McGruder* used that term (i.e., independently actionable acts). Take the aftermath of the investigations first. Bryant alleges that the City: (1) left Brown in the same district and on the same schedule as Bryant after its investigation of him;[16] (2) did not keep her complaints confidential; and (3) attempted to alter her "schedule in favor of employees who did not complain of sexual assault or harassment." (Doc. 3, #30). Take separate incidents, besides the alleged rape and sexual assault, next. Bryant alleges (1) that derogatory language about women is used every day, citing the Women Helping Women report; (2) that the City's investigation process of Wright and Brown included inappropriate and harassing commentary towards Bryant; and (3) that the City required her to work during the pendency of the investigation, forcing her to use PTO hours. (*Id.* at #26–29). Then there are also the allegations of Mitchell's sexually harassing comments, which in light of the Women Helping Women report, give rise to a plausible inference that such comments are not irregular at CFD. (*Id.* at #26). While some of these events could potentially on their own constitute separate unlawful employment practices, most seem to fit into the hostile-work-environment framework—that is, they could not carry a claim on their own. *See Bannister*, 49 F.4th at 1015 (explaining that "an

---

[16] The City could not substantiate a violation of its administrative regulations in its investigation of Bryant's incident with Brown. (*See* Doc. 8-4, #96). The investigation report found that "accounts of the alleged sexual encounter differ including crucial details regarding whether the physical contact was consensual. While it is evident that the parties perceived the encounter differently, the differing accounts could not be resolved with objective evidence." (*Id.*).

isolated incident (such as a single sexist or racist comment) might not suffice to violate Title VII; rather the abuse must continue over a sufficient period"). So, the Court concludes Bryant's Amended Complaint contains allegations of timely acts contributing to the "cumulative effect" of a potentially hostile work environment.

Additionally, even if the Court could not consider the discrete acts themselves,[17] the rape and sexual assault allegations may still tangentially serve Bryant's purposes. That is because the Court can still consider the *effects* of those events. As the Supreme Court's noted in *Morgan*, Title VII "does not bar an employee from using the prior [discrete] acts as background evidence in support of a timely claim." 536 U.S. at 113. For example, in *Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, the Sixth Circuit reasoned that "when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the environment to be hostile." 3 F. App'x 302, 311 (6th Cir. 2001). However, because the plaintiff in that case did not work at the same location as her assailant, she "failed to show that the alleged rape … altered the terms and conditions of her employment or created a hostile work environment." *Id.* In contrast, here, as noted above, the Amended Complaint alleges that Bryant worked *with* one

---

[17] Cincinnati also argues that the Court should not consider Defendants' "alleged conduct that occurred while all the individuals were offduty [sic], outside the workplace." (Doc. 11, #105). But the Sixth Circuit has not determined "whether off-premises harassment by a coworker may be considered as part of the severe or pervasive test under Title VII's sexual harassment provisions." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008). True, other courts hold that generally an employer isn't liable for off-premises, after-hours, harassment or unlawful conduct perpetrated by non-supervisors. *Id.* But the Court need not put a finger on this scale since it finds that Bryant's hostile-work-environment claim survives dismissal here without considering the rape or sexual assault.

of her alleged assailants (Brown) after the assault. (*See* Doc. 3, #30 ("Subsequent to the investigation, the City permitted Defendant Brown to work in Plaintiff's district and on Plaintiff's same schedule.")). It also appears that at some point in time Bryant worked in close proximity to the other assailant (Wright). (*See* Doc. 8-1, #56 (explaining that proximity occurs "when I go to paramedic class because his office is in the same building, on the same floor, and right around the corner from my classroom")). Viewed in the light most favorable her, then, Bryant has plausibly alleged that her continued employment in close proximity to one, or both, of her assailants could contribute to a hostile work environment.

Finally, the present procedural posture also counsels against dismissal. Arguments about the timely exhaustion of administrative remedies, like statute of limitations defenses, "are generally not appropriately raised in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Collier v. City of Memphis*, No. 19-cv-2476, 2020 WL 5332974, *2 (W.D. Tenn. Sept. 4, 2020) (quotation omitted). That's because "[f]ailure to exhaust administrative remedies in a timely manner is an affirmative defense, and the defendant bears the burden of pleading and proving this failure." *Lockett v. Potter*, 259 F. App'x. 784, 786 (6th Cir. 2008). As a result, while "exhaustion issues are susceptible to resolution on a motion to dismiss if a plaintiff affirmatively pleads [herself] out of court … a plaintiff need not respond to a motion to dismiss with affirmative matter" proving timeliness. *Rembisz v. Lew*, 590 F. App'x. 501, 504 (6th Cir. 2014). Here, the City takes a broad stroke in an attempt to dismiss the entire hostile workplace claim—"any discriminatory acts occurring before August 11, 2022,

are untimely." (Doc. 11, #107). But immediately after that, the City says that only "a large portion of the allegations involving Mr. Wright and Mr. Mitchell predate the August 11, 2022 deadline." (*Id.*). What the City fails to recognize is that if *some* of the allegations are after that date, then this Court cannot dismiss the claim. The City's lack of specificity illustrates why challenges to the timely exhaustion of administrative remedies (like statute of limitations defenses) are rarely successful at this stage of the litigation.

In short, Bryant's allegations—again, assuming they are true, as the Court must at this stage—give rise to a plausible inference that Bryant experience a hostile work environment within the 300 days before she filed her EEOC claim.

### b.    Bryant's employment status

The City next argues that the Court should dismiss Bryant's hostile-work-environment claims because the principal conduct of which she complains occurred while she was an applicant, not an employee. (Doc. 11, #107–08). True, Title VII applies only to employers.[18] And a hostile work environment refers to conditions that an employee experienced during his or her employment. *See Ogbonna-McGruder*, 91

---

[18] However, the relevant provision states that "[i]t shall be an unlawful employment practice for an employer … to fail to refuse to hire or to discharge *any individual*, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of *such individual's* … sex[.]" 42 U.S.C. § 2000e-2(a)(1) (emphasis added). So the City's reliance on a definitional provision for a term not in the statute ("employee") is unpersuasive. (Doc. 11, #107); *see* 42 U.S.C. § 2000e(f) (defining an employee as "an individual employed by an *employer*" (emphasis added)). Congress' decision to use the term "individual" rather than "employee" in 42 U.S.C. § 2000e-2(a)(1) appears to be meaningful, especially given that Congress used the term "employee" in an adjacent provision. *See* 42 U.S.C. § 2000e-2(a)(2).

F.4th at 839 (requiring that plaintiffs allege the workplace harassment "is sufficiently severe and pervasive to alter the conditions of [] employment").

But here, Bryant *is* complaining about her experience as an employee. As noted above, in her Amended Complaint, she points to a host of alleged wrongs that happened to her while she was employed at CFD. True, she also points to the rape, and that occurred while she was an applicant, but that is, at least in part, to provide context for why working with Wright (while she was employed) might constitute a hostile work environment. (*See* Doc. 16, #229 (claiming that the "pre-hiring actions of her supervisor affected her later employment"); *see also* Doc. 8-1, #56–57 ("I have been terrified to speak up about this for the entire duration of my young career with the Cincinnati Fire Department"; "I feel as though I have barely made it through class, largely due to my lack of focus because of my fear of running into [Wright].")).

