UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---------------------------
                                    :
REBECCA BRYANT,                     :
                                    :   CASE NO. 1:24-cv-00119-DRC
        Plaintiff,                  :
                                    :   Judge Douglas R. Cole
     vs.                            :
                                    :   Magistrate Judge
CITY OF CINCINNATI,                 :   Stephanie Bowman
et al.,                             :
                                    :
        Defendants.                 :
                                    :
---------------------------


DEPOSITION OF:     KELSEY L. BRAIDO

TAKEN BY:          The Plaintiff

PURSUANT TO:       Notice of Deposition

DATE & TIME:       November 25, 2025
                   Commencing at 9:34 a.m.

LOCATION:          Freking, Myers & Reul
                   600 Vine Street
                   Ninth Floor
                   Cincinnati, Ohio 45202

BEFORE:            Colleen E. Wimmel, RPR, RMR
                   Notary Public - State of Ohio

APPEARANCES:

    On behalf of the Plaintiff:

        PAIGE E. RICHARDSON, ESQ.
          and
        KELLY MULLOY MYERS, ESQ.
          of
        Freking, Myers & Reul, LLC
        600 Vine Street
        Ninth Floor
        Cincinnati, Ohio 45202
        prichardson@fmr.law
        kmyers@fmr.law


    On behalf of Defendant City of Cincinnati:

        MATTHEW J. SLOVIN, ESQ.
          and
        KATHERINE C. BARON, ESQ.
          of
        City of Cincinnati Law Department
        801 Plum Street
        Room 214
        Cincinnati, Ohio 45202
        katherine.baron@cincinnati-oh.gov
        matthew.slovin@cincinnati-oh.gov

    On behalf of Defendants Harold Wright and
    Damonte Brown:

        JAMES E. KOLENICH, ESQ.
          of
        Kolenich Law Office
        9435 Waterstone Boulevard
        Suite 140
        Cincinnati, Ohio 45249
        JEK318@gmail.com


    Also Present:
    Sara Sonnier, City of Cincinnati Law Fellow

S T I P U L A T I O N S

It is stipulated by counsel for the respective parties that the deposition of KELSEY L. BRAIDO, a witness herein, may be taken at this time by the Plaintiff as upon cross-examination pursuant to the Federal Rules of Civil Procedure; that the deposition may be taken stenographically by the notary public - court reporter and transcribed by her out of the presence of the witness; and that submission of the transcribed deposition to the witness for examination and signature is expressly waived.

I N D E X

DEPONENT                                                        PAGE

KELSEY L. BRAIDO

    CROSS-EXAMINATION BY MS. RICHARDSON          5
    CROSS-EXAMINATION BY MR. KOLENICH            123
    RECROSS-EXAMINATION BY MS. RICHARDSON        128

E X H I B I T S

| BRAIDO EXHIBIT NO. | MARKED | REFERENCED |
|---|---|---|
| 1 | 59 | - |
| 2 | 99 | - |
| 3 | 102 | - |
| 4 | 114 | - |
| 5 | 119 | - |
| 6 | 120 | - |
| 7 | 122 | - |
| 8 | 122 | - |

- - -

KELSEY L. BRAIDO

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

CROSS-EXAMINATION

BY MS. RICHARDSON:

Q.    All right, Kelsey, we met briefly just before a couple minutes ago.  My name is Paige Richardson.  I represent Rebecca Bryant with Kelly Mulloy Myers.

A.    Hi.

Q.    I am going to ask a couple questions up front just to gauge how experienced you are at depositions.  Have you ever had your deposition taken before?

A.    No.

Q.    Okay.  So I'm going to go over a couple of rules just so we're all on the same page then.  So the first thing is we have Colleen here, she's our court reporter, and she is taking down everything that everyone says.  So it's very important that we all verbalize our answers.  So instead of nodding or shaking your head, you say "yes" or "no" or whatever the answer may be.  And that also goes for "uh-huh," "mm-hmm," it's very hard.  If you --

A.    Sure.

Q.    -- say "uh-huh," I may just say, "Is that a yes?"  Not meant to be rude, just to make the record clear.

A.    Understood.

Q.    I can sometimes ask bad questions.  So if you're confused at any point, just let me know.  I'm happy to rephrase or try to figure out what the confusion is.  But if you answer, I am going to assume you understood the question as I asked.

A.    Okay.

Q.    The other thing for Colleen is it's pretty natural in a conversation to kind of talk over each other.  I'm going to do my very best to let you finish your complete answer, and I would ask that you try to let me finish my question even though a lot of times you may know where I'm going.

A.    Understood.

Q.    All right.  I think today is going to be fairly long.  We will stop for a lunch break.  If at any time you need a break to go to the bathroom, get a cup of water, just let me know, I'm happy to let you have a break.  I would just ask that if I have asked a question, you answer it before we go on break.

A.    Sure.

Q.   Okay.  I'm going to ask a couple of questions about your prep for today.  But before I do that, I also just want to say, and Matt will tell you, as well, I don't want to know what you have talked about with Matt or Katie or any other lawyers.  But I do want to know some of -- if you prepped for today.  So have you prepped for today?

A.   Somewhat.

Q.   Okay.  Did you meet with your attorneys before --

A.   Yes.

Q.   -- today?  Okay.  Did you meet with anyone else?

A.   No.

Q.   Okay.  When you met with your attorneys -- again, I don't want to know what you talked about -- but did you go over documents?

A.   Briefly.

Q.   Okay.  Do you remember what documents those were?

A.   Very briefly transcripts, but yeah.

Q.   Okay.  Transcripts of the investigation into Damonte and Harold?

A.   Yeah, but we did not necessarily review them, that was --

Q. They were given to you?

A. -- more indication that that, yeah, is a document that may be discussed.

Q. Got it. Any other documents?

A. None that I recall.

Q. Okay, that's fine. If -- obviously, there are a lot of documents here today.

A. Yes.

Q. If at any point we're going through documents and you recognize one that you've seen before, will you just let me know?

A. Sure.

Q. Okay. Thank you.

I'm going to start off with some easy questions just about yourself.

A. Okay.

Q. And I want you to know I'm not asking this to pry. I'm asking because if you live in Hamilton County, I want to know if this goes to trial, for jury pool considerations, and we can take it off the record so it's easier for you, but I'm going to ask the question on the record.

A. Okay.

Q. What is your current address?

A. (Address given off record.)

MS. RICHARDSON:  We can go back on.

Q.    Off the record, you gave me your current address, correct?

A.    Correct.

Q.    Okay, thank you.

Are you from around here?  Did you go to high school here?

A.    No.

Q.    Okay.  Where did you go to college?

A.    Miami University in Oxford.

Q.    And what did you study there?

A.    Psychology.

Q.    When did you graduate?

A.    2012.

Q.    Was it a normal four-year?

A.    Yes.

Q.    Would that be a B.S. or a B.A.?

A.    B.A., I think.  I haven't looked in a while.

Q.    Did you have any other schooling after that?

A.    I did.  I went to Chase College of Law from 2014 to 2017, graduated in 2017.

Q.    Did you pass the bar?

A.    I didn't take the bar here.

Q.    Congrats.

A.    Yeah, I decided pretty early out of law school I did not want to practice.

Q.    Fair enough.  Any other schooling?

A.    No.

Q.    Okay.  How about employment?  And I particularly -- I don't want to know, you know, if you mowed lawns in elementary school, but particularly in between law school and Miami and after law school, if you could just give me a rundown of --

A.    Sure.  So in between Miami and law school, I worked for a criminal attorney, Will Welsh, as a paralegal for about two years, approximately, year and a half, however long was in between that period. Also waited tables at Bonefish.

During law school, I worked a variety of places.  The longest tenure was clerking at Wolnitzek, Rowekamp & DeMarcus in Covington.  Also worked for -- I can't remember his first name -- Richards & Co. in Blue Ash for a bit my summer between 1L and 2L year.  Worked for an immigration attorney that summer, as well.  His name is escaping me.  And then following law school -- so Wolnitzek was 2L and 3L year.

Following law school, I worked for about a year and a half at a company called Vora Ventures.

That's a parent company for a variety of, um, they did tech startups, staffing, things like that, in the legal section under their general counsel.

And then came to the City a little over seven years ago.  Started out as an HR analyst in the Human Resources Department.  Moved into a senior HR analyst role after about a year and a half.  Was in that role for about 10 months and then promoted to a supervising managing analyst in the Emergency Communications Center.  I worked in HR in policy development, end clients, 2020, then promoted to a division manager and came back to the Department of Human Resources, and that position was over the Employee Services and Labor Relations Division.

And then in about two -- a little over two years ago, moved into the deputy director role for the Department of Human Resources, and that is my current role.

Q.   Got it.  With Vora -- is it Vora Ventures?

A.   Mm-hmm, yes.

Q.   You said you were under general counsel?

A.   Yes.  So the legal team was just the general counsel and myself.

Q.   Did you do HR type duties?

A.    A little overlap, but it was mainly immigration and contract related, so reviewing contracts and doing H-1B petitions, green cards, things like that.  We did consult with their HR department on various matters, especially with the immigration piece, but was not actually located in HR doing primary HR duties.

Q.    Got it.  So your first HR position was with the City?

A.    Yes.

Q.    Did you receive training when you went into HR?

A.    Yes.

Q.    Okay.  What types of training?

A.    So when I started, I was in several sections or I -- I cross-trained in what's called our Workforce Management Division.  So there was training on hiring processes, compensation studies, job studies, things like that.  And then I also trained in our Employee Services Division on corrective action investigations, FMLA processing, ADA accommodations and the interactive process, handling of grievances, contract negotiations.  I'm sure there's a lot more, but that's sort of the high level.

Q.    And where did you get the training

through?

A. So most of it was on the job through training with our, you know, our current managers and staff, but there was -- I may have taken external trainings, as well, throughout my tenure with the City, so it kind of varies. But the initial training was primarily in-house. They paired you with like a mentor or trainer who went, you know, went through those processes and things and ensured you're learning throughout your first year on the job.

Q. And was it kind of a shadowing situation?

A. Yeah, there was certainly shadowing.

Q. Okay. As far as external training, did you receive anything on Title VII?

A. I likely have, but I wouldn't be able to quote like who gave it, the dates, things like that --

Q. Got it.

A. -- but I mean we had -- I mean the EEOC came in and has done training. I've, like I said, gone to trainings at like local firms and things that provide that type of training, so -- but specifics, not a hundred percent sure.

Q. Did those trainings include sexual harassment training?

A.    Yes.

Q.    Other than Rebecca Bryant, have you, with the City, done any sexual harassment investigations?

A.    Yes.

Q.    Okay.  How many would you say, do you know?

A.    I don't know.

Q.    Do you know, other than Rebecca Bryant, have you done sexual harassment investigations for the CFD?

A.    No.  Well, let me rephrase.  Prior to Rebecca Bryant, no, but I have done some other investigations since then for CFD.

Q.    Specifically sexual harassment?

A.    They had a -- so they were multifaceted, but there was a sexual harassment component to at least one that I can think of since then.

Q.    Okay.  Do you recall the names of the people involved in that investigation?

A.    So we would have looked into that in terms of Ari Hall and Sherman Smith.  Those are the names I can recall.

Q.    Ari, A-R-I?

A.    Yes.  Or Arian is her full name,

A-R-I-A-N.

Q. Was Ari Hall the complainant?

A. Yes. The complaint was not primarily focused on that, that was sort of an adjacent piece. It was in regards to Sherman Smith only.

Q. Okay. What was the sexual harassment component of that complaint?

A. Just some like offhand comments to her about her attire and things of that nature.

Q. Was Sherman terminated?

A. He has been terminated for conduct unrelated to that complaint.

Q. Unrelated to the sexual harassment complaint or unrelated to Ari Hall completely?

A. Both.

Q. Okay. What was he terminated for?

A. For violating various city policies in relation to confidentiality, our IT policies, our administrative regulations for workplace behavior.

Q. Did any of the policies he violated have to do with Rebecca Bryant?

A. No.

Q. Did any of it have to do with this case at all?

A. No.

Q.    Did any of it have to do with sexual harassment?

A.    No.

Q.    Did you substantiate Ari Hall's sexual harassment component of her complaint?

A.    No.

Q.    Why?

A.    The evidence -- evidence did not support that he had sexually harassed her.

Q.    Did the evidence show that he didn't make the comments at all or that -- well --

MR. SLOVIN:  Objection; form.  You can answer.

A.    Can you ask the question again?

Q.    Sure.  When you say the evidence showed he didn't sexually harass her, did the evidence show that he didn't make the comments at all?

A.    Um, I cannot recall details.  I believe so, but I would have to look back at the investigation for specifics.

Q.    Have you done any other sexual harassment investigations for CFD?

A.    Not that I recall.

Q.    Okay.  How about assault?

A.    Not that I recall, no.

Q.    Okay.  Do you know the name Meghan McQuiddy?

A.    I have heard her name before.

Q.    Okay.  In what context have you heard her name?

A.    I think I -- just this once, that she was a CFD employee, and I believe she reached out previously, asking for a copy of the complaint she had filed at some point.  That's the extent of my knowledge of her.

Q.    Do you know what the complaint was about?

A.    No.

Q.    Do you know why she was asking for the complaint?

A.    I do not.

Q.    Did you assist the City with trying to find the complaint?

A.    That would have primarily been my boss at the time who searched our files, so, no.

Q.    Who was your boss at the time?

A.    Ed Ramsey.

Q.    Ed Ramsey is no longer with the City?

A.    Correct.

Q.    Do you know if they ever found Meghan

McQuiddy's complaint?

A.    I don't believe they did.

Q.    Does that concern you?

A.    Yes, possibly.

Q.    Why?

A.    If I want to -- I, as someone in HR, want to ensure that we're following, you know, recordkeeping, our recordkeeping policies and public records laws, so I don't know the, um, the date specifically she filed the complaint, so I couldn't speak for certain whether we should have had copies still and things, but I -- from a general recordkeeping standpoint, you know, we want to keep good records.

Q.    How long is the City supposed to keep records?

A.    I would not be able to speak to the fire department's public records retention policy, so I am -- I'm not sure.

Q.    Okay.  Did you speak to Meghan McQuiddy as part of the investigation into Rebecca Bryant's complaint?

A.    No.

Q.    Did she come up at all in that investigation?

A.    Not that I recall specifically during

her investigation, no.

Q. Okay. If you had been made aware that someone had made complaints about Harold Wright previously, would that have been someone you would have reached out to?

A. Potentially. So it would have -- the context we would have reached out would have depended on what information she had. So in the context of Rebecca Bryant's complaint, it would have depended on if she had relevant information related to Ms. Bryant or her allegations. Doesn't mean we wouldn't have reached out separately to engage with her within that context. It -- no one ever alleged that she had any relevant information to the Bryant complaint.

Q. Got it. As far as -- and I'm just asking for your opinion as someone with a long history of HR positions with the City. As far as your experience and your knowledge of City policies, if someone alleges sexual harassment, should it be investigated?

A. Yes.

Q. Whether they ask for it to be investigated or not?

A. Correct.

Q. Okay. If Meghan McQuiddy alleged that

she was sexually harassed by Harold Wright, should that have been investigated?

A. Yes.

Q. Okay. Is there any reason why the City would not have investigated?

A. Not that I'm aware of.

Q. Okay. Should that complaint have appeared in Harold Wright's personnel file?

A. It depends on when it was filed.

Q. Is that why?

MR. SLOVIN: Object to form. You can answer.

A. So we -- I mean back to the retention policy, you know, I don't know what year she allegedly filed it or like the specific facts surrounding it, but I also -- I mean fire would be able to speak more accurately on the way they store records. They may -- their investigations and things I think are maybe stored in a like specific investigation file, so I -- yeah, I can't answer in detail to that.

Q. I understand. So you're saying it should have been retained depending on the year, but maybe not in his personnel file?

A. Yes.

Q. Okay. Would it concern you if that did

not happen?

A.    Yes.

Q.    Okay.  And why?

A.    That we should be keeping accurate records of all things including complaints.

Q.    If there had been other complaints of sexual harassment from Harold Wright prior to Rebecca Bryant, would that have affected how you did the investigation in Rebecca's case?

A.    No.  I mean we would have came to the same findings looking at the evidence that we did and so I don't think so.

Q.    If Meghan McQuiddy's -- and again, you've said a couple times you don't know those circumstances.  If a sexual harassment complaint had been substantiated against Harold Wright prior to Rebecca Bryant's, what is the City's stance on what that means for someone's employment?

A.    That's -- I can't really answer that. It's complex, it depends on the severity of the sexual harassment, their progressive discipline.  The fact pattern is very important on the City's position.  I mean if sexual harassment is substantiated, we're certainly going to take appropriate corrective action, but whether that's termination of someone's employment

is going to be fact specific.

Q.   Okay.  So the City -- does the City not have a zero tolerance policy on sexual harassment?

A.   They do not.

Q.   Prior to Rebecca Bryant, had you heard -- and her complaint, had you heard of any concerns about women in the CFD?

A.   Can I go back to the previous question?

Q.   Yes.

A.   I do want to clarify.  So in terms of zero tolerance, do you mean like that it's termination, I guess -- we have -- we are not tolerant of sexual harassment, so I want that to be clear, but there isn't a policy that says if you engage in any level of sexual harassment that you're terminated like automatically.

Q.   Okay.

A.   So I just want to be clear on that that it's not -- it is zero tolerance from the regard of it being prohibited.

Q.   Okay.

A.   Just in terms of penalty.  So my apologies for going backwards, but could you ask the next question again, please?

Q.   Yes.

MS. RICHARDSON:  Can you read my

question back?

(Whereupon, the court reporter read back the record as follows:

"Question:  Prior to Rebecca Bryant, had you heard -- and her complaint, had you heard of any concerns about women in the CFD?")

A.    Prior to Rebecca Bryant's complaint? Um, I don't recall prior to that complaint if -- um, yeah, I don't recall.

Q.    Okay.  Subsequent to her complaint, have you become aware of concerns of gender discrimination in the CFD?

A.    Yes, I mean it's -- in regards to -- yeah, following Bryant's -- yes, that that was, um, something that arose after.

Q.    Was it something that arose after or something the City became aware of after?

A.    I guess became aware of after.

Q.    How did the City become aware of it?

A.    I would not be able to speak in great detail of this, but I know there were some concerns brought up in our assessment that we had Women Helping Women conduct in the department.

Q.    What were those concerns as far as you can describe?

A. I can't recall exact details. I mean I think that gender discrimination or that some people were -- had brought up concerns related to that, but in terms of specifics, I can't speak to those.

Q. Okay. Were there concerns of sexual harassment as well?

A. In that study, I can't recall specifically.

Q. Who decided to bring Women Helping Women in, if you know?

A. I don't know for sure.

Q. Was it a City decision, if you're aware?

A. I believe so.

Q. Okay. As far as you're aware, it didn't come from CFD?

A. I don't know.

Q. Okay. Did you review the Women Helping Women assessment?

A. I -- yes, I think I looked at it when it came out, I believe, yes.

Q. Okay. Were there discussions on what to do with that information?

A. I'm sure -- yes.

Q. Did those discussions include you?

A. Most of those would have included

Mr. Ramsey.

Q. Okay. Are you certain that there were conversations or are you guessing that Mr. Ramsey was involved in conversations?

A. I guess I -- I believe so, but can't say for certain without him confirming.

Q. Okay. He didn't talk to you about those discussions if they happened?

A. I think we talked about more globally, I just -- I cannot -- I don't remember specifics about all of the conversations.

Q. Got it.

A. Yeah.

Q. Has the City changed any policies in relation to the CFD since the Women Helping Women report?

A. I do not know if CFD has changed any policies. Um, City policies, not that I'm aware of.

Q. Okay.

A. We -- I know in response, there was extensive training and things that were conducted, but I don't believe there were policy changes to any City policies or regulations that I can recall.

Q. Did the City ask the CFD to take affirmative action in response to the Women Helping

Women report?

A.    What do you mean by "affirmative action"?

Q.    Changing something in response to the feedback?

A.    Yes, I believe so.

Q.    Okay.  Do you know who that request would have come from?

A.    I can't speak definitively, but I believe our -- I mean our city manager.

Q.    Sheryl Long?

A.    I believe so, but I -- so those conversations would have occurred with our director.

Q.    Has the CFD made affirmative changes in response to the Women Helping Women report?

A.    I think so.

Q.    Okay.  What have they changed?

A.    I think they have changed their training or their -- they have -- it's done more robust training in discrimination and sexual harassment across the city.  We've also implemented, um -- so Women Helping Women has a training that they did for all of CFD in terms of like gender-based violence, both in and out of the workplace, and they did a train the trainer series where we trained around 25 to 30 people across the city

in that training that now deliver that training citywide as well as to CFD recruit classes as they're coming in.  So I can't speak to specific policy changes necessarily, but they have also, um -- there has been a number of I guess complaints and things that they have better consultation with human resources on whether we do -- we partner on some investigations and things, whereas previous, before the Bryant, uh, internal investigations handled all of their sworn complaints, so that has evolved depending on the complaint itself.

Q.    Why was it important to have HR involved instead of just internal affairs?

A.    Uh, I mean I think we -- due to the nature of the complaint and the allegations, um, it was -- the City feels strongly about having someone who has been trained in that type of complaint investigation and subject matter involved to ensure a thorough and complete investigation.

Q.    Were there concerns that IA had not been doing thorough investigations?

A.    I don't believe so.  I don't think the rationale was necessarily an issue with internal so much as just an extra layer of expertise.

Q.    Were there concerns that IA was covering up results to protect harassers?

A.   No.  Not that I'm aware of at least.

Q.   Okay.  Do you think the training is a good enough response to the Women Helping Women assessment?

A.   I don't think the training is the only thing they have done.  Like I said, I think they've -- I think they have also -- I think that, um, CFD would have to speak for certain on it, but I think they have worked on the process for complaint filings, as well, to make that an electronic process versus just a paper process, to ensure more accurate recordkeeping and things.

Q.   Do you think those two things are a good enough response to the Women Helping Women assessment?

A.   I think the City is continuing to find ways to respond, so I don't really know that I can answer that definitively, but I think those are good steps and that we'll continue to assess and evaluate if there's changes that are needed in CFD.

Q.   Were you involved in the decision to terminate Michael Washington?

A.   Yes.

Q.   Why was he terminated?

A.   For his performance or -- because, um, I mean there was a variety of reasons.  There wasn't one

particular reason he was terminated, so I would say his overall performance as the fire chief.

Q.   Was one aspect of his poor performance related to gender discrimination in the workplace?

A.   To some degree.  I mean I think it was more his handling of various matters and one of them was related to his failure to do a climate assessment to assess the environment, which then subsequently, you know, the Women Helping Women study spoke to that somewhat, so, um, yeah, I think it's...

Q.   What were the matters that he failed to handle?

A.   I -- I mean I can't remember all the specifics, there was a variety of things.  From what I can remember, one was related to a fire response or a lack of response from him when called.  Some of it was related to just a lack of following HR guidance in matters and, like I said, a failure to get the climate assessment process going.  There are likely others that I just -- it's been a few years and I can't remember all of the specifics.

Q.   Was any of the rationale for his termination related to Rebecca Bryant?

A.   No.

Q.   Okay.

A.   Not that I'm aware of.

Q.   Okay.  When you say, "lack of following HR guidance," did any of that have to do with gender discrimination or sexual harassment?

A.   Within the workplace?

Q.   Yes.

A.   Not that I recall.

Q.   Were there incidents outside of the workplace?

A.   That he failed to -- uh, I mean not -- so the incident I am indicating is the failure -- the guidance failure was to -- was whether to place somebody on unpaid leave or an alternative assignment. The individual had an external matter that was related to violence, so -- but not specifically like sexual harassment.  But so the -- yeah, the dispute was related to that employee's status during the course of the investigation.

Q.   Who was that individual?

A.   Brandon Freeman.

Q.   Was the violence issue DV, was it related to women at all?

A.   I don't believe it was DV.  I think it -- I think there was a female involved.

Q.   Sorry, "DV" meaning domestic violence?

A.    Yes.  So I know what that -- but yes, I know what that means.  I don't believe it was a domestic violence charge.

Q.    Okay, good.

And rather -- let me know if I am putting words in your mouth.  Rather than placing Freeman on unpaid leave during the investigation, Michael Washington placed him on a different assignment?

A.    Correct.

Q.    Okay.  Why was that an issue?

A.    HR had said to do unpaid leave just due to the nature of the external charges, so I -- yeah, so it was -- it was more of an issue that he did not, you know, did not follow guidance from HR was the primary issue.

Q.    Okay.  So HR wasn't concerned about women on the workforce being near him during that time?

A.    So Mr. Freeman had never had any -- there were no allegations or anything to our awareness of him having issues with women on the job or being violent on the job, nothing like that.  So it was CFD had historically -- did not do unpaid leave for individuals while criminal proceedings were playing out, but other departments in the city, we often do

that, so we were trying to align them with our practice in other city departments was the rationale for wanting to do the unpaid leave for Mr. Freeman while the process played out. There wasn't -- he had never shown any indication, I guess in his career, that he was violent towards coworkers, women or otherwise.

Q. What was the result of the criminal investigation into Freeman, if you know?

A. I think everything was dismissed, but I --

Q. Okay.

A. -- guess you would have to verify that's the case.

Q. Okay. Does he still work at CFD?

A. I am not sure. I think so, but I am not certain if since then he's retired or resigned or left the City.

Q. Okay. Have you had any complaints about Freeman since then?

A. Not that I'm aware of.

Q. Okay. Are you aware that at some point, Harold Wright was charged with domestic violence?

A. I became aware of that I think during the -- like following the Bryant investigation wrapping up. At the time, I don't believe that was on my radar.

Like the time it happened, I'm not certain I even worked at the City yet, so I wasn't involved in that.

Q.   Got it.  Do you know if he was placed on unpaid leave during the pendency of the criminal investigation?

A.   I have no idea.

Q.   Okay.  Do you know how we could find that out?

A.   Probably from the fire department payroll records, depending on what time -- like the timing of when that occurred.

Q.   Did you say, "payroll records"?

A.   Yeah, would likely show like pay codes and things.  But I'm not sure -- I'm not certain when the domestic violence charges, like the dates of them and things, if it would have -- like how our recordkeeping was at that point in time.

Q.   Got it.

You mentioned that part of the reason for Michael Washington's termination was his failure to take a climate assessment.  What was the climate assessment supposed to be on?

A.   The work environment or the climate of the department.

Q.   Anything in particular or just general?

A.    I'm not sure.

Q.    Okay.  Do you know who asked him to do that?

A.    I believe it was a former city manager, Paula Boggs Muething, but that predated me coming back to HR when those conversations were occurring.

Q.    Do you know why she asked him to do a climate assessment?

A.    I do not.

Q.    Is it normal for the City to ask different departments to do climate assessments at various times?

A.    Yeah.

Q.    Okay.  So there doesn't need to be a triggering event for the City to ask for that?

A.    There does not have to be, no.  There could be, but it's not the only rationale for a climate assessment.

Q.    Okay.  As far as you know, would the best way of figuring out why the climate assessment was an ask would be to ask Paula Boggs?

A.    I suppose so.

Q.    Okay.  Are you aware of anything in writing or any documentation?

A.    No.

Q.    Okay.  As far as you are aware, was there any awareness in the City that there was an issue with gender discrimination at CFD prior to Rebecca Bryant?

A.    One more time?

Q.    As far as your personal knowledge, are you aware of anyone at the City having knowledge of gender discrimination issues at CFD prior to Rebecca Bryant?

A.    Not that I recall.

Q.    Okay.

A.    But that's a number of years ago, so -- but not that I -- yeah, not that I can remember.

Q.    Okay.  What would "CMO" mean in the context of a City HR investigation?

A.    City Manager's Office.

Q.    Okay.  Explain to me what you recall of the Rebecca Bryant investigation as far as the process.

MR. SLOVIN:  Objection.  You can answer.

A.    I believe she filed what's called a Form 47, CFD's internal communication form they use for a variety of things, um, two Form 47s, I believe one with allegations against Harold Wright, one with allegations against Damonte Brown.  CFD, from what I recall, brought those to HR's attention.  Then we

reviewed them and there was dialogue internally with HR, CFD, City Manager's Office, Law Department about the investigation and who the appropriate investigator would be or who should look into it based on the seriousness of the allegations, and it was decided -- There is a provision in the Local 48 contract that they have -- an article that outlines their internal investigations procedures.  And typically, like I said, those were handled by internal investigations.  There was a specific section about the City Manager having authority to -- like to delegate that investigation, and that people still had to participate in the investigation.