The Sixth Circuit has not yet weighed in on whether courts can consider pre-hiring harassment in hostile-work-environment claims. Nonetheless, the Court finds Bryant's cited authority instructive. *See Morales-Evans v. Admin. Off. of the Cts. of N.J.*, 102 F. Supp. 2d 577 (D.N.J. 2000). In *Morales-Evans*, the court allowed post-interview, pre-employment incidents between plaintiff and her supervisor to be considered in the hostile-work-environment inquiry. *Id.* at 587. And these allegations were far less severe than rape—unsavory commentary, uninvited house visits, and unwanted hand grabbing. *Id.* at 579. As the court noted there, these types of "events may very well influence an employee's experience on the job, her perception of the workplace environment, and her sense of what is expected of her." *Id.* at 587. The

20

*Morales-Evans* court also prudently observed that "the law makes clear that an employer may not refuse to hire an applicant who refused to accede to the sexual advances of her interviewer … [so t]o refuse to consider such incidents in determining whether a hostile or abusive work environment existed would be incongruous." *Id.* The City's attempt to cordon off the pre-employment rape allegation thus misses the mark.

The City argues for a different result by pointing to another ostensible bright-line rule it purports to find in cases like *Sanders v. City & Cnty. of Honolulu*, No. 20-cv-495, 2021 WL 3376821 (D. Haw. Aug. 3, 2021), and *Willacy v. Balt. Police Dep't*, No. 21-3162, 2022 WL 3700875 (D. Md. Aug. 26, 2022). (Doc. 11, #108). According to the City, those cases stand for the proposition that job applicants cannot make hostile-work-environment claims. (*Id.*). But in both of those cases the employer never hired the applicant, so the applicant never became an employee. *See Sanders*, 2021 WL 3376821, at *2 ("It is undisputed that [plaintiff] was never an employee of HPD[.]" (emphasis omitted)); *Willacy*, 2022 WL 3700875, at *1 ("BPD rejected his application").[19] And in that context—where an employer never hires the claimant—it makes sense to say that hostile-work-environment liability does not arise, as the claimant never experiences the allegedly hostile work environment. But here Bryant

---

[19] Two different Ohio intermediate appellate courts have followed similar logic to *Sanders* and *Willacy*. *Kinnison v. Advance Stores Co.*, 2003-Ohio-3387, ¶ 17 (5th Dist.) ("the applicant did not state a claim for hostile work environment sexual harassment because she was not an employee"); *Hoyt v. Nationwide Mut. Ins. Co.*, 2005-Ohio-6367, ¶ 71 (10th Dist.) ("A plaintiff must be an employee at the time of the harassment to establish a claim for hostile work environment."). But again, in both cases, the plaintiffs were never hired. 2003-Ohio-3387, ¶ 5; 2005-Ohio-6367, ¶ 61.

alleges she became an employee. What's more, a broad reading of the holdings in cases like *Sanders* and *Willacy* would run headlong into *Morgan*'s instruction that Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim." 536 U.S. at 113. So the Court does not read either case as precluding an employee from relying on events that occurred during the application process to substantiate a hostile-work-environment claim.

In a last-ditch effort, the City's argues that one of the quotes Bryant relies on betrays her—that when she says "I have been terrified to speak up about this for the entire duration of my young career," it proves that the Wright rape never actually altered anything. (Doc. 8-1, #56; Doc. 17, #370).[20] To put the City's point differently, it basically argues that even if Employee A's employment starts out with (badly) altered conditions when compared to similarly situated Employees B and C's starting conditions, because Employee A's conditions never *changed* during the span of her employment, she has no hostile-work-environment claim. Accepting the City's argument—that work conditions cannot be altered if the conditions have remained the same from an employee's first day—would essentially insulate employers who maintain consistently hostile work environments as to a given employee from day one from any liability under Title VII. But that result does not comport with Title VII. *See e.g.*, *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 654 F. Supp. 2d 767, 803–04, 815–16, 818–20 (N.D. Ill. 2009) (examining hostile-work-environment claims of women who experienced sexual harassment starting on their first day). What matters for Title

---

[20] The City misquotes Bryant's Form-47 as saying: "I have been terrified to speak up about this for the *entire duration* of my entire [sic] career." (Doc. 17, #370 (emphasis in original)).

VII is alteration of conditions of employment based on sex; it is not a requirement that alterations occur over time. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."). So the City's last argument fails.

Accordingly, the Court rejects the City's request to dismiss the hostile-work-environment claims to the extent they rely on Mr. Wright's pre-hiring actions, because those actions may inform post-hiring hostile-work-environment conditions.

### c.   The City's prompt action

In its final effort to convince the Court to dismiss Counts I and II, the City says that it acted promptly to address Bryant's allegations. (Doc. 11, #108–09). The City correctly notes that to find the employer liable based on a coworker's conduct, the employer's "response to a coworker's harassment must manifest indifference or unreasonableness in light of the facts the employer knew or should have known." *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021) (cleaned up).[21] And to prove that it

---

[21] Because we find that Bryant's claims can continue under a standard of employer liability related to a coworker, rather than a supervisor, the Court need not conclusively determine which standard is more appropriate at this time. *See Doe*, 3 F.4th at 301 ("The standard for employer liability differs depending on whether the harassment was carried out by a supervisor or coworker. In the case of a harassing supervisor, the employer is vicariously liable for the hostile work environment."). However, the Court notes that it generally agrees with the City that Bryant has not alleged sufficient facts that Wright was her supervisor. (Doc. 17, #372; Doc. 16, #232). A supervisor is an employee with the power to take tangible employment actions against the victim, such as hiring, firing, promoting, or similar actions. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 413 (6th Cir. 2021). While Bryant has alleged that Wright "vouched for her" throughout the employment process, even viewed in the light

did not act in such a manner, it points the Court to the investigation reports for the allegations concerning Wright and Brown, then says that Mitchell's "investigation concluded that [his] actions constituted violations of two Administrative Regulations … [so he] was disciplined through a suspension." (Doc. 11, #109–10). However, there are two reasons the Court cannot dismiss the hostile-work-environment claims at this time under this theory.

First, at the motion-to-dismiss stage, the Court accepts well-pleaded allegations as true. Here Bryant alleges facts giving rise to a plausible inference that the investigations were not handled appropriately.[22] (*See, e.g.*, Doc. 3, #29 (alleging that the investigatory interviews consisted of "inappropriate comments," "leading questions," and improper disclosure of findings)). And "[a]n inadequate investigation may render an employer's response unreasonable." *Doe*, 3 F.4th at 303. So, while it is true that "[t]he most significant immediate measure an employer can take in

---

most favorable to Bryant, that does not sound like he had supervisory authority to hire her. (Doc. 3, #26). Additionally, even though Bryant alleges that the "City permitted Wright to remain in charge of recruiting and supervising female firefighters," she never says that Wright supervised her. (*Id.* at #39). And that is what matters—not that Wright may have supervised other female firefighters.