So I believe that I think it was HR's recommendation just due to the subject matter that this may be one that should be delegated at least partially to HR.  The City manager agreed, and then there's an offer -- there was a delegation offered and the investigation began in terms of the formal interviews and fact finding process.

Q.   Okay.  You said, "delegated at least partially".  Was it not delegated fully?

A.   So it was delegated to HR and law, but their -- the memo mentions that others may be involved in that process like internal investigations or CFD for

consultation, so -- but the primary investigator was HR in conjunction with law and then consultation with the fire department.

Q. Okay. Did you ask for Lieutenant Frazier to be involved in the investigation?

A. I don't recall who asked for her to be involved. I don't know if it was me specifically, um, I -- I don't recall.

Q. Why was she asked to be involved?

A. For a variety of reasons. One was -- so like I said, this was the first time in -- just as far as I'm aware, in like the history of CFD or the labor agreement that a complaint had been delegated, so it was always internal investigations that typically did it. So there's -- the contract article for internal investigations is extensive, there's a lot of kind of procedural checks and things in there, and some of them kind of the language speaks specifically to fire department processes versus how we maybe were handling, you know, HR complaints in other departments. So we wanted to ensure contract compliance and that all procedural aspects were taken care of, especially if there -- you know, if things were to be substantiated. We would not have wanted there to be any holes from a procedural aspect that they could poke holes in.

So, also, the, um, Lieutenant Frazier had -- she worked in Internal Investigations Section, so it -- she was selected based on -- I think there was only two individuals in that section at the time, so we wanted somebody who was specifically in that section that would be familiar with the internal investigations, not just, you know, fire department operations, but both the fire department operations and culture and things as well as the investigation procedure so that we would get it right.

(Ms. Mulloy Myers exited the room.)

Q. Did you do a conflict check to ensure that Lieutenant Frazier was the appropriate person to include in the investigation?

A. I don't know if I -- I mean there was nothing to indicate that she was not a neutral investigator.

Q. Are you aware that Harold Wright has indicated that he and Lieutenant Frazier are close personal friends?

A. No.

Q. Would that concern you if he had?

A. Potentially, but I think it -- I think that's case by case, as well. I mean I think many people who work together for extended periods of time

in their career would consider each other friends.  I don't think that means automatically that you can't be a neutral and unbiased investigator, but it may, so I think it's -- I mean I think I would need to know more information to determine whether she would be an appropriate investigator or not.

Q.    Okay.  Did Lieutenant Frazier say anything about that to you prior to becoming involved in the investigation?

A.    That they were close personal friends? No.

Q.    Okay.  Would you have expected her to if that were the case?

A.    I would expect her to tell us if there was anything she viewed as a conflict or something that would have affected her ability to be an unbiased investigator.

Q.    And you would leave that up to her to decide?

A.    I mean there's some clear-cut ones and there's others that are more gray.  So I mean if she was related to Harold Wright, right, like that would be one that would be expected, she would indicate that. But in terms of, like I said, I don't know the nature of what that means with a close personal relationship,

so I don't know if she views it that way.  So I mean, yeah, I would expect her to be able to tell us if she had a conflict or a bias.

Q.   Okay.  Did you ask her to -- well, let me start over because you said you don't recall.  Was part of the reason for asking her to be involved in the investigation to help fact find?

A.   That wasn't the primary reason, but, um, I mean the major fact finding came from HR and law, but I mean she was -- her role was an internal investigator, so she was certainly -- if there were facts that came about that she found pertinent, things like that, she was able to bring them to us and we would sift through them, but that was not her primary role was not fact finding.

Q.   Do you recall her bringing any facts to your attention that she felt were pertinent?

A.   No.

Q.   At any time in the course of the investigation, did you find that she was inappropriate?

A.   No.

Q.   Okay.  Do you recall her asking Rebecca Bryant about what type of clothing she was wearing when she was assaulted?

MR. SLOVIN:  Objection.  You can answer.

A.    I can't remember her -- I -- specifically, but I think there were questions during the investigation related to attire based on some of the facts that had come out in that investigation.

Q.    Can you explain more?

A.    So from what I recall, Ms. Bryant had -- in discussing that, had talked about -- I guess is this Wright or Brown that you'd like to focus on?  Because they're two totally different fact patterns.  But for Mr. Wright, she was talking about a strip poker game, things like that, so like it would be like clothing and layers of clothing things would be relevant facts for that.

In terms of Damonte Brown, I think there was -- I recall her bringing up some things related to clothing, and so we're asking like questions to clarify things like that based on the fact pattern that she's giving us.  So, um, yeah, a lot of questions related to the allegations and the facts surrounding them.

Q.    Do you think it's appropriate to ask someone who has been sexually assaulted what they were wearing?

A.    So I don't think the question was asked exactly like that.  I mean if we opened up on the sexual assault case and said that that may not be the

most appropriate, but I think there is nuance to that, and so it's going to vary in the investigation and whether it's relevant, how it's asked, things like that, so, um, yeah, I think there's nuance to that question.

Q.    Do you recall Lieutenant Frazier asking about Rebecca Bryant's breast size?

A.    That specific question, no, I do not.

Q.    Would there be any reason why that would be an appropriate topic of conversation in the investigation?

A.    I -- I don't know.

Q.    Do you think that would make Rebecca uncomfortable?

A.    Potentially.  Um, I think -- yeah, potentially.

Q.    Does that concern you?

A.    That she was -- like that someone made her uncomfortable or what specifically are -- Could you clarify the question?

Q.    Sure.  Would it concern you if Rebecca was uncomfortable because an investigator asked or made comments about her breast size during a sexual assault investigation?

A.    Yes.

Q.   Okay.  Did you and Lieutenant Frazier discuss that at all?

A.   So I don't recall any indication of Ms. Bryant saying she was uncomfortable during -- specifically related to Frazier's questioning during the interview, so that came to our attention later while in the -- the investigation concluding.  So during the investigation, no, we did not -- Lieutenant Frazier I don't recall specifically discussing her being -- like us discussing Ms. Bryant being uncomfortable because of Ms. Frazier.

Now, obviously, the allegations and the subject matter are uncomfortable in general, and so there were many times of some discomfort or emotion during those investigations, and so there may have been discussion how to best make her comfortable and how we could, you know, get the facts we needed while ensuring to the best of our ability that we were not making, you know, a situation worse, something like that, but I -- so that would have been the dialogue with Lieutenant Frazier and Lauren, the attorney that worked on the case, more from a global perspective of how can we best get the information while being sensitive to Ms. Bryant.

Q.   Okay.  You said you became aware after

the investigation concluded that Rebecca was uncomfortable.  How did that happen?

A.    Through this litigation.

Q.    Okay.  And you said you don't recall Rebecca ever bringing that to your attention during the investigation?

A.    Or during the interviews when she was giving like -- so the interview where I think there were discussions about clothing and things, I -- yeah, I don't recall her saying like can we stop, I'm uncomfortable, things like that.  I -- my recollection of when we were talking about it is that Lieutenant Frazier occasionally would ask questions and make sort of like jokes about herself or like, um, a little self-deprecating or things like that in an effort to make her more comfortable.  I think she felt that she was trying to like build rapport.  So there was usually like, um, the responses coming from them, there wasn't somebody saying, hey, I'm uncomfortable, um, while that dialogue was going on about clothing and things, um, so, yeah.

Q.    Do you think that was an appropriate way for Lieutenant Frazier to go about the investigation?

A.    I -- I mean hindsight is 20/20, so knowing she was uncomfortable, right, might skew my

answer versus others might find that made them comfortable, so I -- I think that's a little nuanced, as well.  I don't think there's an issue with her trying to build rapport.  I think that, like I said, in hindsight, knowing that it made her uncomfortable, we would have encouraged her to take a different direction to do so.

Q.   Bear with me here.  I'm trying to find something specific.

A.   I figured.

Q.   You might not know this, but I have audio transcriptions from Elite Reporting of investigation -- the different interviews in the investigation.  And then I have more, um, more informal transcripts.  I'm not seeing them match up.

A.   Okay.

Q.   Do you understand why that would be?

A.   I believe the transcripts are created by CFD.  Internal creates transcripts like from all of their investigations, so that would probably be a question for them.

Q.   Okay.

MS. BARON:  Paige, if we want to go off the record, so --

THE COURT REPORTER:  Are we off the

record?

MS. RICHARDSON:  Sure.

(Off-the-record discussion held.)

MS. RICHARDSON:  We can go back on.

BY MS. RICHARDSON:

Q.   So I am just asking -- and I know you said you don't know.  I'm missing like entire questioning, lines of questioning in one of Rebecca's interviews.  Do you have any reason to know why that would be?

A.   No.

Q.   Okay.  So do you recall the first time -- let me start over.  Did you and Lauren have an interview with Rebecca, just the three of you?

A.   We did.

Q.   Okay.  And then the second interview, Lieutenant Frazier was also there?

A.   Yes.

Q.   Okay.  Do you recall in that second interview Rebecca questioning why Lieutenant Frazier was there?

A.   Yeah, I think she did ask since there was a new person there, and I think we touched on that and then she said okay, and then we continued investigating, but yes, I vaguely recall her asking

about a new person suddenly appearing.

Q.   Okay.  And you didn't take that as her expressing discomfort?

A.   No.

Q.   Okay.  Did you believe Rebecca?

MR. SLOVIN:  Object to form.  You can answer.

A.   In what regard?

Q.   That she was assaulted?

A.   By both individuals, one individual?  I mean --

Q.   We can start with Wright.  Did you believe the allegations Rebecca raised against Harold Wright?

A.   We substantiated them.

Q.   From a personal position is what I'm asking.

A.   Yes.

Q.   Okay.  And from a personal perspective, did you believe Rebecca's allegations that she raised against Damonte Brown?

A.   So I feel like this is hard to say yes or no.  I found Rebecca to be credible and I -- individual, in my conversations with her, but, um... But, yes, I generally believed her.

I think it's important to note that like -- so you're asking me from a personal standpoint, right? My job as an HR investigator is to look at the evidence, so I have to separate what I believe personally and what -- how our investigation processes play out, right?

Q. Sure.

A. So I just -- yeah, I think that's -- that's important to note that I -- I have to set personal feelings aside when I look into matters to ensure I can do my job effectively.

Q. Sure. Does it concern you at all that from a personal perspective, you believe someone who sexually assaulted a coworker is still working at the City?

A. So -- I think that's super nuanced, as well. I mean I can believe somebody -- I was not there, right? So I believe her from the stance, like I said, I find her to be a credible person. I -- I think she went through something, you know, bad, but I can't say that I believe every single fact necessarily went like she said in the cases, so I think it's complex, um, and so I -- I can't say with certainty that there is still somebody working in the department who assaulted her.

Q.    Okay.  So do you have a personal belief that what happened between Damonte and Rebecca was consensual?

A.    I don't know.  I wasn't there.  It's like I said, the evidence we gathered, we could not say for sure whether it was or was not, um, so...

Q.    Do you recall Rebecca bringing up the fact that her center console was ruined in the assault with Damonte Brown?

A.    I don't remember her saying it was ruined.  I remember her saying there was some minor damage to it from the incident.

Q.    From her being pulled over?

A.    Correct.

Q.    Did you ask for pictures of that, any substantiation of that?

A.    I don't recall.  We didn't see -- we didn't go physically see her car.  I can't recall if we asked for pictures or for any specifics or if she had since gotten it repaired or not, I -- I can't remember.

Q.    Would that have been important for determining whether she was willingly moving to the back seat or not?

A.    I think based on the rest of the evidence, not necessarily.  I don't know that it would

have changed the preponderance of the evidence either way.

Q. What was the rest of the evidence that was weighing against her?

A. I mean the lack of -- there are no witnesses, there were, um -- we didn't have the credibility issues with Mr. Brown that we had with Mr. Wright. There were no text conversations between them like there were with Mr. Wright. So there was -- while the Wright-Bryant investigation also did not have witnesses to the incident, per say, there was a lot of other factors we were able to -- like to weigh in to come to our determination. Those were not necessarily present in the Damonte Brown-Rebecca Bryant investigation.

Q. Would the center console being bent not have corroborated Rebecca's allegation that she was pulled back with force?

A. Potentially. I -- I can't say definitively.

Q. Okay. Did you talk to someone named Jerrell Brown as part of that investigation?

A. I think his name may -- his first name may be slightly different, but we talked to a Mr. Brown, another Mr. Brown.

Q.    A witness?

A.    Mm-hmm.

Q.    Is that a yes?

A.    Yes.

Q.    His interview is not on the investigation timeline that has been provided by the City.  Do you know why that would be?

A.    I'm sure it was inadvertent.

Q.    Okay.  We also don't have his transcript.  Do you know why that would be?

A.    CFD may not have created one.  I don't know.  Like I said, we -- I didn't personally create any transcripts, so I -- that would be a question for the fire department.

Q.    Okay.  The fire department was the one creating all the transcripts?

A.    From my recollection, yes.

Q.    Okay.

A.    Or at least I personally did not create transcripts.  I guess it's -- so the -- yeah.

Q.    Off the record, we talked about some of the transcripts were --

A.    Yes.

Q.    -- later created by the City, but as far as you know, CFD was creating the first round of

transcripts?

A.    I think so.

Q.    Okay.  And you were present at the Witness Brown interview?

A.    I was.

Q.    Okay.  What did he say?

A.    He -- I mean I can't recall exact details.  I think we did include his information in the report that was authored, but I think -- the question was we talked to him about the actual night of the party and things like that as well as his communication with Ms. Bryant the day following the party.

Q.    And what did he say that communication was?

A.    I can't recall exactly.  I think she reached out to him about the alleged assault from what I recall.

Q.    Did you talk to him about his communications with Damonte Brown?

A.    I think we may have.  I can't remember explicit details, but I -- I think so.

Q.    Okay.  Do you remember that Damonte Brown talked about talking with Witness Brown the next day, the next morning?

A.    Vaguely, but I don't remember details,

but that sounds accurate.

Q.    Would it be important to know what Damonte's take on that conversation was?

A.    I -- without recalling details, I don't -- I can't say definitively.

Q.    I'm just asking because in the interview, it looks like he mentioned talking to Witness Brown, and no one followed up on what that conversation was.  Do you recall that?

A.    Not specifically.

Q.    Okay.  Would that have been a topic that you should have pursued more thoroughly?

A.    I can't say definitively on that without reviewing all of the records and evidence.

Q.    When did the interview with Witness Brown occur?

A.    Like the date?  I'm not certain without checking -- going back and looking at my calendar and things.

Q.    Was it near the end?

A.    No, I believe it was near the beginning.

Q.    Why near the beginning?

A.    We would typically talk to the witnesses before the subject so that we can ask them questions about anything pertinent the witness may have said.

Q. Okay. It looks like you did Keshia Terry and Erica Burks last. Is there a reason for that?

A. That was related to information that came out in Harold's interview, so he named them as people to talk to in like sort of his defense. So we then talked to them. Whereas Brown was given to us by Rebecca Bryant as someone to talk to related to Damonte Brown. So, um, yeah, so that's why -- like we would differ.

Q. Okay. I know this is some time ago. Would it be in your calendar in your phone when you did that interview?

A. Maybe, yeah, I don't know. Are you asking if I could check?

Q. We've been going for more than an hour. We can take a break and you can look if you want to do that.

A. Are you -- I guess are you asking me to do that?

Q. I am asking you to check for the date --

A. Sure.

Q. -- on your phone --

A. I can do that.

Q. -- but we can also take a break if you

want.

A. I can search right now. We don't have to take a break unless anybody else wants to.

(Brief pause.)

Jerrell Brown. So it looks like I have the date in the investigation report that he was interviewed of 1/13/2023. Is that -- do you want me to check my calendar, as well? I feel pretty confident we would have put an accurate date in the report when he was interviewed.

Q. Sure, that's fine. That's fine with me. That's good enough. Thank you.

A. You're welcome.

Q. And you don't recall what Jerrell Brown said about his conversations with Damonte Brown?

(Ms. Mulloy Myers reentered the room.)

A. Not specifically, no.

Q. Is there any reason you can think of why this would be the one interview that was not transcribed?

A. I mean I think that would be an inadvertent error, no reason of substance.

Q. Okay. Did Lieutenant Frazier have input on the conclusions drawn in -- the final conclusions drawn that went into the report?

A.     No, not really.

Q.     Okay.  You say, "Not really."  Did she have any input?

A.     Not that I can recall.

Q.     Okay.  What's been the general response from the CFD towards the Women Helping Women assessment?

MR. SLOVIN:  Objection.  You can answer.

A.     The general response, I think that's tough to answer.  I mean the response I have seen from those I have talked to is that they generally want to make the work environment better and find ways to ensure that no one feels that way in the department that there's any discrimination, favoritism, anything like that, harassment.  So, obviously, I haven't spoken -- you know, there's hundreds of individuals in the fire department, but I have -- I have found like the command staff, things I've talked to are focused on improving the culture to the best of their ability.

Q.     The reason I am asking is because we took Lieutenant Frazier's deposition and she seemed fairly dismissive of the Women Helping Women report. Is that something you've noticed?

MR. SLOVIN:  Objection.  You can answer.

A.     No.

Q.     She said she had never even read it.

A.     I don't think that's necessarily unusual.  I mean I don't think they gave the full report due to like the -- like they didn't send it out like an email blast.  There was a lot of information that -- yeah, I don't think that's unusual, I guess, that she wouldn't have read it in depth, necessarily.  Her -- I think she's moved into a different role, she's no longer the internal investigator, so I don't -- yeah, I've never found her to be dismissive of women's concerns.  I would say quite the opposite in my interactions with her.

Q.     Do you know what her role is now?

A.     I think she is the recruiter, does recruitment for CFD.

Q.     That was Harold Wright's position before, right?

A.     There is -- yes, but it didn't go from Harold Wright to Lieutenant Frazier.  There were other individuals in it.  But yes, at one point in time, Harold held that job, yes.

Q.     Do you think, given the circumstances, that the person in that role should be a little concerned with how the culture of the CFD is presented?

MR. SLOVIN:  Objection.  You can answer.

A.     From Lieutenant Frazier?

Q.     Mm-hmm.

A.     No, I don't think they should be concerned.  I've never found her to present the culture in a way that is, um, negative or false, things like that, so --

Q.     And I asked a bad question, so that wasn't really what I was asking, but that's understandable because I was rambling.

Do you think, given the circumstances of Rebecca's situation, that the person, whoever it is, whether it's Lieutenant Frazier or anyone else, person in the recruiting position should be pretty on top of the workplace assessments that come out?

A.     She wasn't in that role, I don't believe, at the time that the assessment came out, and I -- no, I'm not concerned.  I mean I think that they need to know the general work environment, things like that, but I don't think they have to read -- they're not going to relay in-depth, confidential comments from people to new hires and things.  They need to have a pulse on the department as a whole, but no, I'm not concerned that the individual in the role couldn't speak to specifics of the individuals who responded in the Women Helping Women report.

Q.   This is Plaintiff's 1.

(Off-the-record discussion held.)

(Braido Exhibit No. 1 marked for identification.)

Q.   So this is the report, this first part, the first four pages I think that Lieutenant Frazier said she had not read.

A.   Okay.

Q.   Is this -- what is this?

A.   It appears to be the Executive Summary from Women Helping Women.

Q.   Have you read this?

A.   Yes.

Q.   Okay.

A.   Not recently, but I have.

Q.   Fair enough.  And is this the results of the Women Helping Women workforce assessment?

A.   I believe so.

Q.   Okay.  So this says, "In November 2022, City HR Deputy Director connected with the agency to explore training for CFD."  Did I read that correctly?

A.   Yes.

Q.   Okay.  Who was City HR Deputy Director in November 2022?

A.   So we have more than one deputy

director, but that likely would have been Kelly Carr.

Q.   Kelly Carr?

A.   Mm-hmm, yes.

Q.   K-E-L-L-Y?

A.   Yes.

Q.   C-A-R-R?

A.   Yes.

Q.   Okay.  Thank you.

Is this the training you were talking about earlier, in that second paragraph, that you mentioned I think as an affirmative result --

A.   This second paragraph in the Executive Summary?

Q.   The second paragraph under "Planning and Preparation."  Sorry, I should have been more clear.

A.   Yes.

Q.   That's the training you were talking about earlier when we were discussing --

A.   The initial, yeah, the initial phases were what this is talking about.

Q.   Okay.  Was this done before or after Chief Washington's termination?

A.   This report?

Q.   Yeah.

A.   I think before.

Q.    Okay.  Did this play a part into his termination?

A.    I think so.

Q.    Okay.  If you're on Page 3, at the bottom, there's a whole section about "the problem lies with key leadership, namely the Fire Chief"?

A.    Mm-hmm, yes.

Q.    And in particular, I'm asking is this part of what led to his termination?

A.    Yes.

Q.    Okay.  And it says in there that there's "language and actions that perpetuate a 'boys club' mentality."  Do you see that?

A.    I do.

Q.    Do you find that to be the case as far as your involvement with CFD?

MR. SLOVIN:  Objection.

THE WITNESS:  Should I answer?

MR. SLOVIN:  You can answer.

A.    I think that's -- depends, um -- yeah, I think it depends on the individual.

Q.    Are you saying that there are individuals who perpetuate a boys club mentality in the CFD?

A.    At that point in time, I think that

there were individuals that did, yes.  Whether that continues -- like, you know, I'm not in the department, so I can't say definitively, but I don't -- It's a large department with, you know, hundreds of employees, so I think it's going to vary based on the person.  But at the time, yes, I think there were some concerns that were -- that was at least the case for some of the individuals in the department, not all of them, and that we needed to address it.

Q.    Okay.  Was this report concerning from an HR perspective?

A.    Yes.

Q.    Okay.  And when you got this report, were you of the opinion that something needed to be done to change this environment?

A.    Yes.

Q.    And now is there HR involvement in ensuring that there is a change?

A.    Yes.

Q.    Okay, what is HR's involvement with the CFD in ensuring that there is a change?

A.    So there are HR staff within CFD that work closely with the HR bureau and the assistant chief in that bureau as well as the other staff on a number of things, but, um, I mean some of them would be, you

know, assisting on some of the investigations of complaints that come in.  Myself, specifically, or staff in my section of the department review all their Administrative Regulation 25 investigations, which is discrimination, sexual harassment, so that we ensure that we are in agreement with the findings.  We assist them with training, ongoing training and training compliance in a variety of areas, but one being Administrative Regulation 25, discrimination, sexual harassment, as well as the Women Helping Women training on gender-based violence.

We also assist -- so the fire department has an employee resource group specifically for women in the fire department.  We work closely with them. Our training manager attends all of those meetings and has helped support them and ensure that, you know, that that group continues and is able to give input in areas where it's relevant or appropriate.

Um, I mean, yeah, we -- I mean just more generally like the -- we consult with the fire department on a regular basis, and like I said, on a whole avenue of fronts.  So I can't speak to all of them, but we generally try to have a collaborative, supportive relationship to assist them in their efforts on a variety of things, including the work environment.

Q.    What is the employee resource group that you mentioned?

A.    Women In Fire.

Q.    Who runs that?

A.    The Women In Fire?  I can't -- I mean I don't know all the individual names of who's in the group, but it is run by women that are in the fire department.

Q.    Is there like a high level -- a high-ranking woman that's spearheading it or --

A.    The group has evolved over time, so, yes, I believe so.  I think that -- the name is going to escape me, but -- I can't remember Alexis's last name off the top of my head, but she's a captain of the fire department, she's been involved in the group.  I don't believe she is any longer the captain.

Melissa Arnold was involved at this point in time when the Women Helping Women survey was taking place.  Um, yeah, so it's -- people can join at any time, exit at any time.  It's not like a mandatory thing, it's a voluntary participation in it.

Q.    On Page 4, in that kind of last full paragraph before the conclusions part, it says, "Overwhelmingly, from female participants, we heard that their voices are not engaged or present in

leadership decisions, including promotional panels, and a sentiment of zero confidence and issues of harassment being adequately addressed by the City."  Did I read that correctly?

A.    Yes.

Q.    Okay.  Do you know anything more than what's in this report about the zero confidence and issues of harassment being adequately addressed by the City?

A.    No, not that I can recall.

Q.    Okay.  Has anyone looked into that at all?

A.    Yes.  I mean we've explored it, that's why we've made some of the changes we have in terms of our involvement and complaints and the change in the processes on, you know, how people can submit complaints, things like that, but, yes, um -- I mean this is a -- like there's limited engagement we can do with the individuals who felt that way without short of them coming forward since there was not specific data provided, right?  There was a condition of like anonymity for people to say that.  So we've done our best to dig into that, make changes to address it, but like I said, in terms of what those -- like who those individuals are, I don't think every female in the fire

department participated in the survey, um, but, yes, so we -- we couldn't dig into each specific individual, but we have made changes to try to build up that confidence that they would be adequately addressed by the City.

Q. Sure. Do you know anyone other than Rebecca Bryant and Meghan McQuiddy who have expressed displeasure with how issues of harassment have been addressed by the City?

A. None come to mind.

Q. Okay. Do you think that the Women Helping Women report would have made this claim of a sentiment of zero confidence if they were just hearing that from two participants?

MR. SLOVIN: Objection. You can answer.

A. I don't know. I think that would be a question for them or the survey data of how many participants responded, so I...

Q. Sure. And I'm not --

A. I can't speak --

Q. -- asking you to guess.

A. Yeah, I can't speak to their work product, so I -- yeah, I would, you know, hope it wasn't two, but I, um, I don't know.

Q. Okay. Does this statement that there's

"a sentiment of zero confidence in issues of harassment being adequately addressed by the City," does that suggest to you that there were issues with harassment that were either covered up, not properly investigated, or something similar in the past?

A.    Potentially, but I think that's, um -- I think that would require, you know, a deep dive into the circumstances of where they think they are having issues of harassment.  Was it reported, did anyone witness it, what -- you know, certainly we have complaint investigations of people who are not satisfied with the outcome of the investigation and things, and it does not necessarily mean that we did not address it, right, but you're never -- I have not found a complaint investigation yet where everybody, all parties, subject, complainant, witnesses are all happy at the end and feel that it was, um, you know, landed where they wanted it to.

So I -- yes, I mean I think that overall, it's a concerning sentiment and things, but I think, you know, we have attempted a deep dive and address it and, yeah, like I said, I think it's nuanced and exactly -- whether that meant things are being covered up or, you know, not done properly or whether it's, um, a matter of the outcomes not being the

resolution that was desired.

Q.   Going through some of the -- in the back, there's a spreadsheet with participant -- it looks like there was a survey done and these are the responses.  There seem to be a lot of concerns that, um -- if you'd turn one more page.

There you go.  There seem to be a lot of concerns, just flipping through here, that it's not -- it wasn't appropriate for the City policies.  It didn't -- there seems to be concerns from these people that the training didn't apply to them.  Do you see some of those?

A.   Um, I see a variety of feedback on the training, some saying good things and some saying bad things.

Q.   Mm-hmm.

A.   Is there a specific spot you want me to look at?

Q.   20669, there's -- it says "City" and it has numbers in the bottom left?

A.   Right.

Q.   Or right?  If you're on Page 20669, the very last one says, "I would make this training more tailored to what firefighters experience..."

On the next page, the third one says,

"This course is not relevant to firehouse life..."

A.    Yeah, okay.

Q.    Do you see those?

A.    Mm-hmm, yes.

Q.    And there's a couple more if you carry on.  Do you think that at least that initial training was effective?

A.    I think it was effective in getting the discussion started.  Like I said, this has a lot of, um, I see a lot of positive feedback about it, too, so we're never going to -- we're never going to please everyone or speak to everyone especially with, you know, close to a thousand people taking the training.  So I think it was a good initial step in making people aware of these things.

Q.    Okay.  If you look at Page 20670?

A.    Yes.

Q.    If you go seven boxes up from the bottom, kind of that biggest comment section?

A.    Yes.

Q.    They say, "It's difficult to think that FD is going to take this topic seriously when the fire chief and A of HR walk out and leave during the training."  Do you see that?

A.    I do.

Q.    Who would A of HR be?

A.    I can't say definitively.  I assume it's the assistant chief of HR.

Q.    Okay.  Who would that have been at the time, do you know?

A.    Sherman Smith.

Q.    And would the fire chief still have been Michael Washington?

A.    Yes.

Q.    Does it concern you that they walked out in the middle of the training?

A.    Potentially.  I think -- I mean they are the fire chief and the assistant fire chief, so certainly the fire chief, if called to an emergency, walking out in the middle of the training would be more appropriate than him deciding to walk out because he didn't think it was important.  So I think that's, um, meets -- I can't speak to it without knowing why they walked out.