[22] Defendant's allegations that Bryant's Response "does not address, and therefore concedes, that the City promptly acted by initiating investigations, interviewing relevant witnesses, and implementing corrective action with regards to Bryant's sexual harassment claims against Mitchell and Brown" are simply false. (Doc. 17, #373). In her Response, Bryant says that she "states in her Complaint that though investigations occurred they were sham investigations primarily because of Frazier's involvement." (Doc. 16, #232). The Amended Complaint indeed discusses the investigations of Wright *and* Brown. (*See* Doc. 3, #29 ("Frazier asked Defendants Brown and Wright leading questions during the interviews.")). So, while Bryant did not explicitly label the investigations as "shams" in her Complaint, viewed in the light most favorably to Bryant the Court considers takes the allegations that the investigations were improper or insufficient as true. The investigation of Mitchell is addressed below.

response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified," *id.* at 301, Bryant is correct that, at this stage, "the documents provided do not disprove [her] contentions that the investigations were not handled appropriately," (Doc. 16, #232).

Second, Bryant is correct that "[t]here is no evidence to support" the City's statements concerning the Mitchell investigation, or any potential discipline Mitchell received. (Doc. 16, #231). The City has only submitted investigation documents concerning Wright and Brown. (*See* Docs. 8-1, 8-2, 8-3, 8-4). Therefore, the Court cannot accept the City's statements as true at this stage.

For all the foregoing reasons, the Court **DENIES** City of Cincinnati's Motion to Dismiss Counts I and II of Bryant's Amended Complaint. (Doc. 11).

### 2. Count V: Intentional Infliction of Emotional Distress.

The City next argues that the Court should dismiss Bryant's intentional infliction of emotional distress claim because she has not alleged the City undertook any actions that could plausibly be considered extreme or outrageous. (Doc. 11, #110). Bryant alleges the City acted to intentionally cause her emotional distress in five ways: (1) it failed to protect her and her wellbeing; (2) it failed to address ongoing harassment; (3) it forced her to continue to work in a hostile environment while her harassers were on administrative leave; (4) it subjected her to a flawed investigative process; and (5) it forced her to work the in the same unit and on the same schedule as Brown and Mitchell. (Doc. 3, #28–29, 35). Bryant amplifies these claims in her Response by lamenting the City's promotion of Wright to a "position of authority over

young, vulnerable female employees and applicants."[23] (Doc. 16, #233–34). And she reminds the Court of Wright's "close personal friend[']s," involvement in the investigative process. (*Id.* at #234; Doc. 3, #29). Bryant also alleges that because of "Defendants' conduct, [she] was diagnosed with and suffers from post-traumatic stress disorder." (Doc. 3, #35). Assuming all of these allegations are true, as the Court must at the motion-to-dismiss stage, the Court concludes that Bryant's IIED claim clears the *Iqbal*/*Twombly* plausibility hurdle.

Ohio law governs this claim. *Westbrook v. City of Cincinnati*, 667 F. Supp. 3d 665, 672 (S.D. Ohio 2023). Under Ohio law, to succeed on an IIED claim, Bryant ultimately must show the following: "(1) [the City] intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) [the City's] conduct was extreme and outrageous, (3) [the City's] actions proximately caused plaintiff's emotional injury, and (4) [that Bryant] suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). "Extreme and outrageous" means conduct that goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized society." *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers*

---

[23] Contrary to the City's assertion that "there are no allegations within Bryant's Complaint that Wright received a promotion or that the City approved of or accepted a work environment where its female employees were subject to sexual harassment, assault, or a hostile work environment," (Doc. 17, #374), both appear in the Amended Complaint, (*see* Doc. 3, #30 ("Subsequent to learning the [sic] Ms. McQuiddy complained about Defendant Wright, the City promoted him to the Lieutenant in charge of recruiting position."); *id.* at #31 ("The City knew of this conduct and the Fire Department's 'boy's club mentality' but tacitly accepted and approved and/or ratified such conduct for year, leading to Plaintiff's rape, assault, harassment, and severe emotional distress.").

*of Am.*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051, 1054–55 (Ohio 2007). And "serious emotional anguish," in turn, consists of emotional distress that is "both severe and debilitating" to the point where "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Burcica v. Ludy*, __ N.E.3d __, 2024 WL 5230210, at * 10 (Ohio Ct. App. 2024) (Zayas, J., concurring in part and dissenting in part) (citations omitted). Some examples of such anguish include "traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.* (quoting *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983)).

"Courts hesitate to dismiss IIED claims where the allegations could reasonably be inferred to create a basis for [finding] extreme and outrageous conduct." *Doe v. Archdiocese of Cincinnati*, No. 1:23-cv-318, 2024 WL 2845935, at *4 (S.D. Ohio June 5, 2024). That said, "when reasonable inferences show that the alleged conduct is clearly too minor to be extreme and outrageous, dismissal is appropriate." *Id.*; *see also Miller*, 50 F.3d at 377–78 ("It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with … in a motion to dismiss."). The Court looks to some past examples of courts handling IIED claims at the motion-to-dismiss stage. In *Strong v. HMA Fentress Cnty. Gen. Hosp.*, the district court held that dismissal would be premature when plaintiff included the following allegations in her complaint: plaintiff's supervisor would press himself against her sexually in the workplace, continually stare at her breasts, inquire about plaintiff's marital relationship, try to access her cellphone to check her messages and pictures, and

27

follow plaintiff and make inappropriate comments to her, among other actions. 194 F. Supp. 3d 685, 690–91 (M.D. Tenn. 2016).[24] Many of these actions took place in the hospital where plaintiff worked, and although plaintiff alleged that she complained about the harassment three times to HR, the harassment "continued unabated" for several months. *Id.* So the Court allowed plaintiff to pursue her IIED claim against her employer and the supervisor. *Id.* at 691.

Bryant also points to *Soehner v. Time Warner Cable, Inc.*, as instructive. No. 1:08-cv-166, 2009 WL 10679159, at *3 (S.D. Ohio Mar. 18, 2009). There, the defendant-employer argued that many of plaintiff's allegations involved "mere insults" that could not sustain an IIED claim (e.g., the director of sales telling "[p]laintiff to get knee pads and service [him] sexually under a desk" or "openly mocki[ng] plaintiff about his eating habits and weight"). *Id.* at *1, *3. Plaintiff argued that those comments and additional actions entailed "sexual harassment in the workplace," that the employer ignored his multiple complaints about that behavior, and that the employer made him choose between his health and maintaining his job (when it pressured him to "keep up his job duties" after an emergency room visit). *Id.* The district court did not weigh whether any of these allegations could sustain an IIED claim. *Id.* at *3. Rather, it decided that "without discovery, [the employer's] motion to dismiss [p]laintiff's claim for emotional distress [wa]s premature." *Id.*

---

[24] While this case involved a Tennessee-law IIED claim, the Tennessee framework for deciding whether conduct is extreme or outrageous is the same as Ohio's. *Compare Bain v. Wells*, 936 S.W.2d 618, 622–23 (Tenn. 1997) (applying the definition from the Restatement (Second) of Torts), *with Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671–72 (Ohio 1983) (same).

28

Additionally, a key consideration for the court was that the "complaint provide[d] sufficient notice and factual support" for defendants to evaluate the IIED claim. *Id.*

Finally, in *Doe v. Archdiocese of Cincinnati*, the district court allowed plaintiff's IIED claim related to sexual harassment to proceed when the "[c]omplaint set[] forth specific types of misconduct by [defendant co-worker] within the workplace" over a five-year period, ranging from "comments about [plaintiff's] appearance to [defendant's] reactions and expressed sexual desires for her."[25] 2024 WL 2845935, at *3. Once again, notice to defendants was a key consideration for the court in *Doe*. *See id.* ("Plaintiffs must present sufficient allegations to give [defendant] 'fair notice of what the … claim is and the grounds upon which it rests.' … Plaintiffs do just that." (citation omitted)).