Q.    Fair.

A.    So, yes, I think it varies.

Q.    On Page 20674, there's someone at the very bottom who says, "In this job (firefighting) there is too much gray areas.  This was not helpful."

A.    Yes.

Q.    Do you think that there's gray areas as far as gender discrimination in firefighting?

MR. SLOVIN:  Objection.  You can answer.

A.    Um, I don't know that they're speaking to that, so -- I think there's gray areas in scenarios, there's not gray area in terms of gender discrimination, like being something we don't tolerate.

Q.    Okay.  Go one more page.  I can't tell if this is the same person or if it's a new one, but it looks like their comments got cut off a bit?

A.    Yeah, yes.

Q.    But, essentially, what we can read is one box says, "introduced by assistant chief who asked a victim of domestic violence (by another CFD member), "Do we all feel safe at home?"  When a complaint was filed, the other assistant chief who was present when questioned was posed lied to cover for his buddy by stating the two had a conversation later that day where the offender stated he had no idea about victim's situation.  Whereas the truth is that the lying/covering chief repeatedly came to victim (as soon as next morning) asking whether or not an apology had been given and questioning why the offending" -- and then it cuts off.  It sounds like there's something going on there?

A.    Yes.

Q.    Do you know who the assistant chief was at that time?

A.    No, because there's -- it doesn't specify the bureau, so --

Q.    There's multiple?

A.    Yes.

Q.    Okay.  Did HR look into that situation at all?

A.    So -- I mean we don't know who these people are, so --

Q.    You couldn't?

A.    I mean I -- to the best of our ability, but, yeah, no, I don't think we could -- actually, the Local 48 contract specifically forbids us from investigating anonymous complaints.  So I -- if -- I can't say that it wasn't investigated, that the person didn't bring this forward outside the Women Helping Women report, that is very possible, but we, um -- I, myself, did not investigate this particular thing without having any identifying information short of like a general title.

Q.    Okay.  And then the next box over, it says, "Hearing this training within the CFD is a joke.  The chief (a known sexual harasser) perpetuates the

'boys club' mentality." Did I read that first part correctly?

A. Yes.

Q. Was it known throughout the City that the chief was a sexual harasser?

A. No.

Q. Okay. As far as you know, was it known throughout the fire department?

A. Well, at what point in time?

Q. I don't know. At any point in time?

A. I don't -- no, I don't believe it was known throughout the fire department or the City that he was a known sexual harasser. I think that towards the end of his tenure with the City, concerns came to our attention through the Women Helping Women and some complaints and we then took action, his employment was terminated. But I don't think that was like a known fact that lingered at the City.

Q. Okay. So if I read on, "Check CFD records. See how many cases of sexual harassment you can find. They hide it all (hide behind the badge). Now, poll the women and you will get a starkly different perspective, where we are all so tired and beat down by the environment with the knowledge that if we press charges or file complaint, nothing will happen

regardless of amount of evidence presented."  Did I read that part correctly?

A.    Yes.

Q.    And then it continues, but it cuts off, so I'm not going to read that half sentence.  Does that concern you?

A.    Yes.

Q.    It sounds at least to me from this commenter's perspective that this is something that's been going on for a while.  Would you agree with that assessment?

A.    That does appear to be her perspective, yes.

Q.    Are you personally aware of anything that would dispute that commenter's information that -- that was provided?

A.    That would dispute it?  I don't -- I mean I'm not aware of cases of sexual harassment that were filed and hidden by CFD against the fire chief, and I -- I don't think a bunch of people came forward and said, hey, I had filed a complaint against chief Washington and it was -- never went anywhere, never heard anything, or it was covered up or whatever.  So I -- I mean disputes it, not necessarily, but I think there, um -- yeah, we -- I mean I don't have specific

evidence that there had been like some coverup scheme for Chief Washington on sexual harassment that was -- had been hidden over the years.

Q. Okay. If you turn to the next page, eight boxes up from the top, again, this is kind of the biggest row, it says, "I highly suggest that the City of Cincinnati legal needs to revisit the sexual harassment policy. I was labeled as disruptive in 2018/2019 by the legal department for reporting sexual harassment." Did I read that correctly?

A. Yes.

Q. Are you aware of that situation at all?

A. No.

Q. Okay. Does that concern you?

A. If it happened exactly like this, it would concern me, yes.

Q. Okay. Did anyone look into that as far as you're aware?

A. Not that I'm aware of. I think there's not really an effective way to look into that.

Q. Okay. On Page 20678, this one also looks like it got cut off, but I'll read what's there. It's the very last one.

A. Okay.

Q. "from the fire department feel that the

fire chief is the biggest problem. City HR and city manager's office is well aware, female membership has informed City HR; brought us in as a PWI.

"Go back seven years to when Washington was AC. There are numerous stories: Wet Willy says it was a case of mistaken identity, but everyone knows it wasn't. He stuck his finger in her ear when he was shaking hands with everyone else. She spoke up about it and it made it to Ed Ramsey and no one did anything about it." Did I read that correctly?

A. Yes.

Q. Are you aware of this situation that it's talking about?

A. I was not in HR at the time, but I -- I am aware of the situation, yes --

Q. Okay.

A. -- that is being discussed here.

Q. Okay. Was there a report of sexual harassment against Chief Washington seven years from before this comment?

A. I can't speak to the dates or like the specifics on --

Q. Okay.

A. -- that.

Q. Was there a complaint about this

wet Willy situation?

A.    I think there -- I think the situation was brought to our attention.  I don't know if the individual filed like a formal complaint, but I -- I think that they reported that he had given them a wet Willy --

Q.    Okay.

A.    -- from my recollection.

Q.    As far as you are aware, was there any action taken?

A.    I think it was looked into.  That is my recollection from a like finding out about it later, not from a being there at the time and looking into it.

Q.    Got it.

As far as you're aware, was there any action taken against Assistant Chief at that time Washington?

A.    I couldn't say for sure whether there was or was not.

Q.    Okay.  And then the first paragraph, do you know what "Brought us in as a PWI" means?

A.    No.

Q.    Okay.

A.    I don't think so.  I'm just trying to rack my brain what "PWI" might stand for, but nothing

popped off that I can think of.

Q. Okay. And then this commenter says, "City HR and city manager's office is well aware, female membership has informed City HR." Do you dispute that commenter's assertion?

MR. SLOVIN: Objection. You can answer.

A. I don't know if -- I don't know if "dispute" would be the right word, but it's -- you know, I don't know what they mean by "female membership". Is that one female or is that every female in the fire department? If it's the entire female membership, yes, I would dispute that. But if they're just simply saying that someone, you know, within this time frame brought concerns to HR's attention, that seems more accurate because we were actively investigating Rebecca Bryant's complaints and the culture as a whole, so I -- yeah, I would say it depends on what they meant by that.

Q. Okay. Do you know someone named George Mezher, M-E-Z-H-E-R?

A. I know that name.

Q. Okay. Who is he?

A. I believe he's an employee in the finance department.

Q. Okay. What do you know about him? I

mean is there a reason why you know his name in particular?

A.    If I'm recalling correctly, I believe he filed a complaint or maybe numerous over the years, complaints against managers he had in the finance department.

Q.    What kinds of complaints?

A.    I think discrimination complaints.

Q.    Were you in charge of investigating those?

A.    No, I -- I don't think so.  I think -- like I said, there were I think more than one.  My recollection is I believe Ron Williams, who is in my section, may have investigated the most recent one, but I'm a little fuzzy on details.

Q.    Got it.  Were any of his complaints related to sexual harassment?

A.    Not that I can recall.

Q.    Okay.  Do you know the name Scott Nicole -- or Nicole Scott?

A.    Yes.

Q.    Okay.  What do you know about Nicole Scott?

A.    My recollection is she is the one who brought the wet Willy incident forward with

Chief Washington and she's also -- yeah, a female firefighter in the department.  So I've heard her name before just generally, but also in relation to that incident.

Q.    Do you recall there being -- her raising an issue with a conflict of interest as far as internal investigating the situation?

A.    No, I don't recall that.  What situation, the wet Willy situation?

Q.    Yes.

A.    Yeah, that would have -- like I said, I don't think I was in HR at the time, so wouldn't have information on that.

Q.    Got it.

Do you know someone named Lawrence Twitty?

A.    I don't know him.  I've heard that name before, but I am drawing a blank on why.

Q.    Do you recall Nicole Scott also making a complaint against Lawrence Twitty?

A.    Not that I can recall.  I don't think the complaint was made with me, so I don't -- that's not necessarily triggering any recollection from me.

Q.    Got it.

Kelly Carr, we talked about her before,

who is she again?

A. She is the other deputy director in human resources.

Q. Okay.

At some point in time, did Rebecca go on limited duty?

A. Yes.

Q. Okay. Do you recall when in the process that was?

A. Not exactly, no. I mean I think it was relatively early on in the investigation process, but I could not tell you exact dates and things. Limited duty is managed by the fire department, so --

Q. Got it. Do you recall Rebecca having an issue with administrative leave during the investigation?

A. Yes.

Q. Can you tell me about that, please?

A. One of our -- Rebecca may have been our final interview or second, I can't remember exactly, but she brought forward concerns about the two subjects being on administrative leave and her being on light duty, and we asked if she would prefer to be on administrative leave, and so then she relayed that she would and we subsequently, I think the next day, placed

her on administrative leave.

Q.   Okay.  Do you know why she was on light duty prior to that?

A.   I don't have a lot of details.  I think she turned in some medical documentation that relayed that she was unable to do full firefighting duties, and was then subsequently moved to light duty as a result of that.

Q.   Was it related to the investigation or the subjects of the investigation?

A.   It may have been, I -- I don't recall for sure.

Q.   Okay.

What do you know about limited duty in the fire department?

A.   Well, it's -- so --

Q.   As far as the rules.

A.   So some of the rules are outlined in our contract with Local 48.  There's -- so there's, um, duty related, non-duty related, and there's different provisions for each in terms of the schedule.  I believe if it's duty related, they work four tens.  If it's non-duty related, they work five eight-hour shifts Monday to Friday, Monday to Thursday if it's duty-related.  Fire department manages that program, so

like I said, I don't have a ton of knowledge.  Once in a while, they'll consult with us, particularly if someone's sent on limited duty for an extended period and things like that, on next steps, but, um, yeah, not a ton of knowledge without specifics on the program.

Q.    Do you know if Rebecca was on duty related or non-duty related?

A.    I think it was initially duty related and then moved to non-duty related relatively early on, I believe.

Q.    Do you know why?

A.    That would probably be a question for Employee Health Services, although I -- I believe it's -- I think you have to have a physical injury for the City to determine like work relatedness, and I don't believe she had a physical injury, but like I said, in terms of definitively, the determination would be our risk management section.

Q.    So are you saying if you have a physical injury, even if you got it off duty, it would be duty related?

A.    No.  So in order -- physical injury would -- could be either.  That, typically, if there is not a physical injury, so if someone is off for like a mental health reason, things like that, that that is

always going to be a non-duty related, I think, typically. I think they follow like the workers' compensation laws and things in terms of like duty relatedness with workplace injuries, and so they require physical injury. And it can also have a psychological component, too, but if there is not a physical injury, I think it's typically considered non-duty related. But they're -- risk management would be able to give kind of the details and nitty-gritty on injured with pay, workers' compensation like determinations on duty relatedness.

Q. Okay. Do you think that's unfair to people who may be in situations like Rebecca?

A. I think that's difficult to answer yes or no on. I think it's, you know, situation dependant, so I -- I don't know.

Q. Okay. Do you think it's unfair in Rebecca's situation?

A. No.

Q. Why?

A. I mean I think Ms. Bryant still -- There are not large changes between the two programs aside from the schedule unless she was being -- pursuing like a claim for injury with pay, things like that, so I don't think there was, um, like harm, I guess, in this

case with the determination on the non-duty relatedness of the injury.

Q.   Are you aware that there's differences with how you can take holiday leave?

A.   Not in depth, but I think that may be in the contract, but I couldn't speak in depth about it.

Q.   Are you aware that Rebecca has had issues with the amount of leave she has in her bank already?

A.   I -- yes, vaguely, I -- When this litigation came forward, that was one of the things that I read.

Q.   Okay.  Do you know who made the decision specifically to move Rebecca from duty related to non-duty related?

A.   I do not.

Q.   Do you know how we could find that information out?

A.   I assume the fire department would be able to relay that, but I'm not certain.

Q.   Okay.  I'm just asking like is there a form that someone would have to fill out to do that, would it be in an email?

A.   To do what?

Q.   To switch her from duty to non-duty.

A.    I don't know.

Q.    Okay.

It is almost noon if you want to take a lunch break.

A.    Can we take a short lunch break?

Q.    Yeah.

A.    I just --

Q.    Do you have a hard stop in the afternoon?

A.    Yeah, around 4:45.

Q.    Okay.  Yeah, let's do a short lunch break maybe until 12:15?

MR. SLOVIN:  35 minutes or so --

THE WITNESS:  Yeah, I can go as fast as you guys want to, so --

MS. RICHARDSON:  12:15, 12:30 --

THE WITNESS:  I'd say earlier the better unless you guys want --

MR. SLOVIN:  Let's say 12:15.

MS. RICHARDSON:  Okay.  Is that fine with everyone?  Okay, we can go off the record.

(Lunch recess taken at 11:38 a.m.)

12:39 P.M.

BY MS. RICHARDSON:

Q.   We will get back on the record.  It is 12:39 after lunch.  We're trying to finish up to get you to your appointment or home, wherever.

Okay, I have a couple follow-up questions from earlier --

A.   Okay.

Q.   -- before lunch.  We talked briefly about the investigation and the different interviews that happened.  Do you recall in an interview, the second interview with Damonte Brown, him being asked if he's experienced any retaliation?

A.   I don't recall specifically.

Q.   Okay.  Is that a standard question that would be asked in a follow-up interview?

A.   No, not necessarily a standard question. We give a standard kind of intro-ish feel where we talk about retaliation and, you know, what it is, that it's illegal, to report it, so -- but we wouldn't necessarily ask in a follow-up interview for every single one of them if they've experienced it.  There likely would be -- would have been some fact that triggered us to ask that, either that they said in an interview or that they reported --

Q.   Okay.

A.   -- that prior to the interview.

Q.   Do you know if Demonte Brown reported anything prior to the interview that triggered that question?

A.   I can't remember.

Q.   Okay.  And then I do just want to ask a couple questions about consent since that was a big issue in the Demonte Brown piece of the investigation in particular.

A.   Okay.

Q.   There was a lot of conversation about how much they had been drinking.  Do you believe that being intoxicated impacts your ability to give consent?

A.   Yes.

Q.   Okay.  There were also statements made by Demonte Brown that he believed it was consensual because there was moaning and it wasn't aggressive.  Do you remember that?

A.   Vaguely.

Q.   Okay.  Do you believe that there could be moaning while it's still non-consensual?

A.   It's possible.

Q.   Okay.  Do you believe that a victim could respond non-aggressively and it still be non-consensual?

A.   Yes, it's certainly possible.

Q. Okay. Was his explanation of why he thought there was consent part of the reason you couldn't substantiate Rebecca's complaints?

A. It certainly went into the determination, um, his statements about consent. Yes, we considered both his statements and Rebecca's statements about that when coming to the conclusion.

Q. Okay. So the result of the Harold Wright investigation was that Rebecca's allegations were substantiated, correct?

A. Correct.

Q. And as a result of that, what was HR's recommendation?

A. Our recommendation was to take the steps for the appropriate corrective action, for him to take corrective action.

Q. Was there a specific corrective action that was being recommended?

A. No, that we would -- the report would not be the appropriate place to recommend that, and he has a right to due process, so we would -- we typically just recommend corrective action, and then the department would move through the steps, and then the hearing officer would make a recommendation. And on the back end, the chief, law, HR all review it and are

able to change the penalty. So if we thought -- if we had an idea of what our recommended penalty was, it would have been that back-end process where we would have ensured alignment with that versus in the front end, saying he should be terminated, right, without him having -- yet had a predisciplinary hearing.

Q. Okay. So the process is you just recommend him to the due process hearing?

A. So kind of two components here. So there's times we do a due process hearing, put someone off on unpaid leave pending a formal predisciplinary process. We don't always recommend a due process hearing. Sometimes we would just recommend a predisciplinary hearing and an employee could keep working or could be on paid leave, it's really going to depend. So there's -- you know, we substantiate much less serious allegations all the time that the person could be at work, they're not necessarily likely going to be terminated, and so we say they should pursue the steps for corrective action, they would go ahead and schedule that predisciplinary hearing if appropriate and things like that.

In this case, we -- there were sort of two things that we were recommending, the -- because we had substantiated it, we thought it was appropriate to

do a due process hearing, we put him off on unpaid leave pending scheduling of a predisciplinary hearing. The contract has certain requirements of how much notice you have to give before that, so we can't turn around and schedule that like the day after a report comes out, for example. So -- but because we -- substantially, we felt, hey, we don't need to continue paid leave due to the substantiation, let's do a due process hearing, put him off on unpaid leave, work on getting all the parties scheduled for the predisciplinary hearing, and then that subsequent process would play out for the recommendations and subsequent corrective action that comes out of that.

Q. Okay, thank you.

Do you recall what happened with Mr. Wright?

A. I do.

Q. What happened?

A. So the report substantiated Rebecca's allegations. We recommended corrective action and to move forward with a due process hearing. Those due process hearings are handled typically by the fire department in consultation if they need us for guidance, things like that, but they usually -- we're not even present for a lot of those. So we said, hey,

fire department, initiate that process.

They reached out to Harold to say, hey, you need to report in for that hearing. We did not hear back. Like I think there was some phone, voicemail, that type of stuff, and did not hear anything. And so we said we'll continue trying, and if worse comes to worst, we'll just go ahead and schedule the pre-D right in and do the administrative leave.

Within like 24 hours I believe it was, the day after, we -- the City attempted to contact him to have him report in for a due process hearing, he showed up to the fire department -- I found this out via a phone call from Lieutenant Frazier who was concerned about the fact he was in the building and said, hey, I think -- he's here, we can now serve him in person with that due process paperwork and get that process started.

So I went up to the fourth floor -- we're on the second floor in the same building -- but where he was, to ensure that Lieutenant Frazier and I served that paperwork together. So we went in to call the union and said, hey -- Matt Alter was the union president at the time -- and said, "Hey, my understanding is that Harold Wright has shown up in the building. We would like to hold a due process hearing

as soon as you can get here, please come in."

And he said, "Okay, I'm on my way" -- he was still at his home, so he said, "It will be about a half hour."

(Mr. Kolenich reentered the room.)

A.   We then went into the office where he was seated and said, "Hey, here is this paperwork. Your union is on the way.  We're doing this."

And he said, "I'm retiring."

And we said, well -- so and this is -- this was a, um -- so, typically, I don't deal with retirements within the fire or police department.  The city's retirement system has like a waiting period, and so I didn't -- fire's to, um, I -- because I hadn't dealt with that, that was new to me.  So we said, well, we're going to go ahead and continue this due process hearing and scheduling of the pre-D, thinking there was a waiting period for the retirement.

Then the district chief at the time who was in charge of it said, no, they can retire effective immediately with our pension system.  So we then -- Lieutenant Frazier and I then contacted the prior district chief of risk to verify and fact check that. He said, yes, that is the case.

And I think at that -- during that

conversation, Mr. Wright had contacted his private attorney who called and said like, well, I need to be there for the due process hearing, you can't hold it, he's retiring anyway.

The union arrived during this and things and they said, hey, there's nothing -- the fire department said we -- he can do his retirement paperwork, he's doing it, so he's effectively retired now, so he's no longer employed to hold this due process hearing or to schedule this predisciplinary hearing.

Q.    Okay.  Did the City have concerns with how that played out as far as you're aware?

A.    Um, I mean -- that's complex.  So I think the City -- I mean the City of -- how do you say that, an employee, right, we would have taken active steps to address this.  I think the, um -- we aren't able to interfere in someone's retirement rights, right, so I don't think there is a way that we could have done it differently, to terminate him or do anything otherwise rather than let him retire.  So I -- Is it frustrating?  Certainly to some degree, with the subject matter and things, and I certainly understand, you know, Rebecca's frustration on it, but I -- I don't know if concern would be the right word for how the

process played out.  I think that, you know, that's how their pension system works for better or worse in terms of retirement, so I certainly understand his decision to retire, as well.

Q.   If he had gone through with the disciplinary hearing and been terminated, would there have been a difference in how he -- essentially, his benefits?

A.   I can't say for certain.  I don't believe so.

Q.   Okay.

A.   Um, but I -- the pension system will have to confirm definitively.

Q.   Okay.

A.   But I don't think they reduce their benefits that I'm aware of.

Q.   Okay.

Do you know anything about the polygraph issue that Harold Wright was involved in?

A.   Not really.  I mean I'm aware that there was an issue and there was an investigation.  He was promptly on leave during that and returned, but I couldn't speak to too many details about that, no.

Q.   Okay.  Do you know who in HR was involved in that, if anyone?

A.    I don't think HR was the one involved. I think that was -- I think the Cincinnati Police Department looked into it or -- yeah, I don't think we did a human resources investigation, but I am not certain.

Q.    Okay.

Who is Mollie Lair?

A.    She is the communications director for the City.

Q.    Okay.  M-O-L-L-I-E L-A-I-R.

And who is Ben Bruninger?

A.    He is the deputy director under Mollie Lair at the communications --

Q.    Okay.

A.    -- section of the City Manager's office.

Q.    And that's B-R-U-N-I-N-G-E-R.

Lateesha (phonetic) Hazell or Hazel?

A.    Latisha, Latisha Hazell, she is currently our HR director.  So I think she -- she was the HR director after Ed Ramsey and the interim director, so I don't know what capacity she was in there, but that's her current capacity.  She may have been a deputy director at that point.

Q.    Okay.  She has since replaced Ed?

A.    Yes.  So, yeah, she was in my -- in the

deputy director role when Ed was a director and I was division, and so then, yes, we subsequently moved into those roles, so I...

Q.   Got it.

We talked about Arian Hall before.  Is she involved in HR?

A.   No.  She doesn't work for the City any longer, but she was their finance manager at fire.

Q.   Okay.  And what about Shante Capel?

A.   She worked in the finance section underneath Arian Hall.

Q.   Okay.

A.   She was a supervisor in finance at fire.

Q.   Do you remember there being an issue with Rebecca's PTO allotment --

A.   Yes.

Q.   -- as she -- Oh, okay.

A.   Vaguely, yeah.

Q.   Okay.  Do you recall what that issue was?

A.   My understanding is there was -- so she, prior to being put on administrative leave, when she was on light duty, she then went from light duty to taking some leave under -- I think it was I think FMLA leave.  And so there was a question about her remaining

balances. I think she was trying to figure out when she would go into an unpaid status. The -- so how our system works, the HRS system has a section with your leave accruals, and so that would be like if I was checking someone's leave balances, that would be the most up to date as of the pay period that has not yet been processed.

So I -- we just -- Bryant reached out to me to ask about her leave balances to try to identify when she may go unpaid. I sent her those. I think there was a -- maybe a lapse in communication between the two of us, so she did not realize that the pay period she was in, that that leave would be -- you know, that that would not yet have been deducted because we were within that pay period, if that makes sense, but -- so she was thinking I have those as of today, not recognizing that, well, I've used about a week and a half of those that won't show any future paychecks which will then remove those balances from the HRS system, if that makes sense.

So I think the discrepancy was the number of hours would have been a pay period or less, and that is the -- that's kind of where the miscommunication came in was she thought she was in a paid status longer based on that screenshot from our

HRS system, and that captures a point in time, wouldn't have captured a future payroll that we were in.

Q. Okay. Were Arian and Shante involved in that discussion?

A. I don't think that discussion. They were involved later on when we were doing replacements of leave balances, but in terms of -- and this -- my reflection is not, you know, it's been a little while, but was that this was prior to that decision, this was -- this was before we put her on admin. leave and we're saying, oh, we'll recoup balances and things. It was during that initial leave period, and this discussion was just her and I. I said, "Here's what's in our risk system," and took a little screenshot from it to determine that. So I don't recall Arian or Shante being involved in that, no.

Q. Got it.

(Braido Exhibit No. 2 marked for identification.)

Q. Do you recognize Exhibit 2?

A. It looks like an email between myself and our public records custodian, Chelsea Milligan.

Q. And it's asking for a sexual violence summary?

A. Yes.

Q. You say in your email you don't know what that is. Did you ever figure it out?

A. No.

Q. Okay. Were there objections to what was produced?

A. I don't know.

Q. Okay.

A. I'm not sure.

Q. Was the investigation into Harold Wright concluded in March of 2023?

A. Without seeing the report, I can't say for certain. I think there was a little -- I don't think they were released the same day, Demonte Brown and Harold Wright, so I can't remember if Harold's or that was Demonte, I'm not sure. Um, ballpark that time frame, but I -- without seeing the date on the report, I'm not sure.

Q. Okay. Who's Steven Bretfelder (phonetic)?

A. Breitfelder. He is an assistant chief in the fire department.

Q. Okay. Was he at some point interim chief?

A. He was.

Q. Okay. Is he a lawyer?

A.    Not that I'm aware of.

Q.    Okay.  Would you have for any reason been giving him legal advice?

A.    I hope not.  I mean I may have given him what he, uh -- something he counted as, hey, this is advice, but not, you know, not legal advice.  I think he, uh, I feel confident Breitfelder would say that he did not receive legal advice.  I may have given him consultant advice, though, certainly, in his -- so he was -- not only was he the interim chief for awhile, but prior to Sherman Smith, he was the HR bureau assistant chief, so we've worked together in several capacities.

Q.    Okay.  The only reason I'm asking is part of an email from you to him is redacted and I just don't know if that was why.  Do you have any idea why that would be?

A.    I'm assuming it had confidential information maybe related to HIPAA or, um, or something that was an investigation report -- yeah, I'm not -- certainly without seeing the email, still might have to actually see the full unredacted email, but I -- my guess if it's -- it would be legal advice, it would likely be HIPAA protected.

Q.    Okay.

(Braido Exhibit No. 3 marked for identification.)

Q. Do you recognize Exhibit 3?

A. Yeah, it looks like an email between myself and Interim Chief Steve Breitfelder.

Q. Do you typically talk about OCRC complaints with the head of whatever department that employee is in?

A. It depends on the complaint. I mean it's -- if they have pertinent information, potentially, um, I don't think it would be uncommon to alert -- like the department may know that one has been filed and then we would reach out to the appropriate individuals for records and things, so -- yeah, so it's -- it's going to depend on the complaint, and the level of information shared may just be, hey, this exists, right? Versus, oh, here's the subject matter, that kind of thing. Department heads may also assist in like if the department themselves have responsive records, that the law department might -- even things in -- in making sure that that's happening in a timely manner.

Q. Okay. Is it typical for a head of a department to ask you about OCRC complaints, about the status of them?

A.    I don't know if "typical" is the right word, but it's not like -- it's also not unusual.  They may -- I mean HR and law work very closely together, they -- the law section, um, most of those that have come out, you know, there often can be background I have or an investigation we have done that maybe, you know, that they then took that step afterwards.  So department heads, you know, they -- they reach out to me, they may reach out to law, um, you know, some of them like may not necessarily know who to reach out to, so they're just reaching out to someone they know that has -- works in that realm, I guess.

Q.    Did you find it odd that he asked about the OCRC complaint in conjunction with Rebecca's leave status?

A.    Uh, no, not really.  So there were some conversations with, um, as he was taking on the role of chief and things, Assistant Chief Breitfelder was -- I think had a great deal of concern in ensuring a smooth transition for Rebecca and wanted to -- like if she was coming back, he wanted to monitor to make sure things were going smoothly and that they're, um -- and so I -- I don't think he was necessarily it was correlated that like one's related to the other, it was more of a global question because he was -- um, he did try to

keep in contact to make sure that he could -- if she was to return, like I said, he could make sure she is being supported.

Q. Is he still the chief?

A. No, he's -- he is not.

Q. Who is the chief now?

A. Chief Frank McKinley.

Q. Has he asked similar questions about status?

A. Uh, no, not -- no.

Q. Okay. Has he expressed to you an interest in ensuring Rebecca is supported?

A. So he's -- so I would -- we don't have -- we have not had too many specific questions about Rebecca because when he came in, this would have been progressed to where, um, there's some time period that was removed, so there wouldn't really be a reason for me to flag and get into these details, you know, for the sake of confidentiality, um, so he might -- so he generally is -- has conversations about ensuring he can support employees as a whole, but he hasn't asked me about Rebecca specifically that I can recall. He's -- our conversations are more just him ensuring that he's supportive of the work environment for everyone.