The instant case is admittedly a closer call than *Strong*, *Soehner*, or *Doe*, but the Court nonetheless concludes that Bryant has stated a viable IIED claim. There are several actions that Bryant alleges that deserve discovery before the Court determines whether they are extreme and outrageous. For example, the following allegations could plausibly, when taken together, rise to the level of extreme and outrageous conduct: (1) Frazier's comments during the investigation interviews about Bryant's breast size, (2) the City forcing Bryant to work the same shifts and units as her alleged harassers and assailants, and (3) the City forcing Bryant to use PTO during the investigations. (Doc. 3, #28–30). While Bryant's alleged harms here are

---

[25] The Court notes however that the district court also did not allow "[t]he portion of [p]laintiff's IIED claim that relate[d] to [defendant's] physical assault of [plaintiff]" to proceed because that portion of her claim was "subject to the one-year statute of limitations for an assault and battery claim." *Doe*, 2024 WL 2845935, at *4.

not as frequent (or as severe) as the harms alleged in *Strong*, *Soehner*, or *Doe*, the Court notes that fair notice was a key component of those holdings—and here, the City has fair notice for the underlying actions supporting Bryant's IIED claim.

The cases the City relies on are unpersuasive. The City cites to *Kulich-Grier v. Ohio Health Corp.*, 2013 Ohio Misc. LEXIS 9884 (Ohio Ct. Com. Pl. 2013), for the proposition that the employer in that case "was not liable for IIED even when requiring the employee to work with the coworker that was suspected to have sexually assaulted her." (Doc. 11, #112). It is true that one of the allegations supporting plaintiff's IIED claim in that case, among others, was that OhioHealth forced her to work with a coworker she alleged sexually assaulted her. 2013 Ohio Misc. LEXIS 9884, at *43. And the court in that case did find that there was "no evidence that … OhioHealth acted with the [necessary] intent" nor that its "conduct was extreme or outrageous." *Id.* at *45–46. But the court made that determination at the motion-for-summary-judgment stage with the "deposition testimony of the doctors and employees of Defendant OhioHealth" as a source of information. *Id.* at *45. Here, the Court does not have that same level of information. Similarly, while the City is correct that the actions defendant took in *Simpson v. Ohio Reformatory for Women* to "look[] into plaintiff's complaints of harassment" helped shield it from liability on an IIED claim, there is a key distinction from the present case. 2003-Ohio-988, ¶ 14 (10th Dist.). The sufficiency of the investigation was trial tested. *Id.* ¶ 18 ("The trial court, however, was free to accept [the] testimony and disregard the competing testimony.").

Accordingly, the Court concludes it is premature to dismiss Bryant's IIED claim at this time. So, the Court **DENIES** City of Cincinnati's Motion to Dismiss Counts V (as it pertains to Defendant City of Cincinnati) of Bryant's Amended Complaint. (Doc. 11).

### 3.    Count VI: Negligent Retention, Hiring, Supervision.

The City invokes Ohio Revised Code § 2744.02(A)(1)'s statutory immunity, available to municipalities, to shield itself from Bryant's negligent retention, hiring, or supervision claim. (Doc. 11, #112–14). Alternatively, it argues that Bryant has not alleged sufficient facts that Wright's and Brown's actions were foreseeable to the City. (*Id.*). Bryant responds that an exception located in Ohio Revised Code § 27044.09(B) forecloses Defendant City from relying on municipal statutory immunity and that she has alleged facts regarding the foreseeability of Wright's and Brown's actions. (Doc. 16, #235–37).

Again, this is a state law claim, so Ohio law applies. *Westbrook*, 667 F. Supp. 3d at 672. That creates a threshold problem for Bryant that makes it unnecessary to address either of the City's arguments. For negligent retention claims, Ohio law "requires that [Bryant] establish a predicate tort claim against [Wright and Brown] to make a colorable claim of negligent retention against the City." *Id.* at 673. As discussed below, because the Court dismisses Bryant's potential predicate claims of intentional infliction of emotional distress against Wright and Brown (dismissals that Bryant does not contest), neither claim can serve that role. And the remaining statutory claims against each individual defendant do not count as "tort" claims for

this purpose. *See Minnich v. Cooper Farms, Inc.*, 39 F. App'x 289, 296 (6th Cir. 2002) ("[A] plaintiff must be able to establish a tort claim against the individual employee in order to maintain an action for negligent supervision or retention against the employer.").

Bryant therefore fails to plausibly state a claim to relief. As a result, the Court **GRANTS** City of Cincinnati's Motion to Dismiss Count VI of Bryant's Amended Complaint. (Doc. 11).

### 4.    Count VII: Civil Recovery for Criminal Act for Defendant City.

The Court's consideration of Count VII, which purports to state a claim under Ohio Revised Code § 2307.60, comes down to a matter of statutory interpretation. The City argues that Bryant cannot rely on that statute to assert a claim against it, because the City is not a "person" who can violate the criminal statute at issue—Ohio Revised Code § 2913.42, which criminalizes the concealment of public records.[26] (Doc. 11, #114–15). Bryant, by contrast, says that when the City did not provide all responsive documents to her public records requests concerning the investigations of Wright, Brown, and Mitchell, it violated § 2913.42, meaning she has a viable claim under § 2307.60. (Doc. 3, #37). The public-records statute states that "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall … [f]alsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record." Ohio Rev.

---

[26] The Court notes that § 2307.60 "permits the use of a conviction as evidence but does not require it." *Buddenberg v. Weisdack*, 161 N.E.3d 603, 607 (Ohio 2020). In other words, it "does not require proof of an underlying criminal conviction" in order for a claimant to prevail in a civil suit. *Id.* at 606.

Code § 2913.42(A)(1). Notably, the statute also makes it a third-degree felony "[i]f the … record is kept by or belongs to a local, state, or federal governmental entity." *Id.* § 2913.42(B)(4). The issue, as noted, is whether municipal corporations, like the City, are "persons" contemplated by § 2913.42.

The Court agrees with the City that it is not a "person" who can violate § 2913.42. (Doc. 11, #115). Start with the statutory definitions. Section 2901.01 contains general definitions that apply across Title 29 of the Ohio Revised Code. That includes § 2913.42. And § 2901.01(B)(1)(a)(i) defines the term "person" to include "[a]n individual, corporation, business trust, estate, trust, partnership, and association." That definition conspicuously fails to include the term "municipal corporation." Other provisions within that section, by contrast, use that term, suggesting that the legislature knows how to include the term when it wants. *See* Ohio Rev. Code §§ 2901(A)(11)(c), (n). That is important because Ohio courts follow a common canon of statutory interpretation—that "words in a statute do not exist in a vacuum" and that courts "should consider, in proper context, all words used by the General Assembly in drafting the relevant statute with a view to its place in the overall statutory scheme." *State v. Gonzales*, 81 N.E.3d 419, 420–21 (Ohio 2017) (cleaned up). The proper context here—the absence of the term "municipal corporation" from the definition of "person," but its inclusion in two other definitions in the same section—signals a deliberate drafting decision by the state legislature that the "persons" in Title 29 do not include municipal corporations like the City.