Q. Okay. What kinds of conversations are

those that you have with him?

A. I mean I talk to the chief about so many things, I, you know, I -- I do our -- I mean I do our labor relations too, so we might -- you know, we have conversations from everything as far as like grievances or a union issue or contract questions to, you know, consultation on investigation reports or, um, a whole gamut of things, so it's -- we have regular correspondence.

Q. Do you talk about gender discrimination with him?

A. I mean if there are -- I can't -- not that topic specifically, that's not like a standing topic we talk about. If he were to bring a concern about it, we would discuss it, but I can't recall any specific times he has reached out to talk about gender discrimination specifically.

Q. Has he talked with you about the results of the Women Helping Women assessment?

A. Not in depth. I mean that would have been something that he would have been briefed on when he came in as the chief to ensure that we're continuing the work to, you know, provide a supportive environment for all of the fire employees, but it's not like a regular topic of discussion now with him, no.

Q. Okay. And he says in here, "Have you had any contact with her regarding her RTD, at least in a LD status?" "RTD," does that mean return to duty?

A. Yes.

Q. And "LD," does that mean limited duty?

A. Yes.

Q. Or light duty?

A. I think they call it limited duty at Fire, but we use them kind of interchangeably, other departments call it light duty, but yes, it would have been limited duty.

Q. Okay. What is your understanding of limited duty in the fire department as far as the rules that go along with it?

A. I don't know that I know more than what we talked about earlier. I mean there's the -- like I said, they've got limited duty for both those injured on duty and who are not. The -- I know that, like I said, the schedule nuances between the two, um, and not a great deal else I can think of. Like I said, fire department manages it, so they are usually reaching out more so to determine if they're at a point where maybe someone's been on extended limited duty and they need to work on transitioning back to full duty or looking for an ADA accommodation in some capacity.

Q. Okay. So is limited duty used as a preliminary ADA accommodation?

A. Essentially, yes.

Q. Okay. So do you recall that one of the rules about being on limited duty is you can't work a second job? Are you aware of that?

A. I have heard that before, but I can't say definitively I know where that's in a policy and things, but I think fire has mentioned that, yes.

Q. Okay. And that makes sense in the sense of if you're injured physically, you want to be healing, right?

A. Oh, I would say if you're on limited duty and you're injured period, you would want to be healing even if it's emotionally or mentally, um, but yes, certainly physically, that too.

Q. Would you agree with me that ADA accommodations are made on a case-by-case basis?

A. Yes.

Q. Okay. In Rebecca's case, was there anything that would have concerned you about her continuing to do a second job?

A. It depends on what the second job is, I think. I mean I would -- I guess the concerns, you know, it -- there's a City policy that requires you to

report secondary employment regardless of your duty status, so I mean the question would be did she alert us and -- and then if we are going to make a determination to go outside the limited duty policy, right, I think we would have to know and then we -- we'd look at the fact specifics, right?  If it -- I would say if the job -- if you have work restrictions and the job specifically violates those, we'd have concerns about that secondary employment.  If it didn't, I think then maybe it would -- you know, that might be a little different if it was you're working as a cashier, right, like -- and you can't do full firefighting, probably not a lot of interaction there, so I think it would vary based on like whether she told us and whether the second job was interfering with any restrictions she had and why she's not doing full firefighting for us.

Q.   Okay.  So as far as you're aware, there are circumstances where it would be appropriate for her to continue to have a second job?  As a possibility, at least?

A.   I think we would entertain it.  I don't think the fire department -- I do think they say no, but most people aren't coming and saying they want to work a second job, so I think if a person were to

approach us and say, hey, I'm thinking about secondary employment, can we talk this through, because of the case by case basis nature of ADAs, that we would certainly be willing to engage in that dialogue.  And it's -- yeah, would depend on all those other factors I just kind of went into.

Q.    Okay.  Is that something that is made known to firefighter employees?

A.    Which piece?

Q.    That it's possible to negotiate some aspects of limited duty to --

A.    No, I mean I wouldn't call it negotiating certain aspects.  They have to comply with the contract and the fire department policies, so we're not advertising like please ask us to go outside the policies, right?  But if -- we're certainly also not ogres where we don't recognize that there could be situations where it's worth talking through whether the policy -- you know, there could be nuance there.  And so I -- they're not saying yes, please go get a second job because, typically, our -- it is going to be a no, we want you to focus on healing and getting back to working for us, right, so particularly because we're paying you to do a limited duty assignment that maybe isn't, you know, is not your major duties per se.  So,

no, that's not advertised, I don't believe.

Q. Okay. Did anyone ever speak to Rebecca about that as far as you're aware?

A. I don't know. I didn't speak to her about it because I am not aware of her having a second job, so, um, I'm not sure.

Q. Okay. Are you aware of any current retaliation that Rebecca has experienced in the workplace?

A. No.

Q. If Rebecca reported that her male colleagues are telling her that they do not want to work with her because they can't be men around her, would that be concerning to you?

A. Yes.

Q. How so?

A. We would want to look into that. Rebecca has not told me people are saying that, so I'm not aware of a complaint into that, but I -- I mean I think that we would want to investigate adequately of whether people are saying that to her.

Q. Would it concern you if there are male colleagues who refuse to work with her completely?

A. Yes.

Q. Would it concern you that that's

potentially retaliation?

A.    Uh, potentially.  We'd want to investigate to see if that was the case, but --

Q.    Sure.

A.    -- we'd certainly want someone to bring that to our attention to look into.

Q.    Would it concern you if Rebecca has had to request multiple times that the schedule be changed so she and Damonte aren't working together?

A.    Um, it depends.  So I -- I think our -- we recommend it to the extent possible, right, for separation for the employee's sake based on the subject matter.  I mean the complaint was not substantiated, so I don't think there's a way like that we have to follow the contract, things like that.  So it is very possible they could get scheduled on overtime together and I -- so if we were purposely scheduling them together, that would concern me.  But if it's happening due to them signing up for overtime or the way that the scheduling and shifts work, I mean all of that is pretty strictly mandated by our contract, that I think would be a little different than the scenario of them purposely scheduling and placing them together if she's expressed discomfort.

Q.    Has leadership in fire been briefed on

trying not to schedule them together?

A.    I mean leadership at the time when the report came out were certainly briefed.  I can't speak to all -- you know, all their -- they've got a lot of shuffling and things there, so -- I mean there are still like -- I think he's, um, in the process of retiring, but for the majority of the time, Assistant Chief Breitfelder, like he has remained in that rank and he was familiar with the case and things.  So, yeah, I can't speak to the extent they have passed some knowledge, but there was, of course, an initial briefing when the report came out, we talked through it and the recommendations that we had with leadership at the time.

Q.    Okay.  Who is Natasha Hampton?

A.    She is a former assistant city manager.

Q.    Okay.  Do you recall her asking you to pull disciplinary information from CHRIS?

A.    I do.

Q.    Why did she ask for that?

A.    Um, I think it was -- it was not in any way related to the fire department from my recollection or Ms. Bryant, it was -- so she reviewed, um, so our process after it goes to the department head, it goes to HR, it goes to law, and then it goes to the

appropriate authority. For those -- so the assistant city managers sign off on the discipline or review it for those that, uh, department directors report to them. So she was reviewing a great deal of discipline because she was over our Public Services Department, and so she wanted to ensure she was -- she was, um, trying to be thorough and wanted to ensure that she was being equitable on her signing off on some disciplines. I think they were attendance related if I remember correctly, but, um, so she -- she wanted more global -- she was also new to the city and the process, she had come from a different state, things like that, so she wasn't an internal city employee. So she was trying to get up to speed on kind of our discipline processes and how she fit in, like I said, making sure she was doing a fair and thorough job. So she I think asked for some records related to a case that I -- like I said, I think it was in public services, but I'm not certain.

Q. Okay. What is AR55 violation?

A. AR55 is our workplace behavior policy.

Q. Okay. Do you know someone -- do you recall someone named Mr. Reynolds?

A. Do you have a first name?

Q. I don't, I'm sorry. You just call him "Mr. Reynolds".

A.    Without seeing the email, I'm not certain.  That's a relatively common name at the city --

Q.    Yeah.

A.    -- so I may be able to speak to it if I saw it.  Without seeing it, I'm not sure.

(Braido Exhibit No. 4 marked for identification.)

A.    My recollection is it's a Metropolitan Sewer District employee.

Q.    Okay.  And you said AR55 is behavior violation?

A.    Workplace behavior.  So it's sort of our general -- more general like -- I won't call it catchall, but policy related to just your conduct in the workplace.  So, you know, professionalism, profanity, you know, bullying, but that doesn't rise to the level of an AR25, right?  So something may like -- so it may be treating employee poorly, but it's not based on a protected trait or gender, things like that, they're just, you know, being a jerk, and so that would trigger our AR55 policy.  So it's got -- it's a pretty big umbrella, so it's one we would have had a lot of complaints under, but, that's, yeah, it's --

Q.    Got it.  And when you say, "AR25," is

that specifically a discrimination --

A. Discrimination and sexual harassment.

Q. Okay.

A. Yes.

Q. Okay. If you go again, the City 15881, those numbers, the first one on here is about a Tyrone Fields.

A. Yes.

Q. And in the explanation part, he allegedly was shouting, "'Fuck that bitch,' referring to Service Area Coordinator Carolyn Jackson. Another employee, Jacqueline Floyd stated you" -- meaning Mr. Field -- "continued shouting, 'Fuck all those bitches, especially them two punk ass bitches.'"

Does that strike you as something related to gender?

A. Yeah, we may have looked -- so -- and I -- this employee's name, all these employees' names, they are, um -- there has been a series of discipline investigations, counter-complaints, lots of, um, looking into the behavior and things. So it likely was looked into under that lens. And I will say this is our Public Services Department employee, they tend to write very long -- like they're not our strongest on corrective action paperwork and so they input a lot of

information that maybe is not where he landed on what was substantiated. So, yes, it was likely looked at under various lenses and then substantiated, or, also, our system is a little, um, is a little clunky in that if you have a discipline for multiple infractions, you have to put multiple injuries in versus allowing you to pick several different things. So sometimes you'll see the same offense, but it's in there like -- and so he may have been found to -- I can't remember exactly because they're frequent flyers, but there may have been multiple charges and they may be in the system multiple times, but it wouldn't be in this report because it only has 55 violations.

Q. Got it.

A. Yes.

Q. So if you pulled a similar report for AR25, it's possible the same --

A. Yes.

Q. -- entry would be in there?

A. It is possible, yeah.

Q. Okay.

A. I don't remember if we substantiated that this whole thing happened or just a very limited piece of the fact pattern, but yes, it is possible that that is the case.

Q. Got it.

MS. MULLOY MYERS: Can I interrupt? I think you guys need to try to slow down.

(Brief, off-record discussion held.)

Q. Do you recall -- is it Latisha or Lateesha (phonetic)?

A. Latisha.

Q. Latisha. Do you recall Latisha asking you a similar question about gathering a snapshot of citywide discipline for the past five years?

A. She very well probably did. I don't -- can't really recall rationale without seeing further --

Q. Okay.

A. -- documentation. But that's -- I mean that's not uncommon, we're -- you know, we have a great deal of discipline, so it's -- you know, we try to look at it regularly.

Q. It's normal for the department to pull year-long periods of discipline to go over them?

A. For -- depending on -- I mean the scenario and things. Like it's not uncommon to get a request to look at specific discipline areas from Latisha or some city manager, things like that. We do try to do like regular checks to make sure we're being equitable in things across the board and across

departments.  Even though we see them in HR, right, there's a great deal of them, so we do our best to spot check and things, but I -- like I said, I'm not certain why exactly she asked for it, but that's not -- doesn't seem that unusual.

Q.    Okay.  What does "HRL" stand for?

A.    Human Resources Liaison.

MS. RICHARDSON:  Let's take a quick five- or ten-minute break just so I can go over things, but I think we're wrapping up.

THE WITNESS:  Okay, great.

(Break taken:  1:24 to 1:33 p.m.)

Q.    Just a couple loose ends.  Were you involved in any investigation into Mitchell Ervin?

A.    Erv Mitchell?

Q.    Erv Mitchell, Ervin Mitchell, sorry.

A.    Uh, no, the investigation was done by internal investigations.

Q.    Okay.  When you interviewed Rebecca, was she visibly emotional?

A.    To varying degrees.  We had one -- I don't remember if it was a second or third interview, um, I think it was a second, but I'm not certain, where she became very emotional and we stopped the recording because it did not feel -- it felt like it had gotten

into territory that wasn't really relevant to the investigation, and so we wanted to, for her privacy, allow her space and time and to talk through how we could support her, so -- so, yes, I mean she -- there were times that she was -- I won't say not emotional, but like more kind of even-keeled and other times where she would, um, you know, was a little more upset and emotional.

Q.    Okay.  And then I'm just going to hand you a couple quick exhibits.  I don't really need to go over them, I just want to ask about the handwriting.

A.    Sure.

(Braido Exhibit No. 5 marked for identification.)

Q.    On Exhibit 5, is this your handwriting?

A.    No, I don't -- I don't think so.

Q.    Okay.  Do you know whose it is?

A.    I do not.

Q.    Okay.  Would the City have retained copies of this if it were Matt Alter's handwriting?

A.    I don't know.  I mean the -- I typically, like HR wouldn't retain notes from union officials, but I don't know if there's a possibility CFD does that in their internal investigations.  I personally didn't retain any -- that I can recall, any

notes from the union, from Matt Alter.

Q. Okay. And do you know one way or the other if this is Lauren's handwriting?

A. I'm not sure.

Q. Okay, that's fine.

And just I recognize your answer is probably going to be the same, but just so that it's on the record --

(Braido Exhibit No. 6 marked for identification.)

Q. -- do you recognize this handwriting?

A. I do not.

Q. Okay.

A. Looks like it's probably the same person as the other handout, but not sure who wrote these.

Q. Okay. So same just -- I know this is tedious, just same question, do you know whether or not this is Lauren's handwriting?

A. I do not.

Q. Okay. And if you look at the top, Matt Alter didn't attend this meeting, correct?

A. Not that I recall. I -- I don't think he was at the majority of them, but I will say this -- I typically -- I likely filled out like some of this form, not the handwriting, and so I do this prior to

the meeting. I can't say I'm always perfect -- like perfectly accurate, go back if somebody showed up I wasn't expecting, so don't take that as gospel, but I don't -- yeah, I don't recall him being in that interview.

Q. Okay. Would it be typical if -- obviously, Matt Alter was the union president at the time, correct?

A. Yes.

Q. And if you look at the previous exhibit, do you believe he was there representing Jerrell in his union capacity?

A. Yeah, if he was -- if he was there, it would have been in his union capacity --

Q. Okay.

A. -- for any of the interviews, but, yeah, it's possible that -- the recording, we would have went around and done introductions, so that would be a better indicator of who was there. Because like I said, it's possible that they may have also sent someone besides Matt, and that because I didn't know who would be present, the coordination of the interviews, a lot of those CFD insisted with because of their weird -- you know, their schedules are a little different than ours, and so they would have been able

to see on their scheduling software that we don't have access to, oh, you know, Damonte's schedule, things like that like -- and Jerrell.  So all that to say that I may have put who I knew was going to be there and then there may be the -- somebody who introduced themselves on the recording from the union.

Q.    Okay.  Would it be typical for Matt to represent multiple different employees in an investigation in his union capacity?

A.    Yeah, I would say so.  I mean they sometimes divvied up amongst the board, there's five of them, but I wouldn't say it's unusual that he may be there for multiple interviews and that -- in representing multiple members.

Q.    Okay.  And, again, I'm sorry that this is tedious.

A.    Okay.

(Braido Exhibit No. 7 marked for identification.)

Q.    Do you recognize the handwriting in Number 7?

A.    No.

Q.    Okay.  We don't have to go through all the questions on that then.

(Braido Exhibit No. 8 marked for

identification.)

Q. There's some handwriting later on in Exhibit Number 8. Do you recognize that handwriting?

A. No.

Q. Okay.

MS. RICHARDSON: I believe those are all my questions. Jim and your attorneys may have some questions for you in follow-up.

CROSS-EXAMINATION

BY MR. KOLENICH:

Q. Good afternoon.

A. Good afternoon.

Q. My name is Jim Kolenich. I represent Harold Brown -- or Harold Wright, excuse me, and Damonte Brown.

Could you briefly describe how the City goes about -- I understand you substantiated a claim against Harold Wright.

A. Yes.

Q. If you recall -- and it's okay if you don't -- what information led to the substantiation?

A. Uh, yeah, I mean I recall from a -- kind of a high level. It was related to we weighed not only the interviews with the employees, but a series of text messages that were exchanged between Ms. Bryant and

Mr. Wright, as well as looking at credibility. Mr. Wright had authored a Form 47 that indicated he had stopped corresponding with Ms. Bryant at a specific point in time. He reiterated that during the interview, and we had hundreds of communications between them after that. So that was weighed from a -- his lack of honesty went into it as well as the text messages and the general fact pattern between the two.

Q. Okay. So you determined that she was more credible, at least generally, than he was during the investigation?

A. We did, yes.

Q. Did you ever get to the bottom of -- I understand that she went to his house and played pool for clothes for lack of a better way of describing it. Did you ever get to the bottom or establish how it is she came to remove all her clothing at his house?

A. Um, I mean I don't recall specific details. I think it was the pool was like strip pool I believe is what one of them called it, and so it was when, you know, if you were losing or lost, that you took an article of clothing off, but I can't remember all of the details surrounding that.

Q. That's okay.

Did she ever allege that she didn't

voluntarily engage in this activity?

A.    Yeah, I think she -- I think, yes, I believe she alleged that it was, uh, she felt there was some coercion there, that it was -- that she suggested an alternative and he pressed that it be her clothes.

Q.    Okay.  Do you recall the alternative that she suggested?

A.    I think it was dollars, but I --

Q.    So money as distinct from clothes?

A.    I believe so.

Q.    Okay.  And the general pressure that she alleged was -- and again, if I'm not mistaken, connected to her employment or being hired onto the fire department?

A.    Yes.

Q.    So she believed that she had to cooperate or else she wouldn't get a job at the fire department?

A.    Yes.

Q.    What -- you may not know this off the top of your head.  Do you recall when she was actually hired onto the fire department?

A.    I can't remember the exact date, but I know that actually hired was after the incident we were looking into --

Q. It was after the incident.

A. It was.

Q. And who makes the final hiring determinations for the fire department?

A. I believe it's the fire chief, although there are several, um, like there's background checks and employee health screenings that could disqualify someone. If they pass those, I believe it's the fire chief who makes that determination in conjunction with consulting senior leadership.

Q. Okay. So as part of your finding of substantiation against Mr. Wright, were you able to determine when he -- when was his final input into this process? When was there a meeting where he recommended her or didn't recommend her?

A. I don't recall exact dates. I recall there was a factor where he, um, there had been some type of meeting prior to the incident with him and that he relayed to Ms. Bryant that he -- that, essentially, they did not want to hire her and he had spoke up for her and said that they should do so. But at that point, there was still I think some remaining steps, maybe the employee health screening and things. From that meeting, the incident occurred and there were still those steps, and then the final offer letter. So

it was, uh, I think there had been a meeting about the contingent offer which he allegedly relayed that he helped, um, gave input to the fire chief that she should be hired.

Q. Okay. So to your knowledge, does he have anything left to do after he gives that input? In other words, as to the remainder of the steps, the health screening and all that, is he involved in that in any way?

A. I am not sure. I don't know if he had any help in the coordination of those things, um, yeah, I don't know.

Q. Okay. And lastly, do you know if he can withdraw his recommendation at any point in this process?

A. Yeah, I think he could withdraw his recommendation, yes.

Q. And would the chiefs care at that point?

A. They'd have to speak definitively, but I would -- I would think, you know, they put him in the recruitment role and tasked him with that kind of overseeing that process, so I would imagine his opinion would carry some weight.

MR. KOLENICH: Okay. Thank you very much.

MR. SLOVIN: Kelsey, you have the right to read your transcript --

MS. MULLOY MYERS: Hold on, we haven't --

MR. SLOVIN: Oh, okay, I'm sorry.

MS. RICHARDSON: I'm so sorry.

THE WITNESS: No, no, no, that's okay.

MS. RICHARDSON: I thought you were going to have questions.

THE WITNESS: We're still way ahead of schedule of what I expected.

RECROSS-EXAMINATION

BY MS. RICHARDSON:

Q. I just have one follow-up question for you.

A. Yes.

Q. Is it typical for recruits in the firefighter process to know the exact decision-making behind the scenes in the fire department?

A. I wouldn't think so, no.

Q. Okay.

A. I think we share the process from a more global aspect, they know how the screening and the background check and the order. I don't know that we're typically telling them here are the exact people who are making those decisions on your employment, no.

Q. Did Rebecca ever indicate to you at any time in the investigation that she was aware that Wright may not have had further input on her --

A. No.

Q. -- employment? Okay.

That's all my questions.

MR. SLOVIN: Okay. We have no questions.

You can read your transcript if you want for accuracy or you can waive that if you don't wish to review it. What do you want to do?

THE WITNESS: I can waive it. I don't need to read the whole thing.

MR. SLOVIN: She'll waive signature.

THE COURT REPORTER: Okay. Do you wish to order this transcribed?

MS. RICHARDSON: Yes, please.

THE COURT REPORTER: Do you want to order a copy?

MR. SLOVIN: Yes, please.

THE COURT REPORTER: Okay.

And also you, Mr. Kolenich, do you --

MR. KOLENICH: Are we still splitting?

MS. BARON: Oh, I don't think on this we

are.

MR. KOLENICH:  This is a copy, right?  I mean --

MS. BARON:  Yeah.

MR. KOLENICH:  Okay.  Yeah, I'll order a copy.

THE COURT REPORTER:  You want a copy? Okay.


(Signature waived)
Kelsey L. Braido


- - -

DEPOSITION CONCLUDED AT 1:46 P.M.

- - -

C E R T I F I C A T E

STATE OF OHIO                :
                            :  SS
COUNTY OF HAMILTON          :

          I, Colleen E. Wimmel, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of her aforesaid deposition, KELSEY L. BRAIDO was by me first duly sworn to depose the truth, the whole truth, and nothing but the truth; that the foregoing is the deposition given at said time and place by the said KELSEY L. BRAIDO; that said deposition was taken in all respects pursuant to agreement and stipulations of counsel hereinbefore set forth; that said deposition was taken by me in stenotype and prepared by computer-aided transcription; that submission of the transcribed deposition to the witness for examination and signature is expressly waived; that I am neither a relative nor employee of any of the parties to this cause, nor relative nor employee of any of their counsel; that I am not under a contract as defined in Civil Rule 28(D), and that I have no interest whatsoever in the result of the action.

          IN WITNESS WHEREOF, I hereunto set my hand and official seal at Harrison, Ohio, this 19th day of December, 2025.

_____
Colleen E. Wimmel
Notary Public - State of Ohio
My Commission Expires:
June 20, 2029

COLLEEN E WIMMEL
Notary Public
State of Ohio
My Comm. Expires
June 20, 2029

Wimmel Reporting Service
wimmelreporting@gmail.com

**'**

'boys [2] - 61:12, 73:1
'Fuck [2] - 115:10, 115:13

**1**

1 [3] - 4:11, 59:1, 59:3
1/13/2023 [1] - 55:7
10 [1] - 11:8
102 [1] - 4:13
114 [1] - 4:14
119 [1] - 4:15
11:38 [1] - 86:23
120 [1] - 4:16
122 [2] - 4:17, 4:18
123 [1] - 4:4
128 [1] - 4:5
12:15 [3] - 86:12, 86:16, 86:19
12:30 [1] - 86:16
12:39 [2] - 86:24, 87:2
15881 [1] - 115:5
1:24 [1] - 118:12
1:33 [1] - 118:12
1:46 [1] - 130:13
1L [1] - 10:20

**2**

2 [3] - 4:12, 99:18, 99:20
20/20 [1] - 44:24
2012 [1] - 9:14
2014 [1] - 9:23
2017 [2] - 9:23
2018/2019 [1] - 75:9
2020 [1] - 11:11
2022 [2] - 59:19, 59:24
2023 [1] - 100:10
20669 [2] - 68:19, 68:22
20670 [1] - 69:16
20674 [1] - 70:22
20678 [1] - 75:21
24 [1] - 92:9
25 [3] - 26:25, 63:4, 63:9
2L [2] - 10:20, 10:23

**3**

3 [4] - 4:13, 61:4, 102:1, 102:3
30 [1] - 26:25
35 [1] - 86:13
3L [1] - 10:23

**4**

4 [3] - 4:14, 64:22, 114:7
47 [2] - 35:21, 124:2
47s [1] - 35:22
48 [3] - 36:6, 72:15, 82:19
4:45 [1] - 86:10

**5**

5 [4] - 4:4, 4:15, 119:13, 119:15
55 [1] - 116:13
59 [1] - 4:11

**6**

6 [2] - 4:16, 120:9

**7**

7 [3] - 4:17, 122:18, 122:21

**8**

8 [3] - 4:18, 122:25, 123:3

**9**

99 [1] - 4:12

**A**

A-R-I-A-N [1] - 15:1
a.m [1] - 86:23
ability [5] - 39:16, 43:18, 56:19, 72:13, 88:12
able [15] - 13:16, 18:16, 20:16, 23:20, 40:2, 40:13, 50:12, 63:17, 84:9, 85:20, 90:1, 94:18, 114:5, 121:25, 126:12
AC [1] - 76:5
access [1] - 122:2
accommodation [2] - 106:25, 107:2
accommodations [2] - 12:21, 107:18
accruals [1] - 98:4
accuracy [1] - 129:10
accurate [6] - 21:4, 28:11, 53:1, 55:9, 78:15, 121:2
accurately [1] - 20:17
action [15] - 12:20, 21:24, 25:25, 26:3, 73:16, 77:10, 77:16, 89:15, 89:16, 89:17, 89:22, 90:20, 91:13, 91:20, 115:25
actions [1] - 61:12
active [1] - 94:16
actively [1] - 78:16
activity [1] - 125:1
actual [1] - 52:10
ADA [4] - 12:21, 106:25, 107:2, 107:17
ADAs [1] - 109:3
address [7] - 8:24, 9:3, 62:9, 65:23, 67:14, 67:22, 94:17
Address [1] - 8:25
addressed [5] - 65:3, 65:8, 66:4, 66:9, 67:2
adequately [5] - 65:3, 65:8, 66:4, 67:2, 110:20
adjacent [1] - 15:4
admin [1] - 99:10
Administrative [2] - 63:4, 63:9
administrative [7] - 15:19, 81:15, 81:22, 81:24, 82:1, 92:8, 97:22
advertised [1] - 110:1
advertising [1] - 109:15
advice [6] - 101:3, 101:6, 101:8, 101:9, 101:23
affairs [1] - 27:12
affected [2] - 21:8, 39:16
afternoon [3] - 86:9, 123:11, 123:12
afterwards [1] - 103:7
age [1] - 5:2
agency [1] - 59:20
aggressive [1] - 88:16
aggressively [1] - 88:23
ago [5] - 5:8, 11:5, 11:16, 35:12, 54:11
agree [2] - 74:10, 107:17
agreed [1] - 36:17
agreement [2] - 37:13, 63:6
ahead [4] - 90:20,

92:7, 93:16, 128:9
alert [2] - 102:12, 108:2
Alexis's [1] - 64:13
align [1] - 32:1
alignment [1] - 90:4
allegation [1] - 50:17
allegations [13] - 19:11, 27:14, 31:20, 35:23, 35:24, 36:5, 41:19, 43:12, 47:13, 47:20, 89:9, 90:17, 91:20
allege [1] - 124:25
alleged [5] - 19:13, 19:25, 52:16, 125:3, 125:12
allegedly [3] - 20:14, 115:10, 127:2
alleges [1] - 19:19
allotment [1] - 97:15
allow [1] - 119:3
allowing [1] - 116:6
almost [1] - 86:3
Alter [4] - 92:22, 120:1, 120:21, 121:7
Alter's [1] - 119:20
alternative [3] - 30:13, 125:5, 125:6
amount [2] - 74:1, 85:8
analyst [3] - 11:5, 11:7, 11:9
anonymity [1] - 65:22
anonymous [1] - 72:16
answer [24] - 5:24, 6:9, 6:15, 6:24, 16:13, 20:12, 20:20, 21:19, 28:17, 35:19, 40:25, 45:1, 47:7, 56:8, 56:10, 56:24, 57:25, 61:18, 61:19, 66:15, 71:3, 78:6, 84:14, 120:6
answers [1] - 5:22
anyway [1] - 94:4
apologies [1] - 22:22
apology [1] - 71:22
appear [1] - 74:12
appeared [1] - 20:8
appearing [1] - 47:1
apply [1] - 68:11
appointment [1] - 87:3
approach [1] - 109:1
appropriate [18] - 21:24, 36:3, 38:13, 39:6, 41:20, 42:1, 42:10, 44:22, 63:18, 68:9, 70:16, 89:15,