Section 2913.42's text supports this interpretation, as well. The statute is phrased in a way that suggests the municipal corporation is a potential victim of the crime, not a perpetrator. *See* Ohio Rev. Code § 2913.42(B)(4) ("If the writing, data, computer software, or record *is kept by or belongs to a local*, state, or federal *governmental entity*, a felony of the third degree." (emphasis added)). The Court also notes that § 2913.42 is described as a "theft offense" elsewhere in Title 29. *See* Ohio Rev. Code § 2913.01(K)(1). So it would be odd for the Court to adopt an interpretation rendering the municipal corporation capable of stealing things kept by or belonging to itself.

Bryant offers a different contextual analysis that looks to the broader statutory code. But her analysis it is too attenuated. Her argument hinges on the notion that "existing Ohio law on whether a municipal corporation is a person is unclear and inconsistent." *City of Centerville v. Knab*. 166 N.E.3d 1167, 1174 (Ohio 2020). While this is true, her reliance on this statement fails for two reasons.

First, *Knab* doesn't support her position. There the Ohio Supreme Court held that "a municipality is not a victim and has no right to restitution under Marsy's Law," which is a voter-enacted constitutional provision that uses, but does not define, the term "person." *Id.* at 1168, 1171. The court reasoned that while Marsy's Law considered corporations as "persons," municipal corporations were not. *Id.* at 1174. While that result would seem to favor the City's interpretation, Bryant notes, as the *Knab* court did, that the Supreme Court has said that "[w]hether the word 'person' … incudes a state [or governmental entity] … depends upon the connection

in which the word is found." *Ohio v. Helvering*, 292 U.S. 360, 370 (1934); *see also Knab* 166 N.E.3d at 1175. She argues the connection, or context, here indicates that municipal corporations should be included as persons under § 2913.42(A)(1). (Doc. 16, #239–40).

And what is that context? Bryant first takes us to a different statute—Ohio Revised Code § 149.43, which governs public records and their release by public offices and persons. (*Id.*). She asserts that "[i]f the release of public records is under the control of either public offices or persons pursuant to R.C. § 149.43, then it would track that the falsification, destruction, removal, concealment, alteration, defacement, or mutilation of those public records could be done by the public office releasing or maintaining those records." (*Id.* at #240). She also relies on the Committee Comment for § 2913.32, which states that "[a]ny writing or record kept by or belonging to a governmental agency can be the subject of an offense under this section, and the document involved need not necessarily be a 'public record' as defined in section 149.43 of the Revised Code." (*Id.*). Finally, she concludes that "[i]f the Legislature specifically contemplated that public records maintained by 'public offices' would be subject to the statute prohibiting the tampering with records, then it follows that the 'public offices' involved in the maintenance and release of public records would be subject to criminal offenses for the intentional misuse of those records." (*Id.*). But as the City points out, this if false logic. (Doc. 17, #379). There is nothing in either statute, or the Committee Comment, that warrants those inferential leaps.

Second, while it is true that Ohio courts have varied decisions on the interpretation of the word "person," this Court is unaware of any caselaw where a municipal corporation has been considered a "person" for the purpose of committing a felony.[27] *See* Ohio Rev. Code § 2913.42(B)(4) (defining the offense at issue as a third-degree felony). So the Court will not wade into the potential problems such an interpretation would entail, especially when the statutory context, as explained above, is clear.

For those reasons, the Court holds that the term "person," as used in § 2913.42(A)(1), does not include municipal corporations like the City of Cincinnati. It then follows that Bryant has not stated a plausible claim against the City under § 2307.60. The Court, therefore, **GRANTS** City of Cincinnati's Motion to Dismiss Count VII of Bryant's Amended Complaint. (Doc. 11).

### 5.    Counts X and XII: 42 U.S.C. § 1983 Claims.[28]

The Court addresses the City's motion to dismiss Bryant's Counts X (equal protection claim) and XII (substantive due process claim) together because both

---

[27] Bryant also cites *Hamilton Cnty. Bd. of Mental Retardation & Developmental Disabilities v. Pros. Guild of Ohio*, 545 N.E.2d 1260 (Ohio 1989) in support of her argument, but she overlooks key differences between the statute at issue in that case versus here. There the Ohio Supreme Court held that a county board should be included in the definition of "person" as used in Ohio Revised Code § 119.01(F). 545 N.E.2d at 1265; *see also* Ohio Rev. Code § 119.01(F) ("'Person' means a person, firm, corporation, association, or partnership."). While the definition in that statute closely resembles § 2901.01(B)(1)(a)(i), the term "municipal corporation" does not appear elsewhere in that section of the Ohio Revised Code. Further, that section has nothing to do with criminal liability.

[28] Bryant's allegations between Count X and Count XII in her Amended Complaint are nearly identical and differ in only a single respect. (*Compare* Doc. 3 ¶¶ 148–170, #39–41, *with* Doc. 3, ¶¶ 181–203, #42–44). For her equal protection claim, Bryant asserts that she "has a right, protected by the Fourteenth Amendment's equal protection clause, to be free form [sic]

counts suffer from the same deficiency that the City correctly highlights—Bryant has failed to sufficiently plead facts that identify City policies or customs to support either of her claims. (Doc. 11, #116–119). So, although the Court reviews Bryant's Amended Complaint assuming its allegations are true, she still does not plead a colorable claim for which the City could plausibly be liable under 42 U.S.C. § 1983.

For a § 1983 municipal liability—or *Monell*—claim "to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must adequately plead (1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014). But "the finding of a custom or policy is the initial determination to be made in any municipal liability claim." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). That is because "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

"Under *Monell* and its progeny, there are four ways a plaintiff can demonstrate a policy or custom that could allow for municipal liability … (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence

---

invidious discrimination based on sex in public employment." (Doc. 3 ¶ 149, #39). For her substantive due process claim, Bryant asserts that she "has a substantive right to bodily integrity and privacy, protected by the Fourteenth Amendment's due process clause, to be free from sexual assault by a local government official." (*Id.* ¶ 182, #42).

of federal rights violations." *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). While only the fourth way is at issue here,[29] the distinction between a policy and a custom is worth noting: "while policies are created through the official acts of the municipality's ultimate decision-makers, a custom can be informal but must be *so extensive as to still be attributable to the municipality as a whole.*" *Id.* at 748 (emphasis added).

Bryant states that she "has alleged that the City has a custom of tolerance or acquiescence to federal right violations and a policy of inaction due to its deliberate indifference to sexual discrimination, harassment, and assault." (Doc. 16, #246; Doc. 3, #40, 43). But, while Bryant stylizes the second part of that allegation as a "policy of inaction," in reality it is just a different type of custom claim, not a policy. *See Claiborne Cnty.*, 103 F.3d at 508. So, the Court addresses each of the two custom allegations in turn. First, though, the Court highlights what Bryant calls the "plenty of factual allegations" that allegedly support her contentions.[30] (Doc. 16, #246). Bryant's Amended Complaint alleges:

- That "CFD has created conditions in which 'complaints and reports are not properly documented, reviewed, or addressed and where

---

[29] Defendant City argued that Bryant did not identify an official City policy in her Amended Complaint. (Doc. 11, #116). The Court agrees. Nor did Bryant allege failure to train. Instead, she discusses only potential customs in her Response. (*See* Doc. 16, #245–50).