89:20, 90:21, 90:25, 102:13, 108:19, 113:1
AR25 [3] - 114:18, 114:25, 116:17
AR55 [4] - 113:19, 113:20, 114:11, 114:22
area [1] - 71:6
Area [1] - 115:11
areas [6] - 63:8, 63:17, 70:24, 71:1, 71:5, 117:22
Ari [5] - 14:22, 14:24, 15:2, 15:14, 16:4
ARI [1] - 14:24
Arian [5] - 14:25, 97:5, 97:11, 99:3, 99:15
Arnold [1] - 64:17
arose [2] - 23:15, 23:16
arrived [1] - 94:5
article [3] - 36:7, 37:15, 124:22
Ash [1] - 10:20
aside [2] - 48:10, 84:22
aspect [3] - 29:3, 37:25, 128:22
aspects [3] - 37:22, 109:11, 109:13
ass [1] - 115:14
assault [5] - 16:24, 41:25, 42:23, 49:8, 52:16
assaulted [5] - 40:24, 41:21, 47:9, 48:14, 48:25
assertion [1] - 78:5
assess [2] - 28:18, 29:8
assessment [16] - 23:22, 24:18, 28:4, 28:14, 29:7, 29:19, 33:21, 33:22, 34:8, 34:18, 34:20, 56:7, 58:16, 59:17, 74:11, 105:19
assessments [2] - 34:11, 58:14
assignment [3] - 30:13, 31:9, 109:24
assist [5] - 17:17, 63:6, 63:12, 63:24, 102:18
assistant [10] - 62:23, 70:3, 70:13, 71:13, 71:16, 72:2, 100:20, 101:12, 112:16, 113:1
Assistant [3] - 77:16,

103:18, 112:7
**assisting** [1] - 63:1
**assume** [3] - 6:9, 70:2, 85:19
**assuming** [1] - 101:18
**AT** [1] - 130:13
**attempted** [2] - 67:21, 92:10
**attend** [1] - 120:21
**attendance** [1] - 113:9
**attends** [1] - 63:15
**attention** [8] - 35:25, 40:17, 43:6, 44:5, 73:15, 77:3, 78:15, 111:6
**attire** [2] - 15:9, 41:3
**attorney** [4] - 10:12, 10:21, 43:21, 94:2
**attorneys** [3] - 7:9, 7:15, 123:7
**audio** [1] - 45:12
**authored** [2] - 52:9, 124:2
**authority** [2] - 36:11, 113:1
**automatically** [2] - 22:15, 39:2
**avenue** [1] - 63:22
**aware** [45] - 19:2, 20:6, 23:11, 23:17, 23:18, 23:19, 24:12, 24:14, 25:18, 28:1, 30:1, 32:20, 32:21, 32:23, 34:23, 35:1, 35:7, 37:12, 38:18, 43:25, 69:15, 74:14, 74:18, 75:12, 75:18, 75:19, 76:2, 76:12, 76:15, 77:9, 77:15, 78:3, 85:3, 85:7, 94:13, 95:16, 95:20, 101:1, 107:6, 108:18, 110:3, 110:5, 110:7, 110:19, 129:2
**awareness** [2] - 31:20, 35:2
**awhile** [1] - 101:10

## B

**B-R-U-N-I-N-G-E-R** [1] - 96:16
**B.A** [2] - 9:17, 9:18
**B.S** [1] - 9:17
**back-end** [1] - 90:3
**background** [3] - 103:5, 126:6, 128:23
**backwards** [1] - 22:22
**bad** [4] - 6:6, 48:20, 58:7, 68:14

**badge)** [1] - 73:21
**balances** [6] - 98:1, 98:5, 98:9, 98:19, 99:7, 99:11
**ballpark** [1] - 100:15
**bank** [1] - 85:8
**bar** [2] - 9:24, 9:25
**BARON** [3] - 45:23, 129:25, 130:4
**based** [12] - 26:23, 36:4, 38:3, 41:3, 41:17, 49:24, 62:5, 63:11, 98:25, 108:14, 111:12, 114:20
**basis** [3] - 63:21, 107:18, 109:3
**bathroom** [1] - 6:21
**bear** [1] - 45:8
**beat** [1] - 73:24
**became** [5] - 23:17, 23:18, 32:23, 43:25, 118:24
**become** [2] - 23:11, 23:19
**becoming** [1] - 39:8
**began** [1] - 36:19
**beginning** [2] - 53:21, 53:22
**behavior** [5] - 15:19, 113:20, 114:11, 114:13, 115:21
**behind** [2] - 73:21, 128:18
**belief** [1] - 49:1
**Ben** [1] - 96:11
**benefits** [2] - 95:8, 95:16
**bent** [1] - 50:16
**best** [9] - 6:14, 34:20, 43:16, 43:18, 43:22, 56:19, 65:23, 72:13, 118:2
**better** [6] - 27:6, 56:12, 86:17, 95:2, 121:19, 124:15
**between** [14] - 10:9, 10:11, 10:14, 10:20, 49:2, 50:8, 84:22, 98:11, 99:21, 102:4, 106:19, 123:25, 124:6, 124:8
**bias** [1] - 40:3
**big** [2] - 88:6, 114:23
**biggest** [3] - 69:19, 75:6, 76:1
**bit** [2] - 10:20, 71:10
**bitch** [1] - 115:10
**bitches** [2] - 115:14
**blank** [1] - 80:18
**blast** [1] - 57:5

**Blue** [1] - 10:19
**board** [2] - 117:25, 122:11
**Boggs** [2] - 34:5, 34:21
**Bonefish** [1] - 10:15
**boss** [2] - 17:19, 17:21
**bottom** [6] - 61:5, 68:20, 69:19, 70:23, 124:13, 124:16
**box** [2] - 71:13, 72:23
**boxes** [2] - 69:18, 75:5
**boys** [1] - 61:23
**BRAIDO** [3] - 4:3, 4:10, 5:1
**Braido** [9] - 59:3, 99:18, 102:1, 114:7, 119:13, 120:9, 122:18, 122:25, 130:10
**brain** [1] - 77:25
**Brandon** [1] - 30:20
**break** [12] - 6:20, 6:21, 6:23, 6:24, 54:17, 54:25, 55:3, 86:4, 86:5, 86:12, 118:9, 118:12
**breast** [2] - 42:7, 42:23
**Breitfelder** [5] - 100:20, 101:7, 102:5, 103:18, 112:8
**Bretfelder** [1] - 100:18
**Brief** [2] - 55:4, 117:4
**briefed** [3] - 105:21, 111:25, 112:3
**briefing** [1] - 112:12
**briefly** [5] - 5:7, 7:18, 7:21, 87:7, 123:16
**bring** [5] - 24:9, 40:13, 72:18, 105:14, 111:5
**bringing** [4] - 40:16, 41:15, 44:5, 49:7
**Brought** [1] - 77:21
**brought** [8] - 23:22, 24:3, 35:25, 76:3, 77:3, 78:14, 79:25, 81:21
**Brown** [28] - 35:24, 41:8, 41:14, 47:21, 49:9, 50:7, 50:14, 50:22, 50:25, 52:4, 52:19, 52:23, 53:8, 53:16, 54:7, 54:9, 55:5, 55:14, 55:15, 87:10, 88:1, 88:7, 88:15, 100:13, 123:14, 123:15
**Brown-Rebecca** [1] - 50:14
**Bruninger** [1] - 96:11

**Bryant** [32] - 5:9, 14:2, 14:9, 14:13, 15:21, 19:10, 19:14, 21:8, 22:5, 23:4, 27:8, 29:23, 32:24, 35:4, 35:9, 35:18, 40:23, 41:6, 43:4, 43:10, 43:24, 50:10, 50:14, 52:12, 54:8, 66:7, 84:21, 98:8, 112:23, 123:25, 124:3, 126:19
**Bryant's** [7] - 18:20, 19:9, 21:17, 23:7, 23:14, 42:7, 78:16
**buddy** [1] - 71:17
**build** [3] - 44:17, 45:4, 66:3
**building** [3] - 92:14, 92:19, 92:25
**bullying** [1] - 114:17
**bunch** [1] - 74:20
**bureau** [4] - 62:23, 62:24, 72:5, 101:11
**Burks** [1] - 54:2
**BY** [8] - 4:4, 4:4, 4:5, 5:6, 46:5, 86:25, 123:10, 128:12

## C

**calendar** [3] - 53:18, 54:12, 55:8
**cannot** [2] - 16:18, 25:10
**capacities** [1] - 101:13
**capacity** [6] - 96:21, 96:22, 106:25, 121:12, 121:14, 122:9
**Capel** [1] - 97:9
**captain** [2] - 64:14, 64:16
**captured** [1] - 99:2
**captures** [1] - 99:1
**car** [1] - 49:18
**cards** [1] - 12:3
**care** [2] - 37:22, 127:18
**career** [2] - 32:5, 39:1
**Carolyn** [1] - 115:11
**Carr** [3] - 60:1, 60:2, 80:25
**CARR** [1] - 60:6
**carry** [2] - 69:5, 127:23
**case** [23] - 15:23, 21:9, 32:13, 38:24, 39:13, 41:25, 43:22, 61:15, 62:7, 76:6, 85:1, 90:23, 93:24,

107:18, 107:20, 109:3, 111:3, 112:9, 113:17, 116:25
**case-by-case** [1] - 107:18
**cases** [3] - 48:22, 73:20, 74:18
**cashier** [1] - 108:12
**catchall** [1] - 114:15
**Center** [1] - 11:10
**center** [2] - 49:8, 50:16
**certain** [18] - 18:11, 25:2, 25:6, 28:8, 32:16, 33:1, 33:14, 53:17, 85:20, 91:3, 95:9, 96:5, 100:12, 109:13, 113:18, 114:2, 118:3, 118:23
**certainly** [17] - 13:13, 21:24, 40:11, 67:10, 70:14, 88:25, 89:4, 94:22, 94:23, 95:3, 101:9, 101:21, 107:16, 109:4, 109:16, 111:5, 112:3
**certainty** [1] - 48:23
**certified** [1] - 5:3
**CFD** [41] - 14:11, 14:14, 16:22, 17:7, 22:7, 23:6, 23:12, 24:15, 25:15, 25:17, 25:24, 26:14, 26:22, 27:2, 28:7, 28:19, 31:22, 32:14, 35:3, 35:8, 35:24, 36:2, 36:25, 37:12, 45:19, 51:11, 51:25, 56:6, 57:15, 57:24, 59:21, 61:16, 61:24, 62:21, 62:22, 71:14, 72:24, 73:19, 74:19, 119:24, 121:23
**CFD's** [1] - 35:21
**change** [5] - 62:15, 62:18, 62:21, 65:15, 90:1
**changed** [6] - 25:14, 25:17, 26:17, 26:18, 50:1, 111:8
**changes** [8] - 25:22, 26:14, 27:3, 28:19, 65:14, 65:23, 66:3, 84:22
**changing** [1] - 26:4
**charge** [3] - 31:3, 79:9, 93:20
**charged** [1] - 32:22
**charges** [4] - 31:13, 33:15, 73:25, 116:11
**Chase** [1] - 9:22

**Check** [1] - 73:19
**check** [7] - 38:12, 54:15, 54:21, 55:8, 93:23, 118:3, 128:23
**checking** [2] - 53:18, 98:5
**checks** [3] - 37:17, 117:24, 126:6
**Chelsea** [1] - 99:22
**chief** [32] - 29:2, 62:23, 69:23, 70:3, 70:7, 70:13, 70:14, 71:13, 71:16, 71:21, 72:2, 72:25, 73:5, 74:19, 74:21, 76:1, 89:25, 93:19, 93:23, 100:20, 100:23, 101:10, 101:12, 103:18, 104:4, 104:6, 105:2, 105:22, 126:5, 126:9, 127:3
**Chief** [10] - 60:22, 61:6, 75:2, 76:19, 77:16, 80:1, 102:5, 103:18, 104:7, 112:8
**chiefs** [1] - 127:18
**CHRIS** [1] - 112:18
**Cincinnati** [2] - 75:7, 96:2
**circumstances** [5] - 21:15, 57:22, 58:10, 67:8, 108:19
**city** [15] - 15:17, 26:10, 26:21, 26:25, 31:25, 32:2, 34:4, 76:1, 78:3, 112:16, 113:2, 113:11, 113:13, 114:3, 117:23
**City** [65] - 11:4, 12:9, 13:5, 14:3, 17:17, 17:23, 18:14, 19:17, 19:18, 20:4, 22:2, 23:17, 23:19, 24:12, 25:14, 25:18, 25:22, 25:24, 27:15, 28:15, 32:17, 33:2, 34:10, 34:15, 35:2, 35:7, 35:15, 35:16, 36:2, 36:10, 36:17, 48:15, 51:7, 51:24, 59:20, 59:23, 65:3, 65:9, 66:5, 66:9, 67:2, 68:9, 68:19, 73:4, 73:12, 73:14, 73:18, 75:6, 76:1, 76:3, 78:3, 78:4, 83:15, 92:10, 94:12, 94:15, 96:9, 96:15, 97:7, 107:25, 115:5, 119:19, 123:16

**City's** [2] - 21:17, 21:22
**city's** [1] - 93:13
**citywide** [2] - 27:2, 117:10
**claim** [3] - 66:12, 84:24, 123:17
**clarify** [3] - 22:10, 41:16, 42:20
**classes** [1] - 27:2
**clear** [5] - 6:4, 22:13, 22:17, 39:20, 60:15
**clear-cut** [1] - 39:20
**clerking** [1] - 10:17
**clients** [1] - 11:11
**climate** [9] - 29:7, 29:18, 33:21, 33:23, 34:8, 34:11, 34:17, 34:20
**close** [4] - 38:19, 39:10, 39:25, 69:13
**closely** [3] - 62:23, 63:14, 103:3
**clothes** [3] - 124:15, 125:5, 125:9
**clothing** [8] - 40:23, 41:11, 41:12, 41:16, 44:9, 44:20, 124:17, 124:22
**club** [1] - 61:23
**club'** [2] - 61:12, 73:1
**clunky** [1] - 116:4
**CMO** [1] - 35:14
**Co** [1] - 10:19
**codes** [1] - 33:13
**coercion** [1] - 125:4
**collaborative** [1] - 63:23
**colleagues** [2] - 110:12, 110:23
**Colleen** [2] - 5:19, 6:12
**college** [1] - 9:9
**College** [1] - 9:22
**comfortable** [3] - 43:16, 44:16, 45:2
**coming** [7] - 27:3, 34:5, 44:18, 65:20, 89:7, 103:21, 108:24
**command** [1] - 56:18
**comment** [2] - 69:19, 76:20
**commenter** [1] - 78:2
**commenter's** [3] - 74:9, 74:15, 78:5
**comments** [6] - 15:8, 16:11, 16:17, 42:23, 58:20, 71:10
**common** [1] - 114:2
**communication** [4] - 35:21, 52:11, 52:13,

98:11
**communications** [4] - 52:19, 96:8, 96:13, 124:5
**Communications** [1] - 11:10
**company** [2] - 10:25, 11:1
**compensation** [3] - 12:18, 84:3, 84:10
**complainant** [2] - 15:2, 67:16
**complaint** [41] - 15:3, 15:7, 15:12, 15:14, 16:5, 17:8, 17:11, 17:15, 17:18, 18:1, 18:10, 18:21, 19:9, 19:14, 20:7, 21:15, 22:6, 23:5, 23:7, 23:8, 23:10, 27:10, 27:14, 27:16, 28:9, 37:13, 67:11, 67:15, 71:15, 73:25, 74:21, 76:25, 77:4, 79:4, 80:20, 80:22, 102:9, 102:15, 103:14, 110:19, 111:13
**complaints** [22] - 19:3, 21:5, 21:6, 27:5, 27:9, 32:18, 37:20, 63:2, 65:15, 65:17, 72:16, 73:16, 78:16, 79:5, 79:7, 79:8, 79:16, 89:3, 102:7, 102:24, 114:24, 115:20
**complete** [2] - 6:15, 27:18
**completely** [2] - 15:14, 110:23
**complex** [3] - 21:20, 48:22, 94:14
**compliance** [2] - 37:21, 63:8
**comply** [1] - 109:13
**component** [4] - 14:17, 15:7, 16:5, 84:6
**components** [1] - 90:9
**concern** [17] - 18:3, 20:25, 38:22, 42:17, 42:21, 48:12, 70:10, 74:6, 75:14, 75:16, 94:25, 103:19, 105:14, 110:22, 110:25, 111:7, 111:18
**concerned** [7] - 31:17, 57:24, 58:4, 58:17, 58:23, 92:14, 107:21
**concerning** [3] - 62:10, 67:20, 110:14

**concerns** [20] - 22:6, 23:6, 23:11, 23:21, 23:24, 24:3, 24:5, 27:19, 27:24, 57:11, 62:6, 68:5, 68:8, 68:10, 73:14, 78:14, 81:21, 94:12, 107:24, 108:9
**concluded** [2] - 44:1, 100:10
**CONCLUDED** [1] - 130:13
**concluding** [1] - 43:7
**conclusion** [1] - 89:7
**conclusions** [3] - 55:24, 64:23
**condition** [1] - 65:21
**conduct** [3] - 15:11, 23:23, 114:15
**conducted** [1] - 25:21
**confidence** [5] - 65:2, 65:7, 66:4, 66:13, 67:1
**confident** [2] - 55:8, 101:7
**confidential** [2] - 58:20, 101:18
**confidentiality** [2] - 15:18, 104:19
**confirm** [1] - 95:13
**confirming** [1] - 25:6
**conflict** [4] - 38:12, 39:15, 40:3, 80:6
**confused** [1] - 6:7
**confusion** [1] - 6:9
**congrats** [1] - 10:1
**conjunction** [3] - 37:2, 103:14, 126:9
**connected** [2] - 59:20, 125:13
**consensual** [4] - 49:3, 88:15, 88:20, 88:24
**consent** [4] - 88:6, 88:12, 89:2, 89:5
**consider** [1] - 39:1
**considerations** [1] - 8:20
**considered** [2] - 84:7, 89:6
**console** [2] - 49:8, 50:16
**consult** [3] - 12:4, 63:20, 83:2
**consultant** [1] - 101:9
**consultation** [5] - 27:6, 37:1, 37:2, 91:23, 105:7
**consulting** [1] - 126:10
**contact** [3] - 92:10, 104:1, 106:2

**contacted** [2] - 93:22, 94:1
**context** [5] - 17:4, 19:7, 19:8, 19:13, 35:15
**contingent** [1] - 127:2
**continue** [5] - 28:18, 91:7, 92:6, 93:16, 108:20
**continued** [2] - 46:24, 115:13
**continues** [3] - 62:2, 63:17, 74:4
**continuing** [3] - 28:15, 105:22, 107:22
**contract** [13] - 12:2, 12:23, 36:6, 37:15, 37:21, 72:15, 82:19, 85:6, 91:3, 105:6, 109:14, 111:15, 111:21
**contracts** [1] - 12:3
**conversation** [7] - 6:13, 42:10, 53:3, 53:9, 71:18, 88:10, 94:1
**conversations** [13] - 25:3, 25:4, 25:11, 26:13, 34:6, 47:24, 50:8, 55:15, 103:17, 104:20, 104:23, 104:25, 105:5
**cooperate** [1] - 125:17
**coordination** [2] - 121:22, 127:11
**Coordinator** [1] - 115:11
**copies** [2] - 18:11, 119:20
**copy** [5] - 17:8, 129:20, 130:2, 130:6, 130:7
**correct** [10] - 9:3, 9:4, 17:24, 19:24, 31:10, 49:14, 89:10, 89:11, 120:21, 121:8
**corrective** [10] - 12:20, 21:24, 89:15, 89:16, 89:17, 89:22, 90:20, 91:13, 91:20, 115:25
**correctly** [8] - 59:21, 65:4, 73:2, 74:2, 75:10, 76:10, 79:3, 113:10
**correlated** [1] - 103:23
**correspondence** [1] - 105:9
**corresponding** [1] - 124:3
**corroborated** [1] -

50:17
**counsel** [3] - 11:3, 11:22, 11:24
**counted** [1] - 101:5
**counter** [1] - 115:20
**counter-complaints** [1] - 115:20
**County** [1] - 8:19
**couple** [10] - 5:8, 5:12, 5:17, 7:1, 21:14, 69:5, 87:4, 88:6, 118:13, 119:10
**course** [4] - 30:17, 40:19, 69:1, 112:11
**COURT** [5] - 45:25, 129:16, 129:19, 129:22, 130:7
**court** [2] - 5:20, 23:2
**cover** [1] - 71:17
**covered** [3] - 67:4, 67:24, 74:23
**covering** [1] - 27:24
**coverup** [1] - 75:1
**Covington** [1] - 10:18
**coworker** [1] - 48:14
**coworkers** [1] - 32:6
**create** [2] - 51:12, 51:19
**created** [3] - 45:18, 51:11, 51:24
**creates** [1] - 45:19
**creating** [2] - 51:16, 51:25
**credibility** [2] - 50:7, 124:1
**credible** [3] - 47:23, 48:19, 124:10
**criminal** [4] - 10:12, 31:24, 32:7, 33:4
**cross** [1] - 12:16
**CROSS** [4] - 4:4, 4:4, 5:5, 123:9
**CROSS-EXAMINATION** [4] - 4:4, 4:4, 5:5, 123:9
**cross-trained** [1] - 12:16
**culture** [5] - 38:9, 56:19, 57:24, 58:4, 78:17
**cup** [1] - 6:22
**current** [6] - 8:24, 9:2, 11:18, 13:3, 96:22, 110:7
**custodian** [1] - 99:22
**cut** [3] - 39:20, 71:10, 75:22
**cuts** [2] - 71:24, 74:4

# D

**damage** [1] - 49:12
**Damonte** [14] - 7:23, 35:24, 41:14, 47:21, 49:2, 49:9, 50:14, 52:19, 52:22, 54:8, 55:15, 87:10, 111:9, 123:15
**Damonte's** [2] - 53:3, 122:2
**data** [2] - 65:20, 66:17
**date** [8] - 18:9, 53:17, 54:21, 55:6, 55:9, 98:6, 100:16, 125:23
**dates** [5] - 13:17, 33:15, 76:21, 81:12, 126:16
**deal** [6] - 93:11, 103:19, 106:20, 113:4, 117:16, 118:2
**dealt** [1] - 93:15
**decide** [1] - 39:19
**decided** [3] - 10:2, 24:9, 36:5
**deciding** [1] - 70:16
**decision** [6] - 24:12, 28:20, 85:13, 95:3, 99:9, 128:17
**decision-making** [1] - 128:17
**decisions** [2] - 65:1, 128:25
**deducted** [1] - 98:14
**deep** [2] - 67:7, 67:21
**defense** [1] - 54:6
**definitively** [11] - 26:9, 28:17, 50:20, 53:5, 53:13, 62:3, 70:2, 83:17, 95:13, 107:8, 127:19
**degree** [2] - 29:5, 94:22
**degrees** [1] - 118:21
**delegate** [1] - 36:11
**delegated** [5] - 36:16, 36:21, 36:22, 36:23, 37:13
**delegation** [1] - 36:18
**deliver** [1] - 27:1
**DeMarcus** [1] - 10:18
**Demonte** [5] - 88:1, 88:7, 88:15, 100:13, 100:15
**department** [63] - 12:4, 23:23, 33:9, 33:24, 37:3, 37:19, 38:7, 38:8, 48:24, 51:14, 51:15, 56:13, 56:17, 58:22, 62:2,

62:4, 62:8, 63:3, 63:12, 63:14, 63:21, 64:8, 64:15, 66:1, 73:8, 73:12, 75:9, 75:25, 78:11, 78:24, 79:6, 80:2, 81:13, 82:15, 82:25, 85:19, 89:23, 91:23, 92:1, 92:12, 93:12, 94:7, 100:21, 102:7, 102:12, 102:18, 102:19, 102:20, 102:24, 103:8, 106:13, 106:21, 108:23, 109:14, 112:22, 112:24, 113:3, 117:18, 125:14, 125:18, 125:22, 126:4, 128:18
**Department** [7] - 11:6, 11:12, 11:17, 36:2, 96:3, 113:5, 115:23
**department's** [1] - 18:17
**departments** [6] - 31:25, 32:2, 34:11, 37:20, 106:10, 118:1
**dependant** [1] - 84:15
**depended** [2] - 19:7, 19:9
**DEPONENT** [1] - 4:2
**deposed** [1] - 5:3
**deposition** [2] - 5:14, 56:21
**DEPOSITION** [1] - 130:13
**depositions** [1] - 5:14
**deprecating** [1] - 44:15
**depth** [5] - 57:7, 58:20, 85:5, 85:6, 105:20
**deputy** [6] - 11:16, 59:25, 81:2, 96:12, 96:23, 97:1
**Deputy** [2] - 59:20, 59:23
**describe** [2] - 23:25, 123:16
**describing** [1] - 124:15
**desired** [1] - 68:1
**detail** [2] - 20:20, 23:21
**details** [13] - 16:18, 24:1, 52:8, 52:21, 52:25, 53:4, 79:15, 82:4, 84:9, 95:23, 104:18, 124:19, 124:23

**determination** [6] - 50:13, 83:17, 85:1, 89:5, 108:4, 126:9
**determinations** [2] - 84:11, 126:4
**determine** [5] - 39:5, 83:15, 99:15, 106:22, 126:13
**determined** [1] - 124:9
**determining** [1] - 49:22
**development** [1] - 11:11
**dialogue** [4] - 36:1, 43:20, 44:20, 109:4
**differ** [1] - 54:10
**difference** [1] - 95:7
**differences** [1] - 85:3
**different** [16] - 31:8, 34:11, 41:9, 45:6, 45:13, 50:24, 57:8, 73:23, 82:20, 87:8, 108:11, 111:22, 113:12, 116:7, 121:25, 122:8
**differently** [1] - 94:20
**difficult** [2] - 69:21, 84:14
**dig** [2] - 65:23, 66:2
**direction** [1] - 45:6
**Director** [2] - 59:20, 59:23
**director** [12] - 11:16, 26:13, 60:1, 81:2, 96:8, 96:12, 96:19, 96:20, 96:21, 96:23, 97:1
**directors** [1] - 113:3
**disciplinary** [2] - 95:6, 112:18
**discipline** [10] - 21:21, 113:2, 113:4, 113:14, 115:19, 116:5, 117:10, 117:16, 117:19, 117:22
**disciplines** [1] - 113:8
**discomfort** [3] - 43:14, 47:3, 111:24
**discrepancy** [1] - 98:21
**discrimination** [17] - 23:11, 24:2, 26:20, 29:4, 30:4, 35:3, 35:8, 56:14, 63:5, 63:9, 71:2, 71:7, 79:8, 105:10, 105:17, 115:1, 115:2
**discuss** [2] - 43:2, 105:15
**discussed** [2] - 8:3,

76:17
**discussing** [4] - 41:7, 43:9, 43:10, 60:18
**discussion** [9] - 43:16, 46:3, 59:2, 69:9, 99:4, 99:5, 99:12, 105:25, 117:4
**discussions** [4] - 24:21, 24:24, 25:8, 44:9
**dismissed** [1] - 32:9
**dismissive** [2] - 56:22, 57:10
**displeasure** [1] - 66:8
**dispute** [6] - 30:16, 74:15, 74:17, 78:5, 78:8, 78:12
**disputes** [1] - 74:24
**disqualify** [1] - 126:7
**disruptive** [1] - 75:8
**distinct** [1] - 125:9
**district** [2] - 93:19, 93:23
**District** [1] - 114:10
**dive** [2] - 67:7, 67:21
**division** [2] - 11:12, 97:2
**Division** [3] - 11:14, 12:17, 12:20
**divvied** [1] - 122:11
**document** [1] - 8:3
**documentation** [3] - 34:24, 82:5, 117:14
**documents** [5] - 7:17, 7:19, 8:4, 8:7, 8:10
**dollars** [1] - 125:8
**domestic** [5] - 30:25, 31:3, 32:22, 33:15, 71:14
**done** [16] - 13:20, 14:3, 14:10, 14:13, 16:21, 26:19, 28:6, 60:21, 62:15, 65:22, 67:24, 68:4, 94:20, 103:6, 118:17, 121:18
**down** [3] - 5:20, 73:24, 117:3
**drawing** [1] - 80:18
**drawn** [2] - 55:24, 55:25
**drinking** [1] - 88:11
**due** [20] - 27:13, 31:12, 36:15, 57:4, 89:21, 90:8, 90:10, 90:12, 91:1, 91:8, 91:21, 92:11, 92:16, 92:25, 93:16, 94:3, 94:9, 111:18
**duly** [1] - 5:2
**during** [23] - 10:16,