[30] Although, Bryant does not distinguish which of the factual allegations support her claim that the City has (1) "a custom of tolerance or acquiescence to federal rights violations" and (2) "a policy of inaction due to its deliberate indifference to sexual discrimination, harassment, and assault." (Doc. 16, #246–47). The Court tries its best to do so here.

relationships and status determine the outcomes.'" (Doc. 3 ¶ 42, #28 (quoting Doc. 15-1, #154)).[31]

- There is "a sentiment of zero confidence in issues of harassment being adequately addressed by the City." (*Id.* ¶ 43, #28, (quoting Doc. 15-1, #155)).

- That the City has failed to produce, and lost some, documents in response to public records requests concerning investigations of Wright and Mitchell. (*Id.* ¶¶ 35, 44–46, #27–28).

- That, in 2014, Wright was previously accused of and reported for sexual harassment by another female firefighter. (*Id.* ¶¶ 36–41, #27–28). Further, that this incident was never investigated. (*Id.* ¶ 41, #28).

- That the City, "CFD Chief, District Chief, Lieutenants, Captains, and City Human Resources" knew about or should have known about the 2014 sexual assault report against Wright. (*Id.* ¶¶ 64–65, #29).

- The City's investigations included improper, and inappropriate, questioning and leaks to at least one individual Defendant. (*Id.* ¶¶ 50–58, #28–29). Bryant characterizes these in her Response as "sham investigations." (Doc. 16, #247).

- That the City knew that Wright engaged in quid pro quo hiring practices and that he "unilaterally chang[ed] CFD applicant polygraph results to benefit individuals he liked." (Doc. 3 ¶¶ 67–68, #29).

- That Bryant "was one of multiple female CFD employees to have voiced concerns about a workplace culture that allows women to be treated unfairly and with disrespect." (*Id.* ¶ 79, #30–31).

- That CFD has a "boys club mentality" that led to her "rape, assault, harassment, and severe emotional distress." (*Id.* ¶ 83, #31).

(Doc. 16, #246–47).

Start with the allegation that the City has a "custom of tolerance or acquiescence to federal rights violations." (Doc. 16, #246; Doc. 3, #40, 43). "[A] custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478. There are two federal rights

---

[31] In her Response, Bryant adds more to this allegation, saying that she "has alleged a systematic attempt to depress [sic] complaints from female Firefighters." (Doc. 16, #246). But reading the allegation in that manner is not construing the allegation the light most favorable to the plaintiff, it is rewriting the allegation. The Court will not permit that amendment here.

asserted, so the Court must evaluate whether the City has engaged in a pattern of tolerating or acquiescing to violations of either based on the facts alleged in the Amended Complaint.[32] For the equal protection claim, Bryant asserts her "right to be free form [sic] invidious discrimination based on sex in public employment."[33] (Doc. 3, #39). For the substantive due process claim, Bryant asserts her right "to be free from sexual assault by a local government official."[34] (*Id.* at #42). Both are firmly established rights.

In regard to the right to be free from invidious discrimination based on sex in public employment, the Court considers the facts that could establish a pattern of inadequate investigation at CFD. These include allegations that derogatory language towards women "happens everyday," Mitchell's harassing comments to Bryant in 2021, that female employees have voiced concerns about a workplace culture that treats women unfairly, that there is a "boy's club mentality," and that complaints, reports, and investigations are not properly handled and female employees do not have confidence that harassment issues are being adequately addressed. (Doc. 3,

---

[32] But the Court notes that it has not actually established whether violations of those rights have occurred. It accepts these allegations as fact at the motion-to-dismiss stage.

[33] Of course, "there is no doubt that the right to be free from sex discrimination is protected by the equal protection clause of the fourteenth amendment." *Poe v. Haydon*, 853 F.2d 418, 432 (6th Cir. 1988).

[34] In the Sixth Circuit, and all circuits, "the right to be free from sexual abuse at the hands of a state actor" is clearly established. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 506 (6th Cir. 1996). As the Sixth Circuit has explained, that is because "it is an unjustified intrusion that strips the very essence of personhood. If the 'right to bodily integrity' means anything, it certainly encompasses the right not to be sexually assaulted under color of law. This conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause." *Id.* at 507.

#26–31). While that is enough for Bryant to allege a discriminatory culture at CFD, it is not enough to plausibly allege the City has a pattern of tolerance for that discrimination. Take the many allegations borne from the Women Helping Women Report. (Doc. 15-1). That document evinces the City's *intolerance* to discrimination in the workplace. (*Id.* at #152 ("WHW has had a strong ongoing partnership with the City over the years, and closely partnered in 2018 through engagement in the Mayor's Gender Equality Taskforce, with the purpose of conducting a two-year gender study across all City departments.")). Next, while Bryant questions the investigations that she's experienced, she does not allege that the policies driving the investigatory process are inadequate. (*See* Doc. 8-3, #73–88 (City of Cincinnati Administrative Regulation Nos. 25, 49, 55)). So these facts militate against Bryant's claim and the Court finds that there is not a pattern of inadequate investigation regarding invidious discrimination based on sex.

Then there is the right to be free from sexual assault by local government officials. Here too, Bryant has not pleaded enough. At best, Bryant has alleged three insufficient investigations: (1) the City's investigation of Wright's alleged rape of Bryant in 2022; (2) the City's investigation of Brown's alleged sexual assault of Bryant in 2022; and (3) Wright's alleged sexual assault of Megan McQuiddy in 2014. (Doc. 3, #27–31). The Court concludes that, even accepting these three instances as true, providing only three examples over the course of eight years is not enough to amount to a *pattern* of inadequate investigations. *See K.D. v. Swafford*, 353 F. Supp. 3d 606, 612 (E.D. Ky. 2018) (finding that there was no school board custom that

"reflected a deliberate, intentional indifference to the sexual abuse of its students" even after there were five employees who either committed or were accused of serious sexual misconduct over a ten-year period because of the board's anti-harassment policy and because it took corrective actions); *Franklin v. Franklin Cnty.*, 115 F.4th 461, 472–73 (6th Cir. 2024) (explaining the "context-dependent" nature in assessing whether patterns of unconstitutional conduct exist, like how the Sixth Circuit "has concluded that five similar incidents over the course of three years were sufficient to constitute a pattern … [b]ut [not] … three instances of similar misconducted revealed in one police investigation").

Simply put, Bryant has not pleaded sufficient facts to give rise to a plausible inference that the City tolerated or acquiesced to violations of those rights in a manner "so extensive as to still be attributable to the municipality as a whole." *Lipman*, 974 F.3d at 748.