18:25, 30:17, 31:7, 31:18, 32:23, 33:4, 41:2, 42:23, 43:4, 43:5, 43:8, 43:15, 44:5, 44:7, 69:23, 81:15, 93:25, 94:5, 95:22, 99:12, 124:4, 124:10
**duties** [4] - 11:25, 12:7, 82:6, 109:25
**duty** [47] - 81:6, 81:13, 81:23, 82:3, 82:7, 82:14, 82:20, 82:22, 82:23, 82:25, 83:3, 83:6, 83:7, 83:8, 83:9, 83:20, 84:1, 84:3, 84:8, 84:11, 85:1, 85:14, 85:15, 85:25, 97:23, 106:3, 106:5, 106:7, 106:8, 106:10, 106:11, 106:13, 106:17, 106:18, 106:23, 106:24, 107:1, 107:5, 107:14, 108:1, 108:4, 109:11, 109:24
**duty-related** [1] - 82:25
**DV** [3] - 30:21, 30:23, 30:25

## E

**ear** [1] - 76:7
**early** [3] - 10:2, 81:11, 83:9
**easier** [1] - 8:21
**easy** [1] - 8:14
**Ed** [6] - 17:22, 17:23, 76:9, 96:20, 96:24, 97:1
**EEOC** [1] - 13:19
**effective** [4] - 69:7, 69:8, 75:20, 93:20
**effectively** [2] - 48:11, 94:8
**effort** [1] - 44:15
**efforts** [1] - 63:24
**eight** [2] - 75:5, 82:23
**eight-hour** [1] - 82:23
**either** [4] - 50:1, 67:4, 83:23, 87:22
**electronic** [1] - 28:10
**elementary** [1] - 10:8
**Elite** [1] - 45:12
**email** [9] - 57:5, 85:23, 99:21, 100:1, 101:15, 101:21, 101:22, 102:4, 114:1
**Emergency** [1] - 11:9

**emergency** [1] - 70:14
**emotion** [1] - 43:14
**emotional** [4] - 118:20, 118:24, 119:5, 119:8
**emotionally** [1] - 107:15
**employed** [1] - 94:9
**Employee** [3] - 11:14, 12:20, 83:13
**employee** [14] - 17:7, 63:13, 64:1, 78:23, 90:14, 94:16, 102:8, 113:13, 114:10, 114:19, 115:12, 115:23, 126:7, 126:23
**employee's** [3] - 30:17, 111:12, 115:18
**employees** [6] - 62:4, 104:21, 105:24, 109:8, 122:8, 123:24
**employees'** [1] - 115:18
**employment** [10] - 10:6, 21:18, 21:25, 73:16, 108:1, 108:9, 109:2, 125:13, 128:25, 129:5
**encouraged** [1] - 45:6
**end** [7] - 11:11, 53:20, 67:17, 73:14, 89:25, 90:3, 90:5
**ends** [1] - 118:13
**engage** [4] - 19:12, 22:14, 109:4, 125:1
**engaged** [1] - 64:25
**engagement** [1] - 65:18
**ensure** [13] - 18:7, 27:17, 28:11, 37:21, 38:12, 48:11, 56:13, 63:5, 63:16, 92:20, 105:22, 113:6, 113:7
**ensured** [2] - 13:9, 90:4
**ensuring** [7] - 43:17, 62:18, 62:21, 103:19, 104:12, 104:20, 104:23
**entertain** [1] - 108:22
**entire** [2] - 46:7, 78:11
**entry** [1] - 116:19
**environment** [9] - 29:8, 33:23, 56:12, 58:18, 62:15, 63:25, 73:24, 104:24, 105:23
**equitable** [2] - 113:8, 117:25

**Erica** [1] - 54:2
**error** [1] - 55:22
**Erv** [2] - 118:15, 118:16
**Ervin** [2] - 118:14, 118:16
**escape** [1] - 64:13
**escaping** [1] - 10:22
**especially** [4] - 12:5, 37:22, 69:12, 115:14
**essentially** [4] - 71:12, 95:7, 107:3, 126:19
**establish** [1] - 124:16
**evaluate** [1] - 28:18
**even-keeled** [1] - 119:6
**event** [1] - 34:15
**evidence** [14] - 16:8, 16:10, 16:15, 16:16, 21:11, 48:4, 49:5, 49:25, 50:1, 50:3, 53:14, 74:1, 75:1
**evolved** [2] - 27:10, 64:11
**exact** [7] - 24:1, 52:7, 81:12, 125:23, 126:16, 128:17, 128:24
**exactly** [8] - 41:24, 52:15, 67:23, 75:15, 81:10, 81:20, 116:9, 118:4
**EXAMINATION** [6] - 4:4, 4:4, 4:5, 5:5, 123:9, 128:11
**examined** [1] - 5:3
**example** [1] - 91:6
**exchanged** [1] - 123:25
**excuse** [1] - 123:14
**Executive** [2] - 59:10, 60:12
**EXHIBIT** [1] - 4:10
**exhibit** [1] - 121:10
**Exhibit** [12] - 59:3, 99:18, 99:20, 102:1, 102:3, 114:7, 119:13, 119:15, 120:9, 122:18, 122:25, 123:3
**exhibits** [1] - 119:10
**exists** [1] - 102:16
**exit** [1] - 64:20
**exited** [1] - 38:11
**expect** [2] - 39:14, 40:2
**expected** [3] - 39:12, 39:23, 128:10
**expecting** [1] - 121:3
**experience** [1] - 19:18
**experience..** [1] -

68:24
**experienced** [4] - 5:13, 87:11, 87:20, 110:8
**expertise** [1] - 27:23
**explain** [2] - 35:17, 41:5
**explanation** [2] - 89:1, 115:9
**explicit** [1] - 52:21
**explore** [1] - 59:21
**explored** [1] - 65:13
**expressed** [3] - 66:7, 104:11, 111:23
**expressing** [1] - 47:3
**extended** [3] - 38:25, 83:3, 106:23
**extensive** [2] - 25:21, 37:16
**extent** [3] - 17:9, 111:11, 112:10
**external** [4] - 13:4, 13:14, 30:14, 31:13
**extra** [1] - 27:23

## F

**fact** [17] - 21:21, 22:1, 36:20, 40:7, 40:9, 40:15, 41:9, 41:17, 48:21, 49:8, 73:18, 87:21, 92:14, 93:23, 108:6, 116:24, 124:8
**factor** [1] - 126:17
**factors** [2] - 50:12, 109:5
**facts** [7] - 20:15, 40:12, 40:16, 41:4, 41:12, 41:19, 43:17
**failed** [2] - 29:11, 30:10
**failure** [5] - 29:7, 29:18, 30:11, 30:12, 33:20
**fair** [4] - 10:4, 59:16, 70:20, 113:16
**fairly** [2] - 6:20, 56:22
**false** [1] - 58:5
**familiar** [2] - 38:6, 112:9
**far** [24] - 13:14, 19:15, 19:17, 23:24, 24:14, 34:19, 35:1, 35:6, 35:18, 37:11, 51:24, 61:15, 71:2, 73:7, 75:17, 77:9, 77:15, 80:6, 82:17, 94:13, 105:5, 106:13, 108:18, 110:3
**fast** [1] - 86:14
**favoritism** [1] - 56:14

**FD** [1] - 69:22
**feedback** [3] - 26:5, 68:13, 69:10
**feelings** [1] - 48:10
**felt** [6] - 40:17, 44:16, 65:19, 91:7, 118:25, 125:3
**female** [10] - 30:24, 64:24, 65:25, 76:2, 78:4, 78:9, 78:10, 78:11, 78:12, 80:1
**few** [1] - 29:20
**field** [1] - 115:13
**Fields** [1] - 115:7
**figure** [3] - 6:8, 98:1, 100:2
**figured** [1] - 45:10
**figuring** [1] - 34:20
**file** [4] - 20:8, 20:19, 20:23, 73:25
**filed** [11] - 17:9, 18:10, 20:9, 20:15, 35:20, 71:16, 74:19, 74:21, 77:4, 79:4, 102:13
**files** [1] - 17:20
**filings** [1] - 28:9
**fill** [1] - 85:22
**filled** [1] - 120:24
**final** [5] - 55:24, 81:20, 126:3, 126:13, 126:25
**finance** [5] - 78:24, 79:5, 97:8, 97:10, 97:13
**findings** [2] - 21:11, 63:6
**fine** [5] - 8:6, 55:11, 86:20, 120:5
**finger** [1] - 76:7
**finish** [3] - 6:15, 6:16, 87:2
**Fire** [4] - 61:6, 64:3, 64:5, 106:9
**fire** [57] - 18:16, 20:16, 29:2, 29:15, 33:9, 37:3, 37:18, 38:7, 38:8, 51:14, 51:15, 56:17, 63:12, 63:14, 63:20, 64:7, 64:15, 65:25, 69:22, 70:7, 70:13, 70:14, 73:8, 73:12, 74:19, 75:25, 76:1, 78:11, 81:13, 82:15, 82:25, 85:19, 91:22, 92:1, 92:12, 93:12, 94:6, 97:8, 97:13, 100:21, 105:24, 106:13, 106:20, 107:9, 108:23, 109:14, 111:25, 112:22,

125:14, 125:17, 125:22, 126:4, 126:5, 126:8, 127:3, 128:18
fire's [1] - 93:14
firefighter [3] - 80:2, 109:8, 128:17
firefighters [1] - 68:24
firefighting [5] - 70:23, 71:2, 82:6, 108:13, 108:17
firehouse [1] - 69:1
firms [1] - 13:21
first [15] - 5:2, 5:19, 10:19, 12:8, 13:10, 37:11, 46:12, 50:23, 51:25, 59:5, 59:6, 73:1, 77:20, 113:23, 115:6
fit [1] - 113:15
five [4] - 82:23, 117:10, 118:9, 122:11
flag [1] - 104:18
flipping [1] - 68:8
floor [2] - 92:18, 92:19
Floyd [1] - 115:12
flyers [1] - 116:10
FMLA [2] - 12:21, 97:24
focus [2] - 41:8, 109:22
focused [2] - 15:4, 56:18
follow [8] - 31:15, 84:2, 87:4, 87:14, 87:19, 111:14, 123:8, 128:13
follow-up [5] - 87:4, 87:14, 87:19, 123:8, 128:13
followed [1] - 53:8
following [8] - 10:22, 10:24, 18:7, 23:14, 29:17, 30:2, 32:24, 52:12
follows [2] - 5:4, 23:3
forbids [1] - 72:15
force [1] - 50:18
form [6] - 16:12, 20:11, 35:21, 47:6, 85:22, 120:25
Form [3] - 35:21, 35:22, 124:2
formal [3] - 36:19, 77:4, 90:11
former [2] - 34:4, 112:16
forward [7] - 65:20, 72:18, 74:20, 79:25, 81:21, 85:11, 91:21

four [3] - 9:15, 59:6, 82:22
four-year [1] - 9:15
fourth [1] - 92:18
frame [2] - 78:14, 100:16
Frank [1] - 104:7
Frazier [22] - 37:5, 38:1, 38:13, 38:19, 39:7, 42:6, 43:1, 43:9, 43:11, 43:21, 44:13, 44:23, 46:17, 46:20, 55:23, 57:19, 58:1, 58:12, 59:6, 92:13, 92:20, 93:22
Frazier's [2] - 43:5, 56:21
Freeman [6] - 30:20, 31:7, 31:19, 32:3, 32:8, 32:19
frequent [1] - 116:10
Friday [1] - 82:24
friends [3] - 38:20, 39:1, 39:10
front [2] - 5:13, 90:4
fronts [1] - 63:22
frustrating [1] - 94:22
frustration [1] - 94:24
full [8] - 14:25, 57:3, 64:22, 82:6, 101:22, 106:24, 108:12, 108:16
fully [1] - 36:22
future [2] - 98:18, 99:2
fuzzy [1] - 79:15

## G

game [1] - 41:10
gamut [1] - 105:8
gathered [1] - 49:5
gathering [1] - 117:9
gauge [1] - 5:13
gender [14] - 23:11, 24:2, 26:23, 29:4, 30:3, 35:3, 35:8, 63:11, 71:2, 71:6, 105:10, 105:16, 114:20, 115:16
gender-based [2] - 26:23, 63:11
general [14] - 11:3, 11:22, 11:24, 18:12, 33:25, 43:13, 56:5, 56:9, 58:18, 72:22, 114:14, 124:8, 125:11
generally [7] - 47:25, 56:11, 63:20, 63:23, 80:3, 104:20, 124:10
George [1] - 78:19

given [9] - 8:1, 8:25, 54:7, 57:22, 58:10, 71:23, 77:5, 101:4, 101:8
global [4] - 43:22, 103:25, 113:10, 128:22
globally [1] - 25:9
gospel [1] - 121:3
graduate [1] - 9:13
graduated [1] - 9:23
gray [5] - 39:21, 70:24, 71:1, 71:5, 71:6
great [7] - 23:20, 103:19, 106:20, 113:4, 117:15, 118:2, 118:11
green [1] - 12:3
grievances [2] - 12:22, 105:5
gritty [1] - 84:9
group [6] - 63:13, 63:17, 64:1, 64:7, 64:11, 64:15
guess [15] - 22:12, 23:18, 25:5, 27:5, 32:5, 32:12, 41:7, 51:20, 54:19, 57:6, 66:21, 84:25, 101:23, 103:12, 107:24
guessing [1] - 25:3
guidance [5] - 29:17, 30:3, 30:12, 31:15, 91:24
guys [3] - 86:15, 86:18, 117:3

## H

H-1B [1] - 12:3
half [6] - 10:14, 10:25, 11:7, 74:5, 93:4, 98:18
Hall [5] - 14:22, 15:2, 15:14, 97:5, 97:11
Hall's [1] - 16:4
Hamilton [1] - 8:19
Hampton [1] - 112:15
hand [1] - 119:9
handle [1] - 29:12
handled [3] - 27:9, 36:9, 91:22
handling [3] - 12:22, 29:6, 37:19
handout [1] - 120:15
hands [1] - 76:8
handwriting [10] - 119:11, 119:15, 119:20, 120:3, 120:11, 120:18,

120:25, 122:20, 123:2, 123:3
happy [3] - 6:8, 6:22, 67:17
harass [1] - 16:16
harassed [2] - 16:9, 20:1
harasser [3] - 72:25, 73:5, 73:13
harassers [1] - 27:25
harassment [39] - 13:25, 14:3, 14:10, 14:15, 14:17, 15:6, 15:13, 16:2, 16:5, 16:22, 19:19, 21:7, 21:15, 21:21, 21:23, 22:3, 22:13, 22:15, 24:6, 26:20, 30:4, 30:16, 56:15, 63:5, 63:10, 65:2, 65:8, 66:8, 67:1, 67:3, 67:9, 73:20, 74:18, 75:2, 75:8, 75:10, 76:19, 79:17, 115:2
hard [3] - 5:25, 47:22, 86:8
harm [1] - 84:25
Harold [23] - 7:23, 19:3, 20:1, 20:8, 21:7, 21:16, 32:22, 35:23, 38:18, 39:22, 47:13, 57:16, 57:19, 57:21, 89:8, 92:2, 92:24, 95:19, 100:9, 100:14, 123:14, 123:18
Harold's [2] - 54:5, 100:14
Hazel [1] - 96:17
Hazell [2] - 96:17, 96:18
head [6] - 5:23, 64:14, 102:7, 102:23, 112:24, 125:21
heads [2] - 102:18, 103:8
healing [3] - 107:12, 107:15, 109:22
Health [1] - 83:13
health [4] - 83:25, 126:7, 126:23, 127:8
hear [2] - 92:4, 92:5
heard [11] - 17:3, 17:4, 22:5, 22:6, 23:5, 64:24, 74:23, 80:2, 80:17, 107:7
Hearing [1] - 72:24
hearing [21] - 66:13, 89:24, 90:6, 90:8, 90:10, 90:13, 90:14, 90:21, 91:1, 91:2,

91:9, 91:11, 91:21, 92:3, 92:11, 92:25, 93:17, 94:3, 94:10, 94:11, 95:6
hearings [1] - 91:22
held [4] - 46:3, 57:21, 59:2, 117:4
help [2] - 40:7, 127:11
helped [2] - 63:16, 127:3
helpful [1] - 70:24
Helping [21] - 23:22, 24:9, 24:17, 25:15, 25:25, 26:15, 26:21, 28:3, 28:14, 29:9, 56:6, 56:22, 58:25, 59:11, 59:17, 63:10, 64:18, 66:12, 72:18, 73:15, 105:19
herein [1] - 5:2
hereinafter [1] - 5:3
herself [1] - 44:14
hi [1] - 5:11
hidden [2] - 74:19, 75:3
hide [2] - 73:21
high [5] - 9:7, 12:24, 64:9, 64:10, 123:23
high-ranking [1] - 64:10
highly [1] - 75:6
hindsight [2] - 44:24, 45:5
HIPAA [2] - 101:19, 101:24
hire [1] - 126:20
hired [4] - 125:13, 125:22, 125:24, 127:4
hires [1] - 58:21
hiring [2] - 12:18, 126:3
historically [1] - 31:23
history [2] - 19:16, 37:12
hmm [8] - 5:25, 11:21, 51:2, 58:2, 60:3, 61:7, 68:16, 69:4
hold [4] - 92:25, 94:3, 94:9, 128:3
holes [2] - 37:24, 37:25
holiday [1] - 85:4
home [3] - 71:15, 87:3, 93:3
honesty [1] - 124:7
hope [2] - 66:23, 101:4
hour [3] - 54:16, 82:23, 93:4
hours [2] - 92:9, 98:22

**house** [3] - 13:7, 124:14, 124:17
**HR** [53] - 11:5, 11:6, 11:10, 11:25, 12:4, 12:6, 12:8, 12:12, 18:6, 19:17, 27:11, 29:17, 30:3, 31:12, 31:15, 31:17, 34:6, 35:15, 36:2, 36:17, 36:23, 37:1, 37:20, 40:9, 48:3, 59:20, 59:23, 62:11, 62:17, 62:22, 62:23, 69:23, 70:1, 70:3, 72:8, 76:1, 76:3, 76:14, 78:3, 78:4, 80:12, 89:25, 95:24, 96:1, 96:19, 96:20, 97:6, 101:11, 103:3, 112:25, 118:1, 119:22
**HR's** [5] - 35:25, 36:14, 62:20, 78:14, 89:12
**HRL** [1] - 118:6
**HRS** [3] - 98:3, 98:20, 99:1
**human** [3] - 27:6, 81:3, 96:4
**Human** [4] - 11:6, 11:13, 11:17, 118:7
**hundred** [1] - 13:23
**hundreds** [3] - 56:16, 62:4, 124:5

## I

**I..** [2] - 66:18, 97:3
**IA** [2] - 27:19, 27:24
**idea** [4] - 33:6, 71:19, 90:2, 101:16
**identification** [8] - 59:4, 99:19, 102:2, 114:8, 119:14, 120:10, 122:19, 123:1
**identify** [1] - 98:9
**identifying** [1] - 72:21
**identity** [1] - 76:6
**illegal** [1] - 87:18
**imagine** [1] - 127:22
**immediately** [1] - 93:21
**immigration** [3] - 10:21, 12:2, 12:5
**impacts** [1] - 88:12
**implemented** [1] - 26:21
**important** [8] - 5:21, 21:22, 27:11, 48:1, 48:9, 49:21, 53:2,

70:17
**improving** [1] - 56:19
**in-depth** [1] - 58:20
**in-house** [1] - 13:7
**inadvertent** [2] - 51:8, 55:22
**inappropriate** [1] - 40:20
**incident** [9] - 30:11, 49:12, 50:11, 79:25, 80:4, 125:24, 126:1, 126:18, 126:24
**incidents** [1] - 30:8
**include** [4] - 13:24, 24:24, 38:14, 52:8
**included** [1] - 24:25
**including** [3] - 21:5, 63:25, 65:1
**indicate** [3] - 38:16, 39:23, 129:1
**Interim** [1] - 102:5
**indicated** [2] - 38:19, 124:2
**indicating** [1] - 30:11
**indication** [3] - 8:2, 32:5, 43:3
**indicator** [1] - 121:19
**individual** [9] - 30:14, 30:19, 47:10, 47:24, 58:23, 61:21, 64:6, 66:2, 77:4
**individuals** [12] - 31:24, 38:4, 47:10, 56:16, 57:20, 58:24, 61:23, 62:1, 62:8, 65:19, 65:25, 102:14
**informal** [1] - 45:14
**information** [19] - 19:8, 19:10, 19:14, 24:22, 39:5, 43:23, 52:8, 54:4, 57:5, 72:21, 74:15, 80:13, 85:18, 101:19, 102:10, 102:16, 112:18, 116:1, 123:21
**informed** [2] - 76:3, 78:4
**infractions** [1] - 116:5
**initial** [7] - 13:6, 60:19, 69:6, 69:14, 99:12, 112:11
**initiate** [1] - 92:1
**injured** [4] - 84:10, 106:17, 107:11, 107:14
**injuries** [2] - 84:4, 116:6
**injury** [9] - 83:14, 83:16, 83:20, 83:22, 83:24, 84:5, 84:7, 84:24, 85:2

**input** [8] - 55:23, 56:3, 63:17, 115:25, 126:13, 127:3, 127:6, 129:3
**insisted** [1] - 121:23
**instead** [2] - 5:22, 27:12
**interaction** [1] - 108:13
**interactions** [1] - 57:12
**interactive** [1] - 12:22
**interchangeably** [1] - 106:9
**interest** [2] - 80:6, 104:12
**interfere** [1] - 94:18
**interfering** [1] - 108:15
**interim** [3] - 96:20, 100:22, 101:10
**internal** [17] - 27:8, 27:12, 27:22, 35:21, 36:7, 36:9, 36:25, 37:14, 37:15, 38:6, 40:10, 45:19, 57:9, 80:6, 113:13, 118:18, 119:24
**Internal** [1] - 38:2
**internally** [1] - 36:1
**interrupt** [1] - 117:2
**interview** [23] - 43:6, 44:8, 46:14, 46:16, 46:20, 51:5, 52:4, 53:7, 53:15, 54:5, 54:13, 55:19, 81:20, 87:9, 87:10, 87:14, 87:19, 87:23, 87:25, 88:2, 118:22, 121:5, 124:5
**interviewed** [3] - 55:7, 55:10, 118:19
**interviews** [9] - 36:19, 44:7, 45:13, 46:9, 87:8, 121:16, 121:23, 122:13, 123:24
**intoxicated** [1] - 88:12
**intro** [1] - 87:16
**intro-ish** [1] - 87:16
**introduced** [2] - 71:13, 122:5
**introductions** [1] - 121:18
**investigate** [3] - 72:20, 110:20, 111:3
**investigated** [7] - 19:20, 19:23, 20:2, 20:5, 67:4, 72:17, 79:14

**investigating** [5] - 46:25, 72:16, 78:16, 79:9, 80:7
**investigation** [66] - 7:22, 14:20, 16:19, 18:20, 18:24, 19:1, 20:19, 21:9, 27:16, 27:18, 30:18, 31:7, 32:8, 32:24, 33:5, 35:15, 35:18, 36:3, 36:11, 36:13, 36:19, 37:5, 38:9, 38:14, 39:9, 40:7, 40:20, 41:3, 41:4, 42:2, 42:11, 42:24, 43:7, 43:8, 44:1, 44:6, 44:23, 45:13, 45:14, 48:5, 50:10, 50:15, 50:22, 51:6, 55:6, 67:12, 67:15, 81:11, 81:16, 82:9, 82:10, 87:8, 88:7, 89:9, 95:21, 96:4, 100:9, 101:20, 103:6, 105:7, 118:14, 118:17, 119:2, 122:9, 124:11, 129:2
**Investigations** [1] - 38:2
**investigations** [23] - 12:21, 14:4, 14:10, 14:14, 16:22, 20:18, 27:7, 27:9, 27:20, 36:8, 36:9, 36:25, 37:14, 37:16, 38:7, 43:15, 45:20, 63:1, 63:4, 67:11, 115:20, 118:18, 119:24
**investigator** [10] - 36:3, 37:1, 38:17, 39:3, 39:6, 39:17, 40:11, 42:22, 48:3, 57:9
**involved** [24] - 14:20, 25:4, 27:11, 27:17, 28:20, 30:24, 33:2, 36:24, 37:5, 37:7, 37:9, 39:8, 40:6, 64:15, 64:17, 95:19, 95:25, 96:1, 97:6, 99:3, 99:6, 99:16, 118:14, 127:8
**involvement** [4] - 61:16, 62:17, 62:20, 65:15
**ish** [1] - 87:16
**issue** [15] - 27:22, 30:21, 31:11, 31:14, 31:16, 35:2, 45:3, 80:6, 81:15, 88:7, 95:19, 95:21, 97:14, 97:19, 105:6

**issues** [10] - 31:21, 35:8, 50:7, 65:2, 65:8, 66:8, 67:1, 67:3, 67:9, 85:8
**IT** [1] - 15:18
**it's..** [1] - 29:10
**itself** [1] - 27:10

## J

**Jackson** [1] - 115:11
**Jacqueline** [1] - 115:12
**jerk** [1] - 114:21
**Jerrell** [5] - 50:22, 55:5, 55:14, 121:11, 122:3
**Jim** [2] - 123:7, 123:13
**job** [21] - 12:18, 13:2, 13:10, 31:21, 31:22, 48:3, 48:11, 57:21, 70:23, 107:6, 107:22, 107:23, 108:7, 108:8, 108:15, 108:20, 108:25, 109:21, 110:6, 113:16, 125:17
**join** [1] - 64:19
**joke** [1] - 72:24
**jokes** [1] - 44:14
**jury** [1] - 8:20

## K

**Katie** [1] - 7:5
**keeled** [1] - 119:6
**keep** [4] - 18:13, 18:14, 90:14, 104:1
**keeping** [1] - 21:4
**Kelly** [4] - 5:9, 60:1, 60:2, 80:25
**KELLY** [1] - 60:4
**KELSEY** [2] - 4:3, 5:1
**Kelsey** [3] - 5:7, 128:1, 130:10
**Keshia** [1] - 54:1
**key** [1] - 61:6
**kind** [19] - 6:13, 13:6, 13:11, 37:16, 37:18, 64:22, 69:19, 75:5, 84:9, 87:16, 90:9, 98:23, 102:18, 106:9, 109:6, 113:14, 119:6, 123:22, 127:21
**kinds** [2] - 79:7, 104:25
**knowing** [3] - 44:25, 45:5, 70:18

knowledge [9] - 17:9, 19:18, 35:6, 35:7, 73:24, 83:1, 83:5, 112:11, 127:5

known [7] - 72:25, 73:4, 73:7, 73:12, 73:13, 73:17, 109:8

knows [1] - 76:6

KOLENICH [6] - 4:4, 123:10, 127:24, 129:24, 130:2, 130:5

Kolenich [3] - 93:5, 123:13, 129:23

## L

L-A-I-R [1] - 96:10

labeled [1] - 75:8

Labor [1] - 11:14

labor [2] - 37:12, 105:4

lack [6] - 29:16, 29:17, 30:2, 50:5, 124:7, 124:15

Lair [2] - 96:7, 96:13

landed [2] - 67:18, 116:1

language [2] - 37:18, 61:12

lapse [1] - 98:11

large [2] - 62:4, 84:22

last [5] - 54:2, 64:13, 64:22, 68:23, 75:23

lastly [1] - 127:13

Lateesha [2] - 96:17, 117:6

Latisha [7] - 96:18, 117:5, 117:7, 117:8, 117:23

Lauren [2] - 43:21, 46:13

Lauren's [2] - 120:3, 120:18

Law [2] - 9:22, 36:2

law [16] - 10:2, 10:9, 10:11, 10:16, 10:22, 10:24, 36:23, 37:2, 40:9, 89:25, 102:20, 103:3, 103:4, 103:9, 112:25

lawful [1] - 5:2

lawns [1] - 10:8

Lawrence [2] - 80:15, 80:20

laws [2] - 18:9, 84:3

lawyer [1] - 100:25

lawyers [1] - 7:5

layer [1] - 27:23

layers [1] - 41:12

LD [2] - 106:3, 106:5

leadership [6] - 61:6, 65:1, 111:25, 112:2, 112:13, 126:10

learning [1] - 13:9

least [11] - 14:17, 28:1, 36:16, 36:21, 51:19, 62:7, 69:6, 74:8, 106:2, 108:21, 124:10

leave [32] - 30:13, 31:7, 31:12, 31:23, 32:3, 33:4, 39:18, 69:23, 81:15, 81:22, 81:24, 82:1, 85:4, 85:8, 90:11, 90:15, 91:2, 91:8, 91:9, 92:8, 95:22, 97:22, 97:24, 97:25, 98:4, 98:5, 98:9, 98:13, 99:7, 99:10, 99:12, 103:14

led [2] - 61:9, 123:21

left [3] - 32:16, 68:20, 127:6

legal [8] - 11:2, 11:23, 75:7, 75:9, 101:3, 101:6, 101:8, 101:23

lens [1] - 115:22

lenses [1] - 116:3

less [2] - 90:17, 98:22

letter [1] - 126:25

level [6] - 12:24, 22:14, 64:9, 102:15, 114:18, 123:23

Liaison [1] - 118:7

lied [1] - 71:17

lies [1] - 61:5

Lieutenant [22] - 37:4, 38:1, 38:13, 38:19, 39:7, 42:6, 43:1, 43:8, 43:20, 44:12, 44:23, 46:17, 46:20, 55:23, 56:21, 57:19, 58:1, 58:12, 59:6, 92:13, 92:20, 93:22

life.. [1] - 69:1

light [7] - 81:22, 82:2, 82:7, 97:23, 106:7, 106:10

likely [10] - 13:16, 29:19, 33:13, 60:1, 87:21, 90:18, 101:24, 115:21, 116:2, 120:24

limited [18] - 65:18, 81:6, 81:12, 82:14, 83:3, 106:5, 106:8, 106:11, 106:13, 106:17, 106:23, 107:1, 107:5, 107:13, 108:4,