Next, the City's alleged "policy of inaction." (Doc. 16, #246; Doc. 3, #40, 43). There are four elements to an inaction theory in municipal liability claims: "(1) the existence of a clear and persistent pattern of discrimination by municipal employees; (2) notice or constructive notice on the part of the City; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Arendale v. City of Memphis*, 519 F.3d 587, 599–600 (6th Cir. 2008). To ultimately prevail on this theory, Bryant must demonstrate "that the City consciously never

acted when confronted with its employees' egregious and obviously unconstitutional conduct." *Id.* at 600 (cleaned up). But for present purposes, the Court primarily focuses on the third prong—"'deliberate indifference' [which] is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

Bryant falls short of plausibly alleging she can meet this "stringent standard." *Id.* This is because the Court cannot make the reasonable inference that CFD disregarded any known and obvious consequence. Again, the Women Helping Women Report, which Bryant incorporates by reference in her Complaint, demonstrates the City's efforts to address, rather than ignore, potential problems. (Doc. 15-1 at #152). Additionally, Bryant's allegations show that CFD *did* investigate after Bryant reported Wright and Mitchell. And nothing she alleges about CFD's investigative processes strikes the Court as suggesting deliberate indifference. While Bryant says the investigations were a sham, the investigation report, in at least the instance of the Wright's investigation, substantiated Bryant's account and recommended a disciplinary hearing along with unpaid leave. (Doc. 8-3, #68–72). Granted, Wright avoided discipline by retiring, and Bryant says this is because Frazier leaked the findings of the investigation to him early. (Doc. 3, #29, 40). But Bryant has not alleged how Wright's avoidance of discipline harmed her given that he is no longer in the workplace. More importantly, she has not explained how CFD was deliberately indifferent in connection with Wright's retirement. Accordingly, the Court finds that

Bryant has not plausibly alleged facts that CFD was deliberately indifferent—Bryant's broad invocation of the inaction theory fails.

As a result, the Court finds that Bryant has not adequately plead a custom or policy. The Court, therefore, need not, and does not, engage with the question of whether the individual Defendants acted under color of the law. In sum, Bryant has not plead sufficient facts to plausibly state a claim against the City under § 1983. So the Court **GRANTS** City of Cincinnati's Motion to Dismiss Counts X and XII of Bryant's Amended Complaint. (Doc. 11).

## B.    Counts Concerning Defendants Wright and Brown.

### 1.    Counts VIII and IX: Civil Recovery for Criminal Act for Defendants Wright and Brown.

In addition to Bryant's claim against the City under § 2307.60 discussed above, she also presses such a claim against Defendants Wright and Brown. Recall that the statute provides a civil remedy for persons harmed by criminal conduct.[35] One thing the statute does *not* address, though, is the applicable limitations period. And the parties disagree about which general statute of limitations should apply—the six-year limitations period found in Ohio Revised Code § 2305.07 or the one-year limitations period in § 2305.11. (Doc. 12, pg. 6; Doc. 13, pg. 3; Doc. 16, #17–18). The former states that "[a]n action upon a liability created by statute other than a forfeiture or penalty shall be brought within six years after the cause of action

---

[35] Regarding Defendant Wright, Bryant alleges that he violated Ohio's rape and sexual battery statutes, Ohio Rev. Code §§ 2907.02, 2907.03. (Doc. 3, #38). Regarding Defendant Brown, she alleges that he violated Ohio's gross sexual imposition and sexual imposition statutes, Ohio Rev. Code §§ 2907.05, 2907.06. (*Id.* at #38–39).

accrued." Ohio Rev. Code § 2305.07(B). The latter states that "an action upon a statute for a penalty or forfeiture shall be commenced within one year after the cause of action accrued." Ohio Rev. Code § 2305.11(A). If the one-year limitations period applies, then Bryant's claims against Wright and Brown are time-barred. If it's the six-year limitations period, both claims may proceed.[36]

The analysis hinges on whether § 2307.60 is remedial or penal in nature. That is because § 2305.07(B) applies to remedial statutes; whereas, § 2307.11(A) applies to penal statutes. "When determining whether a statute is remedial or penal, courts first consider the nature of the remedies offered and then must consider 'whether the primary purpose of the statute is to penalize or to remedy and compensate.'" *Garner v. Cleveland Clinic Found.*, 735 F. Supp. 3d 867, 886 (N.D. Ohio 2024) (quoting *Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless*, 865 N.E.2d 1275, 1279 (Ohio 2007)). But it is also worth noting that the Ohio Supreme Court has said that "it is not possible to determine the precise tipping point between payback and punishment." *Cleveland Mobile*, 865 N.E.2d at 1279 (cleaned up).

"[W]hen interpreting a state statue, [a federal court] must follow state interpretations of those statutes, and must predict how the state Supreme Court would interpret the statute if it has not yet done so." *Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019) (cleaned up). The Ohio Supreme Court has

---

[36] Bryant filed this lawsuit on March 11, 2024, (Doc. 1), Wright allegedly raped Bryant on December 8, 2018, and Brown allegedly sexually assaulted Bryant sometime in August of 2022. (Doc. 3, #26–27; *see also* Doc. 8-2, #58 (listing the date of Brown's alleged assault as August 2, 2022)). So, if the six-year statute of limitations applied, only claims accruing before March 11, 2018, would be time barred. If the one-year limitations period applied, all claims accruing before March 11, 2023, would be time barred.

engaged with § 2307.60 twice before. In *Jacobson v. Kaforey*, that court, in answering a narrowly-phrased certified question, held that "R.C. 2307.60(A)(1), by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act." 75 N.E.3d 203, 206 (Ohio 2016). Next, in *Buddenberg v. Weisdack*, that same court found that the text of § 2307.60 "does not require proof of an underling criminal conviction," because of the absence of the word "conviction" and the fact that "crimes can be committed without a conviction." 161 N.E.3d 603, 606 (Ohio 2020). In neither case did the court address the applicable statute of limitations for § 2307.60. That leaves this Court to predict how that court would decide the question. And in making that determination, the Court is mindful that "[Ohio's] intermediate appellate court decisions are the best authority in the absence of any supreme court precedent." *United States v. Simpson*, 520 F.3d 531, 536 (6th Cir. 2008).

Until recently, "[e]very court that [] considered the issue, State or federal, applie[d] a one-year limitation period to claim under Section 2307.60." *Brack v. Budish*, 539 F. Supp. 3d 794, 800 (N.D. Ohio 2021) (applying the one-year limitations period, but due to the "longstanding, uniform rulings"); *see also Doe v. Springboro Cmty. City Sch. Dist. Bd. of Educ.*, No. 1:21-cv-623, 2024 WL 361666, at *6 (S.D. Ohio Jan. 31, 2024) (noting that "Ohio courts have consistently held … that claims under § 2307.60 are subject to a one-year limitation period," but finding that a more specific Ohio statutory provision applied that superseded that limitations period). "But that most courts have applied a particular statute of limitations is not dispositive of the

issue." *Hi-Vac Corp. v. Coley*, No. 2:23-cv-4184, 2024 WL 4266014, at *11 (S.D. Ohio Sept. 23, 2024). And in 2020, the District Court for the Northern District of Ohio rocked the boat when it said that a six-year statute of limitations argument "on a blank slate might well carry the day." *Brack*, 539 F. Supp. 3d at 800.