109:11, 109:24, 116:23

lines [1] - 46:8

lingered [1] - 73:18

litigation [2] - 44:3, 85:11

live [1] - 8:18

Local [3] - 36:6, 72:15, 82:19

local [1] - 13:21

located [1] - 12:6

longest [1] - 10:17

look [17] - 16:19, 36:4, 48:3, 48:10, 54:17, 68:18, 69:16, 72:8, 75:17, 75:20, 108:6, 110:17, 111:6, 117:16, 117:22, 120:20, 121:10

looked [9] - 9:18, 14:21, 24:19, 65:11, 77:11, 96:3, 115:17, 115:22, 116:2

looking [7] - 21:11, 53:18, 77:13, 106:24, 115:21, 124:1, 125:25

looks [9] - 53:7, 54:1, 55:5, 68:4, 71:10, 75:22, 99:21, 102:4, 120:14

loose [1] - 118:13

losing [1] - 124:21

lost [1] - 124:21

lunch [7] - 6:20, 86:4, 86:5, 86:11, 86:23, 87:2, 87:7

lying/covering [1] - 71:21

## M

major [2] - 40:9, 109:25

majority [2] - 112:7, 120:23

male [2] - 110:11, 110:22

managed [1] - 81:13

Management [1] - 12:17

management [2] - 83:18, 84:8

Manager [1] - 36:10

manager [8] - 11:12, 26:10, 34:4, 36:17, 63:15, 97:8, 112:16, 117:23

manager's [2] - 76:2, 78:3

Manager's [3] - 35:16,

36:2, 96:15

managers [3] - 13:3, 79:5, 113:2

manages [2] - 82:25, 106:21

managing [1] - 11:9

mandated [1] - 111:21

mandatory [1] - 64:20

manner [1] - 102:22

March [1] - 100:10

marked [8] - 59:3, 99:18, 102:1, 114:7, 119:13, 120:9, 122:18, 122:25

MARKED [1] - 4:10

match [1] - 45:15

Matt [9] - 7:3, 7:5, 92:22, 119:20, 120:1, 120:20, 121:7, 121:21, 122:7

matter [8] - 27:17, 30:14, 36:15, 43:13, 67:25, 94:23, 102:17, 111:13

matters [5] - 12:5, 29:6, 29:11, 29:18, 48:10

McKinley [1] - 104:7

McQuiddy [4] - 17:2, 18:19, 19:25, 66:7

McQuiddy's [2] - 18:1, 21:13

mean [83] - 13:19, 19:11, 20:13, 20:16, 21:10, 21:23, 22:11, 23:13, 24:1, 26:2, 26:10, 27:13, 28:25, 29:5, 29:13, 30:10, 35:14, 38:15, 38:24, 39:4, 39:20, 39:21, 40:1, 40:9, 40:10, 41:24, 44:24, 47:11, 48:17, 50:5, 52:7, 55:21, 56:10, 57:3, 58:17, 62:25, 63:19, 64:5, 65:13, 65:17, 67:13, 67:19, 70:12, 72:10, 72:13, 74:18, 74:24, 74:25, 78:9, 79:1, 81:10, 84:21, 94:14, 94:15, 95:20, 101:4, 102:9, 103:3, 105:2, 105:3, 105:12, 105:20, 106:3, 106:5, 106:16, 107:24, 108:2, 109:12, 110:19, 111:13, 111:20, 112:2, 112:5, 117:14, 117:20, 119:4, 119:21, 122:10,

123:22, 124:18, 130:3

meaning [2] - 30:25, 115:12

means [5] - 21:18, 31:2, 39:2, 39:25, 77:21

meant [3] - 6:3, 67:23, 78:18

medical [1] - 82:5

meet [2] - 7:9, 7:12

meeting [6] - 120:21, 121:1, 126:14, 126:18, 126:24, 127:1

meetings [1] - 63:15

meets [1] - 70:18

Meghan [6] - 17:1, 17:25, 18:19, 19:25, 21:13, 66:7

Melissa [1] - 64:17

member [1] - 71:14

members [1] - 122:14

membership [3] - 76:2, 78:4, 78:12

membership" [1] - 78:10

memo [1] - 36:24

men [1] - 110:13

mental [1] - 83:25

mentality [3] - 61:13, 61:23, 73:1

mentally [1] - 107:15

mentioned [5] - 33:19, 53:7, 60:11, 64:2, 107:9

mentions [1] - 36:24

mentor [1] - 13:7

messages [2] - 123:25, 124:8

met [2] - 5:7, 7:15

Metropolitan [1] - 114:9

Mezher [1] - 78:20

MEZHER [1] - 78:20

Miami [3] - 9:10, 10:9, 10:11

Michael [4] - 28:21, 31:8, 33:20, 70:8

middle [2] - 70:11, 70:15

might [9] - 44:25, 45:1, 45:11, 77:25, 101:21, 102:20, 104:19, 105:4, 108:11

Milligan [1] - 99:22

mind [1] - 66:10

minor [1] - 49:11

minute [1] - 118:9

minutes [2] - 5:8,

86:13
**miscommunication** [1] - 98:24
**missing** [1] - 46:7
**mistaken** [2] - 76:6, 125:12
**Mitchell** [4] - 118:14, 118:15, 118:16
**moaning** [2] - 88:16, 88:20
**Mollie** [2] - 96:7, 96:12
**MOLLIE** [1] - 96:10
**Monday** [2] - 82:24
**money** [1] - 125:9
**monitor** [1] - 103:21
**months** [1] - 11:8
**morning** [2] - 52:24, 71:22
**most** [7] - 13:2, 24:25, 42:1, 79:14, 98:6, 103:4, 108:24
**mouth** [1] - 31:6
**move** [3] - 85:14, 89:23, 91:21
**moved** [6] - 11:6, 11:16, 57:8, 82:7, 83:9, 97:2
**moving** [1] - 49:22
**mowed** [1] - 10:8
**Muething** [1] - 34:5
**Mulloy** [3] - 5:10, 38:11, 55:16
**MULLOY** [2] - 117:2, 128:3
**multifaceted** [1] - 14:16
**multiple** [9] - 72:6, 111:8, 116:5, 116:6, 116:11, 116:12, 122:8, 122:13, 122:14
**MYERS** [2] - 117:2, 128:3
**Myers** [3] - 5:10, 38:11, 55:16

## N

**name** [20] - 5:8, 10:19, 10:22, 14:25, 17:1, 17:3, 17:5, 50:23, 64:12, 64:14, 78:21, 79:1, 79:19, 80:2, 80:17, 113:23, 114:2, 115:18, 123:13
**named** [5] - 50:21, 54:5, 78:19, 80:15, 113:22
**namely** [1] - 61:6
**names** [4] - 14:19,

14:23, 64:6, 115:18
**Natasha** [1] - 112:15
**natural** [1] - 6:13
**nature** [5] - 15:9, 27:14, 31:13, 39:24, 109:3
**near** [4] - 31:18, 53:20, 53:21, 53:22
**necessarily** [16] - 7:24, 27:4, 27:22, 48:21, 49:25, 50:13, 57:2, 57:7, 67:13, 74:24, 80:23, 87:15, 87:19, 90:18, 103:10, 103:23
**need** [13] - 6:21, 34:14, 39:4, 58:18, 58:21, 91:7, 91:23, 92:3, 94:2, 106:23, 117:3, 119:10, 129:14
**needed** [4] - 28:19, 43:17, 62:9, 62:14
**needs** [1] - 75:7
**negative** [1] - 58:5
**negotiate** [1] - 109:10
**negotiating** [1] - 109:13
**negotiations** [1] - 12:23
**neutral** [2] - 38:16, 39:3
**never** [10] - 31:19, 32:4, 57:1, 57:10, 58:4, 67:14, 69:11, 74:22
**new** [6] - 46:23, 47:1, 58:21, 71:9, 93:15, 113:11
**next** [9] - 22:23, 52:23, 52:24, 68:25, 71:22, 72:23, 75:4, 81:25, 83:4
**Nicole** [4] - 79:20, 79:22, 80:19
**night** [1] - 52:10
**nitty** [1] - 84:9
**nitty-gritty** [1] - 84:9
**NO** [1] - 4:10
**non** [12] - 82:20, 82:23, 83:7, 83:9, 84:1, 84:8, 85:1, 85:15, 85:25, 88:20, 88:23, 88:24
**non-aggressively** [1] - 88:23
**non-consensual** [2] - 88:20, 88:24
**non-duty** [9] - 82:20, 82:23, 83:7, 83:9, 84:1, 84:8, 85:1,

85:15, 85:25
**none** [2] - 8:5, 66:10
**noon** [1] - 86:3
**normal** [3] - 9:15, 34:10, 117:18
**note** [2] - 48:1, 48:9
**notes** [2] - 119:22, 120:1
**nothing** [5] - 31:22, 38:16, 73:25, 77:25, 94:6
**notice** [1] - 91:4
**noticed** [1] - 56:23
**November** [2] - 59:19, 59:24
**nuance** [3] - 42:1, 42:4, 109:19
**nuanced** [3] - 45:2, 48:16, 67:22
**nuances** [1] - 106:19
**Number** [2] - 122:21, 123:3
**number** [4] - 27:5, 35:12, 62:24, 98:22
**numbers** [2] - 68:20, 115:6
**numerous** [2] - 76:5, 79:4

## O

**object** [2] - 20:11, 47:6
**objection** [10] - 16:12, 35:19, 40:25, 56:8, 56:24, 57:25, 61:17, 66:15, 71:3, 78:6
**objections** [1] - 100:4
**obviously** [4] - 8:6, 43:12, 56:15, 121:7
**occasionally** [1] - 44:13
**occur** [1] - 53:16
**occurred** [3] - 26:13, 33:11, 126:24
**occurring** [1] - 34:6
**OCRC** [3] - 102:6, 102:24, 103:14
**odd** [1] - 103:13
**off-record** [1] - 117:4
**off-the-record** [2] - 46:3, 59:2
**offender** [1] - 71:19
**offending** [1] - 71:23
**offense** [1] - 116:8
**offer** [3] - 36:18, 126:25, 127:2
**offered** [1] - 36:18
**offhand** [1] - 15:8
**office** [4] - 76:2, 78:3,

93:6, 96:15
**Office** [2] - 35:16, 36:2
**officer** [1] - 89:24
**officials** [1] - 119:23
**often** [2] - 31:25, 103:5
**ogres** [1] - 109:17
**once** [2] - 17:6, 83:1
**one** [48] - 8:10, 14:18, 19:13, 28:25, 29:3, 29:6, 29:15, 35:5, 35:22, 35:23, 36:16, 37:10, 39:23, 46:8, 47:10, 51:11, 51:15, 53:8, 55:19, 56:13, 57:20, 59:25, 63:8, 68:6, 68:23, 68:25, 71:8, 71:9, 71:13, 75:21, 75:23, 76:9, 78:10, 79:12, 79:14, 79:24, 81:19, 85:11, 87:20, 96:1, 102:12, 107:4, 114:23, 115:6, 118:21, 120:2, 124:20, 128:13
**one's** [1] - 103:24
**ones** [1] - 39:20
**ongoing** [1] - 63:7
**opened** [1] - 41:24
**operations** [2] - 38:8
**opinion** [3] - 19:16, 62:14, 127:22
**opposite** [1] - 57:11
**order** [5] - 83:22, 128:23, 129:17, 129:20, 130:5
**otherwise** [2] - 32:6, 94:21
**outcome** [1] - 67:12
**outcomes** [1] - 67:25
**outlined** [1] - 82:18
**outlines** [1] - 36:7
**outside** [4] - 30:8, 72:18, 108:4, 109:15
**overall** [2] - 29:2, 67:20
**overlap** [1] - 12:1
**overseeing** [1] - 127:22
**overtime** [2] - 111:16, 111:19
**Overwhelmingly** [1] - 64:24
**Oxford** [1] - 9:10

## P

**p.m** [1] - 118:12
**P.M** [2] - 86:24, 130:13
**PAGE** [1] - 4:2

**Page** [6] - 61:4, 64:22, 68:22, 69:16, 70:22, 75:21
**page** [5] - 5:18, 68:6, 68:25, 71:8, 75:4
**pages** [1] - 59:6
**paid** [3] - 90:15, 91:8, 98:25
**Paige** [2] - 5:8, 45:23
**paired** [1] - 13:7
**panels** [1] - 65:1
**paper** [1] - 28:10
**paperwork** [5] - 92:16, 92:21, 93:7, 94:8, 115:25
**paragraph** [5] - 60:10, 60:12, 60:14, 64:23, 77:20
**paralegal** [1] - 10:13
**parent** [1] - 11:1
**part** [14] - 18:20, 33:19, 40:6, 50:22, 59:5, 61:1, 61:9, 64:23, 73:1, 74:2, 89:2, 101:15, 115:9, 126:11
**partially** [1] - 36:16
**partially"** [1] - 36:22
**participant** [1] - 68:3
**participants** [3] - 64:24, 66:14, 66:18
**participate** [1] - 36:12
**participated** [1] - 66:1
**participation** [1] - 64:21
**particular** [6] - 29:1, 33:25, 61:8, 72:20, 79:2, 88:8
**particularly** [4] - 10:7, 10:8, 83:2, 109:23
**parties** [2] - 67:16, 91:10
**partner** [1] - 27:7
**party** [2] - 52:11, 52:12
**pass** [2] - 9:24, 126:8
**passed** [1] - 112:10
**past** [2] - 67:5, 117:10
**pattern** [4] - 21:22, 41:17, 116:24, 124:8
**patterns** [1] - 41:9
**Paula** [2] - 34:5, 34:21
**pause** [1] - 55:4
**pay** [7] - 33:13, 84:10, 84:24, 98:6, 98:12, 98:15, 98:22
**paychecks** [1] - 98:19
**paying** [1] - 109:24
**payroll** [3] - 33:10, 33:12, 99:2
**penalty** [3] - 22:21,

90:1, 90:2
**pendency** [1] - 33:4
**pending** [2] - 90:11, 91:2
**pension** [3] - 93:21, 95:2, 95:12
**people** [21] - 14:20, 24:2, 26:25, 36:12, 38:25, 54:6, 58:21, 64:19, 65:16, 65:22, 67:11, 68:10, 69:13, 69:14, 72:11, 74:20, 84:13, 108:24, 110:18, 110:21, 128:24
**per** [2] - 50:11, 109:25
**percent** [1] - 13:23
**perfect** [1] - 121:1
**perfectly** [1] - 121:2
**performance** [3] - 28:24, 29:2, 29:3
**period** [11] - 10:14, 83:3, 93:13, 93:18, 98:6, 98:13, 98:15, 98:22, 99:12, 104:16, 107:14
**periods** [2] - 38:25, 117:19
**perpetuate** [2] - 61:12, 61:23
**perpetuates** [1] - 72:25
**person** [14] - 38:13, 46:23, 47:1, 48:19, 57:23, 58:11, 58:12, 62:5, 71:9, 72:17, 90:17, 92:16, 108:25, 120:14
**personal** [10] - 35:6, 38:20, 39:10, 39:25, 47:16, 47:19, 48:2, 48:10, 48:13, 49:1
**personally** [5] - 48:5, 51:12, 51:19, 74:14, 119:25
**personnel** [2] - 20:8, 20:23
**perspective** [7] - 43:22, 47:19, 48:13, 62:11, 73:23, 74:9, 74:12
**pertinent** [4] - 40:12, 40:17, 53:25, 102:10
**petitions** [1] - 12:3
**phases** [1] - 60:19
**phone** [4] - 54:12, 54:23, 92:4, 92:13
**phonetic** [3] - 96:17, 100:19, 117:6
**physical** [7] - 83:14, 83:16, 83:19, 83:22,

83:24, 84:5, 84:7
**physically** [3] - 49:18, 107:11, 107:16
**pick** [1] - 116:7
**pictures** [2] - 49:15, 49:19
**piece** [5] - 12:5, 15:4, 88:7, 109:9, 116:24
**place** [3] - 30:12, 64:19, 89:20
**placed** [3] - 31:8, 33:3, 81:25
**places** [1] - 10:17
**placing** [2] - 31:6, 111:23
**Plaintiff's** [1] - 59:1
**Planning** [1] - 60:14
**play** [3] - 48:6, 61:1, 91:12
**played** [4] - 32:4, 94:13, 95:1, 124:14
**playing** [1] - 31:24
**point** [19] - 6:7, 8:9, 17:9, 32:21, 33:17, 57:20, 61:25, 64:18, 73:9, 73:10, 81:5, 96:23, 99:1, 100:22, 106:22, 124:4, 126:22, 127:14, 127:18
**poke** [1] - 37:25
**poker** [1] - 41:10
**police** [1] - 93:12
**Police** [1] - 96:2
**policies** [12] - 15:17, 15:18, 15:20, 18:8, 19:18, 25:14, 25:18, 25:23, 68:9, 109:14, 109:16
**policy** [15] - 11:10, 18:17, 20:14, 22:3, 22:14, 25:22, 27:3, 75:8, 107:8, 107:25, 108:4, 109:19, 113:20, 114:15, 114:22
**poll** [1] - 73:22
**polygraph** [1] - 95:18
**pool** [4] - 8:20, 124:14, 124:19
**poor** [1] - 29:3
**poorly** [1] - 114:19
**popped** [1] - 78:1
**posed** [1] - 71:17
**position** [6] - 11:13, 12:8, 21:22, 47:16, 57:16, 58:13
**positions** [1] - 19:17
**positive** [1] - 69:10
**possibility** [2] - 108:20, 119:23

**possible** [11] - 72:19, 88:21, 88:25, 109:10, 111:11, 111:15, 116:17, 116:20, 116:24, 121:17, 121:20
**possibly** [1] - 18:4
**potentially** [10] - 19:6, 38:23, 42:15, 42:16, 50:19, 67:6, 70:12, 102:11, 111:1, 111:2
**practice** [2] - 10:3, 32:1
**pre** [2] - 92:8, 93:17
**pre-D** [2] - 92:8, 93:17
**predated** [1] - 34:5
**predisciplinary** [7] - 90:6, 90:11, 90:14, 90:21, 91:2, 91:11, 94:10
**prefer** [1] - 81:23
**preliminary** [1] - 107:2
**prep** [1] - 7:2
**Preparation** [1] - 60:15
**preponderance** [1] - 50:1
**prepped** [2] - 7:6, 7:7
**present** [7] - 50:14, 52:3, 58:4, 64:25, 71:16, 91:25, 121:22
**presented** [2] - 57:24, 74:1
**president** [2] - 92:23, 121:7
**press** [1] - 73:25
**pressed** [1] - 125:5
**pressure** [1] - 125:11
**pretty** [6] - 6:13, 10:2, 55:8, 58:13, 111:20, 114:22
**previous** [3] - 22:8, 27:8, 121:10
**previously** [2] - 17:8, 19:4
**primarily** [3] - 13:7, 15:3, 17:19
**primary** [5] - 12:6, 31:15, 37:1, 40:8, 40:14
**privacy** [1] - 119:2
**private** [1] - 94:1
**problem** [2] - 61:5, 76:1
**procedural** [3] - 37:17, 37:22, 37:25
**procedure** [1] - 38:10
**procedures** [1] - 36:8
**proceedings** [1] - 31:24
**process** [40] - 12:22,

28:9, 28:10, 28:11, 29:19, 32:4, 35:18, 36:20, 36:25, 81:8, 81:11, 89:21, 90:3, 90:7, 90:8, 90:10, 90:12, 91:1, 91:9, 91:12, 91:21, 91:22, 92:1, 92:11, 92:16, 92:17, 92:25, 93:16, 94:3, 94:10, 95:1, 112:6, 112:24, 113:11, 126:14, 127:15, 127:22, 128:17, 128:21
**processed** [1] - 98:7
**processes** [6] - 12:18, 13:9, 37:19, 48:5, 65:16, 113:14
**processing** [1] - 12:21
**produced** [1] - 100:5
**product** [1] - 66:23
**profanity** [1] - 114:17
**professionalism** [1] - 114:16
**program** [2] - 82:25, 83:5
**programs** [1] - 84:22
**progressed** [1] - 104:16
**progressive** [1] - 21:21
**prohibited** [1] - 22:19
**promoted** [2] - 11:8, 11:11
**promotional** [1] - 65:1
**promptly** [1] - 95:22
**properly** [2] - 67:4, 67:24
**protect** [1] - 27:25
**protected** [2] - 101:24, 114:20
**provide** [2] - 13:22, 105:23
**provided** [3] - 51:6, 65:21, 74:16
**provision** [1] - 36:6
**provisions** [1] - 82:21
**pry** [1] - 8:18
**psychological** [1] - 84:6
**psychology** [1] - 9:12
**PTO** [1] - 97:15
**Public** [2] - 113:5, 115:23
**public** [4] - 18:8, 18:17, 99:22, 113:18
**pull** [2] - 112:18, 117:18
**pulled** [3] - 49:13, 50:18, 116:16
**pulse** [1] - 58:22

**punk** [1] - 115:14
**purposely** [2] - 111:17, 111:22
**pursue** [1] - 90:19
**pursued** [1] - 53:12
**pursuing** [1] - 84:23
**put** [9] - 55:9, 90:10, 91:1, 91:9, 97:22, 99:10, 116:6, 122:4, 127:20
**putting** [1] - 31:6
**PWI** [3] - 76:3, 77:21, 77:25

## Q

**questioned** [1] - 71:17
**questioning** [5] - 43:5, 46:8, 46:20, 71:23
**questions** [20] - 5:12, 6:6, 7:2, 8:15, 41:2, 41:16, 41:18, 44:13, 53:24, 87:5, 88:6, 104:8, 104:14, 105:6, 122:24, 123:7, 123:8, 128:8, 129:6, 129:8
**quick** [2] - 118:8, 119:10
**quite** [1] - 57:11
**quote** [1] - 13:17

## R

**rack** [1] - 77:25
**radar** [1] - 32:25
**raised** [2] - 47:13, 47:20
**raising** [1] - 80:5
**rambling** [1] - 58:9
**Ramsey** [6] - 17:22, 17:23, 25:1, 25:3, 76:9, 96:20
**rank** [1] - 112:8
**ranking** [1] - 64:10
**rapport** [2] - 44:17, 45:4
**rather** [3] - 31:5, 31:6, 94:21
**rationale** [5] - 27:22, 29:22, 32:2, 34:17, 117:12
**reach** [4] - 102:13, 103:8, 103:9, 103:10
**reached** [8] - 17:7, 19:5, 19:7, 19:12, 52:16, 92:2, 98:8, 105:16
**reaching** [2] - 103:11, 106:21

**read** [21] - 22:25, 23:2, 57:1, 57:7, 58:19, 59:7, 59:12, 59:21, 65:3, 71:12, 73:1, 73:19, 74:2, 74:5, 75:10, 75:22, 76:10, 85:12, 128:2, 129:9, 129:14
**realize** [1] - 98:12
**really** [13] - 21:19, 28:16, 56:1, 56:2, 58:8, 75:20, 90:15, 95:20, 103:16, 104:17, 117:12, 119:1, 119:10
**realm** [1] - 103:12
**reason** [17] - 20:4, 29:1, 33:19, 40:6, 40:8, 42:9, 46:9, 54:2, 55:18, 55:22, 56:20, 79:1, 83:25, 89:2, 101:2, 101:14, 104:17
**reasons** [2] - 28:25, 37:10
**Rebecca** [51] - 5:9, 14:2, 14:9, 14:13, 15:21, 18:20, 19:9, 21:7, 21:17, 22:5, 23:4, 23:7, 29:23, 35:3, 35:8, 35:18, 40:22, 42:7, 42:13, 42:21, 44:1, 44:5, 46:14, 46:20, 47:5, 47:13, 47:23, 49:2, 49:7, 50:14, 54:8, 66:7, 78:16, 81:5, 81:14, 81:19, 83:6, 84:13, 85:7, 85:14, 103:20, 104:12, 104:15, 104:22, 110:2, 110:8, 110:11, 110:18, 111:7, 118:19, 129:1
**Rebecca's** [14] - 21:9, 46:8, 47:20, 50:17, 58:11, 84:18, 89:3, 89:6, 89:9, 91:19, 94:24, 97:15, 103:14, 107:20
**recalling** [2] - 53:4, 79:3
**receive** [3] - 12:11, 13:15, 101:8
**recent** [1] - 79:14
**recently** [1] - 59:15
**recess** [1] - 86:23
**recognize** [8] - 8:10, 99:20, 102:3, 109:17, 120:6, 120:11, 122:20, 123:3

**recognizing** [1] - 98:17
**recollection** [9] - 44:11, 51:17, 77:8, 77:12, 79:13, 79:24, 80:23, 112:22, 114:9
**recommend** [7] - 89:20, 89:22, 90:8, 90:12, 90:13, 111:11, 126:15
**recommendation** [6] - 36:15, 89:13, 89:14, 89:24, 127:14, 127:17
**recommendations** [2] - 91:12, 112:13
**recommended** [4] - 89:18, 90:2, 91:20, 126:14
**recommending** [1] - 90:24
**record** [15] - 6:4, 8:21, 8:22, 8:25, 9:2, 23:3, 45:24, 46:1, 46:3, 51:21, 59:2, 86:22, 87:1, 117:4, 120:8
**recording** [3] - 118:24, 121:17, 122:6
**recordkeeping** [5] - 18:8, 18:12, 28:11, 33:17
**records** [14] - 18:9, 18:13, 18:15, 18:17, 20:17, 21:5, 33:10, 33:12, 53:14, 73:20, 99:22, 102:14, 102:20, 113:17
**recoup** [1] - 99:11
**RECROSS** [2] - 4:5, 128:11
**RECROSS-EXAMINATION** [2] - 4:5, 128:11
**recruit** [1] - 27:2
**recruiter** [1] - 57:14
**recruiting** [1] - 58:13
**recruitment** [2] - 57:15, 127:21
**recruits** [1] - 128:16
**redacted** [1] - 101:15
**reduce** [1] - 95:15
**reentered** [2] - 55:16, 93:5
**REFERENCED** [1] - 4:10
**referring** [1] - 115:10
**reflection** [1] - 99:8
**refuse** [1] - 110:23
**regard** [2] - 22:18, 47:8