Taking inspiration from *Brack*, the Ohio Tenth District Court of Appeals broke the mold in *Harris v. Cunix*. 187 N.E.3d 582, 591 (Ohio Ct. App. 2022) ("R.C. 2307.60(A)(1) is a remedial statute subject to the six-year statute of limitations in R.C. 2305.07(B) rather than a penalty statute governed by the one-year statute of limitations in R.C. 2305.11(A)."). First, that court traced back the history of cases that had applied a one-year statute of limitations to § 2307.60. *Id.* at 586. It identified *Steinbrick v. Cleveland Elec. Illuminating Co.*, No. 66035, 1994 WL 463817 (Ohio Ct. App. Aug. 25, 1994), as an early example. *Id.* In that case, the Eighth District Court of Appeals found that since § 2307.60 allowed for punitive damages, "R.C. 2307.60 contemplate[d] a penalty, [so] R.C. 2305.11(A) is the applicable statute of limitations." *Steinbrick*, 1994 WL 463817, at *2. The *Harris* court found this analysis unpersuasive, finding that *Steinbrick* "provides no analysis beyond the cursory finding that because the statute allows a plaintiff to recover punitive or exemplary damages" it is penal. 187 N.E.3d at 592.

In departing from the usual one-year limitations application, the *Harris* court relied on four cases involving the remedial-penal dichotomy. First, the court discussed the factors used to distinguish between the two, referring to the Ohio Supreme Court's discussions in *Cleveland Mobile* and *Cosgrove v. Williamsburg of*

*Cincinnati Mgt. Co., Inc.*, 638 N.E.2d 991 (Ohio 1994). *Id.* Those factors include (1) "whether the statute is [meant] to penalize or remedy and compensate," (2) "whether the statute redresses individuals or public wrongs, (3) "whether recovery runs to the individual or to the public," and (4) "whether the statute was designed to augment enforcement of the law and to deter violations through penalties rather than simply compensate victims." *Id.*; *see also Cosgrove*, 638 N.E.2d at 996 (Resnick, J. concurring); *Cleveland Mobile*, 865 N.E.2d at 1279–80. Next, the court pointed to *Rosette v. Countrywide Home Loans, Inc.*, 825 N.E.2d 599 (Ohio 2005). *Harris,* 187 N.E.3d at 592. There, the Ohio Supreme Court said that "[t]o conclude that R.C. 5301.36(C) creates a penalty, this court would have to delete the term 'damages,' a word used by the legislature, and insert the term 'penalty' or 'forfeiture,' words not chosen by the legislature."[37] *Rosette*, 825 N.E.2d at 601. Finally, the court identified an analogous case that discussed § 2307.60—*Brothers v. Nixon*, 157 N.E.3d 164 (Ohio Ct. App. 2020). *Id.* In *Brothers*, an Ohio court of appeals found that Ohio Revised Code § 2307.70—a statute creating a civil action for damages for vandalism, desecration, or ethnic intimidation—is remedial because "the overall purpose of the statute is not punishing defendants but rather compensating victims." 157 N.E.3d at 170. While the *Brothers* court discussed *Steinbrick* and other courts to assign a one-year statute of limitations period to § 2307.60, it cast doubt on those decisions because they relied solely on § 2307.60's authorization of punitive damages. *Id.*; *see Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1220 (Ohio 1999) (explaining "that the

---

[37] Ohio Revised Code § 5301.36(C) allows mortgagors to recover damages of $250 in civil actions against mortgagees in certain circumstances.

availability of punitive damages [does not automatically] render a statute penal in nature"). The *Harris* court also noted some of the persuasive reasoning in *Brack*, including its finding that "the statute's creation of a civil cause of action for a crime victim to 'recover full damages' suggests that the statute is not penal." 187 N.E.3d at 593; *Brack*, 539 F. Supp. 3d at 800.

With these considerations in mind, the Tenth District Court of Appeals found that § 2307.60(A)(1) is remedial for a number of reasons—its use of the term "damages" rather than "forfeiture" or "penalty" as in *Rosette*, and the presumption that criminal statutes would be used to punish offenders instead of this statute, among other reasons. *Harris*, 187 N.E.3d at 593. Since *Harris*, many decisions (albeit primarily in federal court) have engaged in similar analyses and come to the same conclusion. *Hi-Vac Corp.*, 2024 WL 4266014, at *12 ("§ 2307.60 is remedial in nature"); *Niederst v. Minuteman Cap., LLC*, No. 1:23-cv-117, 2024 WL 3522413, at *15 (N.D. Ohio July 24, 2024) ("the Court predicts that the Ohio Supreme Court would determine that § 2307.60 is remedial"); *Garner*, 2024 WL 2803376, at *15 ("the arguments in support of the remedial nature of § 2307.60 are more persuasive"); *Harbold v. Smash Restro & Bar, LLC*, No. 5:22-cv-1583, 2023 WL 4085309, at *4 n.3 (N.D. Ohio June 20, 2023) ("§ 2307.60 is remedial in nature"); s*ee also Bend-Fast, Inc. v. SBA Monarch Towers III, LLC*, 246 N.E.3d 61, 71 n.1 (Ohio Ct. App. 2024) (acknowledging the *Harris* decision). And recently, another Ohio appellate court— the Seventh District Court of Appeals—has followed the lead of the *Harris* court. *See Am.'s Wholesale Outlet LLC v. Eckert*, ___ N.E.3d ___, 2024 WL 4982804, at *11 (Ohio

49

Ct. App. 2024) ("[W]e adopt the sound reasoning advanced by the Tenth District [in *Harris*] and conclude R.C. 2307.60 is remedial in nature and subject to the six-year statute of limitations.").

While the Court is cognizant that only two intermediate appellate courts in Ohio have followed this path so far, it finds the more recent, in-depth analyses set forth in *Harris* and *America's Wholesale Outlet* convincing. These two recent cases more accurately follow how Ohio courts have determined applicable statutes of limitations generally and are more convincing than the perfunctory application of the finding in *Steinbrick* that § 2307.60 is penal merely because it "contemplates a penalty." 1994 WL 463817, at *2. Accordingly, this Court finds that the six-year limitations period found in § 2305.11 applies and that Bryant's claims are not time barred. The Court, therefore, **DENIES IN PART** Defendant Wright's Motion to Dismiss (Doc. 12, pgs. 5–7) and **DENIES IN PART** Defendant Brown's Motion to Dismiss (Doc. 13, pgs. 3–5)—Counts VIII and IX may proceed.

### 2. Counts V, XI, XIII: Uncontested Counts.

Bryant does not contest Defendants Wright's and Brown's motions to dismiss Counts V (the IIED claim, as it pertains to them), XI (equal protection claim), and XIII (substantive due process claim). (Doc. 16, #225 n.2). Accordingly, the Court **GRANTS IN PART** Defendant Wright's Motion to Dismiss (Doc. 12, pgs. 1–5, 7–8) and **GRANTS IN PART** Defendant Brown's Motion to Dismiss (Doc. 13, pgs. 1–2, 5–

6) and **DISMISSES** Count V (as it pertains to Defendants Wright and Brown), Count XI, and Count XIII.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** City of Cincinnati's Motion to Dismiss (Doc. 11). The Court **DISMISSES** Counts VI, VII, X, XII. The Court also **GRANTS IN PART AND DENIES IN PART** Defendant Wright's Motion to Dismiss (Doc. 12) and **GRANTS IN PART AND DENIES IN PART** Defendant Brown's Motion to Dismiss (Doc. 13). So, consistent with the opinion, the Court **DISMISSES** Counts V (as it pertains to Defendants Wright and Brown), Count XI, and Count XIII. In sum, Counts I, II, V (as it pertains to Defendant City), VIII, and IX may proceed. Counts III and IV were uncontested and may also proceed.

**SO ORDERED.**

March 19, 2025
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**