**regarding** [1] - 106:2
**regardless** [2] - 74:1, 108:1
**regards** [2] - 15:5, 23:13
**regular** [4] - 63:21, 105:8, 105:25, 117:24
**regularly** [1] - 117:17
**Regulation** [2] - 63:4, 63:9
**regulations** [2] - 15:19, 25:23
**reiterated** [1] - 124:4
**related** [42] - 12:2, 19:10, 24:3, 29:4, 29:7, 29:15, 29:17, 29:23, 30:14, 30:17, 30:22, 39:22, 41:3, 41:15, 41:18, 43:5, 54:4, 54:8, 79:17, 82:9, 82:20, 82:22, 82:23, 82:25, 83:7, 83:8, 83:9, 83:21, 84:1, 84:8, 85:14, 85:15, 101:19, 103:24, 112:22, 113:9, 113:17, 114:15, 115:16, 123:23
**relatedness** [4] - 83:15, 84:4, 84:11, 85:1
**relation** [3] - 15:18, 25:15, 80:3
**relations** [1] - 105:4
**Relations** [1] - 11:14
**relationship** [2] - 39:25, 63:24
**relatively** [3] - 81:11, 83:9, 114:2
**relay** [2] - 58:20, 85:20
**relayed** [4] - 81:24, 82:5, 126:19, 127:2
**released** [1] - 100:13
**relevant** [7] - 19:10, 19:14, 41:12, 42:3, 63:18, 69:1, 119:1
**remainder** [1] - 127:7
**remained** [1] - 112:8
**remaining** [2] - 97:25, 126:22
**remember** [26] - 7:19, 10:19, 25:10, 29:13, 29:15, 29:20, 35:13, 41:1, 49:10, 49:11, 49:20, 52:20, 52:22, 52:25, 64:13, 81:20, 88:4, 88:17, 97:14, 100:14, 113:9, 116:9, 116:22,

118:22, 124:22, 125:23
**remove** [2] - 98:19, 124:17
**removed** [1] - 104:17
**repaired** [1] - 49:20
**repeatedly** [1] - 71:21
**rephrase** [2] - 6:8, 14:12
**replaced** [1] - 96:24
**replacements** [1] - 99:6
**report** [33] - 25:16, 26:1, 26:15, 52:9, 55:6, 55:9, 55:25, 56:22, 57:4, 58:25, 59:5, 60:23, 62:10, 62:13, 65:7, 66:12, 72:19, 76:18, 87:18, 89:19, 91:5, 91:19, 92:3, 92:11, 100:11, 100:16, 101:20, 108:1, 112:3, 112:12, 113:3, 116:12, 116:16
**reported** [5] - 67:9, 77:5, 87:23, 88:1, 110:11
**REPORTER** [5] - 45:25, 129:16, 129:19, 129:22, 130:7
**reporter** [2] - 5:20, 23:2
**reporting** [1] - 75:9
**Reporting** [1] - 45:12
**reports** [1] - 105:7
**represent** [3] - 5:9, 122:8, 123:13
**representing** [2] - 121:11, 122:14
**request** [3] - 26:7, 111:8, 117:22
**require** [2] - 67:7, 84:5
**requirements** [1] - 91:3
**requires** [1] - 107:25
**resigned** [1] - 32:16
**resolution** [1] - 68:1
**resource** [2] - 63:13, 64:1
**Resources** [4] - 11:6, 11:13, 11:17, 118:7
**resources** [3] - 27:6, 81:3, 96:4
**respond** [2] - 28:16, 88:23
**responded** [2] - 58:24, 66:18
**response** [11] - 25:20, 25:25, 26:4, 26:15,

28:3, 28:14, 29:15, 29:16, 56:5, 56:9, 56:10
**responses** [2] - 44:18, 68:5
**responsive** [1] - 102:19
**rest** [2] - 49:24, 50:3
**restrictions** [2] - 108:7, 108:16
**result** [5] - 32:7, 60:11, 82:7, 89:8, 89:12
**results** [3] - 27:25, 59:16, 105:18
**retain** [2] - 119:22, 119:25
**retained** [2] - 20:22, 119:19
**retaliation** [4] - 87:11, 87:17, 110:8, 111:1
**retention** [2] - 18:17, 20:13
**retire** [3] - 93:20, 94:21, 95:4
**retired** [2] - 32:16, 94:8
**retirement** [5] - 93:13, 93:18, 94:7, 94:18, 95:3
**retirements** [1] - 93:12
**retiring** [3] - 93:9, 94:4, 112:7
**return** [2] - 104:2, 106:3
**returned** [1] - 95:22
**review** [6] - 7:24, 24:17, 63:3, 89:25, 113:2, 129:11
**reviewed** [2] - 36:1, 112:23
**reviewing** [3] - 12:2, 53:14, 113:4
**revisit** [1] - 75:7
**Reynolds** [1] - 113:22
**Reynolds"** [1] - 113:25
**Richards** [1] - 10:19
**RICHARDSON** [17] - 4:4, 4:5, 5:6, 9:1, 22:25, 46:2, 46:4, 46:5, 86:16, 86:20, 86:25, 118:8, 123:6, 128:5, 128:7, 128:12, 129:18
**Richardson** [1] - 5:9
**rights** [1] - 94:18
**rise** [1] - 114:17
**risk** [4] - 83:18, 84:8, 93:23, 99:13
**robust** [1] - 26:19

**role** [14] - 11:7, 11:8, 11:16, 11:18, 40:10, 40:15, 57:8, 57:13, 57:23, 58:15, 58:23, 97:1, 103:17, 127:21
**roles** [1] - 97:3
**Ron** [1] - 79:13
**room** [3] - 38:11, 55:16, 93:5
**round** [1] - 51:25
**row** [1] - 75:6
**Rowekamp** [1] - 10:18
**RTD** [2] - 106:2, 106:3
**rude** [1] - 6:3
**ruined** [2] - 49:8, 49:11
**rules** [5] - 5:18, 82:17, 82:18, 106:13, 107:5
**run** [1] - 64:7
**rundown** [1] - 10:10
**runs** [1] - 64:4

## S

**safe** [1] - 71:15
**sake** [2] - 104:19, 111:12
**satisfied** [1] - 67:12
**saw** [1] - 114:6
**scenario** [2] - 111:22, 117:21
**scenarios** [1] - 71:5
**scenes** [1] - 128:18
**schedule** [11] - 82:21, 84:23, 90:21, 91:5, 92:7, 94:10, 106:19, 111:8, 112:1, 122:2, 128:10
**scheduled** [2] - 91:10, 111:16
**schedules** [1] - 121:24
**scheduling** [6] - 91:2, 93:17, 111:17, 111:19, 111:23, 122:1
**scheme** [1] - 75:1
**school** [9] - 9:7, 10:3, 10:8, 10:9, 10:12, 10:16, 10:22, 10:24
**schooling** [2] - 9:20, 10:4
**Scott** [4] - 79:19, 79:20, 79:23, 80:19
**screening** [3] - 126:23, 127:8, 128:22
**screenings** [1] - 126:7
**screenshot** [2] - 98:25, 99:14

**se** [1] - 109:25
**search** [1] - 55:2
**searched** [1] - 17:20
**seat** [1] - 49:23
**seated** [1] - 93:7
**second** [18] - 46:16, 46:19, 60:10, 60:12, 60:14, 81:20, 87:10, 92:19, 107:6, 107:22, 107:23, 108:15, 108:20, 108:25, 109:20, 110:5, 118:22, 118:23
**secondary** [3] - 108:1, 108:9, 109:1
**section** [13] - 11:3, 36:10, 38:4, 38:5, 61:5, 63:3, 69:19, 79:14, 83:18, 96:15, 97:10, 98:3, 103:4
**Section** [1] - 38:2
**sections** [1] - 12:16
**see** [14] - 49:17, 49:18, 61:13, 68:11, 68:13, 69:3, 69:10, 69:24, 73:20, 101:22, 111:3, 116:7, 118:1, 122:1
**seeing** [7] - 45:15, 100:11, 100:16, 101:21, 114:1, 114:6, 117:12
**seem** [3] - 68:5, 68:7, 118:5
**selected** [1] - 38:3
**self** [1] - 44:15
**self-deprecating** [1] - 44:15
**send** [1] - 57:4
**senior** [2] - 11:6, 126:10
**sense** [4] - 98:16, 98:20, 107:10
**sensitive** [1] - 43:23
**sent** [3] - 83:3, 98:10, 121:20
**sentence** [1] - 74:5
**sentiment** [4] - 65:2, 66:13, 67:1, 67:20
**separate** [1] - 48:4
**separately** [1] - 19:12
**separation** [1] - 111:12
**series** [3] - 26:24, 115:19, 123:24
**serious** [1] - 90:17
**seriously** [1] - 69:22
**seriousness** [1] - 36:5
**serve** [1] - 92:15
**served** [1] - 92:21

**Service** [1] - 115:11
**Services** [5] - 11:14, 12:20, 83:13, 113:5, 115:23
**services** [1] - 113:18
**set** [1] - 48:9
**seven** [4] - 11:5, 69:18, 76:4, 76:19
**several** [4] - 12:15, 101:12, 116:7, 126:6
**severity** [1] - 21:20
**Sewer** [1] - 114:10
**sexual** [38] - 13:24, 14:3, 14:10, 14:15, 14:17, 15:6, 15:13, 16:1, 16:4, 16:21, 19:19, 21:7, 21:15, 21:20, 21:23, 22:3, 22:12, 22:14, 24:5, 26:20, 30:4, 30:15, 41:25, 42:23, 63:5, 63:9, 72:25, 73:5, 73:13, 73:20, 74:18, 75:2, 75:7, 75:9, 76:18, 79:17, 99:23, 115:2
**sexually** [5] - 16:9, 16:16, 20:1, 41:21, 48:14
**shadowing** [2] - 13:11, 13:13
**shaking** [2] - 5:23, 76:8
**Shante** [3] - 97:9, 99:3, 99:15
**share** [1] - 128:21
**shared** [1] - 102:16
**Sherman** [5] - 14:22, 15:5, 15:10, 70:6, 101:11
**Sheryl** [1] - 26:11
**shifts** [2] - 82:23, 111:20
**short** [4] - 65:19, 72:21, 86:5, 86:11
**shouting** [2] - 115:10, 115:13
**show** [4] - 16:10, 16:16, 33:13, 98:18
**showed** [3] - 16:15, 92:12, 121:2
**shown** [2] - 32:4, 92:24
**shuffling** [1] - 112:5
**sift** [1] - 40:14
**sign** [1] - 113:2
**signature** [1] - 129:15
**Signature** [1] - 130:10
**signing** [2] - 111:19, 113:8
**similar** [4] - 67:5,

**104:8, 116:16, 117:9
**simply** [1] - 78:13
**single** [2] - 48:21, 87:20
**situation** [15] - 13:12, 43:19, 58:11, 71:20, 72:8, 75:12, 76:12, 76:15, 77:1, 77:2, 80:7, 80:9, 84:15, 84:18
**situations** [2] - 84:13, 109:18
**size** [2] - 42:7, 42:23
**skew** [1] - 44:25
**slightly** [1] - 50:24
**SLOVIN** [20] - 16:12, 20:11, 35:19, 40:25, 47:6, 56:8, 56:24, 57:25, 61:17, 61:19, 66:15, 71:3, 78:6, 86:13, 86:19, 128:1, 128:4, 129:7, 129:15, 129:21
**slow** [1] - 117:3
**Smith** [4] - 14:22, 15:5, 70:6, 101:11
**smooth** [1] - 103:19
**smoothly** [1] - 103:22
**snapshot** [1] - 117:9
**so..** [1] - 49:6
**software** [1] - 122:1
**someone** [24] - 18:6, 19:3, 19:4, 19:16, 19:19, 27:15, 41:21, 42:18, 48:13, 50:21, 54:8, 70:22, 78:13, 78:19, 80:15, 83:24, 85:22, 90:10, 103:11, 111:5, 113:21, 113:22, 121:21, 126:8
**sometimes** [4] - 6:6, 90:13, 116:7, 122:11
**somewhat** [2] - 7:8, 29:10
**soon** [2] - 71:21, 93:1
**sorry** [7] - 30:25, 60:15, 113:24, 118:16, 122:15, 128:4, 128:5
**sort** [6] - 12:24, 15:4, 44:13, 54:6, 90:23, 114:13
**sounds** [3] - 53:1, 71:24, 74:8
**space** [1] - 119:3
**speaking** [1] - 71:4
**speaks** [1] - 37:18
**spearheading** [1] - 64:10
**specific** [17] - 20:15,

**20:19, 22:1, 27:3, 36:10, 42:8, 45:9, 65:20, 66:2, 68:17, 74:25, 89:17, 104:14, 105:16, 117:22, 124:3, 124:18
**specifically** [24] - 14:15, 18:10, 18:25, 24:8, 30:15, 37:7, 37:18, 38:5, 41:2, 42:19, 43:5, 43:9, 53:10, 55:17, 63:2, 63:13, 72:15, 85:14, 87:12, 104:22, 105:13, 105:17, 108:8, 115:1
**specifics** [11] - 13:22, 16:20, 24:4, 25:10, 29:14, 29:21, 49:19, 58:24, 76:22, 83:5, 108:6
**specify** [1] - 72:5
**speed** [1] - 113:14
**splitting** [1] - 129:24
**spoken** [1] - 56:16
**spot** [2] - 68:17, 118:2
**spreadsheet** [1] - 68:3
**staff** [5] - 13:4, 56:18, 62:22, 62:24, 63:3
**staffing** [1] - 11:2
**stance** [2] - 21:17, 48:18
**stand** [2] - 77:25, 118:6
**standard** [3] - 87:13, 87:15, 87:16
**standing** [1] - 105:13
**standpoint** [2] - 18:13, 48:2
**starkly** [1] - 73:22
**start** [4] - 8:14, 40:5, 46:13, 47:12
**started** [4] - 11:5, 12:15, 69:9, 92:17
**startups** [1] - 11:2
**state** [1] - 113:12
**statement** [1] - 66:25
**statements** [4] - 88:14, 89:5, 89:6, 89:7
**stating** [1] - 71:18
**status** [8] - 30:17, 98:2, 98:25, 102:25, 103:15, 104:9, 106:3, 108:2
**step** [2] - 69:14, 103:7
**steps** [9] - 28:18, 83:4, 89:14, 89:23, 90:20, 94:17, 126:22, 126:25, 127:7

**Steve** [1] - 102:5
**Steven** [1] - 100:18
**still** [17] - 18:12, 32:14, 36:12, 48:14, 48:24, 70:7, 84:21, 88:20, 88:23, 93:3, 101:21, 104:4, 112:6, 126:22, 126:25, 128:9, 129:24
**stop** [3] - 6:20, 44:10, 86:8
**stopped** [2] - 118:24, 124:3
**store** [1] - 20:17
**stored** [1] - 20:19
**stories** [1] - 76:5
**strictly** [1] - 111:20
**strike** [1] - 115:15
**strip** [2] - 41:10, 124:19
**strongest** [1] - 115:24
**strongly** [1] - 27:15
**stuck** [1] - 76:7
**studies** [2] - 12:18
**study** [3] - 9:11, 24:7, 29:9
**stuff** [1] - 92:5
**subject** [8] - 27:17, 36:15, 43:13, 53:24, 67:16, 94:23, 102:17, 111:12
**subjects** [2] - 81:21, 82:10
**submit** [1] - 65:16
**subsequent** [3] - 23:10, 91:11, 91:13
**subsequently** [4] - 29:8, 81:25, 82:7, 97:2
**substance** [1] - 55:22
**substantially** [1] - 91:7
**substantiate** [3] - 16:4, 89:3, 90:16
**substantiated** [12] - 21:16, 21:23, 37:23, 47:15, 89:10, 90:25, 91:19, 111:13, 116:2, 116:3, 116:22, 123:17
**substantiation** [4] - 49:16, 91:8, 123:21, 126:12
**suddenly** [1] - 47:1
**suggest** [2] - 67:3, 75:6
**suggested** [2] - 125:4, 125:7
**Summary** [2] - 59:10, 60:13

**summary** [1] - 99:24
**summer** [2] - 10:20, 10:21
**super** [1] - 48:16
**supervising** [1] - 11:9
**supervisor** [1] - 97:13
**support** [4] - 16:8, 63:16, 104:21, 119:4
**supported** [2] - 104:3, 104:12
**supportive** [3] - 63:24, 104:24, 105:23
**suppose** [1] - 34:22
**supposed** [2] - 18:14, 33:22
**surrounding** [3] - 20:15, 41:19, 124:23
**survey** [4] - 64:18, 66:1, 66:17, 68:4
**switch** [1] - 85:25
**sworn** [2] - 5:2, 27:9
**system** [11] - 93:13, 93:21, 95:2, 95:12, 98:3, 98:20, 99:1, 99:14, 116:4, 116:11

**T**

**tables** [1] - 10:15
**tailored** [1] - 68:24
**tasked** [1] - 127:21
**team** [1] - 11:23
**tech** [1] - 11:2
**tedious** [2] - 120:17, 122:16
**ten** [1] - 118:9
**ten-minute** [1] - 118:9
**tend** [1] - 115:23
**tens** [1] - 82:22
**tenure** [3] - 10:17, 13:5, 73:14
**terminate** [2] - 28:21, 94:20
**terminated** [10] - 15:10, 15:11, 15:16, 22:15, 28:23, 29:1, 73:17, 90:5, 90:19, 95:6
**termination** [7] - 21:25, 22:11, 29:23, 33:20, 60:22, 61:2, 61:9
**terms** [16] - 14:22, 22:10, 22:21, 24:4, 26:23, 36:19, 39:24, 41:14, 65:14, 65:24, 71:6, 82:21, 83:17, 84:3, 95:2, 99:7
**territory** [1] - 119:1
**Terry** [1] - 54:2

**text** [3] - 50:8, 123:24, 124:7
**THE** [12] - 45:25, 61:18, 86:14, 86:17, 118:11, 128:6, 128:9, 129:13, 129:16, 129:19, 129:22, 130:7
**themselves** [2] - 102:19, 122:6
**they've** [4] - 28:6, 87:20, 106:17, 112:4
**thinking** [3] - 93:17, 98:16, 109:1
**third** [2] - 68:25, 118:22
**thorough** [4] - 27:17, 27:20, 113:7, 113:16
**thoroughly** [1] - 53:12
**thousand** [1] - 69:13
**three** [1] - 46:14
**throughout** [5] - 13:5, 13:10, 73:4, 73:8, 73:12
**Thursday** [1] - 82:24
**timeline** [1] - 51:6
**timely** [1] - 102:21
**timing** [1] - 33:11
**tired** [1] - 73:23
**Title** [1] - 13:15
**title** [1] - 72:22
**today** [7] - 6:19, 7:2, 7:6, 7:7, 7:12, 8:7, 98:17
**together** [9] - 38:25, 92:21, 101:12, 103:3, 111:9, 111:16, 111:17, 111:23, 112:1
**tolerance** [3] - 22:3, 22:11, 22:18
**tolerant** [1] - 22:12
**tolerate** [1] - 71:7
**ton** [2] - 83:1, 83:5
**took** [5] - 56:21, 73:16, 99:14, 103:7, 124:22
**top** [5] - 58:13, 64:14, 75:5, 120:20, 125:21
**topic** [6] - 42:10, 53:11, 69:22, 105:13, 105:14, 105:25
**totally** [1] - 41:9
**touched** [1] - 46:23
**tough** [1] - 56:10
**towards** [3] - 32:6, 56:6, 73:13
**train** [1] - 26:24
**trained** [4] - 12:16, 12:19, 26:25, 27:16

**trainer** [2] - 13:8, 26:24
**training** [35] - 12:11, 12:14, 12:17, 12:25, 13:3, 13:6, 13:14, 13:20, 13:22, 13:25, 25:21, 26:18, 26:19, 26:22, 27:1, 28:2, 28:5, 59:21, 60:9, 60:17, 63:7, 63:10, 63:15, 68:11, 68:14, 68:23, 69:6, 69:13, 69:24, 70:11, 70:15, 72:24
**trainings** [3] - 13:5, 13:21, 13:24
**trait** [1] - 114:20
**transcribed** [2] - 55:20, 129:17
**transcript** [3] - 51:10, 128:2, 129:9
**transcriptions** [1] - 45:12
**transcripts** [10] - 7:21, 7:22, 45:15, 45:18, 45:19, 51:13, 51:16, 51:20, 51:22, 52:1
**transition** [1] - 103:20
**transitioning** [1] - 106:24
**treating** [1] - 114:19
**trial** [1] - 8:19
**trigger** [1] - 114:22
**triggered** [2] - 87:22, 88:2
**triggering** [2] - 34:15, 80:23
**truth** [1] - 71:20
**try** [9] - 6:8, 6:16, 63:23, 66:3, 98:9, 103:25, 117:3, 117:16, 117:24
**trying** [12] - 17:17, 32:1, 44:17, 45:4, 45:8, 77:24, 87:2, 92:6, 98:1, 112:1, 113:7, 113:13
**turn** [3] - 68:6, 75:4, 91:4
**turned** [1] - 82:5
**Twitty** [2] - 80:16, 80:20
**two** [18] - 10:13, 11:15, 11:16, 28:13, 35:22, 38:4, 41:9, 66:14, 66:24, 71:18, 81:21, 84:22, 90:9, 90:24, 98:12, 106:19, 115:14, 124:8
**type** [6] - 11:25, 13:22,

27:16, 40:23, 92:5, 126:18
**types** [1] - 12:14
**typical** [5] - 102:23, 103:1, 121:6, 122:7, 128:16
**typically** [14] - 36:8, 37:14, 53:23, 83:23, 84:2, 84:7, 89:21, 91:22, 93:11, 102:6, 109:21, 119:22, 120:24, 128:24
**Tyrone** [1] - 115:6

**U**

**um..** [1] - 47:24
**umbrella** [1] - 114:23
**unable** [1] - 82:6
**unbiased** [2] - 39:3, 39:16
**uncomfortable** [11] - 42:14, 42:19, 42:22, 43:4, 43:11, 43:13, 44:2, 44:11, 44:19, 44:25, 45:5
**uncommon** [3] - 102:11, 117:15, 117:21
**under** [8] - 11:3, 11:22, 60:14, 96:12, 97:24, 114:24, 115:22, 116:3
**underneath** [1] - 97:11
**understandable** [1] - 58:9
**understood** [3] - 6:5, 6:10, 6:18
**unfair** [2] - 84:12, 84:17
**union** [12] - 92:22, 93:8, 94:5, 105:6, 119:22, 120:1, 121:7, 121:12, 121:14, 122:6, 122:9
**University** [1] - 9:10
**unless** [3] - 55:3, 84:23, 86:18
**unpaid** [11] - 30:13, 31:7, 31:12, 31:23, 32:3, 33:4, 90:11, 91:1, 91:9, 98:2, 98:10
**unredacted** [1] - 101:22
**unrelated** [3] - 15:12, 15:13, 15:14
**unusual** [5] - 57:3, 57:6, 103:2, 118:5, 122:12

**up** [35] - 5:12, 18:23, 23:22, 24:3, 27:25, 32:25, 39:18, 41:15, 41:24, 45:15, 49:7, 53:8, 66:3, 67:4, 67:24, 69:18, 74:23, 75:5, 76:8, 87:2, 87:4, 87:14, 87:19, 92:12, 92:18, 92:24, 98:6, 111:19, 113:14, 118:10, 121:2, 122:11, 123:8, 126:20, 128:13
**upset** [1] - 119:7

## V

**vaguely** [5] - 46:25, 52:25, 85:10, 88:18, 97:18
**varies** [2] - 13:6, 70:21
**variety** [9] - 10:16, 11:1, 28:25, 29:14, 35:22, 37:10, 63:8, 63:25, 68:13
**various** [5] - 12:5, 15:17, 29:6, 34:12, 116:3
**vary** [3] - 42:2, 62:5, 108:14
**varying** [1] - 118:21
**Ventures** [2] - 10:25, 11:20
**verbalize** [1] - 5:22
**verify** [2] - 32:12, 93:23
**versus** [6] - 28:10, 37:19, 45:1, 90:4, 102:17, 116:6
**via** [1] - 92:13
**victim** [3] - 71:14, 71:21, 88:22
**victim's** [1] - 71:19
**viewed** [1] - 39:15
**views** [1] - 40:1
**VII** [1] - 13:15
**violated** [1] - 15:20
**violates** [1] - 108:8
**violating** [1] - 15:17
**violation** [2] - 113:19, 114:12
**violations** [1] - 116:13
**violence** [10] - 26:23, 30:15, 30:21, 30:25, 31:3, 32:22, 33:15, 63:11, 71:14, 99:23
**violent** [2] - 31:22, 32:6
**visibly** [1] - 118:20
**voicemail** [1] - 92:5

**voices** [1] - 64:25
**voluntarily** [1] - 125:1
**voluntary** [1] - 64:21
**Vora** [3] - 10:25, 11:19

## W

**waited** [1] - 10:15
**waiting** [2] - 93:13, 93:18
**waive** [3] - 129:10, 129:13, 129:15
**waived** [1] - 130:10
**walk** [2] - 69:23, 70:16
**walked** [2] - 70:10, 70:19
**walking** [1] - 70:15
**wants** [1] - 55:3
**Washington** [9] - 28:21, 31:8, 70:8, 74:22, 75:2, 76:4, 76:19, 77:17, 80:1
**Washington's** [2] - 33:20, 60:22
**water** [1] - 6:22
**ways** [2] - 28:16, 56:12
**wearing** [2] - 40:23, 41:22
**week** [1] - 98:18
**weigh** [1] - 50:12
**weighed** [2] - 123:23, 124:6
**weighing** [1] - 50:4
**weight** [1] - 127:23
**weird** [1] - 121:24
**welcome** [1] - 55:13
**Welsh** [1] - 10:12
**wet** [5] - 76:5, 77:1, 77:6, 79:25, 80:9
**whereas** [3] - 27:8, 54:7, 71:20
**whole** [8] - 58:22, 61:5, 63:22, 78:17, 104:21, 105:7, 116:23, 129:14
**Williams** [1] - 79:13
**willing** [1] - 109:4
**willingly** [1] - 49:22
**Willy** [5] - 76:5, 77:1, 77:6, 79:25, 80:9
**wish** [2] - 129:11, 129:16
**withdraw** [2] - 127:14, 127:16
**witness** [4] - 5:2, 51:1, 53:25, 67:10
**WITNESS** [7] - 61:18, 86:14, 86:17, 118:11, 128:6,

128:9, 129:13
**Witness** [4] - 52:4, 52:23, 53:8, 53:15
**witnesses** [4] - 50:6, 50:11, 53:23, 67:16
**Wolnitzek** [2] - 10:17, 10:23
**woman** [1] - 64:10
**women** [9] - 22:7, 23:6, 30:22, 31:18, 31:21, 32:6, 63:13, 64:7, 73:22
**Women** [44] - 23:22, 23:23, 24:9, 24:17, 24:18, 25:15, 25:25, 26:1, 26:15, 26:21, 26:22, 28:3, 28:14, 29:9, 56:6, 56:22, 58:25, 59:11, 59:17, 63:10, 64:3, 64:5, 64:18, 66:11, 66:12, 72:18, 72:19, 73:15, 105:19
**women's** [1] - 57:10
**word** [3] - 78:8, 94:25, 103:2
**words** [2] - 31:6, 127:7
**workers'** [2] - 84:2, 84:10
**Workforce** [1] - 12:17
**workforce** [2] - 31:18, 59:17
**workplace** [11] - 15:19, 26:24, 29:4, 30:5, 30:9, 58:14, 84:4, 110:9, 113:20, 114:13, 114:16
**works** [3] - 95:2, 98:3, 103:12
**worse** [3] - 43:19, 92:7, 95:2
**worst** [1] - 92:7
**worth** [1] - 109:18
**wrapping** [2] - 32:24, 118:10
**Wright** [29] - 19:3, 20:1, 21:7, 21:16, 32:22, 35:23, 38:18, 39:22, 41:8, 41:10, 47:12, 47:14, 50:8, 50:9, 50:10, 57:19, 89:9, 91:16, 92:24, 94:1, 95:19, 100:9, 100:14, 123:14, 123:18, 124:1, 124:2, 126:12, 129:3
**Wright's** [2] - 20:8, 57:16
**Wright-Bryant** [1] - 50:10

**write** [1] - 115:24
**writing** [1] - 34:24
**wrote** [1] - 120:15

## Y

**year** [10] - 9:15, 10:13, 10:20, 10:23, 10:25, 11:7, 13:10, 20:14, 20:22, 117:19
**year-long** [1] - 117:19
**years** [10] - 10:13, 11:5, 11:16, 29:20, 35:12, 75:3, 76:4, 76:19, 79:4, 117:10
**yourself** [1] - 8:15

## Z

**zero** [7] - 22:3, 22:11, 22:18, 65:2, 65:7, 66:13, 67:1