# Rebecca Bryant

October 15, 2025

REBECCA BRYANT

v.

CITY OF CINCINNATI, et al.

Case No. 1:24-CV-119



513.233.3000

depo@elitereportingagency.com

www.elitereportingagency.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

REBECCA BRYANT,

    Plaintiff,

            vs.

CITY OF CINCINNATI, et al.,

    Defendants.

Case No. 1:24-CV-119

Deposition of:  REBECCA BRYANT

Pursuant to:  Notice

Date and Time:  Wednesday, October 15, 2025
9:05 a.m.

Place:  Office of the City Solicitor
City Hall
801 Plum Street
Room 338
Cincinnati, Ohio  45202

Reporter:  Tracy L. Allen, RPR, RMR
Notary Public - State of Ohio

APPEARANCES OF COUNSEL:

For the plaintiff:

Paige E. Richardson, Esq.
        and
Kelly Mulloy Myers, Esq.
        of
Freking Myers & Reul, LLC
600 Vine Street
Ninth Floor
Cincinnati, Ohio  45202
513.721.1975
prichardson@fmr.law
kmyers@fmr.law

For the defendant The City of Cincinnati:

Katherine C. Baron, Esq.
        and
Matthew J. Slovin, Esq.
        of
Office of the City Solicitor
City Hall
801 Plum Street
Room 214
Cincinnati, Ohio  45202
513.352.3330
katherine.baron@cincinnati-oh.gov
matthew.slovin@cincinnati-oh.gov

APPEARANCES OF COUNSEL:

For the defendants Harold Wright and Damonte Brown:

    James E. Kolenich, Esq.
       of
    Kolenich Law Office
    9435 Waterstone Boulevard
    Suite 140
    Cincinnati, Ohio  45249
    513.444.2150
    jek318@gmail.com

- - -

I N D E X

REBECCA BRYANT                                    PAGE

    EXAMINATION BY MS. BARON                     5
    EXAMINATION BY MR. KOLENICH               202
    EXAMINATION BY MS. RICHARDSON             209
    FURTHER EXAMINATION BY MS. BARON          215

EXHIBITS                          MARKED    REFERENCED

    DEFENDANTS' EXHIBIT  1       5          10
    DEFENDANTS' EXHIBIT  2       5          12
    DEFENDANTS' EXHIBIT  3       5          26
    DEFENDANTS' EXHIBIT  4       5          53
    DEFENDANTS' EXHIBIT  5       5          70
    DEFENDANTS' EXHIBIT  6       5         109
    DEFENDANTS' EXHIBIT  7       5         125
    DEFENDANTS' EXHIBIT  8       5         146
    DEFENDANTS' EXHIBIT  9       5         154

    DEFENDANTS' EXHIBIT 10       5         154
    DEFENDANTS' EXHIBIT 11       5          97
    DEFENDANTS' EXHIBIT 12       5         187
    DEFENDANTS' EXHIBIT 13       5          16
    DEFENDANTS' EXHIBIT 14       5          18

- - -

www.elitereportingagency.com
513.233.3000

(Defendants' Exhibits 1 - 14 were marked for identification.)

REBECCA BRYANT

plaintiff herein, having been duly sworn, was examined and deposed as follows:

EXAMINATION

BY MS. BARON:

Q. All right. So I'm Katie Baron. I'm an attorney for the City of Cincinnati.

I also have Matt Slovin here, who's also an attorney for the City of Cincinnati.

Can you state your name for the record?

A. Rebecca Bryant.

MS. MYERS: Speak up.

BY MS. BARON:

Q. Have you -- otherwise, we're going to have to turn the heat or air, or whatever it is, off.

Have you previously attended a deposition before, had your deposition taken?

A. No.

Q. Okay. So I'll go over kind of the ground rules for it.

We would ask that you say your

answers audibly instead of shaking your head.

We do have a court reporter here, so she's not able to take down nonverbal cues. She has to have yes-and-no answers.

Can we agree that we will verbalize instead of using nonverbal communication today?

A. Yes.

Q. Let me know if you'd like to take a break. I know that there's some sensitive topics here.

So if, at any point, you feel uncomfortable and you want to take a break, you want to talk to your attorneys, you need to go to the bathroom, anything like that, just let me know.

I would just ask that you finish answering whatever question we're on, and then we can take a break.

A. Okay.

Q. If there's any question that you don't understand, just let me know. I'll clarify as best as I can.

So if you answer a question, I'll assume that you understand it.

Is that fair?

A. Yes.

Q. Are you on any medication or anything that would affect your ability to answer questions today?

A. No.

Q. And did you bring any documentation with you today?

A. No.

Q. You don't have to.

A. I already know the answer to that.

Q. All right. So we'll start with the easy questions.

Tell me a little bit about yourself.

MS. MYERS: Objection.

You can answer.

A. A little about me?

I'm from Cincinnati. I'm a firefighter.

BY MS. BARON:

Q. Are you married?

A. No.

Q. Do you have any children?

A. No.

Q. And you said you're from Cincinnati?

A. Yes.

Q. Where did you go to high school?

A. Mount Healthy.

Q. And what year did you graduate?

A. 2008.

Q. Then did you attend college?

A. Yes.

Q. Where did you go?

A. I went to a junior college in Illinois for my first two years, and then I finished my undergrad at St. Andrews in North Carolina, and then I got my master's at UC.

Q. When you went to junior college, did you have a major there?

A. I got my associate's in science.

Q. Okay. And, then, when you went to St. Andrews college, you said you got your bachelor's degree there?

A. Yes.

Q. What was that degree in?

A. Biology.

Q. And then you have a master's as well?

A. Yes.

Q. And what is that in?

A. That's in health promotion and

education, exercise and fitness.

Q. Did you have any other, like, certificates or any training that you received?

A. Through fire. I have my fire certification, my paramedic certification, and then we get, like, I think ACLS and small things like that for continuing education.

Q. When did you receive your fire certificate?

A. Well, I went through drill school in 2019, so like through that is when we get those.

Q. Okay. And then paramedic school, when did you do that?

A. I finished that in '22.

Q. How long is that process for the paramedic school?

A. Class is about a year.

Q. So you probably started that around 2021?

A. Yeah, or like the very beginning. It was 11 months.

Q. Okay.

A. So it was, like, roughly a year.

Q. Okay. So also the COVID timing in

there, too, so --

A.    Yeah.

Q.    All right.  So what do you enjoy doing in your free time?

A.    I like to work out.  I like to eat. I like to watch TV and hang out with my dogs, hang out with my family sometimes.

I don't do much.

Q.    Do you live with any of your family members or do you live on your own?

A.    Just me and my dogs.

Q.    All right.  So we're going to go over kind of your employment history.  And there's a binder in front of you that should have tabs on it.

We're going to open to what's been marked as Exhibit 1.

Do you recognize this document?

A.    I know what -- like I can read it and know what it means, but I haven't, like, looked at it itself.

Q.    Okay.  So what does it mean to you? Looking at this, what is it?

A.    My -- with the fire department, just like when we get promotions and stuff like

that, like step-ups.

Q. Okay. So would you agree with me it's kind of a timeline of the work you've done with the fire department?

A. Yes.

Q. Okay. And what is your typical work schedule with the fire department?

A. Well, on normal duty, we work 24 hours, and then we're off for 48 hours. Unless we pick up overtime or trade shifts with somebody, then it's 24 on, 48 off.

Q. And you are currently on a normal schedule; is that correct?

A. Yes.

Q. And at most of the time that we're talking about in the complaint, were you operating under a normal schedule?

A. No.

Q. No. Okay.

A. For most of -- after, like, I reported it, no, I was on limited duty.

Q. Okay. But when the actions happened, before you reported it, you were on a normal schedule?

A. Yes.

Q. So you were working that 24 on, 48 off?

A. Yes.

Q. Okay. Do you typically work overtime?

A. Yes.

Q. How many hours a month would you estimate that you're working overtime now?

A. Right now a month, I work as much as I can.

So every two weeks I typically get between, like, 60 and 96 hours.

Q. And, then, before you reported any incidents, how many hours of overtime were you typically averaging?

A. Probably about the same.

Q. Okay. And, then, when you were on limited duty, did you get any overtime?

A. No.

Q. So I'm going to ask that you flip to Exhibit 2.

Do you recognize this document? And if you need a second to look through it, feel free.

A. Yes.

Q. Yes, you recognize it?

A. Yes.

Q. And what are they?

A. These are the responses to the questions that I was asked to answer.

Q. Okay. And, to the best of your knowledge, are these still accurate and truthful?

A. Yes.

Q. Anything that you remember that you need to update on these?

A. No.

Q. I'll have you flip to interrogatory number 5.

Did you find it?

A. Yes.

Q. Okay. So interrogatory number 5 asks about your employment outside of the City.

And you indicate that you worked at First Care -- or DNA Diagnostic Center.

Tell me about that job.

MS. RICHARDSON: Objection.

You can answer.

A. It's just the place where we tested DNA.

Like me working there?  What do you mean?

BY MS. BARON:

Q.  Yeah.  I mean, like what were your duties there?

A.  Oh, to test the samples, just prepare them and put them through a machine, and then the report was sent to the people that read them.

Q.  And when did you start that job?

A.  I don't remember the start date there.  Yeah, I don't remember exactly when I started.

Q.  Was it prior to you being a firefighter or was it while you were a firefighter?

A.  Yes, it was prior to.

Q.  And about how many hours a week did you work there?

A.  Forty.  A normal workweek.

Q.  And are you still employed there?

A.  No.

Q.  And when did you quit that job?

A.  When I became a fire -- well, a recruit, technically.

And I would work, like, sometimes on weekends, but that was -- I wasn't full-time anymore there.

Q. Okay. When did you quit working part-time there?

A. I think when I finished -- or maybe like throughout drill school.

It was just to help with the money.

Q. All right. And then the next one you have is First Care Ohio.

What were your duties there?

A. Paramedic.

Q. And when did you start that job?

A. June, I believe, of '24.

Q. And what were your duties as a paramedic with First Care?

A. Patient care. Just -- mostly just like private transports is what they do.

Q. And how many hours a week did you work there?

A. Not many. It wasn't like a consistent number of hours there. It was kind of random, so --

Q. And are you still employed there?

A. I don't think so, because, like, if

you don't work for, like, a long time, then, like, they just -- it's like an automatic -- they just let it go.

Q. Okay.

A. Because I wasn't full-time or anything.

Q. Okay. So in the back folder of this, there should be Exhibit 13.

Do you recognize this document?

MS. RICHARDSON: Before we go, has this been produced?

It doesn't have Bates numbers.

MS. BARON: I just sent it to you when we got it.

It's in response to the subpoena that we sent out.

MS. RICHARDSON: Okay.

MS. BARON: But if you need a second to look it over, feel free.

MS. RICHARDSON: No, that's fine.

BY MS. BARON:

Q. Do you recognize this document?

A. I've never seen it.

Q. Okay. If I represented to you that this is the time that you worked at First Care,

does that sound accurate?

A.   Well, I haven't looked at it, so --

Q.   Feel free to take a second to look at it.

A.   Okay.

Q.   Does that seem accurate, that this is the time that you were working at First Care?

A.   Yeah, if those are the timestamps. I mean, I didn't, like, track it on my own or anything, but -- yeah, I would always clock in and out.

Q.   All right.  So -- and it has your hire date at the very top as June 18th of 2024?

A.   Okay.

Q.   Does that match your recollection of when you started there?

A.   Yes.

Q.   And this would have been when you were on limited duty; is that correct?

A.   Yes.

Q.   And if you look at the line that's -- it's the first one on there, it says, Tuesday, June 18th.

Do you see that?

A.    Yeah.

Q.    And it says that you worked 9:00 a.m. to 4:00 p.m.?

A.    Yes.

Q.    And that was a Tuesday?

A.    Yes.

Q.    While you were on limited duty, what was your schedule?

A.    On limited duty, I worked weekdays from 7:00 to 4:00.

Q.    So you would have been scheduled to work that day; is that correct?

A.    Unless it was a holiday or something.

Q.    Okay.  Then I'm going to show you what's been marked as Exhibit 14.  It's also in the back of the binder.

So this is a document that the fire department uses to track Limited Duty Daily Staffing levels.

And do you see at the top, it says June 18 of 2024?

MS. RICHARDSON:  Katey, this also isn't Bates stamped.

MS. BARON:  This was produced as

well.

MS. RICHARDSON: Okay.

MS. MYERS: Just today?

MS. BARON: What was that?

MS. MYERS: Just today?

MS. BARON: I think this was -- it may not have been.

If you want a second to look at it, feel free.

BY MS. BARON:

Q. So this is the daily staffing levels for June 18th of 2024.

And if you look down, you see your name on there, correct?

A. Yes.

Q. Okay. And if you slide all the way over, the category that says Duty Status, what does it say that your duty status was on June 18th of 2024?

A. It says SWP.

Q. And do you know what SWP means?

A. It means sick with pay.

Q. So you called in sick on June 18th of 2024?

A. Yes. I don't remember, but, yes.

Q. But you were actually working at First Care Ohio that day?

A. Yes.

Q. Okay. And, then, have you been involved in any previous court actions?

A. No.

MS. RICHARDSON: Objection.

MS. MYERS: Objection.

BY MS. BARON:

Q. Any bankruptcy cases?

MS. RICHARDSON: Objection.

MS. MYERS: Objection.

MS. RICHARDSON: You can still answer.

A. No.

BY MS. BARON:

Q. And have -- in the past ten years, have you received any medical treatment?

A. In --

MS. RICHARDSON: Objection.

MS. MYERS: Objection.

A. In the past what?

BY MS. BARON:

Q. Ten years, have you received any medical treatment?

A.   Yeah, I've been to the doctor plenty of times and --

Q.   Any, like, recurring injuries or illnesses, whether mental or physical?

A.   Yes.

Q.   Okay.  When did you first have your first incident?

A.   Well, I've gone to therapy, and I've also gone to like a regular doctor for, like, physical things.

So they're two different things, but --

Q.   Let's talk about therapy first.

When did you first start going to therapy?

A.   I first went to therapy -- I don't remember exactly when, but it was since being on the job.

Q.   Do you know who you were treating with?

A.   Initially, I started with a PEAP therapist, and I forget her name, but that's where I started.

Q.   Okay.  And that was with the City of Cincinnati, then?

A. Yes.

Q. After the PEAP therapist, who did you see next?

A. After that, she helped me find someone. And I only saw her for -- well, it was months. I don't know if it was up to a year.

And now I can't think of her name, but --

Q. That's fine.

A. -- it's not who I've seen most recently.

Q. Okay. And then after the one that you don't recall her name, who did you see next?

A. Sabrina.

Q. Okay. Do you know Sabrina's last name or is she just Sabrina?

A. Mignerey or something like that. I always mess it up. But I do know that's how you say it.

Q. Fair enough.

And what were you specifically seeing her for?

A. What do you mean, like --

Q. Like what was your reason for seeing her?

A. Initially, when I went to see PEAP, I spoke with her about work, like runs at work.

And then I spoke to her about what happened with Harold.

Q. Okay. And then with the second therapist that you don't recall her name, what did you see her for?

A. For what happened with Harold.

Q. Okay. And then your most recent, Sabrina, therapist, what did you see her for?

A. Everything.

Q. Okay. When you say everything, what do you mean?

A. I spoke with her mostly about the sexual assaults and work and kind of everything with work, like the environment of work, how I deal with things now.

Q. And are you still treating with Sabrina?

A. I haven't seen her for a few months, but she is still my therapist.

Q. Okay. And, then, have you seen any other therapists in the past ten years?

A. Yes.

Q. Who else did you see?

A. Well, I went to the Center of Excellence, and so we have -- like we'll have classes.

And so, like, throughout the day we'd be with multiple, but like I had one that we'd have, like, sessions with our clinician.

And so the one I went to see on my own, her name was Courtney, and I do not remember her last name.

Q. That's fine.

And what -- when did you see Courtney?

A. Like do you mean how often or --

Q. Like what year did you start seeing Courtney?

A. Oh, the Center of Excellence? I went there -- it's been about two years now, so in '23.

Q. Okay. And what did you see her for, specifically?

A. For the sexual assaults.

Q. Any other therapist that you've seen?

A.    Not -- no, I don't believe so.

Q.    And then you indicated that you've seen doctors for physical things.

What were you seeing doctors for, specifically?

A.    I guess I still don't technically know, but I have a pain that I get in my right side.

And they've tested for, like, gallbladder.  They've sent me to, like, a pulmonologist.  I don't know what it is.

Like I've had scans, x-rays, and things like that.  So I'm not sure exactly what it is.

It began in drill school, that pain did.  So I didn't know much about, I guess anything at that point, but one time I did go to the hospital.

I've been to the hospital for -- multiple times.  But one time they did say I had a spontaneous pneumothorax, but all the other times I've gone they didn't see anything.

So I'm still not sure what it is. I've talked to the doctors, my paramedic teacher, so not really sure.  Been told it

could just be psychosomatic pain.

So I don't know what it is, but I tried to figure it out, so --

Q. And then going back to the Center of Excellence, was that work-related? Is that like a training that you go to through the fire department or is that something you did on your own?

A. It's not, like, provided by the fire department. It was my decision to go.

Q. Okay. So is that the name of the provider, like Center of Excellence?

A. Yeah. The Center of Excellence is like the name of the place.

Q. Okay. Okay. And then they have a few different providers in training and things?

A. Oh, they have a lot. So it's not necessarily training. It's inpatient therapy.

Q. Okay. Okay. All right. So I will have you flip to Exhibit 3.

And do you recognize this document?

A. Yes.

Q. And it's the amended complaint that your attorneys filed?

A. Yes.

Q.    Okay.  So we're going to kind of walk through this and talk about it.  I'll refer to it every once in a while.

So when did you first decide to apply to be a fire recruit with the fire department?

A.    In 2018.

Q.    And what does the application process entail?

A.    You take a test, like a written test, with a bunch of people.  I think it was like at the Duke Energy Center.

So we took our test.  And then -- first you apply, and then you take a test.  If you score high enough, you go to the next step.

Q.    Does everybody who applies get to take the test?

A.    I believe.  I'm not sure.  I would assume so.  If you take -- like if you do what you have to do in time.

Q.    And before you take the test, are there any sort of trainings or things that are provided by the City to help prepare for the test?

A.    Oh, they had -- like you could go

down to Liberty and Lynn, where the training center was then. It's just Fire Station 29, where they would let you, like, practice running the stairs, like the towers. So they let you do stuff like that, and practice the dummy drag.

Just the stuff we had to do on the test, they would let you practice.

Q. And this was while you were an applicant?

A. Yeah. And they had study sessions, also.

Q. And who led those training practice things?

A. I don't know the people that did it.

Knowing now, kind of how they just kind of send an email and ask people if they want to come down and help.

Q. At the time when you were doing it, who did you think these people were? Like what did you think their rank was?

A. No idea. I didn't really, you know, think about it. I assumed they were firefighters.

Q. And were there ever any, like,

information meetings about being an applicant or was this kind of it, the trainings that you just talked about?

A. They had study sessions.

I know I went to one through CAFA, which is the Cincinnati African American Firefighter Association.

So I know I went to at least one of those. But other than that, I'm not sure what else was offered.

Q. Do you remember who taught that, that study session, or who was available for you to ask questions to?

A. I do not.

Q. For either of these trainings and study sessions that we just talked about, was Harold Wright ever present?

A. I know he wasn't at the study session. I don't recall if he was at the physical one.

Q. Okay. And, then, what is your understanding of how applicants are chosen to be fire recruits?

A. You go through the process, and if you pass everything, score high enough, then

you should be selected.

Q. So it's fair to say you scored high enough on everything and you moved on to being a fire recruit; is that correct?

A. Yes.

Q. And during any time while you were in the application process or while you were going through the recruit process, did anybody ever talk about how to file a complaint with -- about sexual harassment or sexual assault or anything like that?

A. No.

Q. Anytime while you've been in the fire department, did anybody explain how to file a complaint?

A. Can you repeat that?

Q. Anytime, during your entire course of being in the fire department, has anybody ever explained how to file a complaint if you're experiencing, like, sexual harassment or sexual assault?

A. No, not until, like, I complained about it.

Q. All right. So when did you first meet Harold Wright?

A. I met him before actually becoming a recruit. So probably in -- near the end of 2018.

Q. And at that point, you were an applicant?

A. Yes.

Q. Okay. And what was that interaction that you had with Harold?

A. The first time that I met Harold, I went with one of my friends to -- he had like a get-together at his house. And it was just like pool and stuff like that.

Q. And who was the friend that you went to that party with?

A. Keshia Terry.

Q. And had you been to Harold Wright's house previously?

A. No.

Q. And had you heard anything about Harold Wright up to that point?

A. No.

Q. Who did you think he was in the fire department, if you had any idea?

A. Just a lieutenant in the fire department.

Q. And who else was at that party?

A. Falencia Frazier was there. I didn't know the other people that were there.

Q. Did you know Falencia Frazier prior to going to Harold Wright's house?

A. No.

Q. And Wright was a lieutenant at the time that you met him?

A. Yes.

Q. And what did you understand his title of lieutenant to mean? Like what specific duties did you think he had?

A. I didn't really know the duties of an officer at that point, but I knew he was the lieutenant for recruiting.

Q. And did the fact that he was the lieutenant for recruiting mean anything to you?

A. It oddly made me kind of, like, respect him and I guess just thought he was a respectable person.

Q. And, at that point, you were an applicant, and you explained the process that basically you just score high enough on the test, and then you become a fire recruit; is that correct?

A.    Well, there's multiple steps.  It's not just one test.

Like there's the written test; there's the physical test, which is like timed and stuff; and then there's a polygraph.

There's a -- I feel like I'm missing something, but --

Q.    Is there an oral interview, maybe?

A.    Was there?  Those are things I know for sure we went through, was the written, the physical, polygraph, background check.

That's what I remember.

Q.    And so, once you've completed all those tasks, do you get a total score that puts you on a list ranking you?

A.    You do get a list.  Like you get to see -- I don't remember how the number looked on it, but there's like a list, and then you're told if you're in the class.

So you're -- the class that I was in was the first class off of the list, so I don't know what kind of happens after the first class, but --

Q.    Okay.  So it's based on your score, as to whether or not you're going to move on,

right, or is it -- is it subjective or objective, if that makes sense?

A. Well, from what I initially thought, I thought it was just scores, but, then, from what I was told by Harold, that there's a group of people.

I don't know who all it includes, like chiefs, officers, not sure who all. But he told me that they discuss the applicants. And that's -- I mean, I guess that's part of how they really decide who gets in.

Q. Okay. And now with 20/20 hindsight, do you know if that's how it actually works or if it's based on score?

A. I believe it's a combination.

Q. And, then, as you went through the application process, how often did you interact with Harold?

A. Often.

Q. And how -- what were these interactions, mostly?

A. Do you mean like how we communicated?

Q. Yeah, like how you communicated. Was it one-on-one? Was it work-related? Was

it out in the public?

A.   Well, the -- he's the one that called me and offered -- well, I guess that was the offer, the official, that I was selected to be in the class that was coming up.

And it was just kind of, the job is yours, you know, if you want it.

So I guess that was -- that was the first time I got the call.  I hadn't spoken to him one-on-one before that.

So that was the first time, was when he reached out and told me that I was selected to be in that first class off of that list.

Q.   That was the first time you interacted with him?

A.   Like just one-on-one.

Q.   Okay.

A.   Yeah.  Other than -- because that was after I had went to his house with Keshia.

Q.   And the time that you went to his house, that you talked about, is that when the rape occurred or was that another time?

A.   Yeah.

Q.   I'm sorry?

A.   Yeah.

Q.    And you indicated that was the first time you met him, was at his house?

A.    What?

Yeah, the first time I met him was with Keshia, but the first time I was alone with him was after he called me and told me.

MS. BARON:  We can take a break.

MS. RICHARDSON:  Let's take a break.

(A recess was taken from 9:41 to 9:49.)

BY MS. BARON:

Q.    So I'm a little confused on the timeline.

So when did you first meet Harold Wright?

A.    I first met him with Keshia at his house.

Q.    And this is when the rape happened?

A.    No.

Q.    Okay.  So you met him at the house. You played pool, you said, that day?

A.    Yeah.  It was everyone.  Like it wasn't just like me and him playing pool.  That was just, like, an activity.

Q.    Okay.  And then, during the process, you saw him a lot, you said, during the

application process?

A. Well, this was like more towards the end of it, when I was more in communication with him.

Q. Okay.

A. After he called me and told me that I was offered the job as a recruit.

Q. Okay. So once you were offered the job as a recruit, that's when it really ramped up, the interaction with him?

A. Yes.

Q. Okay. And then what did those interactions -- what were they typically? What did they typically consist of?

A. Well, after the rape, it was mostly texts.

Q. And you indicated your contact with him had ramped up. Was that before or after the rape?

A. It was like right before and then after.

Q. And, at that point, what were your interactions? Were they work-related; was it personal?

A. I would ask him stuff about, like

what's next, after he told me that I had it.

I would ask him, like, okay, well, when do I hear from someone about, you know, when we start, things like that, but --

Q. So you were asking, kind of, logistics questions about the process?

A. Yeah. And then he -- he said, like, well, let's celebrate. When he called, that was like where it really started.

He said, well, let's celebrate you getting the job. And then that's how I ended up at his house.

Q. And prior to you going to his house to celebrate, what did you believe his role at that point was with the fire department?

A. Lieutenant of recruiting.

Q. And what did you think his duties or what was he -- what did he do?

A. I didn't really know, like, the duties of a lieutenant.

I knew they were in charge, like out in companies and things like that, but I didn't know specifics.

Q. And as the lieutenant in charge of recruiting, what did that mean to you, if

anything?

A. Well, I thought I could trust him. I mean, I -- that's, I guess, at the end of the day, how I ended up there, just trusted him.

And I think that -- well, I know it was mostly based off of his position. He didn't seem, I guess, in the short little bit of being there with Keshia and everyone else, didn't seem that I shouldn't trust him.

So it was more based off of his position. And he seemed like he wanted to be helpful about the process, so --

Q. And now Keshia, was she already a firefighter while you were going through the process or was she also an applicant recruit with you?

A. She was already a firefighter.

Q. Had she told you anything about Harold Wright?

A. Nothing bad, no.

Q. What had she told you?

A. I mean, she knew him already. So I knew that she knew him. At that point, I don't think she had told me much about him.

I believe she had dated his

daughter, but other than that, she didn't say anything, really, about him.

Q. And during the application process, was discipline ever given for anything?

A. To who?

Q. To the applicants.

A. Not that I'm aware of.

Q. Okay. So then, at some point, in December of 2018, you allege that Wright told you the City was not going to move forward with your employment, and he had been vouching for you; is that correct?

A. Yes.

Q. And, at that point, what stage were you in? Were you an applicant or were you a recruit?

A. We hadn't started class yet, because we were starting class in February, but -- so, at that point I was offered the job, but -- I believe there was some, like, just like small paperwork things that had to be done, but I was offered already.

So I guess it's like a -- I don't know if you consider me already a recruit at that point or it's like between, but I think

it's --

Q. So you had been offered the job as a recruit?

A. Yes.

Q. Okay. But you hadn't started classes?

A. Correct.

Q. Okay. And how did Harold tell you that, that he had been vouching for you and that they weren't going to pick you, originally?

A. Face-to-face. He told me at his house.

Q. And is that when the rape occurred or was it a different time that you were at his house?

A. It was at that time.

Q. And do you recall what he specifically told you?

A. I remember him saying that he was the only black person in the room. He said that it was a room full of older white men and that he was the only black person, and that they weren't going to pick me.

They were going to pick a white male

who apparently, according to Harold, said that this guy failed something on his polygraph, and they were going to pick him.

But there was a section of mine that was -- like it didn't say -- like I didn't fail it, but it said they couldn't tell if it was -- what I said was true or not, and so they weren't going to pick me.

And so he said that he spoke up and said that that's not fair, they can't do that.

And so he said that was the reason that I got the job.

Q. And that was at his house that he had told you this?

A. Yes.

Q. So what made you decide to go to his house that evening?

A. He offered. And I honestly didn't think it was an unsafe thing to do.

I did ask -- I did reach out to Keshia and ask her if she could go with me, but she was busy, so she didn't go with me.

Q. Were you the only person there that night or were there other recruits?

A. It was just me.

Q. Did you know that it was just going to be you or did you think there were going to be other people there?

A. I didn't ask, so I guess it was assumed that it was, but -- which is kind of why I did ask Keshia, because I didn't know him, even though I guess I just kind of trusted him that it would be okay, but -- yeah, I asked Keshia but she couldn't.

Q. So at this point when you were -- before you get to his house, do you feel indebted to him at that point or is it after you go to his house and he tells you more about how your application was selected?

A. Yeah. No, it was at his house that he told me that.

Q. Okay. Did you ever follow up with anybody about that statement, let them know that he had said that to you?

A. No, not until I reported everything. But, like, through the process, no, I didn't.

Q. And when he made that statement to you, did you believe him, that he really did vouch for you and helped you get the job?

A. Yeah.

Q. And why did you believe that?

A. I didn't believe there was a reason to lie about it. I just trusted that he was telling me the truth.

Q. Did you ever tell anyone that you felt indebted to Harold for the employment opportunity?

A. Not until I reported things, but -- like I didn't get the job and tell anyone that Harold was the reason I got the job, if that's what you mean.

Q. Yeah. Yeah. Okay.

And so after that meeting with Harold when he told you that he helped you to get the job and then the rape happened, did you tell anybody about it?

A. Not right away.

Q. When was the first time you told anybody?

A. The PEAP therapist that I went to, she was the first one I told.

Q. Do you remember how long, after that evening, you told her?

A. It was years. I didn't go to PEAP until probably, like, '21, I think, maybe.

Q.   And what's your understanding -- I know that PEAP is affiliated with the City of Cincinnati, but what is your understanding of whether or not they're able to report what you tell them?

A.   Well, as a therapist, I didn't think they could tell that at all.

Q.   So you don't think they had a duty to tell the fire department that this was going on?

A.   No.

Q.   Did you tell anybody else, prior to reporting it to the City?

A.   Besides therapists?

Q.   Yes.

A.   Police.

Q.   Okay.  So you told the police before you reported it to the City?

A.   Yes.

Q.   Okay.

A.   Because they told me to wait to do my chief's reports.

Q.   The police department did?

A.   (Nodding head.)

Q.   Do you recall --

A. Yes.

Q. -- who you spoke with at the police department?

A. For Cincinnati police, I spoke with Tiffany Green. She's a detective. At least at the time she was a detective. That's who I spoke with.

I told my -- well, I guess before that, I did tell my -- he's also a police officer, but he was my old high school coach, and I've coached with him, Anthony Johnson.

So I told him, and he's the one that connected me with Tiffany.

Q. When did you first tell Anthony? Do you recall how far after the rape it was?

A. It was a long time. It was after the sexual assault by Damonte.

Q. Okay.

A. It was all of the reporting, outside the therapist, that was -- it was after Damonte. So -- I remembered everything a lot better before I sat here.

So it was August of -- it was my mom's birthday, so it was August of '22, I believe.

Q. Is when you told Anthony Johnson?

A. Yes.

Q. Okay. So what did you specifically tell Anthony Johnson?

A. I didn't give him details, but I told him that I was sexually assaulted by Harold and Damonte.

And I didn't really know how to go about doing anything about it, because I didn't tell right away.

And so he connected me with Tiffany.

Q. Okay. So he connected you, then, with Tiffany Green?

A. Yeah.

Q. And when you met with Tiffany Green, what occurred?

A. I told her what happened. I went -- I met her at -- because at first, after I told the police, I told my dad, so that he could go with me.

Q. Was that -- when you say, the police, was that you telling Anthony Johnson or you telling Tiffany Green?

A. Both.

Q. Okay.

A.   But I hadn't met with her yet.

Q.   Okay.

A.   So I remember going to one of the districts, but I didn't talk to anyone there.

The first police I talked to, like officially, was Tiffany.  And I met her at the building that's over -- it's like West Eighth and something.

Q.   Okay.

A.   It's the same place as the polygraph.  I just don't know the address, but it was that same building.  So that's where I met her.

It was -- I know it was late.  My dad went with me but didn't stay.  I told him he could leave.

Q.   Do you know if she made a formal report?

A.   So there was -- so since I reported both, Cincinnati didn't handle Harold's because of where it happened, and so they only handled Damonte's.

At the time, I didn't realize that I had to report to someone else for both instances, but -- so even though I spoke to her

about both, initially -- initially, I told her everything about both.

But I had to talk to -- I don't know if this was a detective or a police officer, but I had to talk with another officer from -- I guess that's Springdale Police.

I keep wanting to say fire. But, yeah, so I had to talk to two different police officers.

Q. Okay. So you talked to Springdale about Harold Wright, and then you talked to Cincinnati Police Department about Damonte Brown; is that fair?

A. Yes.

Q. Okay. So did Tiffany Green file a formal report about Damonte Brown?

A. I believe so.

Q. And then do you recall who you talked to at Springdale about Harold Wright?

A. I cannot think of his name, but I know that Cincinnati, I guess they sent him the -- I don't know if you call it an interview, but me talking to Tiffany, so that I didn't have to go over everything with him again, so --

Q. Was that interview with Tiffany recorded, do you know?

A. I think so. I didn't, like, see a recorder, but I believe so, since they sent something to Springdale.

So I didn't actually have to tell him every -- like go through everything again with him.

I mean, I still talked to him and everything, about what happened, but he talked with Cincinnati, which I believe would have been Tiffany, but there were other people involved in it, so --

Q. So after you meet with Tiffany, how long does it take for you to report it to the City that this happened?

A. From August to October.

October is when I wrote my chief's reports about them.

Q. And you said that that was at the direction of the police department. They said to wait; is that correct?

A. Yes. They told me to wait, since they were doing their investigations, and they didn't want him to get, like a heads-up, I

guess.

But I pushed for it more when I actually did it, because I ran into Harold at work when I hadn't been running into him because he was out.

He wasn't in the office while I was in paramedic class, which is why I was in the same building as him.

Q. So what was the outcome of the investigation with CPD on Damonte Brown?

A. They did nothing. They, I assume, talked to him. Of course, I don't know anything that was asked or -- so with him, nothing.

There wasn't -- like with Harold, I did, like, the grand jury hearing, but they didn't do that with Damonte.

They told me that they didn't think they would win, so they weren't doing anything else.

Q. And, then, with Harold, you said you testified in front of a grand jury?

A. Yes.

Q. And it was ignored at that point; is that correct?

A.  Yes.

Q.  And were they -- was that -- was Harold Wright's ignored and Damonte Brown's kind of unsubstantiated prior to you reporting it to the City?

MS. RICHARDSON:  Objection.

Go ahead.

A.  I don't remember the date that I went.  I remember the day.  I remember exactly how it went, but I don't remember the date that we did the grand jury hearing.

BY MS. BARON:

Q.  Okay.

A.  But it was weeks before they told me that we weren't going to do anything about Damonte, that it wasn't going to be the same process.

Q.  After the evening at Harold Wright's house on December 8th, you continued to text with him; is that correct?

A.  Yes.

Q.  Why did you continue to text with him?

A.  I didn't really know what else to do.

Q. All right. So I'm going to have you go to -- it's Exhibit 4.

And this is the Investigation Report that was completed for Harold Wright.

Do you recognize this document?

A. I know I was given access to it. I didn't read the whole thing.

Q. Okay.

MS. RICHARDSON: I'm just -- before we go on, I'm just going to put an objection, because it's not Bates stamped.

We'll have to check that it's the same.

MS. BARON: Yeah.

BY MS. BARON:

Q. All right. So I put different color tabs. This is the first tab in there.

A. Go to the first color tab?

Q. Yeah. Yeah. So what I'm referring to, it looks like it's a text message from January 17th of 2019.

Do you see that?

A. Yes.

Q. And you indicate in there that you

feel like, between you and Keshia, I don't know who to trust.

And this is a text message between you and Lieutenant Harold Wright; is that correct?

A. Yes.

Q. Why don't you trust Keshia at that point?

A. Because he told Keshia that me and him were sexually involved. And she asked me about it.

And I didn't tell her what happened, because I was embarrassed and ashamed of what happened. So all I really said to her was, that's not how that went.

And so it just really bothered me that, first of all, he said something about that and made it seem as if it was consensual, and it wasn't.

And then that my friend was asking me about it and thinking that, you know, I was involved with him in that way and, you know, I guess usually you tell your friends stuff like that, but -- so that just was something that really bothered me.

Q. And how did you find out that he had told Keshia about this?

A. She told me. She asked me about it.

Q. Okay. And then you also mentioned a Craig. Who is Craig?

A. I went to high school with Craig, and he's actually the one that told me about them hiring -- about the fire department hiring.

Q. And had he told you anything about the fire department prior to applying?

A. Well, he loves it. Because I was actually going into the military, and then I messed up my ankle, and so I was talking to him about it.

And he was, like, well, we'll be hiring probably in the next, you know, year or so. So he said that with my reasoning of wanting to go to the military, I wanted to, you know, give back and serve, he was like, well, this is a way to do it, but at home. You know, you don't have to leave.

And he pointed out -- well, he said, you know, it's like a big -- the environment is like a family thing. I come from a big family.

I've always played sports.

And so the way that, you know, he talked about it, it just seemed like something that would be a good fit because of the -- what I thought was like the family feel of it, and always kind of being part of teams, I guess an athlete.

So it just sounded like a good idea. So he was the first one to tell me.

Q. And what is Craig's last name?

A. Scruggs, S-c-r-u-g-g-s.

Q. And in this same text message, you also men -- or not the same text message. If you go to the third color tab.

A. Third, you said?

Q. Yeah. There you mention that, I trusted you in the beginning of this process as not an officer in the department, but as a black man who I thought was looking out for me and had my best in mind.

Do you see that?

A. Yes.

Q. And that's a text message between you and Harold Wright on April 22nd of 2021?

A. Yes.

Q.   All right.  And what do you mean by that?

A.   Based on what he told me when he said that he spoke up for me when they were in the process of picking who would get into the class.

He was very clear when he said that about the fact that me, being a black woman, was why I was going to be overlooked.

And so that's what -- those are things that he pointed out being the difference in me and the white male, who he said was going to be picked instead of me.

Q.   What is your understanding of when you're a fire recruit, how you become a firefighter?

A.   Sorry.  Say that again.

Q.   When you're a fire recruit, what is the process to becoming a firefighter?  Is it like a probation?

A.   Going to drill school.

Q.   At that point, do you just have to pass drill school?

A.   Well, it's not that easy, but, yes, you have to make it through drill school and

pass your -- I mean, at the beginning, all I knew was drill school.

But how it -- how it goes is, you have tests, like book -- open book -- well, not open book, but you have tests from books. You also have physical tests.

You have all those things you have to do. Like they have fire inspector, they have firefighter, also EMT afterwards.

So we did, I think it was 22 weeks of drill school, and then EMT class if you weren't already one. I think it was 8 weeks, so --

Q. And who was primarily doing the training for drill school?

A. We had quite a few instructors. We had -- the captain that we had was Kirby. Captain Kirby was our captain.

Harold was the lieutenant of recruiting, but he was rarely ever out there. I don't think we ever saw him. I think at the very beginning we may have seen him in drill school once, maybe twice.

And then we had -- like do you want like the people's names, the instructors, or

what exactly do you want?

Q. I was more getting at whether or not Harold was one of the people who was doing the training at drill school, but it sounds like he wasn't really there.

A. He did not. No, he wasn't -- definitely wasn't a daily part of our drill school.

Q. And, then, once you completed drill school, was he a part of paramedic school?

A. No. He was in the same building, same floor, his office was. It was down at Centennial -- Centennial II, so that's where we do EM -- or did -- I think now they're at the new training building for those things.

But, at that time, we were on the fourth floor in that building for EMT class, and paramedic was also.

Q. And that was prior to you reporting the rape to the City; is that correct?

A. EMT class and everything? Yes.

Q. And, at that point, what did you understand Harold Wright's role to be and you becoming a firefighter?

Did you feel indebted to him or, at

that point, were you, like, he's not involved in the process anymore?

A. After becoming a fire -- like after I finished everything?

Q. Well, I guess, while you were a fire recruit and becoming a firefighter.

A. Well, after I finally confronted him about it, and I guess kind of got it out, I knew that it was up to me to get the -- to become a firefighter, because I was in drill school.

Even though, from what he told me, he was, I guess, why I was there, but it was just a lot to carry at that point.

And so I wasn't communicating with him as much anymore.

Did I answer your question? I'm sorry.

Q. Yeah. Yeah, you did. Yeah.

All right. And then you have allegations in your complaint about Harold Wright's 2024 domestic violence charge.

How did you learn that he had been charged with domestic violence?

A. I don't remember how I found that

out, actually. I mean, you can Google it, but I don't remember how I came across that, but --

Q. And what specifically, if anything, do you know about it?

A. I don't know about that specific thing. I remember talking to someone in my church.

Well, I don't go there anymore, but the church I used to go to, we were just talking about my job.

And, oddly enough, he had asked -- he had mentioned how one of his relatives was involved with someone. And it happened to be Harold, and that he was abusive.

But I didn't -- I don't know if I Googled that, but -- I don't remember.

Q. Do you know how that case resolved, the domestic violence?

A. No.

Q. Okay. Would you be surprised to know that it was dismissed -- or it wasn't dismissed, he was found not guilty after a jury trial?

MS. RICHARDSON: Objection.

Go ahead.

A.   Surprised?  No.  I guess, just because I feel like justice doesn't happen a lot.

BY MS. BARON:

Q.   And why do you believe or know that the City knew about this domestic violence charge?

A.   Because it's -- I guess if there's, like, a police report or anything like that, that that's something I would think the City would know about.

Q.   And why, based on this domestic violence charge, should the City have known the incidents like what you've talked about, what Harold Wright did to you, could happen?

A.   Not just based off of that.  I wouldn't say that.

But I know, for sure, at least one other woman came forward about him sexually harassing her.

Q.   Yeah.  And we'll get into that as well.

And so describe to me why you believe, that after being acquitted of domestic violence, the City should have removed Wright

from his position?

MS. RICHARDSON: Objection.

Go ahead.

A. Well, I didn't say that. I mean --

BY MS. BARON:

Q. So let's go to Exhibit 3. It's your complaint, or your amended complaint, and then it's paragraph 69.

And paragraph 69 says, Subsequent to learning that Defendant Wright had domestic violence charges against him, the City retained Defendant Wright in his Lieutenant in charge of recruiting position until his retirement.

What are you -- so what are you alleging in that paragraph?

MS. RICHARDSON: Objection.

It speaks for itself.

Go ahead.

A. What do you want me to answer?

BY MS. BARON:

Q. So I want to know why you believe that, after being acquitted of domestic violence, that the City should have removed Wright from his position.

MS. RICHARDSON: Objection.

It doesn't say that.

MS. BARON: Which is why I asked her what she's alleging.

A. Well, I -- someone in such a powerful position I believe should be held to a certain standard.

And domestic violence, and who knows what else he's done and not been disciplined for, it's not fair or safe, for the people he comes across, to be in such a powerful position.

Q. And do you have that same opinion, even if he was found not guilty by a jury of his peers?

A. Yes.

Q. Okay. So you received an offer to be a fire recruit on February 10th of 2019.

Does that sound right?

A. No, that's not when I received the offer.

Q. When did you receive the offer?

A. The offer was when he called me. He told me that I was offered. Class started in February --

Q. Okay.

A. -- of '19.

Q. And when you say he, you mean Harold?

A. Yes.

Q. And do you recall what date he called you about? Was that December 8th?

A. December 8th was when I was at his house, I believe. I know it was December --

Q. Okay.

A. -- when I was at his house.

So it was either like some point in November or early December, but I do not recall exactly when he called me.

Q. Okay. Then while you were going through the recruitment process, was any discipline issued for anybody?

A. Not that I know of.

Q. So, then, on July 14th of 2019, you become a firefighter.

Does that sound right?

A. Yes. Graduating, yes, was in July of '19.

Q. Where were you initially assigned to work?

A. I was assigned -- after EMT class.

So after graduation, I went through EMT class --

Q. Okay.

A. -- which was eight weeks.

So I was assigned to, like, the 40-hour workweek, which was the EMT class.

So I wasn't at a firehouse yet.

Q. You were just going to classes then?

A. Yes.

Q. And so after you completed your EMT classes, where were you initially assigned?

A. To the 17s in Lower Price Hill.

Q. What was your schedule?

A. Twenty-four on, forty-eight off.

Q. And, then, did you ever go to a different firehouse?

A. I'd get detailed out, but like my assigned house was the 17s.

So you get -- whether it was sometimes on the medic unit or just a different house, based on the schedule, because you're -- it's called a sixth man when you first come out.

So, technically, you're kind of like extra. So if the other firefighters are there,

the sixth person probably gets detailed out.

So I would be at other houses sometimes for that. But I had to be there -- we had to do three tours on the truck if you're on the engine, and three on the medic unit before we could be, like, sent out of the house. But, yeah, I was at other houses.

Q. But you were primarily at the 17s?

A. I don't know if I'd say primarily, just because, you know, we take details out of the house, but I was there a good bit.

I also worked a lot of overtime. So for those, I would also be out of the house. But that was my assigned house, though.

Q. Okay.

A. That doesn't change, just because -- like, if you're detailed out, that's still your assigned house.

Q. Did you ever get a different assigned house besides 17 or is that still your assigned house?

A. No. I've changed.

Q. Where are you at now?

A. Now I'm at the 2s, which is in Carthage.

Q. And have you been at any other -- or permanently assigned to any other house besides the 17s and the 2s?

A. No.

Q. And did you have the same shift when you were at the 2s?

A. The 24 on, 48 off?

Q. Yes.

A. Except for the limited duty, yes.

Q. Okay. All right. So let's talk about Ervin Mitchell.

Tell me what you knew about Ervin Mitchell prior to meeting him, if anything.

A. What I knew about him? He was kind of creepy.

Q. Why do you say that?

A. That's what people say, literally.

But -- and I had, like, come across him before, but after -- before, like when I filed the complaint about him, that was my first time working with him on, like, the same apparatus.

Q. Who specifically was saying he was creepy?

A. Oh, I don't remember names. It was

just -- it was just kind of the general opinion of him, that he may say -- like, he's very, like, politically opinionated and, you know, he looks at whatever he -- you know, like he's -- I don't know.

Like, I don't remember exactly who said what, but it's just kind of one of those firehouse talk things, I guess, maybe, if there's a way to define it.

Q. Do you know if anybody had reported this activity to anybody at the City, that he was kind of creepy?

A. I don't know.

Q. So on -- when did you first meet Mitchell?

A. I don't remember when I first met him, but I know I had come across him before actually working next to him, like.

Q. Had you had any issues with him prior to you reporting this?

A. No, I would just avoid him. Like I avoid a lot of people. So like I just stayed to myself for the most part.

Q. When you say you avoid a lot of people, why are you avoiding these people?

A. I just -- that's how I am. Now I just don't care to be around a lot of people, especially at work.

Q. So on or around June 21st of 2021, you allege that Ervin Mitchell made sexually harassing comments to you; is that correct?

A. Yes.

Q. And when this happened, you didn't report this, because you wanted to handle it yourself, is that correct, initially?

A. I did report or --

Q. This might help.

If you want to go to -- I think it's Exhibit 5.

MS. RICHARDSON: Katey, again, I'm just going to say, this is not Bates stamped. And I had someone look, and we don't have this version.

MS. BARON: Okay.

MS. RICHARDSON: So I'm going to object to the whole exhibit.

MS. BARON: Okay.

BY MS. BARON:

Q. Have you seen this before?

A. Not that I recall.

Q.   Are you familiar with the Form 32?

A.   Is that what this form is called?

Q.   Yes.  The discipline form.

A.   No.

Q.   All right.  So I will have you flip to, in Exhibit 5, it's a letter dated February 24th, 2022, from Steve Breitfelder -- or, sorry, from Hugh Hains to Steve Breitfelder.

A.   Okay.

Q.   And midway down -- or I guess it's the last sentence in the first paragraph under Events, it says, Also, Firefighter Brown -- or, sorry -- Firefighter Bryant stated that she wished to handle her interaction with Firefighter Mitchell on her own and did not report them to her officer.

A.   Where?

Q.   It's -- there's a paragraph that says, Event.

         MS. RICHARDSON:  I don't even see that.

A.   It's on the first page?

BY MS. BARON:

Q.   It's on the -- there's a letter

dated February 24th of 2022.

A. Yeah.

Q. It's on the first page. There's a bolded paragraph that says, Events.

A. Yeah.

Q. And then go down to where it says -- it's the last sentence in the first paragraph.

A. Oh, in the first paragraph.

Oh, it's talking about the officer I was working with that day, not my -- that's what that's talking about.

Q. So you didn't want to report Mitchell to the officer you were working with?

A. He was -- so I believe that he put that in there, because when all of this happened, the officer that was there was sitting there when he said some of these things, and he did nothing about it.

So I guess that didn't give me any confidence that he would do anything about it. Yeah.

Like he was right there. And he just kind of tried to kind of like brush it off. Like he didn't do anything about it. He didn't tell him that was inappropriate and to

stop talking. He just -- he just let it go.

Q. Okay. And when you say the officer, is he a lieutenant?

A. Yes.

Q. Do you know who that was?

A. That was -- that day it was Brandon Freeman.

Q. Do you know if Lieutenant Freeman was disciplined for not doing anything?

A. No, he was not, not that I know of.

Q. So if you flip to the next page, under Observations, it says, Some -- and this is like midway down in the first paragraph where it starts, Some time after.

A. Yes. I see Some time after.

Q. It says, Some time after the comments at the dinner table, the Lieutenant did approach Firefighter Bryant to ask if she was upset and if she wanted to move forward with an official complaint, and she indicated that she did not wish to do so.

Is that accurate?

A. I'm trying to recall what happened.

Like, I know like the things he said, and I remember being upset about the

things he said and the lieutenant being there and not saying anything.

And as far as him talking to me after, and him asking if I was upset, it was clear that I was upset, because I was visibly upset.

And as far as him -- I don't remember him asking if I wanted to move forward.

I remember, when I did report it, though, that I was talking to my normal officer. Like I wasn't actually talking with Freeman when I did it.

Q. Okay. So do you recall indicating that you didn't wish to move forward, at that point, when you talked with Brandon Freeman?

A. I don't recall if those were the words I used. I remember feeling that he wasn't helpful.

I do remember that, but I don't remember exactly what I said to him.

Q. Then in the next sentence, it says, It was approximately three weeks later that Firefighter Bryant reported her concerns to her chain of command.

Is that your recollection, as well, that three weeks later you reported it?

A.    I know I reported it later, yes.

Q.    And who did you report this to?

A.    So my officer, then, I believe was Captain -- I can see his face.  I don't know why I can't think of his name, but I remember -- Wessel, that's his name.

Captain Wessel was my officer at the 17s.  And I think I was -- I wasn't at the house at the 17s.  It was a day I was detailed out.

And he had asked me about it, about, you know, what happened.  And I had told him that, yes, I do want to report it.

And so I had to come down to the 17s.  I believe I was on, like, Medic 24, so like we just drove down to the 17s.  They're like right up the street from each other.

Q.    So the harassing comment by Ervin Mitchell happened when you were detailed somewhere else?

A.    Yes.  That was at Engine 49.  But when I was at the 24s is when I spoke with my captain from the 17s, and then I came down to

the 17s to speak with then District Chief Potter. He's retired now. But that's who I spoke to about it that day.

Q. And why did you wait three weeks to report this?

A. I didn't really have -- I guess I didn't have, like, a specific reason that I can recall right now.

I guess I didn't really know what to do about it, either. I just knew that what he said was inappropriate, and I knew how it made me feel.

And, also, my officer's right there and didn't do anything about it. So it kind of made me feel that it's something that wouldn't matter much.

But even though I know it does matter, like in the back of my head it was wrong, but -- yeah. My officer not doing anything about it kind of made me feel like nothing's really going to come of it.

But after talking with my -- my actual officer, talking to Chief Potter and, you know, I did a chief's report, so --

Q. And as a result of your complaint,

do you know if an investigation into Ervin Mitchell's statements was investigated or was it completed?

A. I was told there was, but I wasn't involved in it at all.

Like, so I really didn't -- like I didn't know, like, the results or anything of it. I just -- I know there was an investigation.

I knew I did my part, you know, as far as write a chief's report and everything, and like went to internal, but -- to, like, talk to them about it. But, after that, I didn't really hear anything about what actually happened.

I talked to -- well, at the time, it was Chief Washington. I remember one time he came by the firehouse at the 2s. That's where I was, at this point. So it was a good bit later.

And I remember he told me, well -- which obviously this wasn't true, but he said that if -- like if this comes across my desk, I'm going to recommend that they fire him.

And I remember finding out much

later that he was not fired, and I didn't even really know the investigation was over. Like I didn't receive a report.

Like after the investigations with Harold and Damonte, I was given reports of it. I didn't know that was a thing, because it didn't happen with Erv. Like I just was told that there was an investigation.

Q. And what was your overall understanding of how the investigation was conducted?

A. Chief's reports, internal investigation, like the interviews, and then whatever action they decided was going to happen.

Q. And do you know what the initial recommendation for discipline was for Mr. Mitchell?

A. No, not until way later. Like -- but when it was actually done, no.

Q. So what do you know that the initial recommendation was?

A. Well, after I finally, like, saw this stuff, but -- and I don't even remember now, but -- yeah. I had -- I knew it was some

type of suspension. That's all I knew.

Q. Would six hours sound accurate, that that was the initial recommendation, a six-hour suspension?

A. It sounds like I did hear that before, because I remember being upset.

Q. And, then, do you know if there was a recommendation to increase the discipline?

A. I think so.

Q. And would it sound accurate that he actually was suspended for 96 hours?

A. I think that's what I was told.

Q. Were you satisfied with the outcome of the investigation?

A. I don't think I would say satisfied, no.

Q. Why not?

A. I don't know. I just felt like it was a slap on the wrist.

I know it was hours taken away, but I think for someone to be allowed to say the things that he said to me at work, in the way that he did, and for it to be something that my officer saw most of, I think it's very minor.

Q. I know you -- go ahead.

A.   No.  I said that's why.

Q.   And I know that you talked about it a little bit, but you were never informed about the findings of that investigation.

What was your understanding, at the time, about the fire department's process for letting a complainant or victim know about the outcome of an investigation?

A.   I didn't know.

Q.   Did you ever tell anybody that you wanted to be apprised of the outcome?

A.   No.

Q.   Did you ever ask anybody what the outcome of the investigation was?

A.   I don't think so.

Q.   Okay.  Do you need a break?  Are you good to keep going?  It's been like an hour since last time.

A.   If it's break time, I want one.

Q.   What was that?

A.   I said, if it's break time, I want one.

Q.   We can take a break.  It's been another hour.

A.   Yes.

MS. BARON: All right. Take a break.

(A recess was taken from 10:44 to 10:51.)

BY MS. BARON:

Q. So we will talk about Damonte Brown. Tell me a little bit about Mr. Brown.

A. What do you mean?

Q. What did you know about him prior to meeting him?

A. Oh, we were assigned to the same firehouse. I knew his parents from church. I didn't realize that those were his parents until we were talking.

And so we were friends before what happened.

Q. Were you in the same recruit class?

A. No.

Q. Was he already a firefighter when you joined or were you before him?

A. Yes. He was a firefighter before me.

Q. And how long had you worked with Damonte Brown prior to the incident?

A.   Let's see.   So I was at the 17s for two years, and then I got made at the 2s.   So I got to the 2s, I guess, in like '21, so --

Q.   And that's where he was at as well, was the 2s?

A.   Yes.

Q.   Did you guys work the same shift as well?

A.   The same unit day?

Q.   Yeah.

A.   Yeah.

Q.   So you were always working with Damonte Brown?

A.   Often, yeah.

Q.   Had you ever heard anything negative about him in regards to sexual assault, rape, or sexual harassment?

A.   No.

Q.   Any other concerns, conduct that you'd heard about?

A.   No.

Q.   So you allege, that in August of 2022, that Brown sexually assaulted you; is that correct?

A.   Yes.

Q. And this occurred at an assignment party?

A. It was after an assignment party.

Q. And what is an assignment party?

A. It's where, when the recruits are finishing up drill school, they all meet together, and they're given where they'll be assigned to.

Like it's like a whole thing like within the department itself.

Q. Is it sponsored by the City?

A. I have no idea. I just know it's done every class.

Q. And did you tell anyone about the assault immediately after it happened?

A. The next day. The next morning.

Q. Who did you tell?

A. I told Jerrell Brown. He is also a firefighter. He's a driver now, but at the time he hadn't promoted yet, I don't think. Had he? I don't think he promoted yet.

Q. And when did you tell Jerrell?

A. The morning after.

Q. And what did you specifically tell him?

A.   I told him -- I didn't go into detail, but I told him that he was trying to force himself on me and that I kept, you know, pushing him away and telling him, just go home, you know.

And Jerrell was like, yeah, that's sexual assault.  That's wrong.

And I was like, I know, but I don't know what to do, basically, so --

Q.   And Derrell (sic) Brown and Damonte Brown are not related; is that correct?

A.   Jerrell, no.

Q.   Okay.  And then -- so when you told Derrell that you didn't know what to do, did he tell you some ideas of what you could do?

A.   I don't remember, like, if he said specifically, go tell the police, but I know he was very straightforward about, like, yeah, that's wrong.  That's sexual assault.  You know, you should do something about it.

But I don't recall if he said specifically, like, oh, go report this to the police right now, but it was very clear of what it was.

Q.   And after disclosing it to Derrell

Brown, did you tell anybody else?

A. Do you have his name right? What are you calling him?

Q. Is it Derrell?

A. Jerrell.

Q. Oh, Jerrell.

A. Yeah. I thought you were saying it wrong.

Q. Thank you. Yeah, I had Derrell written down.

So after you told Jerrell, did you tell anybody else?

A. I mean, I talked about it in therapy. I told the police.

Q. And that's when you reported it to Tiffany Green as well?

A. Yeah. So I reported both at the same time.

Q. And then you reported Damonte Brown on October 10th of 2022.

Does that sound right, to the City?

A. Both of them. I believe I did my chief's reports for both of them at the same time.

Q. Yes, with Harold Brown and Damonte

Brown -- or, sorry --

A. Yes.

Q. -- Harold Wright and Damonte Brown?

A. I didn't catch that, but yes.

Q. Okay. And who did you specifically report this all to at the City?

A. So a chief's report you turn in, but I told my, then officer Lieutenant Dunham, and my district chief, which then was Jay Bosse, because I told them that I was reporting it.

I believe I told them that this is something that I've gone to the police about and I haven't done a chief's report. I told them before I did it.

And I told them that I wasn't sure how this was going to unfold and how I would react to it, because I hadn't told yet.

And I told them that I didn't know how I'd handle it, being out in the fire department, just to give them a heads-up that I didn't know what to do.

So before I submitted my chief's reports, I told my officer and my district chief.

Q. Did you talk to them together or

separate, Lieutenant Dunham and District Chief
Bosse?

A.    Together.

Q.    And when you told them you didn't
know what to do, what did they say?

A.    Just that, you know, turn in the
chief's report, and if I can't, like -- so my
concern was being in the firehouse.

I said I wasn't sure how it would
be, because I know how fast people start
talking about things.  And so I told them I was
concerned about that.

And he said -- Chief Bosse, because
that's who I would really go to, would be like
a district chief would be the ones that make
these decisions about -- at the time it was
just limited duty.

And so, he was like, well, let me
know if you need to go to limited duty and then
we'll handle it at the time.

And so -- yeah, I told them
together, showed them -- I think I showed them
my chief's report at the time.  And then it was
submitted.

Q.    Did you ever go to District Chief

Bosse and say that you needed to or wanted to be placed on limited duty?

A. Yes, that's who I called.

Q. When did you call him about limited duty?

A. When my -- we graduated from paramedic class, because that's when things started getting, I guess, gossipped about around the fire department. And that's when I found out about it. And I --

Q. Let me back you up.

So when were you doing -- what were the dates for paramedic classes?

A. The days or dates?

Q. Dates. Like time frame. When were you doing paramedic classes?

A. I don't remember our start date, but we finished in, I believe, November or December of -- when would that be, '22? Yeah.

Q. And this was -- you finished your paramedic classes after you had already reported Damonte Brown and Harold Wright, right?

A. Yes.

Q. Okay. So, at that point, you asked

to be placed on limited duty?

A. That was the only option I thought, so, yeah. I -- I told him that it's being talked about, and I can't be in the firehouse right now.

So he told me just to, like -- I decided to, like, do paperwork for limited duty.

I think we graduated on a Friday, and I didn't go back to the firehouse after that, so --

Q. And how did you talk to District Chief Bosse about wanting to be on limited duty? Was it in person or over an email or phone?

A. It was a phone call when I called him. I believe I called him on my way home from the graduation.

Q. And do you recall what date you were placed on limited duty?

A. I do not recall what time or date.

Q. So between the alleged assault with Damonte Brown and when you reported it, had you two continued to work together?

A. I don't remember seeing him. I

don't know why that's not -- I don't remember.

I don't think I worked with him since then, because he -- he did change firehouses. I don't remember exactly when.

I believe he was already gone from our firehouse when that happened, because he went to the 31s, which is in Oakley.

So we're in the same district, but they're kind of far apart. Like -- because, like I said, I'm in Carthage and he's in Oakley at the 31s. So that's where he went from the 2s.

Q. Do you know why he switched from the 2s to the 31s?

A. No.

Q. Do you know if it had anything to do with the allegations against him?

A. No. I'm pretty sure he was gone before that. Because I -- I know I have not worked with him since then.

I just don't remember when he left, but I know he left.

Q. And, then, did you report Harold Wright's conduct to Lieutenant Dunham and District Chief Bosse as well, or did you report

that to someone else?

A. I told them that there were -- I think I just said sexual assaults.

Like I told them -- I believe I showed them my chief's report, so they knew from that, but, like, no detail or anything like that.

Q. Then, as a result of your complaints, an investigation was conducted; is that correct?

A. Yes.

Q. And who knew that you had complained about Harold Wright and Damonte Brown?

A. Like, officially? I mean, apparently the whole fire department found out, but, I mean, I -- like who knew, like as far as being involved in the investigation, or what do you mean?

Q. So initially who knew about it? I know you said that it spread, but who initially knew about it?

A. Before it spread?

Q. Yes.

A. Well, I told -- of course, at that point, some of my family knew. But like they

didn't know, like, names and details. They just knew what happened -- roughly, what happened.

Jerrell knew. I don't remember, like, actually talking to other people in the fire department about it.

Q. And, then, when you said it spread, do you know who was spreading this information?

A. No, I don't know who. One of my classmates asked me about it.

So Meghan McQuiddy was texting me. She just -- she texted me. She's like, hey, heads-up. So just so you know, people are asking questions and kind of talking about Harold and like a sexual assault or something.

And she said that they were assuming that it was her, because, you know, apparently I guess people knew that she complained about him before. And she was like, I didn't say your name. And this was all on the same day.

Like it started in the morning, and then when we were out celebrating after paramedic class, same day of graduation, she texted me and said, okay, well actually, yeah, now they do know it's you.

And so, basically, just kind of trying to warn me, I guess, for returning to work, that people are talking about it and asking questions.

And then one of my classmates came up to me and was like -- I guess I looked upset. And he was like, what's wrong with you?

And I just said, nothing. And then he mentioned it.

I forget exactly what he said, but I remember when he said, Harold, he was like -- like, does it have something to do with Harold, or something like that.

And I was surprised, because I didn't know that he had heard anything, because we were all there, you know.

I guess I just didn't think it was being talked about with other people that I was with at the moment.

And I just, like, broke down, and I went in the bathroom for probably like an hour. And that's when I decided I wasn't going back to the firehouse at that point.

And so that's why later I had reached out to Chief Bosse about not going back

to the firehouse.

Q. And who was this classmate that came up to you?

A. Jamil Turner.

Q. So I know you mentioned that Meghan McQuiddy, at some point, had texted you and let you know what was going on.

Do you know who told Meghan McQuiddy about the allegations?

A. No.

Q. Did you know Meghan prior to her texting you and reaching out?

A. I had met her. Like all the women -- well, not all, but, like, when you make it through drill school, like we usually have a -- like a get-together, kind of introduce yourself to, like, other women, and, you know, kind of like, hey, if you need anything.

So I had met her previously. I never worked directly with her, but I met her.

Q. In that meeting that you said you had with all the women in the fire department, is that sponsored by the City or is that just something that you guys individually put on?

A. I don't know. I think it's just an individual thing. I mean, I know they'll like -- I think they send an email out, so -- but, yeah, it wasn't -- yeah. I don't know.

We just -- I went to mine, and I think I've gone to one since, but that's it.

Q. And prior to Meghan McQuiddy reaching out to you, do you know that she had had a previous issue with Harold Wright?

A. No. I was told that there are other women who have had problems with him, and I believe it was Captain Arnold -- Melissa Arnold, because there's two.

But Captain Melissa Arnold, I believe she's the one that told me that there is another woman who may have been through something similar. She didn't know details.

But she said who -- she would see if they were okay talking with me about it. And so that's how I, you know, got in contact with Meghan about that specific thing.

Q. So what -- after you started talking with Meghan McQuiddy, what was your understanding of the issue that she had with Harold Wright?

A. Before talking to her, I wasn't sure. I just knew it was in some way related to what happened to me.

So I knew it was some type of sexual harassment in some way. I wasn't sure how physical at all.

I just knew it was something with someone, with another female firefighter, at least one, and the -- whoever else, I didn't talk to.

Q. So after you talked to Meghan, what was your understanding of the issues that she had with Harold Wright?

A. That he kind of, like, cornered her in his office. I'm not sure if she had been on limited duty at the time, but however it happened, she was called into his office, and he kind of, like, blocked the door and was, like, talking to her, and told her that -- kind of the same thing about like, well, you wouldn't be here if it wasn't for me. Like, you wouldn't have this job if it wasn't for me.

And, like, he touched her, I think her leg, and just -- that she was very uncomfortable, and he, I guess, just didn't

care, but hence the cornering her -- or blocking the door so she couldn't leave.

But it was in the office, I guess, and she was, like, you got to let me out of here, basically, so --

Q. And, then, I'll have you flip to Exhibit 11. And this one is Bates labeled. It should be RB 001826. It's really small. Test your eyes today.

So the text message -- do you recognize these?

A. Yes.

Q. All right. And they're text messages between you and Meghan McQuiddy?

A. Yes.

Q. And in the second black bubble, then, where it starts, I'm sorry you're going through this, Ms. McQuiddy says, I wish I'd had the courage to stand up for myself when it happened. It might have prevented it from happening to you or anyone else.

What do you understand this to mean?

A. That she was sexually harassed or assaulted by Harold, also.

Q. Do you know if she requested an

investigation?

A. I know that she did a chief's report. She did complain about it. She told her superiors about it, and that -- somehow that's not anywhere in the records, but she did her report.

She told her supervisors, and that they, from what she told me, that they basically just put all of the pressure on her about doing something.

And they told her that, well, nothing -- he needs to be disciplined, because he's always doing things, and the only way for him to actually be disciplined is if you do something about it.

But they didn't do anything about it, even though she told them what happened, even though she did her chief's report, nothing happened with that. And that report is nowhere to be found.

Q. And so what is your understanding of if a complainant or a victim wants to report something but doesn't want an investigation done, what's the fire department's policy on that?

A.    I don't know.

Q.    And I know you talked a little bit about what your understanding of Ms. McQuiddy's complaints against Harold Wright were, but why do you believe, that based on what she alleged happened to her, that the City should have known that Harold Wright might rape someone?

A.    Because he physically put his hands on her.  He -- he sexually harassed her, and they did nothing about it.  And she reported it.

And they didn't take any responsibility as, supposed to be, leadership in the fire department.  Supposed to -- those are the people we're supposed to be able to trust and go to to handle things.  That's the point of the chain of command.  And they did absolutely nothing.

Where if something was done, then maybe he would have realized you can't do things like this to people and get away with it, or if he was actually disciplined, you know.  But, instead, they just brushed it under the rug and nothing was done.

So it's impossible to know how many

women have been through the same thing, if everyone's afraid to report it.

Because she was afraid, you know, especially the way that she described it to me, was that there were like multiple white shirts, which means that they're higher ranking in the fire department, that she had to sit here, intimidated by it.

Because, first of all, she's the only woman in there, and she's telling a bunch of men how a man sexually harassed her, and they didn't do anything about it.

So I think that if the leadership, which goes up to the City, if they did something about it, that what happened to me may not have happened. And if other women had gone through the same thing, that maybe it wouldn't have happened to them.

Q. Would you agree that, despite all of this, that Ms. McQuiddy indicated to the higher-ups that she did not want to have an investigation completed?

A. I'm not sure if she said she didn't want an investigation, but she clearly wanted something done, which is why she reported it.

Q. So we're going to go back a little bit to the investigation that's occurring on Damonte Brown and Harold Wright.

So what were you told about the investigation process before it began?

A. I was told that it would not be an internal investigation, because internal is the fire department.

I was told that it was going to go straight to the City and that fire was not going to be involved.

Q. And what is your understanding of why the City did it rather than fire?

A. I guess, like conflict of interest, the fact that Harold was a lieutenant, and just to avoid, I guess, a conflict of interest.

Q. And who explained the process to you?

A. City HR, which -- I remember working with Kelsey Braido -- Broado. Am I saying --

Q. Yeah.

A. I don't remember the other lady's name. If you said it, I might, but I do not remember her name.

But those were the two that I spoke

with initially about, kind of, this is how it was done. It was like a lawyer, but that's who the other person was.

Q. Was it Lauren Creditt Mai?

A. That sounds like her name, Lauren, yeah.

Q. Had you previously been involved in any investigations?

A. Aside from Erv? Like --

Q. Just -- yeah. So Erv, and then, I guess, now Harold?

A. Yeah. Just these three -- or those three, yeah.

Q. Okay. And describe your -- the process for the investigation into Erv.

A. With Erv it was the internal investigation. So that was how that was handled.

All I did was, like I said, my chief's reports or chief's report, and then the interviews with internal.

And then the investigation was done, which I didn't realize what all happened with that.

Q. And based on the interviews that you

had in that case with internal, would you agree that getting all of the facts out, even though some of the questions might be uncomfortable, is important?

MS. RICHARDSON: Objection.

A. Yeah. Yes.

BY MS. BARON:

Q. All right. So when you met for your initial interview on Harold Wright and Damonte Brown, did you bring anything with you for -- to present to the interviewers?

A. No.

Q. Did the interviewers, during the process, ever ask you to follow up with any information?

A. Not that I remember.

Q. Did the interviewers ask you who would have information that supported your side of what happened?

A. They asked me. Like -- I mean, like I told them about how, like, Keshia -- like how I met him and things like that.

But, I mean, no one else was there, so I didn't have any of that to give them.

Q. Do you know if they interviewed

Keshia?

A.    I believe so, yes.

Q.    And who is -- who do you know was interviewed as part of the investigation?

A.    I did read it.  I looked -- well, I didn't -- actually, I didn't read through it, but I looked at, like, who I believe -- are you talking about for both of them?

Q.    Yes.

A.    Okay.  I believe Keshia, Jerrell.  I think Falencia.  I don't know.  No, she was involved.  I don't know if Keshia -- I know for sure Keshia and Jerrell.  I'm not sure who else.  I don't remember.

Q.    And who was present for the interview that you had?

A.    Kelsey, the lawyer, I forgot her name again, and Falencia.

Q.    Okay.  And what did you know about Kelsey Braido, prior to the investigation, if anything?

A.    Nothing.

Q.    What did you know about Lauren Creditt Mai, the lawyer?  What did you know about her prior to the investigation, if

anything?

A.    Nothing.

Q.    And, then, Falencia Frazier, what did you know about her prior to the investigation?

A.    That she's a lieutenant, that she was close with Harold.  She was a lieutenant of internal at the time.  She's not anymore, but she was.

And she's one of my good friend's cousin, who was a firefighter, no longer a firefighter, but that's how I knew Falencia.

Q.    And I know you talked about Falencia alleged that Frazier and Wright were close personal friends.

How do you know that information?

A.    She was at his house the very first time when I went with Keshia.  And it was just kind of a known fact.

I mean, Keshia even knew that they were friends, that they were close.

Q.    Did anybody else know that they were close?

A.    Yeah.  I think it was just like a -- like people who knew them in the fire

department knew that they were friends.

Q. Do you know if any of the individuals that you said know that Wright and Frazier are close friends decided to participate in the interviews that you participated in?

A. Did any of their mutual friends participate?

Q. So did anybody know -- anybody that knew about their relationship, were they the ones that decided, hey, Kelsey, Lauren, and Falencia Frazier are going to be the people that are tasked with doing this investigation?

A. Oh, I have no idea who picked the people.

Q. And you already said that Frazier was the lieutenant over internal investigation at the time.

What do you understand that title to mean?

A. That they were involved in investigations. Like that that was just the, I guess, part of the leadership in that department. Like that was my understanding of the lieutenant of internal.

Q.    So would it be a fair assessment to say that, because she was the lieutenant of internal investigations, that she would be present in this interview?

MS. RICHARDSON:  Objection.

A.    No.  Because I was told that fire would not be involved in this investigation.

And then to have her in there, not only as fire, but fire internal and someone that's close with Harold, it just didn't -- I didn't understand how she got in there.

And I did question it.  I asked them.  And, at the time, I didn't -- I didn't know her very well.

Like, I mean, I would talk to her if I saw her or anything.  But I was, like, well, why is she here?  I was told that it was -- no fire involved.

And I remember she responded and acted or -- I don't know -- like she was offended that I asked.

And I was, like, well, no offense, but I was told that fire wasn't going to be here, and you're also internal, and I was told that it wasn't going to be that.

And then they told me that she was only there for, like, the contract, like our procedures and all of that.

And I'm, like, well, we have a union president. You know, we have union reps who know all of that stuff.

But -- and they said that she wasn't there to ask questions. They said she was there simply to observe and make sure that the contract and all of that was, I guess, respected.

I don't remember the word they used, but that was the reason that she was supposedly there.

But I wasn't -- I didn't have anyone with me. Like I didn't have union representation or anything, which I did bring the next time. But I didn't have anyone with me at that first one.

BY MS. BARON:

Q. And so when you say that you raised the concerns about Frazier being there, who did you raise those to? Who were the people?

A. Kelsey and Lauren.

Q. And Lauren?

A. Yeah. I asked right there in front of them. They were all three in there when I asked.

Q. And then these interviews that you had, they were recorded; is that correct?

A. Yes.

Q. All right. I'll have you look at Exhibit 6.

And this is a transcript of your second interview that occurred on March 17 of 2023.

In your complaint, you indicate that Frazier made inappropriate comments during the interviews.

What, specifically, were these comments that she made?

A. She asked -- she asked something about my breast size. She asked what I was wearing when it happened, as if that's relevant to being sexually assaulted, because it's not.

Q. Why do you say it's not?

A. Because it doesn't matter what I'm wearing. If I tell someone no, and they continue, it's still wrong.

Q. And these comments, did they occur

in the first or second interview, do you know?

A. I don't recall, but I think it was the first, but I don't remember.

Q. So you specifically, in your complaint, you say that she had made comments about your breast size.

Do you recall what she specifically said?

A. No. And I purposely did not read back through the interviews because -- I did try, but it was very upsetting, and so I never went back to look.

Q. So I am going to refer you to a small portion of it. So it would be marked as City 20562 through 20563.

MS. RICHARDSON: We only have 206.

A. Is it 65 or 56?

MS. BARON: It must be 65.

Let me find it first.

MS. MYERS: Fair enough.

BY MS. BARON:

Q. Okay. It's 20662 to 20663.

Were you able to find that page?

A. Yeah.

Q. Okay. So, in this, there's a

question from Falencia Frazier.

It says, Did you have a bra on?

Your response is, yes -- or, Yeah.

She asked, So he was pulling the bra and the tank down?  Or just --

Your response is, Yeah.  I mean, it's not much.  I don't --

And then Frazier says, Because it's just so -- No, I'm not -- I'm just saying it's just a -- is it a bra -- I mean, so --

And you say, It's a regular bra.

And then Falencia says, Sports bra, what was the --

And you say, It's just a regular bra.

And then Falencia says, Okay.  I got the wire, you know, big bra.  I'm sorry.  I'm trying to figure out -- oh.

And you respond, So I don't know. Mine are small.

Do you recall that line of questioning?

A.   I do remember her asking about what I had on and my bra, yes.

Q.   Okay.  So why, in your opinion, was

that line of questioning inappropriate?

A. Because it's irrelevant to being sexually assaulted.

Q. And would you agree with me that Frazier never actually comments on the breast size there, it's actually you that comments on it?

MS. RICHARDSON: Objection.

A. From this, yes, it looks like that's what I said. And I know, for sure, when she was questioning me about -- I was kind of confused about, I guess, asking what -- like my bra.

And when she was asking about, like him pulling on, you know, my shirt or my bra, and saying mine are small, it's like -- well, I don't know.

To me, the asking about that was just -- I don't know.

BY MS. BARON:

Q. I think we previously discussed it, and you did indicate that you believe, by giving the details in an investigation, regardless of whether or not the questions are uncomfortable, is important.

Do you still agree with that?

MS. RICHARDSON: Objection.

A. Yeah, if it's important.

But if it's irrelevant, then I don't see a reason for her to ask. And I don't think that was relevant at all.

BY MS. BARON:

Q. And then you also indicate in your complaint that Frazier asked leading questions of Brown and Wright.

What do you specifically mean there?

A. Like I said, I didn't read the whole thing from theirs, and I only tried once. So I don't remember exactly what it was.

Q. And so, then, what is your understanding of how these types of questions may have impacted the investigation, if at all?

A. I think that -- I don't think she took it seriously.

Q. When you say she, who do you mean?

A. Falencia. I think that -- I don't think she should have been questioning me at all or them.

I don't think that it was fair for her to be in there, to start. I don't think it

was okay, at all, for her to be in there.

And then to be questioning, and then to obviously -- at least at the end of it, have been in contact with Harold about the results of the investigation.

Now I forgot your question. Sorry.

Q. Oh, I was asking -- I asked, what's your understanding of how leading types of questions may have impacted the investigation, if at all?

A. Oh, leading questions?

MS. RICHARDSON: Objection then.

If you can answer.

A. I don't remember what all I read from her interviewing him, at this point.

BY MS. BARON:

Q. And, then, when you say that you don't think it's appropriate that Falencia Frazier was in the interviews, what's your understanding of who decided would be present in those interviews? Who made that decision?

A. Like the question you asked a little bit ago? Like, that's the same, right? Like I don't know. I don't know who decides that.

Q. All right. So you also alleged,

that, while the investigation going on -- was going on, you were required to use your leave balances, while Wright and Brown were on administrative leave; is that correct?

A. On paid administrative leave, yes.

Q. And describe that to me. When was that occurring?

A. When I was on limited duty. When I went -- when they were -- well, I believe they went off after I reported it.

So I wasn't -- I don't believe I was on limited duty right away, because I did my chief's reports in October, but I didn't go on limited duty until after graduation. Well, the day of graduation is when I started that process.

So -- and at the time, Harold already wasn't in the office. I guess he was already on paid leave for something else he had done.

So that's why I also felt not as urgent, originally, about the fire department knowing.

And, like I said, also the police said to wait, but -- because I wasn't going to

run into Harold.  I knew his office was right there, but I also knew that he wasn't in there at the time.

And so they finished whatever else he was involved in, and then he came back.  And then almost immediately was back out, because that's when I reported it to the fire department.

Q.    So when you learned that Harold Wright and Damonte Brown were on paid administrative leave, what did you do?

A.    Well, I mean, they were just on it. I mean, I was on limited duty, and they were on it.  I didn't do anything about it at the time.

I was just going to class and going to work.  That's what I was doing.

Q.    But you did ultimately talk to somebody about it; is that correct?

A.    Yes.

Q.    Who?

A.    In one of the interviews I told them that I felt that it was unfair, that I reported what they did to me and they're off on paid leave.

And then when I can't handle coming

to work, that I have to use my time off. So that was who I told, was Falencia and Lauren.

Q. Okay. And what was their response when you told them?

A. They said that they would see about me also being off and not having to be on limited duty.

I think -- I know when I talked to them about it, they said -- no, they got -- they saw about getting my hours back that I had burned. That's what it was.

Q. But --

A. Then I was -- yeah.

Q. Did they correct it, and were you able to be on administrative leave or paid administrative leave?

A. Yeah. For -- I forget how long. It wasn't long, because it was -- they said until the end of the investigation.

Q. And your -- any leave balances were restored; is that correct?

A. Yes, for -- back past that, yes.

Q. So essentially you were made whole from -- or treated equally to Harold Wright and Damonte Brown at that point?

MS. RICHARDSON: Objection.

A. I wouldn't call it equal.

BY MS. BARON:

Q. Why do you say that?

A. Because there was still all of the stress of still going to work and listen -- not -- in the environment that I feared going into because of how things were going.

Q. Had you told anybody, at that point, that things weren't going well, even though you were on limited duty?

A. Just from -- in the investigation.

You mean, like in my personal life?

What do you mean?

Q. At work, have you ever told anybody at the City that things weren't going well, even on limited duty, that you were struggling to come to work?

A. Not outside of the interviews.

Q. Okay. So the first time anybody knew about it was when you reported it to Kelsey and Lauren in the interview?

A. Directly, yes.

Q. And, then, you do mention -- I'll have you go to Exhibit 11. And it's Bates

labeled RB 001844.

This is, once again, a text message between you and Meghan McQuiddy. And in the first blue bubble you indicate that you mentioned admin leave in the very beginning.

Who did you mention admin leave to?

A.    The -- Kelsey and Lauren.

Q.    Okay.

A.    I believe.

Q.    So you're still referring --

A.    Yeah. I don't recall talking to anyone else about it.

Q.    So once you brought the issue to their attention, it was rectified?

        MS. RICHARDSON: Objection.

A.    Eventually, yes.

BY MS. BARON:

Q.    And, ultimately, at the end of the investigation, the allegations against Harold Wright were substantiated; is that correct?

A.    Yes. I believe so.

Q.    What is your understanding of the next steps that the City took after the investigation substantiated the allegations?

A.    After -- they let him retire. He

retired. That was what happened.

Q. So you indicate in your complaint that Frazier called Wright to inform him that the charges against him would be substantiated and that the City would recommend termination; is that correct?

A. Yes.

Q. How do you know this information?

A. Well, I don't recall now, like exactly how, but there was no one else involved in the investigation that -- there's no other way he would have known.

And it was something that was, when mentioned to them, they said, yeah, but there's nothing -- to the City.

They said, yes, okay, but there's nothing that says she couldn't do that, that she couldn't tell them.

Q. How do you know Falencia Frazier told Wright about -- that the allegations have been substantiated and that he would be terminated?

A. It was obvious. He -- he went in before coming in for his -- his -- I don't know what it would be called, an interview or

whatever, for -- to be told the results of it.

I also have -- my brother ran into a firefighter, who didn't know that he was my brother, and he just -- he was kind of asking, like, hey, have you heard about what was going on with, like, that lieutenant and that firefighter.

And he said, my name, my brother, you know. He said, yeah, Rebecca Bryant. And this firefighter, his response was, oh, yeah, Rebecca with the big butt.

And then he said, well, what do you think about what's going on?

And he was like, well, she shouldn't have been there. And when it came to Falencia -- because my brother asked, like, well, about -- that's not fair, right, that, you know, he got to retire.

And he told him -- the firefighter told my brother, sorry, that basically that's her job, as an internal, that she looks out for fellow firefighters who are in situations like this, so that they know what's coming to them.

Q. Who is the firefighter that told your brother that?

A. Twitty.

Q. Twitty?

A. Yes.

Q. Is that a nickname or is that his actual name?

A. That's actually his last name.

Q. Okay.

A. What is his -- I don't know his -- I've never called him anything but Twitty.

I just worked with him recently for like the second time ever. I think Lawrence is his first name, but he's the only Twitty on the fire department, I'm sure.

But he made it very clear to my brother that -- of course he didn't know it was my brother at the time -- but that Falencia was in that position to give people a heads-up.

And he even said, if I was involved in something, I would want to know if I was going to be fired.

Q. Any other supporting evidence that you have about for your -- calling and telling him that he should retire?

MS. RICHARDSON: Objection.

Go ahead.

A. No. That's the most, like, I guess concrete, that someone, I guess, knows how she's supposed to do it. Said it, not even knowing who they were saying it to.

BY MS. BARON:

Q. All right. You also indicate the City allowed Wright to maintain his pension upon retirement.

What steps do you believe the City had or has to prevent this?

A. If he was actually terminated, I'm not sure all of what's affected by that, honestly, but I know he, for sure, left with a lot more than he would have if he was terminated. That's for sure.

Q. You also allege that the City allowed Wright to retire in good standing.

What does it mean to you to retire in good standing?

A. He retired, and he wasn't terminated.

Q. You also allege that Wright was unilaterally changing Cincinnati Fire Department applicants' polygraph results to benefit individuals he likes.

What do you know about that?

A. That is what I was told he was under investigation for, for the -- that's why he wasn't in the office, initially, when I made my complaint, you know.

Q. Who told you about the polygraph investigation?

A. The police told me, and, then -- I don't remember who in the fire department.

It was just kind of, like, people talk, but I usually don't just sit and listen to most of that, so --

Q. And do you know who at CPD told you? Was it Tiffany Green?

A. There were multiple people in the room when I would go back there for interviews.

The only time it was only me and Tiffany was the initial.

Q. All right. Then you also allege that the City allowed Wright to retire, in general.

What is your understanding of the City's ability to prevent somebody from retiring?

A. Well, if you're terminated before

you retire, then you didn't retire. You've been terminated.

Q. And going back to the polygraph situation, do you know how that was handled?

A. I do not. I mean, he returned to work. The only reason he was back out was because of what I reported.

Q. Do you know if there's an investigation into the polygraph issue?

A. I believe so, because his office was closed off.

So I believe so, but I don't know any specifics of that. I didn't look for it. I just -- it was -- something happened. I just don't know.

Q. Okay. I'll have you flip to Exhibit 7.

Have you --

MS. RICHARDSON: We're also just going to have to check that this is the same that's been produced, because it's not Bates stamped.

MS. BARON: All right.

BY MS. BARON:

Q. And, then, do you recognize this?

If you need a second to look at it, feel free.

A. I've never seen it. I've never seen it.

Q. Okay. If I represented to you that this is the investigation that the Cincinnati Police Department did into Lieutenant Harold Wright about the polygraph being changed, does that seem accurate to you?

A. I wouldn't know if it's accurate. I've never seen one of their reports or anything.

Q. Okay. Did you ever have any understanding of the outcome of the investigation of Harold Wright?

A. For the polygraph stuff?

Q. Yes.

A. Not officially. I guess I just assumed they didn't do anything, because he returned to work.

Q. So can you describe to me how you believe the allegation that Wright was changing polygraph results supports your claims?

A. How it supports my claims?

Q. Yes.

MS. RICHARDSON: Objection.

Go ahead.

A.   It shows that he's dishonest.  It shows that he doesn't have any respect for his position, and the power that he has, he abuses.

BY MS. BARON:

Q.   Does your opinion change if, based on the recommendation after the investigation that the Cincinnati Police Department had, that this be closed with no further action, and that the Hamilton County prosecutors' office declined to charge Harold Wright?

MS. RICHARDSON: Objection.

A.   No.

MS. BARON:  It's been another hour. I don't know if you want to break for lunch or a quick break?

THE REPORTER:  Can we go off the record?

MS. BARON:  Yes.

(Lunch was taken from 11:52 to 1:00.)

BY MS. BARON:

Q.   So we'll kind of go back to the investigation into Harold Wright and Damonte Brown.

Is it correct that the City was unable to substantiate the claims against Brown?

A. Yes.

Q. How was that information relayed to you?

A. I was just given the investigation reports.

Q. Who gave you the reports, if you recall?

A. I don't remember. I think Kelsey emailed them. It was an email.

Q. At that point, did you make any request for accommodations or anything to Kelsey?

A. When I got the reports?

Q. Yes.

A. I don't recall doing that, no.

Q. And, at that point, was Damonte Brown still working at your firehouse?

A. No.

Q. He'd already been transferred to the 2s?

A. No, from the 2s. We were at the 2s.

Q. Okay. So he was transferred from

the 2s?

A. To the 31s, which I believe was, like, just his decision. They didn't, like, move him.

Like you put a ticket in to go to another house if you want. So that's how he moved.

Q. But you indicate that, after the investigation, the City permitted Brown to work in your district and on your schedule; is that correct?

A. Yeah.

Q. And what does that exactly mean, that you're still working at the same district?

A. We have four fire -- four districts for the firehouses. And the house I'm at and the house he's at are both in District 4.

Q. And how often, if at all, do those two houses interact?

A. Not extremely often. I don't know what you would define as often, but, I mean, even in the past -- the way that they have him on my unit day was a -- I think he was working a trade or he, like, owed the district for a trade, and so they put it on my day.

And then I actually did -- I didn't run into him, like face-to-face, but I was on the medic unit and he was on his engine, 31, and we both were on a fire.

And I actually almost did go over there to where he was. But then I just stopped and checked Manpower, like on my phone, because it's emailed to us, and I saw that it was -- that he was on there.

Because I saw two people standing there. One, I knew who it was; the other was him. And so I avoided running into him by just stopping and checking Manpower.

But other than that, I have not run into him. But the district chiefs are supposed to be made aware of that.

We're not supposed to work together or near each other. And I have had to tell them that I couldn't work a certain -- I guess, assignment, because one time they tried to put me at -- actually at the house he was assigned to.

Q. And you indicated that he was working a trade when you almost ran into him; is that correct?

A. It's not that I almost -- like it wasn't like we were on a run together. When I almost ran into him on the fire, I don't remember why we were both -- like I don't remember if -- I don't think I was working overtime.

I think it was my normal day, because I was on the ambulance. So he was on a trade or overtime.

Q. What does it mean to be on a trade?

A. Just you switch shifts with somebody.

Q. Okay.

A. And you have to be in your unit days, of course, or like it has to be your Kelly Day, one of the person's Kelly Day.

Q. So you only ran into him that one time after the investigation?

A. Yes.

Q. And when you ran into him, did you bring it to anybody's attention?

A. No.

Q. Then you indicate that the City attempted to reassign you and change your schedule in favor of employees who did not

complain about sexual assault or harassment.

Describe that to me.

A. My assignment being changed or the fact that it wasn't changed?

Q. Well, you say that they attempted to reassign you.

So when the City attempted to reassign you, who were they not reassigning that you're alleging you were discriminated against because of it?

A. Can you show me where you're talking about?

Q. So it would be in Exhibit 3. Let me find the exact paragraph.

It would be paragraph 101 of Exhibit 3. You indicate, Defendant altered the conditions of Plaintiff's employment by attempting to change her schedule in favor of those who did not complain of sexual harassment.

A. Oh, when I was on limited duty, is what that is.

Q. Okay. So when you were on limited duty, they attempted to change your schedule?

A. When I was on limited duty, I was

initially told that it was work-related, because it's people that I worked with or did work with, and I was -- the difference in when it's work-related and non-work-related for limited duty, is work-related you have to -- or you get to work four 10-hour days instead, and if they say it's non-work-related, then you have to work five.

And so the initial paperwork that I did when I went to limited duty was work-related. My schedule was the four 10s. That's the paperwork I signed originally.

And then they changed it and said that it wasn't.

Q. So now you're working five 10s?

A. I was.

Q. Well, when you were on limited duty?

A. Yeah.

Q. Okay.

A. Wait. Did you say five 10s?

Q. Is it five 10s?

A. No. It was eight hours.

Q. Five, eight hours. So you're --

A. You still had to work the hours, but they made you do four days if it was

work-related, five days if it was not work-related.

So if you were work-related, it was, what, 7:00 -- we had to be there at 7:00.

So you were actually there four 10 hours if it was work-related.

And if it wasn't work-related, you were actually -- they included an hour lunch in there. So you still -- you actually had to do like a little -- you had to be there a little longer, because you had to count that hour.

Q. And do you know why they have the distinction between work-related and non-work-related limited duty and changes in the schedule times?

A. I don't know their reasoning for it, no.

Q. And why do you say that they changed that just based on your complaints about sexual harassment or sexual assault?

A. Based on that? I don't think I said they did it based on that. I think it was the fact that it was different.

Like I said, I wasn't offered the option of administrative leave originally when

they were -- I didn't even know that was an option for me at all.

And months and months went by before I said anything about it, and that it actually was, you know, given to me for, like, the couple of months that were left.

But, yeah. It's the fact that it was just different, not, you know -- and then the changing it, I don't understand why it was changed from the -- work-related to non-work-related. I wasn't given a reason really.

Q. Do you know who made the decision to change from work-related to non-work-related?

A. I don't know who made the call for it, but I was told that it wasn't by -- I know Falencia was in charge of limited duty, and -- what is his name -- Marcus Moses, he was -- I don't know. He was kind of like helping.

I was kind of confused about what his role was within it, but he would be on, like, the emails and stuff.

I was under the impression that they were just kind of like making a transition. And so that's why there were two of them

instead of one. I still don't really know what it was.

Q. So they were in charge of limited duty, Frazier and Moses, when you were changed from work-related to non-work-related?

A. Yes, but they weren't who I signed the original paperwork with. Like when I first did it, it was -- he's a lieutenant. I can see his face. Wallace is his last name. I believe his first name is Ed, but I'm not a hundred percent sure on the first name, because there's more than one, I think.

But I'm pretty sure it's Ed Wallace. He was the one when I went down and did my paperwork initially.

Q. Okay.

A. That's who I signed with.

Q. And, then, how were you notified that it would be changing to non-work-related?

A. I don't remember if they called me, but I remember when it was actual changed, like on the paper, I was down there. Like I had to go in, and they changed it like that.

Q. And was that with Frazier and Moses or was somebody else there?

137

A. They were the only two there, yeah. Yeah, I believe it was just -- it was them when that was -- that change was made.

Q. And did you ask them why the change was being made?

A. Yes, I did.

Q. And what did they say?

A. They didn't really have an answer. They just said it's not -- they -- I think they -- okay.

I questioned why it wasn't, and they told me it was because they didn't have an on-duty. That was the reason they gave me.

When -- that's not how everyone's treated when it comes to that. And I know that for a fact, because I was on limited duty with another guy who -- it didn't happen on a run. That's what they said.

They said, if you could connect it to a run, like if there was some sexual assault run and, you know, that that put you in a certain space, then you could connect it.

And I was like, well, I don't have one. But then I was on limited duty with a guy who -- he was hurt, I think working out or

something, so nothing happened to him on a run, and he was on limited duty, and his was work-related.

Q. Do you know who that individual was?

A. I forgot his name now at some point. He's really nice and he just retired. I think Scott was his first or last name. His name may have been on there (indicating.)

No. And it's not Scott Ervin. I know I said Scott, but there's another Scott on here but it's not who I'm talking about.

Yeah. It's not Scott Ervin, but this guy's name was -- I thought it was Scott -- not Scott Rice. Maybe that wasn't his -- I can see his face, but he was on limited duty with me and he was not -- he was not injured on a run.

And he -- and I asked him, I just was like, oh, you know -- and it was just normal talk, you know, because he was hurt. And it didn't happen on a run, but yet he had work-related.

Q. So what evidence do you have to support your claim that you were changed from work-related injury to non-work-related injury,

based on your complaints of sexual assault?

MS. RICHARDSON: Objection.

A. The fact that someone else with -- was work-related, and their reasoning wasn't something that happened on a run.

BY MS. BARON:

Q. So you also indicate the City failed to keep your complaints confidential; is that correct?

A. Yes.

Q. Were you ever warned that that's part of the investigation, some of the information relayed may not be kept confidential?

A. No.

Q. So who, specifically, are you alleging was telling people about your complaints?

A. I don't know who, exactly. It's kind of why I didn't go back out to the firehouse, because that was something that I knew, especially from how it hit me when I found out about it after our graduation, that I couldn't face in the firehouse.

So I don't know exactly who was

saying what or where it started or how it got out there.

All I know is the only place that had, you know, my chief's reports and, you know, that should have had the interviews, were from the investigation and who I reported it to.

Q. And so what evidence do you have that the City was not keeping your complaints confidential?

MS. RICHARDSON: Objection.

A. The fact that it was being discussed throughout the firehouse.

BY MS. BARON:

Q. And, at one point, is it true that you decided you were thinking about going to the news about this incident?

MS. RICHARDSON: Objection.

A. What was the question?

BY MS. BARON:

Q. At one point, isn't it true that you were thinking about going to the news about this incident?

MS. RICHARDSON: Same objection.

Go ahead.

A. Yes.

BY MS. BARON:

Q. And I'll have you flip to Exhibit 11. It's labeled RB 001840.

A. What was the last two numbers again?

Q. Four zero. So it's 1840.

In the first blue bubble, you put, I might go to the news anyway.

Would you agree that going to the news would have made your situation even less confidential?

A. Yes, but it already wasn't confidential.

Q. And what specific steps do you allege that the City did not take, once it became aware of your complaints, to ensure your safety and well-being?

A. What steps did they not take?

Q. Yes.

A. I mean, a big thing that -- about the City and the fire department, like my personal information, basically anyone that works there can access it, even a firefighter.

And even if it did have to be an officer, Harold was an officer. And so anyone

being able to see where I live, get my phone number. I think you can see our emergency contacts on there. It doesn't make me feel safe at all.

And I don't know how they're able to leave stuff like that up there. Every firehouse has the roster of the people that are assigned there, and it has their name, address, phone number.

But where I'm at, I told them to take my address off. So it's off where I'm at, but that is a huge threat to safety for me.

Q. Anything else that the City didn't do?

A. Well, they didn't do anything, so --

Q. And is it fair that the City wouldn't be able to do anything until it became aware of the ongoing issues you were having?

MS. RICHARDSON: Objection.

A. Well, they were made aware, at least of Harold and his behavior, before mine, but -- yeah, until I said anything, they wouldn't know about me, specifically.

BY MS. BARON:

Q. And is it fair that, once the City

became aware of your complaints against Harold, Damonte, and Ervin, that it did act?

MS. RICHARDSON: Objection.

Go ahead.

A. They acted by investigating it, but as far as safety, they didn't do anything.

BY MS. BARON:

Q. And that's because your address was still --

A. Everything is on there today. Like everything is on there.

Q. And when you say it's on there, where do you mean it is?

A. On our personnel management system. That's the place I know for sure. I don't know if it's other places.

But you can log in. There's like a drop-down for, like, employee information. And then you can click on it, you can search for anyone's name within the fire department, and you can see that information.

Q. And who has access to that personnel management system?

A. Anybody with a login within the -- I don't know if it's a whole city thing or just

fire department, but it's on the CFD Web, like the intranet.

So you can't, like, do it from home unless you have like a -- like how some officers or whoever can work from home, but it has to be on the intranet.

Q. Do you know who has logins?

A. As far as I know, everyone that's left in the fire department.

Q. Do you have a login?

A. Yes.

Q. And when you're being trained on the system -- or were you trained on the system at all?

A. No. We were given, like, this is our information to log in, and this is where you can see, like, Manpower, and like overtime and things like that. I was never trained on it, though.

Q. Okay. But what are you supposed to be using that system for?

A. Me, specifically, or anyone?

Q. Anyone.

A. I guess it would depend on your duties or just what you're looking for.

Because, like I said, it has -- it has like the entire -- it has everything.

It has seniority. It has overtime. It has, like, dates for overtime. It has, like, vacation inputs and things like that.

I haven't explored the entire thing. There's a lot of stuff on there, but --

Q. And it sounds like what you're explaining to me or what you've described is on there, it's work-related; is that correct?

A. Yes.

MS. RICHARDSON: Objection.

THE WITNESS: Sorry.

MS. RICHARDSON: That's okay.

BY MS. BARON:

Q. All right. You also indicate that, because of the City not taking steps to ensure your safety and well-being, you were diagnosed with PTSD; is that correct?

A. Yes.

Q. And who diagnosed you with that?

A. When I went to the Center of Excellence.

Q. Do you --

A. My therapist prior to that, that

was, I guess -- I don't know when the official diagnosis was made.

I just know that's what I've been dealing with and being seen for.

Q. And do you have any medical records that reflect that diagnosis?

A. Yes.

MS. BARON: Are you able to --

MS. RICHARDSON: I know it was the most recent -- Julie's been working on it. There's been a couple hang-ups, but we're trying.

MS. BARON: No worries.

Thank you.

BY MS. BARON:

Q. As a result of everything that we've discussed, you decided to file a complaint with the Ohio Civil Rights Commission; is that correct?

A. Yes.

Q. Okay. And that -- if you want to look at Exhibit 8.

MS. RICHARDSON: Eight, you said?

MS. BARON: Eight, yeah.

BY MS. BARON:

Q. Is this the complaint that you filed with the Ohio Civil Rights Commission?

A. It looks like it.

MS. RICHARDSON: Objection.

THE WITNESS: Sorry.

MS. RICHARDSON: No, it's all right.

Go ahead.

BY MS. BARON:

Q. When did you file with the Ohio Civil Rights Commission?

A. I don't remember the date.

Q. Does June 7th, 2023 sound right?

A. From this stamp, yes.

Q. Okay. And why did you decide to file this?

MS. RICHARDSON: Objection, just to the extent it's asking for privileged communications.

Don't discuss anything Kelly and I have talked about with you. But to the extent that you have your own answer to this question, that doesn't involve Kelly and I, you can answer.

A. Can you ask the question again?

BY MS. BARON:

Q. I'll just withdraw it.

All right. So in this charge, you explain that the City was going to assign you to a different station and a different schedule.

We previously talked about your alleging that you were removed from a work-related injury to a non-work-related injury while you were on limited duty.

Is this a different schedule change that you're talking about in the charge?

A. I'm looking for exactly where you're reading.

Q. It is -- so it's in the typed part that's not on the form. It's like the attachment. And it's in the last paragraph.

It starts, They were going to assign me to a different station and a different schedule.

A. Okay. I had to refer to that. I'm sorry.

So this -- there was -- so I went to limited duty. And then when I tried to return to normal duty, there was a day that I went

through the proper steps of -- you have to, like, call back on track to be placed back on the schedule. I did that, and I was in place on the schedule like I should have been.

And so when that happened, you just show up to your assigned house. So I showed up to my assigned house, and I was told that I was going to be assigned out of the house for this tour.

I was told I was going to be on Medic 23, and instead, being in my house on my assigned apparatus, which, at that point was Engine 2. And the other people that were on the apparatus, I was more senior than at least one of them.

And the way that it's supposed to be, if you're -- when it comes to, like, being detailed out, is that the least senior person is the one that gets detailed out.

Q.    Okay.

A.    So I was being detailed out when I shouldn't have been.

And after six months of being gone, I didn't see why I would be detailed out of the house now.

Q. Who made the decision to detail you out of the house?

A. I believe that would have been Chief Bosse, the district chief.

Q. Did he give a reason?

A. No.

Q. And who were the other individuals that you say were less senior than you that day?

A. I don't remember who all was working that day, but I did look at Manpower.

Q. So you would have seen who was --

A. Yeah, so I could see who was there.

Q. Okay. And why do you think that Chief Bosse made a decision to detail you rather than someone else?

A. I don't know why he made the decision.

I did ask my previous officer, which was Dunham, and the reason he said was just, oh, they always mess up Manpower, and that was it.

Q. Are you alleging that Chief Bosse had any sort of a discriminatory animus when he made the change or do you believe that it was

just a mess-up?

A. I'm not sure.

Q. You also mention in this complaint that there was a lot of gossip and rumors.

Do you know who was spreading these gossip and rumors?

MS. RICHARDSON: Just -- sorry, Katey, to interrupt for me.

Are you talking about the charge or the complaint?

MS. BARON: The charge.

MS. RICHARDSON: Okay. Thanks.

A. So the, like, chief's report? Is that what you mean?

BY MS. BARON:

Q. So in the charge, it's like the next -- it's close to where we just talked.

It says, There is a lot of gossip and rumors that make me feel uncomfortable.

A. Say your question again, please.

Q. No, you're fine.

Who was spreading those rumors and gossip?

A. I don't know the source of it. I don't know who started them.

Q. Who was telling you that there was this rumor -- these rumors and gossip?

A. Multiple people asked me about it. Or people -- and people would just kind of try to check on me, because they were hearing, kind of, what was going on.

Q. And who were these individuals that were checking on you or asking you?

A. I didn't respond to most people, but like my friend -- well, one of them, which was one of my classmates, like Adkins, she would check on me sometimes.

Bri, but now his name's Bre Dale. Like, they've changed their name, legally. So I don't know what I'm supposed to --

Q. Is it --

A. It was Brienna, initially. So when we went through drill school together, Brienna Dale. That's actually Falencia's cousin.

Q. Dale's the last name?

A. CJ Battle. He's now a lieutenant on the engine at the 2s where I'm at, but I'm on the truck. He had checked on me.

I believe he was the one that told me that -- I don't know exactly where he got it

from -- but that he told me that everyone was talking about it and was checking on me, and that they were even sending out -- well, at this point -- okay, what's the difference in the charge and the complaint?

MS. RICHARDSON: This is -- we're talking about the charge.

THE WITNESS: Okay.

MS. MYERS: The charge is what we filed with the agency. The complaint is what we filed with the Court.

A. Okay. So -- but it's just, like I said, I don't know where these things started.

The only way I really heard about them was when people reached out about it.

BY MS. BARON:

Q. Did you report to anybody in leadership that these gossip and rumors were spreading?

A. No.

Q. And what was ultimately the outcome of the Ohio Civil Rights Commission investigation, if you know?

MS. RICHARDSON: Objection.

Go ahead.

A.    The outcome of it?  Is that where we did, like, the mediation?

I don't know how to answer that.

BY MS. BARON:

Q.    So did you receive right to -- right to sue letters from the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission?

A.    I believe so.

Q.    Okay.  If you want to look at Exhibit 9 and Exhibit 10.

MS. RICHARDSON:  I'll just object to these exhibits.

BY MS. BARON:

Q.    Are these both the exhibits -- or both the right to sue letters that you received?

A.    I believe so.

Q.    Okay.

MS. BARON:  And, Kelly, just so you know, these were attached to your complaint.

MS. MYERS:  Okay.

BY MS. BARON:

Q.    So, let's see.  So the first one is

from -- it's Exhibit 9. It's from the Ohio Civil Rights Commission.

And it says that that was mailed to you on January 11th of 2023.

Does that sound right?

A. I don't remember.

Q. Okay.

A. I'm not going to be checking my mail. I know that's not a good reason. As far as the mail, I really don't remember.

Q. Okay. And, then, the EEOC issued one on February 14th of 2024.

Does that look accurate, in Exhibit 10?

A. Yes.

Q. So we're going to get into the, like, actual claims in your complaint instead of so much the facts.

So in paragraph 85 of your complaint -- it's Exhibit 3 if you want to look at it -- you allege that you were subjected to a hostile work environment because of your sex.

A. What was the number?

Q. It's Exhibit 3, paragraph 85.

So you're alleging a hostile work

environment because of your sex.

What evidence do you have to support your claim?

MS. RICHARDSON: Objection.

Go ahead.

A. The entire incident with Mitchell was all based off of my sex.

Even since returning, there's been things that -- I've clearly been treated differently, based off of my sex.

BY MS. BARON:

Q. And when you say since returning, is that from being on limited duty to being full duty?

A. Yes.

Q. And what, specifically, are you alleging?

A. A lot. So a few things have happened with my current officer, which is Captain Harris.

With him -- when I returned -- I believe it was my first day back -- it may have been second -- but I believe it was my first day back on regular duty, we were doing some drilling.

So we were down at what we call the burn building, which is where the new site, the new training site is, so down there.

We went down there to use the roof prop to practice cutting a hole in the roof, since that's a truck skill. So that's what we went down there for.

And it was -- I was the only female. And so we go up to the roof, and we're going -- all four of us are going over the steps to make the roof cut. And the other firefighter, who -- there's two firefighters on every apparatus, sometimes three.

So we're going over it. He went to cut first, did it the exact way that we all just discussed it, the safest way, most effective way. And then it was my turn to go.

And so when it was my turn to go, I go to make the first cut the exact same way that the first guy did. And then Harris says, no, you have to do that from the ladder.

So the way that we cut is -- if the ladder's here (indicating), we make the very first cut furthest from the ladder. But for safety reasons, we like sound the roof as we go

to make sure it's safe. I did that.

I go to make my first cut, and he yells, stop. And I was, like, okay, what?

And he said, you have to make your cut from the ladder.

And I said, no, I don't. We just did this. And I was like, I can't reach from the ladder. No one -- no one can reach from the ladder, which is why we're doing it this way.

And so he was like, yeah, you can.

So I was like, you can't.

And he was like, watch this.

And so he takes the saw and he tries to cut from the ladder and he can't reach it, and so he uses one arm and tries to do it, and he breaks our saw -- he broke the chain on the saw.

And so I just started taking my fire gear off. I was extremely irritated, extremely hot. It was like 80-something degrees. We had on full gear. And he tried to single me out, as the only woman, to make it more difficult for me. And he couldn't even do it.

So that was the very first day I

returned back that he did that.

Before returning, I was even told, yeah, they said they don't want a woman that works -- they don't want to work with a woman.

I was like, okay, well, I have to work with these guys, so it's kind of -- whatever.

And I thought I knew the one that said it, because one of the firefighters that's also assigned to the truck with me -- I'm sorry. Excuse me.

Q. You're good.

A. I tried speaking to him three times. He ignored me the very first time. And I kind of wrote it off as, it's early, he might be tired.

Second two times I was down at the burn building. Prior to coming back out, I was just trying to get some -- I guess sets and reps, like practicing stuff with the drill school that was in, and he ignored me.

So I just kind of assumed that that was the person that didn't want to work with me. I didn't find out until much later, and my friend that I went to high school with actually

even told me this, that it was my captain who said that.

Q. And that's Captain Harris?

A. Harris, yes. So that's a very uncomfortable and hostile environment to be in, where one of the firefighters that I work with -- we don't speak at all.

I mean, we've been on runs. And I've even asked -- and this is only patient care. I don't speak to him at all. I don't really speak to Captain Harris.

There's been days where he -- he kind of like ignores me. Like I'll have to ask stuff twice. And, again, it's only about stuff on runs that I even try, at this point.

Q. And what you're discussing right now, that all happened after you received your notice of right to sue letter?

It's not in your charge, the OCRC charge that we just talked about?

I think it's Exhibit 7 -- no, Exhibit 8.

A. This is all after returning to duty.

Q. Okay.

A. Normal duty. Full duty.

Q. And prior -- so prior to returning to full duty, how frequently would you say that you were subjected to discriminatory conduct?

MS. RICHARDSON: Objection.

Go ahead.

A. Being on limited duty? I mean, that's the only place I was, was on limited duty.

And the only difference would have been how I wasn't given the same status as the firefighter I mentioned who received work-related and mine was non-work-related.

Other than that, there were things with, like, Falencia that happened on limited duty that I felt very singled out. And it didn't really seem to start until after she knew I was upset that she told Harold.

BY MS. BARON:

Q. Did you ever ask her if she told Harold?

A. No.

Q. So, as a whole, prior to 2022 and you reporting the assault and the rape, how frequently were you subjected to discriminatory conduct?

MS. RICHARDSON: Objection.

Go ahead.

A. I never really had any issues before I came forward about these things.

BY MS. BARON:

Q. And how -- how did your claims of sexual assault and rape, how did that interfere with your work performance and how you were treated because of those complaints?

A. My work performance? I know I'm not as -- I don't know the word. I stay to myself at work, for the most part. I don't really -- I don't reach out about stuff.

Yeah, I just stay to myself. I don't eat with them. I don't -- I'll -- I come out for, like, drills, of course, like if it's time to drill.

Like I do the things that are required, but -- yeah.

Q. And we already kind of touched on it, but it was a few years between when you were raped and when you reported it to the City, and it was a few months between the sexual assault and when you reported it to the City.

And you were able to continue to work during those two periods of time; is that correct?

A. Yes.

Q. Okay. And how did your work performance change after you reported it, if at all, between when you were working, you'd already had these things happen to you but you hadn't yet reported it?

A. My performance has never changed. I mean, I always still do my job well.

Q. Has anything changed?

MS. RICHARDSON: Objection.

Asked and answered.

Go ahead.

A. Are you asking just work-wise or personally?

BY MS. BARON:

Q. Work-wise, personally, has anything changed?

A. Since reporting or -- well, since it happened?

Q. Yeah, since reporting.

A. Yes. A lot has changed.

Q. What, specifically?

A. At work, the way that -- I don't engage with people much at work.

Q. Let me stop you there.

Prior to reporting, were you engaging with people at work?

A. Yeah. I was very -- I was pretty social. I would go to -- like, they have, like, the annual picnic for, like, the union.

We have -- I would just go to events that we had. Like parades and things like that, I would attend, just --

Q. And was that before or after the rape, that you were attending these events?

A. It was after.

Q. And what about after the assault?

A. No, I didn't go to anything outside of work.

Q. Okay. Keep going. What else?

A. Sorry, I got distracted.

So what else changed at work and personally?

Q. Yeah. You said you went from being social to not social.

A. Yes. The way I, like -- I've been told this, that men don't want to work with me

because they're afraid that I'll tell on them.

Q. When were you told that?

A. I don't remember the date, but I was working with another firefighter, male firefighter. I believe I was on Medic 9. And I didn't even ask these questions.

It was, you know, we were just talking about how work was, you know. He was like, how's it been being back?

And I just was like, well, you know, Truck 2, everyone knows how Cap is. And I was -- and I said, well, this one I don't even talk to because he ignores me. So we don't talk.

I was, like, the other two, fine to work with, but I don't plan on staying at that assign -- like on Truck 2.

And he told me, literally, he said, well, I understand why he ignores you.

And I was surprised, and I was like, why?

And he said, because of what happened with you and Damonte.

And, obviously, he doesn't know what happened with me and Damonte. And he went on

to tell me that he understands why men don't want to work with me, because they can't be men. They can't say certain things.

And I responded that this is our job; this isn't a social club. And he said that a lot of men, which I guess at this point he's just speaking for the men on the fire department, I guess, complaining about the fact that women were getting separate facilities in the firehouses, that there's pump rooms, that -- just things like that.

But for me, specifically, that men do not want to work with me because I will tell on them if -- just -- and he said that I would tell on them.

Q. Who was this individual?

A. That was -- his last name is Haygood, H-a-y-g-o-o-d. His first name, I think it's like, say, Siyr. I don't know if it's S-y-r-e or S-i-r-e.

Q. And when did he tell you this?

A. I don't remember the date, but it was since I've returned from limited duty. So it was within the last few months.

Q. All right. So in paragraph 86 of

your complaint, Exhibit 3 again, you indicate that the City was aware of the hostile, abusive work environment and took no or insufficient action to prevent it or remedy it.

When do you believe that the City became aware of the hostile environment?

MS. RICHARDSON: Objection.

A. I think that was apparent from -- with Erv. That was a hostile environment there.

BY MS. BARON:

Q. So would it be fair to say that, at that point, the City was unaware of your allegations against Harold Wright, correct?

A. Correct.

Q. And who, specifically, do you think was aware of the hostile work environment?

A. The officer I was working with when I was there with Erv.

Q. Is that Brandon Freeman?

A. Yes.

Q. Anybody else?

A. Since returning, or what time frame are you -- are you -- when are you asking?

Q. I'm asking about what was in your

complaint.

So the time frame that you're alleging the hostile work environment in your complaint.

A. Yes. Then I would say that was what I was referring to, so, yeah.

Q. And what action do you think that Brandon Freeman, as the officer who witnessed Ervin Mitchell's statement, what should he have done?

A. He should have called the district chief and had someone removed.

Q. And you also allege that the City responded inappropriately to your complaints.

Why do you say that?

A. Inappropriately? The fact that nothing was -- nothing was changed.

Like there was the investigation, of course with Erv, and they took hours.

Nothing was done to change the actual workplace.

Q. So I know we touched on this a little bit.

When you were taking paramedic classes, initially Harold Wright was off on

leave, so you didn't risk running into him, right?

A.   Right.  I don't know if he was off when we first started.

Q.   Okay.

A.   When I reported it, he was off.

Q.   Okay.  So after you reported it, did you ever run into him while you were at paramedic school?

A.   Yes.  The day that -- that was when I did the reports, like right after that.

Q.   Okay.  Did you run into him before or after the report was made?

A.   Right before the chief's report, yes.

Q.   Okay.  So after the chief's report, you never ran into him?

A.   No, because they placed him on the paid administrative leave.

Q.   Okay.  So when you ran into him, the City wasn't aware, at that point, of the rape allegations, since you hadn't submitted your chief's report?

A.   Well, I guess the City, itself, was, because the Cincinnati police is part of the

city, right, but the fire department was not.

Q. Okay. So the fire department wasn't aware?

A. Right. Not that I told them.

Q. Who else, besides Meghan McQuiddy, do you believe complained that the Cincinnati Fire Department's environment was hostile and abusive?

A. Just, in general, not relating to Harold?

Q. Yeah. Just, in general, who else has complained about that?

A. I don't know who has.

Q. Do you know if any males have ever complained about the Cincinnati Fire Department's environment?

A. Not for my same reasons.

Q. What reasons have they complained about it?

A. I don't know what official complaints have been made by anyone. Like, that's not something I like look into at all.

Q. Okay. Have you heard anything about other people making complaints about the hostile work environment?

A. Yeah. But that -- I guess that's just part of the -- you hear people complain about things.

And I can't recall if, like, specifics and names, but I have heard people talk about -- kind of more of people abusing their power and, say, not liking how you do something, even if it's not outside of, you know, the procedures.

Like they just want you to do it their way, and if you don't, like they'll write you up.

But, like I said, I don't have, like, specific, like, names and like the officer and stuff like that.

Q. So you don't -- is it fair to say that you also don't know if these, like, complaints were ever reported to anybody or if there's any truth to them or anything like that?

MS. RICHARDSON: Objection.

A. Well, if there's a chief's report on it, it should be -- like if someone is written up, then that's something that should be on file.

Q. Okay. But you're not aware of anything, as we sit here today?

A. I have not looked at anything, no.

Q. Okay. You also claim that the City's actions were willful, wanton, and malicious, and in conscious disregard of your rights.

What evidence do you have to support those allegations?

MS. RICHARDSON: Objection.

You can answer, if you know.

A. Where are you looking at?

BY MS. BARON:

Q. It is in the same paragraph, 89, of Exhibit 3, still.

A. I don't know how to answer that.

I mean, the City's actions and -- I mean, they kept Harold in that position. He was in that position, I believe, for, like, over 15 years, I believe, or somewhere around that, which, within that time, of course, is when Meghan made her complaint, which the City somehow couldn't find.

That's not a position that has had any supervision or any, like, partner in it,

like there's no accountability in it. And they just left one person with all of that power for that long, because that was the first person that would make the call for us, you know.

So I think that was very -- I don't know -- but I think keeping him in that position is something that caused negative actions.

Q. And, then, let's talk about the Women Helping Women report.

What do you know about that report?

A. The report?

Q. Yeah, the Women Helping Women reports. They were attached to your complaint. I don't have copies.

A. I did not include those in here.

Q. You do reference them in your complaint as well.

A. I'm not sure.

Q. Let me see if I can help you out.

You discuss it in paragraph 42 of your complaint.

A. Okay. So complaints and reports are not being documented. I believe they were looking into, not just like my situation, but

that other women had made complaints that weren't taken seriously or considered at all, such as Meghan's.

Like I said, I have not talked to any other women about something that they had gone through, outside of Meghan.

Q. What is your understanding of why the City sought to have this report created?

A. Because of complaints -- from my understanding, because of complaints about our former fire chief, Michael Washington. That's what I thought it was about.

And then, I guess, finding out that more people had complained about him, and I'm not sure who else.

That was my understanding of it.

Q. Do you know when the report was compiled?

A. No.

Q. Do you know who participated in the report?

A. No.

Q. Did you participate?

A. In -- like, in what exactly?

Q. Like, were you interviewed or

submitted a survey or any of your data, was that contained in the report?

A. I don't remember, honestly. I know there have been, like, surveys sent out that were -- I would only do them if they were anonymous.

But I do remember things going on with women all the time, but there were a lot of other things going on, you know, with everything that I was going through.

I believe I may have done one of those anonymous surveys, but outside of that, no. I wasn't, like, interviewed by them anything.

Q. You indicate that the report stated that complaints and reports were not properly documented or reviewed.

What is your understanding of what these complaints and reports were that were not properly documented or reviewed?

A. The ones that I know for sure, Meghan McQuiddy's and my -- well, my -- what I came forward about, they didn't do the investigation.

But as far as, like, those records

being, I guess, available, that was something that the City didn't have or didn't show that they had.

Yeah. So I guess that's part of it not being addressed, like if you can't even see them. Unless you're involved in it, you wouldn't know about it.

Q. You also allege that the Women Helping Women report states that there is zero confidence in issues of harassment being adequately addressed by the City from female participants.

Do you know how many female participants -- or how many females participated in the survey or in giving their information for this report?

A. No.

Q. Do you know any of the women who made this statement to the Women Helping Women investigators?

A. Who made a statement to them?

Q. Yeah, who -- women who made that statement and told the Women Helping Women investigators that they had zero confidence.

A. I do not know, by name, who said

anything.

Q. Do you know why these women said they had zero confidence?

A. For a fact, like do I know why they said what they said?

Q. Yeah, for a fact.

A. No, because I haven't talked to them.

MS. BARON: Okay. We've been at it for like another hour. Do you guys want a break or --

MS. MYERS: I could use a personal comfort break.

MS. BARON: All right. Let's take another break.

(A recess was taken from 2:07 to 2:10.)

BY MS. BARON:

Q. So in paragraph 105 of your complaint, you allege that you engaged in protected activity by opposing sex discrimination.

Is this activity the -- is the protected activity that you allege you engaged in, the complaints you made about Mitchell, Brown, and Wright?

MS. RICHARDSON:  Objection.

Go ahead.

A.   What does protected activity mean?

MS. BARON:  Do you want to meet with her or I can try to --

MS. MYERS:  Well, I mean, I think your question calls for a legal conclusion, which is why I made the objection, so -- but --

MS. BARON:  Yeah.

BY MS. BARON:

Q.   I mean, so what are you alleging that -- what conduct did you engage in that you're alleging opposed sex discrimination?

A.   Like sexual assaults?  Like, what do you mean?

Q.   Yeah.  Like the sexual assaults, the rape?

A.   Okay.  I engaged in protected activities?  Like what's the question?  I'm confused.

Q.   I'll just move forward.  I'll just withdraw it.

So in addition to what we already discussed, you allege that someone

misrepresented your remaining PTO hours, which resulted in you not being paid for two weeks.

Who are you alleging misrepresented your PTO?

A. Kelsey Braido.

Q. And when were the two weeks that you were not paid for?

A. I don't recall the dates.

Q. Have you since been reimbursed for those days?

A. No.

Q. Did you tell anybody about this?

A. It was -- I mean, I told, like, when I made the complaint.

Q. But did you tell Kelsey, like, hey, I should have had more PTO hours and now I've had to take two weeks of unpaid leave?

A. It was brought up later.

Q. When did you bring it up?

A. I don't remember when. I know that I checked to see what I had left, because I knew I was using my own time, and -- because I was called by -- it was someone in the union, because they called me to tell me that I was out of time.

And I said, no, I'm not, because I was told I wasn't.

And so then I asked for, like, all of my pay stubs. Because we can't access our pay stub unless we're on a work computer, unless we have access to the intranet.

And so, based on those, I asked Kelsey how much time I had left. And so when I was told that I was out, I responded to -- I think it was Joe Elliott. I believe that was who called me.

And I was, like, no, I'm not, because with this I was told I had this much left, but when you look at the pay stubs and actually calculate it, I did not. I was actually out of time.

Q. So is this that you -- when you were using your personal leave, while Brown and Wright were on paid administrative leave, and then Kelsey worked to restore that leave balance? Is that what happened?

A. No.

Q. No?

A. No, that was -- that was after that.

Q. Okay. So, then, how did Kelsey

misrepresent your PTO?

A. I asked her exactly how many hours I had as of the day that I was asking.

Q. And how do you know that this was intentional and not just a misstatement or miscommunication?

A. Well, I didn't miscommunicate. My question was very direct. I asked exactly how much I had left.

Q. Do you think Kelsey had any malicious intent in giving you that amount of leave or telling you you had that amount of leave?

A. I don't think so. I don't know her intentions.

Q. And so that situation was never resolved; is that correct?

A. Correct.

Q. And do you believe that Kelsey told you the wrong leave balances because you complained of sexual assault or sexual harassment?

A. I don't know why she did.

Q. All right. And, then, moving on to your Intentional Infliction of Emotional

Distress claim.

You allege, in paragraph 111, that the City acted with malice when it intentionally engaged in conduct that caused you emotional distress.

What evidence do you have to support this claim?

MS. RICHARDSON: Objection.

Go ahead.

A.  I think the fact that the position that Harold was kept in was them intentionally engaging in that.

BY MS. BARON:

Q.  So you allege that, by keeping Harold Wright in the position, the City was intentionally trying to cause you emotional distress?

A.  That was the result of it.

Q.  But is it fair to say that he was not really working in that position after you told -- or after you made your complaint, since he was on leave?

A.  Correct.

Q.  You also allege that the City should have known that his conduct could cause

emotional distress.

Why do you say that the City should have known, by keeping Harold Wright in the position of lieutenant over recruiting, would cause you -- they knew that it would cause you emotional distress, especially since you had not complained at that point?

MS. RICHARDSON: Objection.

THE WITNESS: Do I answer it?

MS. RICHARDSON: Unless I tell you don't answer, you answer.

A.    Can you say it again?

BY MS. BARON:

Q.    So why do you allege that the City should have known, that by keeping Harold Wright in the position of lieutenant over recruiting, prior to the City being aware that he had raped you, that it would cause you emotional distress?

MS. RICHARDSON: Object. Same objection.

A.    I think that is something they may not have known how it would affect me, individually, because they didn't know about me, specifically, what happened yet, but just

the damage, in general, that he's been allowed to cause.

BY MS. BARON:

Q. And then you say that, because of the City's actions, you suffered emotional distress.

What specific emotional distress did you suffer? Was it the PTSD or something else?

A. I guess all of it would kind of fall under PTSD, like the depression and all of the negative thoughts that come with that.

My complete change in my relationships that I won't form with people, I guess. Coworkers, and just, in general, anywhere. It's been really emotionally, like, draining and taxing.

Q. Were you diagnosed with depression at the same time as PTSD?

A. Yes, I believe so.

Q. And that would be at the Center for Excellence, when you were seeing them?

A. Yeah. Like I said, these are things that I don't know when, like, an official diagnosis was, I guess, declared by my therapist.

Like, because I was going to therapy before I went to the Center of Excellence. So the Center of Excellence is where I first saw it on paper, I'll say that. That's where I first saw it on paper.

I knew these were things I was discussing with my therapist before, so, I guess, if I had seen my actual records, then it probably was on there before I ever saw it on paper.

Q. Okay. All right. So in your complaint, you also talk about making a public records request.

Did you make that public records request in your name or anonymously?

A. Mine.

Q. Okay.

A. Then my email, like, because you have to put what email to send it to.

Q. Do you recall what you specifically requested?

A. I know I requested, like, any investigations, disciplinary action, chief's reports, because these are things that I knew should be in there.

It was very, very -- like a big umbrella, so I included everything.

Q. So you do allege that the chief's report was missing about Wright and Brown. Is that what you were referring to, your chief's report?

A. Yes.

Q. And the report from Meghan McQuiddy?

A. Yes.

Q. What is your understanding of where chief's reports are stored?

A. I honestly didn't know. I just knew it was something that is kept somewhere for -- and it's public record. That's all I knew.

Q. And do you know if you specifically asked for chief's reports or did you ask for personnel files?

A. The personnel file is just like the whole -- I know I asked for chief's reports.

Q. Okay. And how was your allegation, that you didn't receive all the records, related to your claims?

MS. RICHARDSON: Objection.

THE WITNESS: Sorry.

MS. RICHARDSON: Go ahead.

A.   It shows that the City has been -- I guess, the mishandling of -- I'm not sure.

To me it shows that they're dishonest and they try to hide things from the public eye.

It shows that -- dishonesty, the way that I see it, and trying to hide things.  It looks like they're hiding things.

Q.   Do you know if they were actually trying to hide stuff or it just has the appearance that they're trying to hide things?

A.   That's how it appeared to me.

Q.   So we're going to flip to Exhibit 12.  And these are initial disclosures that we received from your attorneys.

And in there, under paragraph Roman numeral number I, you list a bunch of people who have knowledge about the case.

So we're just going to kind of run through them and see what you believe that they know.  We've talked about some of them.

Falencia Frazier.  Do you have anything that we haven't talked about that she would know about?

A.   I mean, she was there for the whole

investigation. So, I mean, she knows all of that.

Outside of that, her relationship with Harold is something that only she knows about, the specifics.

Q. Sheryl Long. What do you believe that she knows? What was her involvement?

A. I never spoke to her. Just as the city manager, that's who I think would see the investigation report.

Q. Ervin Mitchell. We've already talked about him.

Is there anything else that he would know?

A. Not that I know of.

Q. Meghan McQuiddy. We talked about her.

Anything she knows?

A. Not that I know of, outside of what was said.

Q. Kelsey Braido?

A. Same.

Q. Lauren Creditt Mai?

A. That's the lawyer, right?

Q. Yeah, that's the lawyer.

A.   Okay.  No, same.  Just from what we talked about throughout the investigation.

Q.   Here's a new name, Curtis Chandler. What does he know?

A.   Police officer -- but he's with fire investigation, I believe.

Like it has him on here as a police officer, but he -- he actually said that he thought maybe he would have some information that could be helpful about Harold.

And he -- from what he told me, that he was the one that -- or one of the people, I guess, that brought up Harold's -- and this isn't verbatim from what he said, but his mishandling of, like, the polygraphs and whatever was going on with that investigation.

Q.   Okay.  So he's aware of the polygraph investigation?

A.   Yes.

Q.   Okay.  Michael Washington, what does he know?

A.   I'm not sure what all he knows, but I believe in all of this, he was, for sure, still the fire chief when I made the complaint about Ervin Mitchell.

And then I believe he still may have been -- when all of this started, he may have been fired by then.

Q. Women Helping Women, who specifically at Women Helping Women has information?

MS. RICHARDSON: Objection.

Go ahead if you know.

A. I don't remember. There was a lady that I spoke with from Women Helping Women, and I don't remember her name.

She helped me get in contact with a group that was for women that had been sexually assaulted. And so sometimes I would like attend a group, but I do not remember her name. Sorry.

Q. That's fine.

Harold Wright. We've already talked about him.

Anything else that he knows?

A. No.

Q. Damonte Brown. We've talked about him.

Anything?

A. No.

Q.   Bre Dale, we talked about a little bit.

Anything else they know?

A.   Just -- they know -- that's Falencia's cousin, so I don't know if there's anything else that they would know about them.

Bre was actually at Falencia's home for a family and friends thing, so she was there.  They were there as family.  And Harold was there.  And this was -- the investigation was going on still.

And Harold was at Falencia's house, and he actually approached my friend, Bre.  And I believe he, like, put his hand on -- first like her shoulder, his shoulder, and he was, like, you know, like, moved, like, okay, get off of me.  And Harold said, oh, it's like that?

And I'm not sure if he didn't know that we were friends, but Bre's response was that -- like Rebecca's one of my best friends.  And then he still proceeds to try to touch Bre's leg.  And it was like, oh, don't be like that.

And so Bre got up and was upset.

And Falencia called Bre into the kitchen after that happened, and was like, oh, you have a problem with Harold?

And Bre told Falencia, like Rebecca's one of my best friends. And, obviously, Falencia knows what's going on, because she's been in the investigation.

So Bre knows about that, that whole incident that happened.

Q. Do you know if Bre --

A. I'm not sure what else.

Q. Do you know if Bre reported that incident?

A. I don't know, but I don't believe so.

Q. Anything else that Bre knows?

A. Not that hasn't already been discussed.

Q. All right. Keshia Terry, we talked about her.

A. Yes.

Q. Anything else for her?

A. She was interviewed and everything, too.

Q. Okay.

A.     I don't think there's anything outside of that.

Q.     Robin Silus?

A.     Robin Sillis?

Q.     Sillis?

A.     She would know about it.  I think I had asked her if she knew about anything that was going on.

She had a problem with a male coworker previously, which she was discriminated against for being a woman.  She was told by her -- I believe, at the time, lieutenant.  It was someone that was over her.

They didn't want to work with her just because she's a woman.

And that person has since been promoted to a captain.  I think it was shortly after that.

So I know I had spoken with her a little bit about it just, I think, seeing if there was anything helpful, but I don't think, outside of that, she would know anything else about it.

Q.     Do you know who the male coworker was that she had an issue with?

A. He is now Captain Baker. And he -- I believe there was an investigation into it and everything.

And I think that -- I know for sure there's three Bakers, and I don't know if two of them are lieutenants or two are captains, but I can't remember which one this was --

Q. Okay.

A. -- but, yeah.

Q. Chief Breitfelder. What does he know?

A. I'm not sure. I believe that's just from, like, the investigation.

He was -- like when Chief Washington was going through all that stuff, he was the one that was in his spot.

Q. Latisha Hazell. What does she know?

A. Whatever HR people know.

Q. Jerrell Brown. We talked about him. Anything else he knows?

A. He made me aware of things that were being said about -- with me and Damonte, that Damonte was making up stories about what happened and that -- to try to damage my character and my reputation, saying that he was

having an affair with me, and that I wanted him to leave his wife and he wouldn't, and so that's why I said what I said.

So he -- and I don't know what else knows, but I know, for sure, he had heard that, because he had -- he told me and asked me about that.

Q. Did he tell you who said that?

A. No.

Q. Ed Ramsey. What does he know?

A. HR stuff.

Q. I thought you might say that.

Erica Burks?

A. Probably the same, but that is someone -- and not confirm -- like I have never saw them together, but that I was told is very close with Harold, but that their relationship didn't end well.

I don't know the specifics, but -- yes, I was told they were very close.

Q. Do you know -- or who told you that they're very close, do you know?

A. I do not recall.

Q. Okay. Sherman Smith?

A. He was in -- he was actually an

assistant chief, not district, but he -- I think he was over HR.

Like he was the HR assistant chief, so just like, I guess, saw the investigation stuff.

Q. Joe Arnold?

A. He was one that I believe Meghan McQuiddy said that she had reported her issue to.

I think he was -- like these names going down, like a few from there, are ones that I think she had told what happened with Harold.

Q. Okay. Maurice Byrd?

A. I think he was one of those. And Mark Marshall.

Q. Jack Klosterman?

A. Same. Because I never met him. That was someone, I believe, that was -- that she had reported.

Q. Okay. Hugh Hains?

A. He was, also. These, from Joe Arnold -- and I think Sherman -- I think that's why that says, former district chief for that, because I think he was a district chief of -- I

think he was over training when this happened with Meghan McQuiddy.

And so, from Sherman down to Hugh Hains, those were their titles when that happened.

Q. Gotcha.

A. I guess that's why they're all --

Q. All right. Mollie Lair. What does she know?

A. I'm not sure who that is.

Q. Ann Schooley?

A. Not sure.

Q. Emily Woerner?

A. Not sure.

Q. Virginia Tallent?

A. Not sure.

Q. Kelly Callen?

A. Not sure. I think he retired.

Q. Andrew Herbert?

A. Not sure.

Q. Sean Ware?

A. Not sure.

Q. Kelly Carr?

A. Not sure.

Q. Then we get into the -- your

therapists that we've kind of already talked about.

Marissa Gray, she was a therapist?

A. Yes.

Q. What does she know?

A. I spoke with her about all of it. She was the first one I saw after PEAP. That was the one that my PEAP therapist, she helped me to search through to find a new therapist.

Q. Are you still treating with her?

A. No.

Q. Sabrina Mig --

A. See.

Q. -- Mignerey?

A. Yes. Sabrina is the current one. She's the one I went to after the Center of Excellence.

Q. Obviously, we know what you know.

Kenneth Bryant?

MS. RICHARDSON: Just to make it clear, Rebecca is her mom.

A. That's my mom, yeah.

BY MS. BARON:

Q. Okay. I was, like, why did we even type your name on there? Like now I know.

A.    Yeah, that's my mom.

Q.    What does your mom know?

A.    Not like super details, but she knows what's happened -- yeah, she's been very supportive.

Q.    All right.  Kenneth Bryant, Jr. What does he know?

A.    He definitely does not know as much detail.  He's my dad.  But he knows, like, this whole process, so --

Q.    Bessie Bryant?

A.    That's my sister.  So Bessie, Lilly, and Kevin are my siblings, and it's all just kind of like they know what has happened but not a lot of the detail.

Just -- like I've talked with them more about the process of how it's going and like more so the -- like, the stress of it, so not necessarily the events, themselves.

Q.    So you allege lost overtime to be about $127,000.

This is from Exhibit 12 and it's from Roman numeral III.

How do you get to that number?

A.    So I was on limited duty for two and

a half years, roughly. Prior to limited duty, I worked a lot of overtime.

I was out of, like -- and this is the list like we see on personnel management, also. I was top five, like consistently, like for overall number of hours.

And on limited duty, I was not able to work any overtime.

So that's where I got that.

Q. You also state front pay. What is front pay?

MS. RICHARDSON: Objection.

Go ahead.

A. I don't know what it means. What does front pay mean?

BY MS. BARON:

Q. I don't know, either.

So how much front pay are you saying you are owed?

MS. RICHARDSON: Objection.

A. I don't know how to answer that.

I don't know if that's a legal term. I don't know or -- sorry.

BY MS. BARON:

Q. All right. So anything else that

you think we need to know about this matter that I didn't ask you about?

MS. RICHARDSON: Objection.

A. A lot has been -- I honestly don't know right now.

BY MS. BARON:

Q. Okay. One question I do have.

You said that you were on limited duty for two and a half years.

Do you know, under the limited duty policy and procedures, how long individuals are able to stay on limited duty, typically?

A. I believe it's two, like, consecutive years. Like two years straight. But there was a break in my time on limited duty.

MS. BARON: Let me talk to my co-counsel quickly, and then we might be free -- well, free of me. The others may have some questions.

THE WITNESS: Okay.

(A recess was taken from 2:40 to 2:41.)

MS. BARON: I do not have any other questions for you.

MR. KOLENICH: I do.

MS. BARON: It's your turn.

BY MR. KOLENICH:

Q. Good afternoon.

A. Good afternoon.

Q. My name is Jim Kolenich. I'm one of the attorneys representing Harold Wright and Damonte Brown.

I don't have very much for you today. Nothing to worry about.

Turning to Exhibit 8 in your exhibit book. Page on mine has the numbers 06072023 at the bottom.

A. Which one?

Q. Exhibit 8.

A. Eight? Okay.

Q. There we go. Thank you.

So toward the bottom of your description here, it says, I felt obligated to respond to him -- that's Harold Wright -- and not report him until my job was secured.

So what does, my job was secured, mean?

A. Until I was a firefighter.

Q. Until you were a firefighter?

A. Yeah.

Q.   Okay.  So you were hired or you were accepted into the academy in February of 2019, correct?

A.   That's when we started.  We started in February of '19.

Q.   Okay.  So when did you complete the academy?

A.   Completed in July of '19.

Q.   July of 2019.  And is there a period of probation after the academy?

A.   Yeah.  You're a probationary firefighter for a year.

Q.   For one year.  So July of 2020 your job was secured, right?

MS. RICHARDSON:  Objection.

A.   I felt --

MS. RICHARDSON:  Go ahead.

A.   I guess, like, legally, as far as how they, like, could fire us?  Yes.

BY MR. KOLENICH:

Q.   Well, we only know what you tell us.  Okay?  And the lawyers here are different.  Okay?  I don't work for the fire department.  I don't work for the City.

So what we want to know is what do

you mean by, my job is secured.

You don't have to know what it legally means or anything like that, just what do you mean by that?

A. Okay. Well, me feeling like -- I felt like I was more secured in my job when -- I guess that, going through drill school, and I more realized that it really is me who's getting me this job, because it was me that had to complete drill school. And, at that point, I didn't feel as controlled by him.

Q. Is drill school -- when is drill school?

A. When is it what?

Q. When do you take drill school?

A. It was after getting accepted into the class, so --

Q. So that's part of the academy?

A. That is the academy. That's what people call the academy.

Q. Oh, drill school would be -- they call the academy drill school?

A. Yeah, those are, like, interchangeable.

Q. Okay. All right. So even during

the term of your probation, after the drill school, you felt your job was secure?

A. I felt secure in my ability to -- I felt that it was in my hands. I didn't feel that he could do anything to take that away.

Q. Okay.

A. Yeah.

Q. All right. So even before your probation was over, you weren't worried about Harold Wright costing you your job?

MS. RICHARDSON: Objection.

A. Not as -- costing me my job? I began to realize he didn't have the power to affect me being there, as time went on.

BY MR. KLOENICH:

Q. Okay.

A. Where, initially, he told me he was the reason I got it, and I believed that. Yeah, I did.

Q. Okay. You've answered it.

This person, Bre Dale, formerly Brienna or Breanna?

A. Yes.

Q. So Brienna was -- she's the Brienna at the academy or drill school?

A. Yes.

Q. And later on becomes -- how do you say the name?

A. Bre.

Q. Bre?

A. Bre.

Q. And you start referring to this person as they?

A. Yes. They transitioned from female to male.

Q. So by transition, do you mean actually took injections or just --

A. Yes.

Q. When did, if you know, when did they transition?

A. I don't know when the exact time frame was.

Q. Before or after they had this experience with Harold Wright?

Did you not testify a few minutes ago that Harold Wright --

A. Yes, that he -- sorry.

Q. No. It's all right. Go ahead.

You know what incident I'm referring to?

A.    Yes.

Q.    The one you testified to in this deposition between Bre Dale and Harold Wright?

A.    Yes.

Q.    Okay.  So was Bre Dale already transitioned at this point or did that happen afterward?

A.    Already transitioned.

Q.    And Harold Wright still -- I don't know what pronoun to use, I guess.

MS. RICHARDSON:  They.

A.    They.

Yes, they still do.

BY MS. BARON:

Q.    Okay.  All right.  Now, if I'm reading -- back to Exhibit 8, the page we were looking at.

If I'm reading this correctly, it has a case number on it.  Maybe it's not on this page.  Back to the first page.

Well, when did you file this Ohio Civil Rights Commission complaint?

A.    I believe it was in June of '23, based on this.

Q.    Are you just basing it on these

documents?

A. Yes. Like exact dates, I don't recall.

Q. Roughly, the way you remember it, is summer of '23?

A. Yes.

Q. Okay. When did you hire the attorneys who are representing you today?

A. I also don't remember exactly when, but it must have been around this time.

Q. Before you filed the charge sheet, right?

A. Yes.

Q. Okay. Can you guesstimate how far before you filed the charge sheet?

A. I'm not sure.

Q. A year before?

A. No, not that far.

Q. Not that far? Okay.

So less than a year?

A. Yes.

MR. KOLENICH: All right. That is it.

I have no further questions for you today.

THE WITNESS: Okay.

MS. RICHARDSON: I am going to have some redirect.

EXAMINATION

BY MS. RICHARDSON:

Q. Rebecca, when you were talking with Katey earlier, you talked about District Chief Bosse and asking about limited duty.

Do you remember that, having that conversation with Katey?

A. Yes.

Q. Okay. And you -- I think you testified, and correct me if I'm wrong, that you asked District Chief Bosse about limited duty because there was gossip spreading and it was affecting you?

A. Yes.

Q. Okay. Did District Chief Bosse say that he could do something about the gossip that was going around the firehouse?

A. No.

Q. Okay. Did anyone try to stop the gossip from spreading, to your knowledge, at least?

A. Not that I know of.

Q. Okay. Were you given any option, other than limited duty, as an accommodation for what was happening?

A. No.

Q. Okay. And if you look at Exhibit 14 in the back. It's in the back folder.

A. Oh.

Q. There it is.

A. Oh.

Q. And there's a column here at the very end that says, Restrictions/Notes.

A. Yes.

Q. And your name is the third down on -- under Non-Work related.

Do you see what it says your restrictions are?

A. Yes.

Q. What does it say your restrictions are?

A. It says, N/A.

Q. Did you have any physical restrictions?

A. No.

Q. So there was nothing keeping you from doing the actual physical demands of the

work?

    A.    Correct.

    Q.    Okay.  What was your understanding of the -- well, let me start over.

    Did you have a medical note that put you on limited duty or a therapist note that supported you on limited duty?

    A.    Yes.

    Q.    What was your understanding of why that note was asking for you to be on limited duty?

    A.    Due to the stressful environment.

    Q.    Were you concerned about having to sleep at the firehouse?

    A.    What did you say?

    Q.    Having to sleep at the firehouse?

    A.    Oh.  Yes.  That's why, when I -- I guess tried to return originally, I was only going to work the first half for a while.

    I was just going to use my time off to do it that way.

    Q.    And despite not having any physical limitations, were you still barred from working overtime hours?

    A.    Yes.

Q. Since we're on this exhibit, the fifth column says, Day Count.

Do you know what that is referencing?

A. I don't know for sure. I thought it was a -- your number of days on limited duty so far.

Q. Okay. And if you look at Ashley Ba, who's the first one, that person has been on -- or at least if that's what that column means -- has been on limited duty for 439 days, correct?

A. Yes.

Q. And then under yours, you have 295?

A. Yes.

Q. And, then, if you look at Richard Frazier, he has 369, right?

A. Yes.

Q. And if you look at Meghan McQuiddy, she has 512?

A. Yes.

Q. And Janos Roper has 383?

A. Yes.

Q. Do you know if any of those people were told they had to leave limited duty and return to work?

A. No, not that I know of.

Q. Do you recall calling off work sick that -- on June 18th?

A. I do not recall doing that.

Q. Okay. Were you ever told that you had to call off of work while you were on limited duty?

A. We were told that we had to use our own time off for holidays if we were non-work-related.

That's -- the work-related ones, they just had to shift their day off to be whatever the day of the holiday would fall on.

Q. Okay. Did the City recognize Juneteenth in 2024 --

A. Yes.

Q. -- as a holiday?

A. Yes.

Q. Okay. Who was the lieutenant in charge of limited duty in 2024?

A. Falencia Frazier.

Q. Do you know who would have had access to this chart and the data in it?

A. I don't know who all has access to it, but, I mean, Falencia, for sure, and then

whoever -- I believe who -- like I think it says, like, the supervisors.

That's what I was trying to -- the supervisors, also, I believe, would get this -- the staffing. So this is limited duty manpower.

Q. Okay. You talked a little bit about things that are still happening with Katey at work, comments that are still being made.

Have you reported them to anyone?

A. No.

Q. Why?

A. It doesn't seem to be effective.

Q. Do you feel safe at work?

A. Somewhat. Not completely.

Q. Do you feel that the Cincinnati Fire Department is a welcoming environment for women?

A. No.

Q. Do you feel like it's a respectful environment for women?

A. No.

Q. Was there a reason you reported Harold Wright and Damonte Brown at the same time?

A. Yes. Up until -- when what happened with Damonte happened, it was -- I don't know if I'd call it like a wake-up call or a -- that -- obviously, I don't want it to happen to me again. But that if I don't say anything, then it's something that will keep happening, whether to me or to other women.

And I guess I was just tired of dealing with it on my own. And I wanted to -- I wanted there to be some justice for what they both did.

So it was like, I guess, the last straw, kind of.

MS. RICHARDSON: Okay. Those are all my questions.

MS. BARON: Based on those questions, I just have two questions.

FURTHER EXAMINATION

BY MS. BARON:

Q. What's your understanding of the overtime policy while anybody is on limited duty?

A. While what?

Q. While individuals are on limited duty.

A. We can't get overtime, even if it's -- you've actually worked over. Like you just -- you're not allowed to work overtime.

Q. Okay. And that goes for everybody; it wasn't just applied to you?

A. Correct.

Q. And were you told that you had to work -- or had to return to work from limited duty?

A. Yes.

Q. Okay. And when were you told that?

A. It was this year. Like it was the earlier part of this year.

Q. And when you returned from limited duty, do you have to have a doctor's note that says that you're fit to return to duty?

A. Yes.

Q. And were you able to get that?

A. Yes.

Q. Okay. So a doctor said you were ready to go back; is that correct?

A. It was my therapist. She's not a doctor, but it was my therapist.

Q. Okay. So your therapist said you were ready to go back to work?

A. Yes.

Q. And are you aware if other individuals were required to go back to work at that point, too?

A. I'm not sure.

MS. BARON: I don't have anything further.

MR. KOLENICH: (Shaking head.)

THE REPORTER: Signature to the deposition?

MS. RICHARDSON: Yes. Please.

_____
REBECCA BRYANT

- - -

DEPOSITION ADJOURNED AT 2:59 P.M.

- - -

C E R T I F I C A T E

STATE OF OHIO          :
                       : SS
COUNTY OF HAMILTON      :

I, Tracy L. Allen, RPR, RMR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do certify that before the giving of her deposition, REBECCA BRYANT was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by REBECCA BRYANT; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 31st day of October 2025.

_____
Tracy L. Allen, RPR, RMR
Notary Public - State of Ohio
My commission expires July 29, 2028.

ERRATA SHEET

DEPOSITION OF: REBECCA BRYANT
TAKEN: OCTOBER 15, 2025

Please make the following corrections to my transcript:

Page  Line Number                    Correction Made

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Witness Signature                    Date

**$**

**$127,000** 199:21

**0**

**001826** 97:8
**001840** 141:4
**001844** 119:1
**06072023** 202:11

**1**

**1** 5:1 10:17
**10** 134:6 154:11 155:14
**10-hour** 133:6
**101** 132:15
**105** 177:18
**10:44** 81:3
**10:51** 81:4
**10s** 133:11,15,20,21
**10th** 64:17 85:20
**11** 9:22 97:7 118:25 141:4
**111** 182:2
**11:52** 127:21
**11th** 155:4
**12** 187:14 199:22
**13** 16:8
**14** 5:1 18:16 210:5
**14th** 65:18 155:12
**15** 172:20
**17** 67:20 109:10
**17s** 66:12,18 67:8 68:3
  75:10,11,17,18,25 76:1
  82:1
**17th** 53:22
**18** 18:22
**1840** 141:6
**18th** 17:14,24 19:12,19,23
  213:3
**19** 65:1,22 203:5,8
**1:00** 127:21

**2**

**2** 12:21 149:13 165:11,17
**20/20** 34:12
**2008** 8:4
**2018** 27:7 31:3 40:9
**2019** 9:11 53:22 64:17
  65:18 203:2,9
**2020** 203:13
**2021** 9:20 56:24 70:4
**2022** 71:7 72:1 82:23
  85:20 161:22

**2023** 109:11 147:13 155:4
**2024** 17:14 18:22 19:12,
  19,24 60:22 155:12
  213:15,20
**20562** 110:15
**20563** 110:15
**206** 110:16
**20662** 110:22
**20663** 110:22
**21** 44:25 82:3
**21st** 70:4
**22** 9:15 46:24 58:10 88:19
**22nd** 56:24
**23** 24:20 149:11 207:23
  208:5
**24** 11:9,11 12:1 15:14 68:7
  75:17
**24s** 75:24
**24th** 71:7 72:1
**29** 28:2
**295** 212:13
**2:07** 177:16
**2:10** 177:16
**2:40** 201:22
**2:41** 201:22
**2:59** 217:17
**2s** 67:24 68:3,6 77:18 82:2,
  3,5 90:12,14 128:23,24
  129:1 152:22

**3**

**3** 26:20 63:6 132:13,16
  155:20,24 167:1 172:15
**31** 130:3
**31s** 90:7,11,14 129:2
**32** 71:1
**369** 212:16
**383** 212:21

**4**

**4** 53:2 129:17
**40-hour** 66:6
**42** 173:21
**439** 212:11
**48** 11:9,11 12:1 68:7
**49** 75:23
**4:00** 18:3,10

**5**

**5** 13:14,17 70:14 71:6
**512** 212:19
**56** 110:17

**6**

**6** 109:8
**60** 12:12
**65** 110:17,18
**69** 63:8,9

**7**

**7** 125:17 160:21
**7:00** 18:10 134:4
**7th** 147:13

**8**

**8** 58:12 146:22 160:22
  202:10,14 207:16
**80-something** 158:21
**85** 155:19,24
**86** 166:25
**89** 172:14
**8th** 52:19 65:6,7

**9**

**9** 154:11 155:1 165:5
**96** 12:12 79:11
**9:00** 18:3
**9:41** 36:9
**9:49** 36:9

**A**

**a.m.** 18:3
**ability** 7:3 124:23 205:3
**absolutely** 99:18
**abuses** 127:5
**abusing** 171:6
**abusive** 61:14 167:2 170:8
**academy** 203:2,7,10
  204:18,19,20,22 205:25
**accepted** 203:2 204:16
**access** 53:6 141:23 143:22
  180:4,6 213:23,24
**accommodation** 210:2
**accommodations** 128:14
**accountability** 173:1
**accurate** 13:7 17:1,6 73:22
  79:2,10 126:9,10 155:13
**ACLS** 9:6
**acquitted** 62:24 63:22
**act** 143:2
**acted** 107:20 143:5 182:3
**action** 78:14 127:10 167:4
  168:7 185:23

221

actions 11:22 20:5 172:5, 17 173:8 184:5
activities 178:20
activity 36:23 69:11 177:20,22,23 178:3
actual 76:23 122:5 136:21 155:17 168:21 185:8 210:25
addition 178:24
address 48:11 142:8,11 143:8
addressed 176:5,11
adequately 176:11
ADJOURNED 217:17
Adkins 152:11
admin 119:5,6
administrative 115:4,5 116:11 117:15,16 134:25 169:19 180:19
affair 195:1
affect 7:3 183:23 205:14
affected 123:12
affecting 209:16
affiliated 45:2
afraid 100:2,3 165:1
African 29:6
afternoon 202:3,4
afterward 207:7
agency 153:10
agree 6:5 11:2 100:19 103:1 112:4 113:1 141:9
ahead 52:7 61:25 63:3,18 79:25 122:25 127:2 140:25 143:4 147:8 153:25 156:5 161:5 162:2 163:15 178:2 182:9 186:25 190:8 200:13 203:17 206:23
air 5:18
allegation 126:22 186:20
allegations 60:21 90:17 94:9 119:19,24 120:20 167:14 169:22 172:9
allege 40:9 70:5 82:22 123:16,22 124:19 141:15 155:21 168:13 176:8 177:19,23 178:25 182:2, 14,24 183:14 186:3 199:20
alleged 89:22 99:5 105:14 114:25
alleging 63:15 64:3 132:9 139:17 148:8 150:23 155:25 156:17 168:3 178:12,14 179:3

allowed 79:21 123:7,17 124:20 184:1 216:3
altered 132:16
ambulance 131:8
amended 26:23 63:7
American 29:6
amount 181:11,12
Andrew 197:19
Andrews 8:10,16
animus 150:24
ankle 55:14
Ann 197:11
annual 164:8
anonymous 175:6,12
anonymously 185:15
answering 6:17
answers 6:1,4
Anthony 46:11,14 47:1,4, 22
anybody's 131:21
anymore 15:3 60:2,16 61:8 105:8
anyone's 143:20
Anytime 30:13,17
apparatus 68:22 149:12, 14 157:13
apparent 167:8
apparently 42:1 91:15 92:17
appearance 187:11
appeared 187:12
applicant 28:10 29:1 31:5 32:22 39:15 40:15
applicants 29:22 34:9 40:6
applicants' 123:24
application 27:8 30:7 34:17 37:1 40:3 43:14
applied 216:5
applies 27:16
apply 27:5,14
applying 55:11
apprised 80:11
approach 73:18
approached 191:13
approximately 74:23
April 56:24
arm 158:16
Arnold 95:12,13,14 196:6, 23
ashamed 54:13
Ashley 212:8
asks 13:18
assault 30:10,21 46:17 82:16 83:15 84:7,19 89:22

92:15 132:1 134:20 137:20 139:1 161:23 162:7,24 164:15 181:21
assaulted 47:6 82:23 97:24 109:20 112:3 190:14
assaults 23:17 24:23 91:3 178:15,17
assessment 107:1
assign 148:4,18 165:17
assigned 65:23,25 66:5,11, 18 67:14,18,20,21 68:2 81:12 83:8 130:21 142:8 149:6,7,8,12 159:10
assignment 83:1,3,4 130:20 132:3
assistant 196:1,3
associate's 8:14
Association 29:7
assume 6:24 27:19 51:11
assumed 28:23 43:5 126:19 159:22
assuming 92:16
athlete 56:7
attached 154:21 173:14
attachment 148:17
attempted 131:24 132:5,7, 24
attempting 132:18
attend 8:5 164:11 190:15
attended 5:20
attending 164:13
attention 119:14 131:21
attorney 5:9,11
attorneys 6:13 26:24 187:15 202:6 208:8
audibly 6:1
August 46:23,24 50:17 82:22
automatic 16:2
averaging 12:15
avoid 69:21,22,24 101:16
avoided 130:12
avoiding 69:25
aware 40:7 130:16 141:16 142:18,20 143:1 167:2,6, 17 169:21 170:3 172:1 183:17 189:17 194:21 217:2

___

**B**

Ba 212:8
bachelor's 8:17
back 16:7 18:17 26:4 55:20 76:18 88:11 89:10 93:22,25 101:1 110:10,12

116:5,6 117:10,22 124:16
125:3,6 127:23 139:20
149:2 156:22,24 159:1,18
165:9 207:16,20 210:6
216:21,25 217:3
background 33:11
bad 39:20
Baker 194:1
Bakers 194:5
balance 180:21
balances 115:3 117:20
181:20
bankruptcy 20:10
Baron 5:7,8,16 7:19 14:3
16:13,18,21 18:25 19:4,6,
10 20:9,16,23 36:7,10
52:12 53:15,16 62:4 63:5,
20 64:2 70:19,22,23 71:24
81:1,5 103:7 108:20
110:18,21 112:20 113:7
114:16 118:3 119:17
123:5 125:23,24 127:6,15,
20,22 139:6 140:14,20
141:2 142:24 143:7
145:15 146:8,13,15,24
147:1,9 148:1 151:11,15
153:16 154:4,14,20,24
156:11 161:18 162:5
163:18 167:11 172:13
177:9,14,17 178:4,10,11
182:13 183:13 184:3
198:23 200:16,24 201:6,
17,23 202:1 207:14
215:16,19 217:6
barred 211:23
based 33:24 34:14 39:6,10
57:3 62:12,16 66:21 99:5
102:25 127:7 134:19,21,
22 139:1 156:7,10 180:7
207:24 215:16
basically 32:23 84:9 93:1
97:5 98:9 121:20 141:22
basing 207:25
Bates 16:12 18:24 53:11
70:16 97:7 118:25 125:22
bathroom 6:14 93:21
Battle 152:21
began 25:15 101:5 205:13
beginning 9:21 56:17
58:1,22 119:5
behavior 142:21
believed 205:18
benefit 123:25
Bessie 199:11,12
big 55:24,25 111:17
121:11 141:20 186:1

binder 10:14 18:17
Biology 8:20
birthday 46:24
bit 7:13 39:7 67:11 77:19
80:3 81:7 99:2 101:2
114:23 168:23 191:2
193:20 214:7
black 41:21,23 56:19 57:8
97:16
blocked 96:18
blocking 97:2
blue 119:4 141:7
bolded 72:4
book 58:4,5 202:11
books 58:5
Bosse 86:9 87:2,13 88:1
89:13 90:25 93:25 150:4,
15,23 209:8,14,18
bothered 54:16,25
bottom 202:12,17
bra 111:2,4,10,11,12,15,
17,24 112:13,15
Braido 101:20 104:20
179:5 188:21
Brandon 73:6 74:16
167:20 168:8
Bre 152:13 191:1,7,13,25
192:1,4,8,10,12,16 205:21
206:4,5,6 207:3,5
Bre's 191:20,23
break 6:9,12,18 36:7,8
80:16,19,21,23 81:2
127:16,17 177:11,13,15
201:15
breaks 158:17
Breanna 205:22
breast 109:18 110:6 112:5
Breitfelder 71:7,9 194:10
Bri 152:13
Brienna 152:17,18 205:22,
24
bring 7:6 103:10 108:17
131:21 179:19
Broado 101:20
broke 93:20 158:17
brother 121:2,4,8,16,20,
25 122:15,16
brought 119:13 179:18
189:13
Brown 49:13,16 51:10
71:13 81:6,8,25 82:13,23
83:18 84:10,11 85:1,19,25
86:1,3 88:22 89:23 91:13
101:3 103:10 113:10
115:3 116:10 117:25
127:25 128:3,20 129:9

177:25 180:18 186:4
190:22 194:19 202:7
214:24
Brown's 52:3
brush 72:23
brushed 99:23
Bryant 5:3,14 71:14 73:18
74:24 121:9 198:19 199:6,
11 217:13
bubble 97:16 119:4 141:7
building 48:7,12 51:8
59:11,15,17 157:2 159:18
bunch 27:11 100:10
187:17
Burks 195:13
burn 157:2 159:18
burned 117:11
busy 42:22
butt 121:11
Byrd 196:14

C

CAFA 29:5
calculate 180:15
call 35:9 49:22 88:4 89:16
118:2 135:15 149:2 157:1
173:4 204:20,22 213:6
215:3
called 19:23 35:3 36:6
37:6 38:8 64:22 65:6,13
66:22 71:2 88:3 89:16,17
96:17 120:3,25 122:9
136:20 168:11 179:23,24
180:11 192:1
Callen 197:17
calling 85:3 122:22 213:2
calls 178:7
Cap 165:11
captain 58:17,18 75:6,9,25
95:12,14 156:20 160:1,3,
11 193:17 194:1
captains 194:6
care 13:20 15:10,16,17
16:25 17:8 20:2 70:2 97:1
160:10
Carolina 8:11
Carr 197:23
carry 60:14
Carthage 67:25 90:10
case 61:17 103:1 187:18
207:19
cases 20:10
catch 86:4
category 19:17

caused 173:7 182:4
celebrate 38:8,10,14
celebrating 92:22
Centennial 59:13
center 13:20 24:3,18 26:4,
12,13 27:12 28:2 145:22
184:20 185:2,3 198:16
certificate 9:9
certificates 9:3
certification 9:5
CFD 144:1
chain 74:25 99:17 158:17
Chandler 189:3
change 67:16 90:3 127:7
131:24 132:18,24 135:14
137:3,4 148:11 150:25
163:6 168:20 184:12
changed 67:22 126:8
132:3,4 133:13 134:18
135:10 136:4,21,23
138:24 152:14 163:10,12,
20,24 164:20 168:17
changing 123:23 126:22
135:9 136:19
character 194:25
charge 38:21,24 60:22
62:7,13 63:12 127:12
135:17 136:3 148:3,12
151:9,11,16 153:5,7,9
160:19,20 208:11,15
213:20
charged 60:24
charges 63:11 120:4
chart 213:23
check 33:11 53:13 125:20
152:5,12
checked 130:7 152:23
179:21
checking 130:13 152:8
153:2 155:8
chief 76:1,23 77:17 86:9,
24 87:1,13,15,25 89:13
90:25 93:25 150:3,4,15,23
168:12 174:11 189:24
194:10,14 196:1,3,24,25
209:7,14,18
chief's 45:22 50:18 76:24
77:11 78:12 85:23 86:7,
13,22 87:7,23 91:5 98:2,
18 102:20 115:13 140:4
151:13 169:14,16,23
171:22 185:23 186:3,5,11,
16,19
chiefs 34:8 130:15
children 7:22

chosen 29:22
church 61:7,9 81:13
Cincinnati 5:9,11 7:17,24
21:25 29:6 45:3 46:4
48:20 49:12,21 50:11
123:23 126:6 127:9
169:25 170:6,15 214:16
city 5:9,11 13:18 21:24
27:23 40:10 45:2,13,18
50:16 52:5 59:20 62:6,10,
13,25 63:11,23 69:11
83:11 85:21 86:6 94:24
99:6 100:14 101:10,13,19
110:15 118:16 119:23
120:5,15 123:7,9,16
124:20 128:1 129:9
131:23 132:7 139:7 140:9
141:15,21 142:13,16,25
143:25 145:17 148:4
162:23,25 167:2,5,13
168:13 169:21,24 170:1
172:22 174:8 176:2,11
182:3,15,24 183:2,14,17
187:1 188:9 203:24
213:14
City's 124:23 172:5,17
184:5
Civil 146:18 147:3,11
153:22 154:6 155:2
207:22
CJ 152:21
claim 138:24 156:3 172:4
182:1,7
claims 126:23,24 128:2
155:17 162:6 186:22
clarify 6:22
class 9:18 33:19,20,21,23
35:5,13 40:17,18 51:7
57:6 58:11 59:17,21 64:23
65:25 66:2,6 81:18 83:13
88:7 92:23 116:15 204:17
classes 24:5 41:6 66:8,11
88:13,16,21 168:25
classmate 94:2
classmates 92:10 93:5
152:11
clear 57:7 74:5 84:23
122:14 198:21
click 143:19
clinician 24:8
clock 17:11
close 105:7,14,21,23 106:4
107:10 151:17 195:17,20,
22
closed 125:11 127:10
club 166:5

co-counsel 201:18
coach 46:10
coached 46:11
college 8:5,8,12,16
color 53:17,19 56:14
column 210:10 212:2,10
combination 34:15
comfort 177:13
command 74:25 99:17
comment 75:20
comments 70:6 73:17
109:13,16,25 110:5 112:5,
6 214:9
Commission 146:18
147:3,11 153:22 154:7,8
155:2 207:22
communicated 34:23,24
communicating 60:15
communication 6:6 37:3
communications 147:19
companies 38:22
compiled 174:18
complain 98:3 132:1,19
171:2
complainant 80:7 98:22
complained 30:22 91:12
92:18 170:6,12,15,18
174:14 181:21 183:7
complaining 166:8
complaint 11:16 26:23
30:9,15,19 60:21 63:7
68:20 73:20 76:25 109:12
110:5 113:9 120:2 124:5
146:17 147:2 151:3,10
153:5,10 154:22 155:17,
20 167:1 168:1,4 172:22
173:14,18,22 177:19
179:14 182:21 185:12
189:24 207:22
complaints 91:9 99:4
134:19 139:1,8,18 140:9
141:16 143:1 162:9
168:14 170:21,24 171:18
173:23 174:1,9,10 175:16,
19 177:24
complete 184:12 203:6
204:10
completed 33:13 53:4 59:9
66:10 77:3 100:22 203:8
completely 214:15
computer 180:5
concern 87:8
concerned 87:12 211:13
concerns 74:24 82:19
108:22

conclusion 178:8
concrete 123:2
conditions 132:17
conduct 82:19 90:24 161:3,25 178:13 182:4,25
conducted 78:11 91:9
confidence 72:20 176:10, 24 177:3
confidential 139:8,14 140:10 141:11,13
confirm 195:15
conflict 101:14,16
confronted 60:7
confused 36:11 112:12 135:20 178:21
connect 137:19,22
connected 46:13 47:11,12
conscious 172:6
consecutive 201:14
consensual 54:18
considered 174:2
consist 37:14
consistent 15:22
consistently 200:5
contact 37:17 95:20 114:4 190:12
contacts 142:3
contained 175:2
continue 52:22 109:24 163:1
continued 52:19 89:24
continuing 9:7
contract 108:2,10
controlled 204:11
conversation 209:10
copies 173:15
cornered 96:14
cornering 97:1
correct 11:13 17:20 18:12 19:14 30:4 32:25 40:12 41:7 50:22 51:25 52:20 54:5 59:20 70:6,10 82:24 84:11 91:10 109:5 115:4 116:18 117:14,21 119:20 120:6 128:1 129:11 130:25 139:9 145:10,19 146:19 163:3 167:14,15 181:17,18 182:23 203:3 209:13 211:2 212:11 216:6,21
correctly 207:18
costing 205:10,12
count 134:11 212:2
County 127:11

couple 135:6 146:11
courage 97:19
court 6:2 20:5 153:11
Courtney 24:10,14,17
cousin 105:11 152:19 191:5
COVID 9:25
coworker 193:10,24
Coworkers 184:14
CPD 51:10 124:13
Craig 55:5,6
Craig's 56:10
created 174:8
Creditt 102:4 104:24 188:23
creepy 68:15,24 69:12
cues 6:3
current 156:19 198:15
Curtis 189:3
cut 157:11,15,19,22,24 158:2,5,15
cutting 157:5

**D**

dad 47:19 48:15 199:9
daily 18:19 19:11 59:7
Dale 152:13,19 191:1 205:21 207:3,5
Dale's 152:20
damage 184:1 194:24
Damonte 46:17,21 47:7 49:12,16 51:10,17 52:3,16 78:5 81:6,25 82:13 84:10 85:19,25 86:3 88:22 89:23 91:13 101:3 103:9 116:10 117:25 127:24 128:19 143:2 165:23,25 190:22 194:22,23 202:7 214:24 215:2
Damonte's 48:22
data 175:1 213:23
date 14:11 17:14 52:8,10 65:5 88:17 89:19,21 147:12 165:3 166:22
dated 39:25 71:6 72:1
dates 88:13,14,15 145:4 179:8 208:2
daughter 40:1
day 18:12 20:2 24:6 36:20 39:4 52:9 72:10 73:6 75:11 76:3 82:9 83:16 92:20,23 115:15 129:23, 25 131:7,16 148:25 150:9, 11 156:22,24 158:25 169:10 181:3 212:2

213:12,13
days 88:14 131:15 133:6, 25 134:1 160:12 179:10 212:6,11
deal 23:19
dealing 146:4 215:9
December 40:9 52:19 65:6,7,8,12 88:18
decide 27:4 34:11 42:16 147:15
decided 78:14 89:7 93:22 106:4,11 114:20 140:16 146:17
decides 114:24
decision 26:10 114:21 129:3 135:13 150:1,15,18
decisions 87:16
declared 184:24
declined 127:12
Defendant 63:10,12 132:16
defendants' 5:1
define 69:9 129:21
degree 8:17,19
degrees 158:21
demands 210:25
department 10:24 11:4,7 18:19 26:7,10 27:6 30:14, 18 31:23,25 38:15 45:9,23 46:3 49:12 50:21 55:8,11 56:18 83:10 86:20 88:9 91:15 92:6 94:23 99:14 100:7 101:8 106:1,24 115:22 116:8 122:13 123:24 124:9 126:7 127:9 141:21 143:20 144:1,9 166:8 170:1,2 203:23 214:17
department's 80:6 98:24 170:7,16
depend 144:24
deposed 5:5
deposition 5:21 207:3 217:10,17
depression 184:10,17
Derrell 84:10,14,25 85:4,9
describe 62:23 102:14 115:6 126:21 132:2
description 202:18
desk 77:23
detail 84:2 91:6 150:1,15 199:9,15
detailed 66:17 67:1,17 75:11,21 149:18,19,21,24
details 47:5 67:10 92:1 95:17 112:23 199:3

detective 46:5,6 49:4
diagnosed 145:18,21
  184:17
diagnosis 146:2,6 184:24
Diagnostic 13:20
difference 57:11 133:3
  153:4 161:9
differently 156:10
difficult 158:23
dinner 73:17
direct 181:8
direction 50:21
directly 94:21 118:23
disciplinary 185:23
discipline 40:4 65:16 71:3
  78:17 79:8
disciplined 64:8 73:9
  98:12,14 99:22
disclosing 84:25
disclosures 187:14
discriminated 132:9
  193:11
discrimination 177:21
  178:14
discriminatory 150:24
  161:3,24
discuss 34:9 147:20
  173:21
discussed 112:21 140:12
  146:17 157:16 178:25
  192:18
discussing 160:16 185:7
dishonest 127:3 187:4
dishonesty 187:6
dismissed 61:21,22
disregard 172:6
distinction 134:13
distracted 164:19
distress 182:1,5,17 183:1,
  6,19 184:6,7
district 76:1 86:9,23 87:1,
  15,25 89:12 90:8,25
  129:10,14,17,24 130:15
  150:4 168:11 196:1,24,25
  209:7,14,18
districts 48:4 129:15
DNA 13:20,25
doctor 21:1,9 216:20,23
doctor's 216:15
doctors 25:3,4,24
document 10:18 12:22
  16:9,22 18:18 26:21 53:5
documentation 7:6
documented 173:24
  175:17,20

documents 208:1
dogs 10:6,11
domestic 60:22,24 61:18
  62:6,12,24 63:10,22 64:7
door 96:18 97:2
drag 28:6
draining 184:16
drill 9:10 15:7 25:15
  57:21,23,25 58:2,11,15,22
  59:4,7,9 60:10 83:6 94:15
  152:18 159:20 162:17
  204:7,10,12,15,21,22
  205:1,25
drilling 156:25
drills 162:16
driver 83:19
drop-down 143:18
drove 75:18
Due 211:12
Duke 27:12
duly 5:4
dummy 28:6
Dunham 86:8 87:1 90:24
  150:20
duties 14:5 15:11,15
  32:12,13 38:17,20 144:25
duty 11:8,21 12:18 17:20
  18:7,9,19 19:17,18 45:8
  68:9 87:17,19 88:2,5 89:1,
  8,14,20 96:16 115:8,12,14
  116:13 117:7 118:11,17
  132:21,24,25 133:5,10,17
  134:14 135:17 136:4
  137:16,24 138:2,16
  148:10,24,25 156:13,14,
  24 160:23,25 161:2,6,8,15
  166:23 199:25 200:1,7
  201:9,10,12,16 209:8,15
  210:2 211:6,7,11 212:6,
  11,24 213:7,20 214:5
  215:22,25 216:9,15,16

### E

earlier 209:7 216:13
early 65:12 159:15
easy 7:12 57:24
eat 10:5 162:15
Ed 136:10,13 195:10
education 9:1,7
EEOC 155:11
effective 157:17 214:13
Eighth 48:7
Elliott 180:10
EM 59:14

email 28:17 89:14 95:3
  128:12 185:18,19
emailed 128:12 130:8
emails 135:22
embarrassed 54:13
emergency 142:2
Emily 197:13
emotional 181:25 182:5,16
  183:1,6,19 184:5,7
emotionally 184:15
employed 14:21 15:24
employee 143:18
employees 131:25
employment 10:13 13:18
  40:11 44:6 132:17 154:7
EMT 58:9,11 59:17,21
  65:25 66:1,6,10
end 31:2 37:3 39:3 114:3
  117:19 119:18 195:18
  210:11
ended 38:11 39:4
Energy 27:12
engage 164:2 178:13
engaged 177:19,23 178:19
  182:4
engaging 164:5 182:12
engine 67:5 75:23 130:3
  149:13 152:22
enjoy 10:3
ensure 141:16 145:17
entail 27:9
entire 30:17 145:2,6 156:6
environment 23:18 55:24
  118:7 155:22 156:1 160:5
  167:3,6,9,17 168:3 170:7,
  16,25 211:12 214:17,21
equal 118:2 154:7
equally 117:24
Erica 195:13
Erv 78:7 102:9,10,15,16
  167:9,19 168:19
Ervin 68:11,12 70:5 75:20
  77:1 138:9,12 143:2 168:9
  188:11 189:25
essentially 117:23
estimate 12:8
evening 42:17 44:23 52:18
Event 71:20
events 71:13 72:4 164:9,13
  199:19
Eventually 119:16
everyone's 100:2 137:14
evidence 122:21 138:23
  140:8 156:2 172:8 182:6

226

exact 132:14 157:15,19 206:16 208:2
**EXAMINATION** 5:6 209:4 215:18
examined 5:5
**Excellence** 24:4,18 26:5, 12,13 145:23 184:21 185:2,3 198:17
**Excuse** 159:11
exercise 9:1
exhibit 10:17 12:21 16:8 18:16 26:20 53:2 63:6 70:14,21 71:6 97:7 109:8 118:25 125:17 132:13,16 141:4 146:22 154:11 155:1,14,20,24 160:21,22 167:1 172:15 187:14 199:22 202:10,14 207:16 210:5 212:1
exhibits 5:1 154:13,15
experience 206:19
experiencing 30:20
explain 30:14 148:4
explained 30:19 32:22 101:17
explaining 145:9
explored 145:6
extent 147:18,22
extra 66:25
extremely 129:20 158:20
eye 187:5
eyes 97:9

---
**F**
---

face 75:6 136:9 138:15 139:24
face-to-face 41:12 130:2
facilities 166:9
fact 32:16 57:8 101:15 105:19 132:4 134:23 135:7 137:16 139:3 140:12 166:8 168:16 177:4,6 182:10
facts 103:2 155:18
fail 42:5
failed 42:2 139:7
fair 6:25 22:22 30:2 42:10 49:13 64:9 107:1 110:20 113:24 121:17 142:16,25 167:12 171:16 182:19
**Falencia** 32:2,4 104:11,18 105:3,12,13 106:12 111:1, 12,16 113:21 114:18 117:2 120:19 121:16 122:16 135:17 161:14

187:22 192:1,4,6 213:21, 25
**Falencia's** 152:19 191:5,7, 12
fall 184:9 213:13
familiar 71:1
family 10:7,9 55:25 56:5 91:25 191:8,9
fast 87:10
favor 131:25 132:18
feared 118:7
**February** 40:18 64:17,24 71:7 72:1 155:12 203:2,5
feel 6:11 12:23 16:19 17:3 19:9 33:6 43:11 54:1 56:5 59:25 62:2 76:12,15,20 126:2 142:3 151:19 204:11 205:4 214:14,16, 20
feeling 74:18 204:5
fellow 121:22
felt 44:6 79:18 115:21 116:22 161:15 202:18 203:16 204:6 205:2,3,4
female 96:8 157:8 176:11, 13 206:9
females 176:14
figure 26:3 111:18
file 30:9,15,19 49:15 146:17 147:10,16 171:25 186:18 207:21
filed 26:24 68:20 147:2 153:10,11 208:11,15
files 186:17
finally 60:7 78:23
find 13:15 22:4 55:1 110:19,23 132:14 159:24 172:23 198:9
finding 77:25 174:13
findings 80:4
fine 16:20 22:10 24:12 151:21 165:15 190:17
finish 6:16
finished 8:10 9:15 15:6 60:4 88:18,20 116:4
finishing 83:6
fire 9:4,8 10:24 11:4,7 14:24 18:18 26:6,9 27:5 28:2 29:23 30:4,14,18 31:22,24 32:24 38:15 45:9 49:7 55:8,11 57:15,18 58:8 60:3,5 64:17 77:24 80:6 86:19 88:9 91:15 92:6 94:23 98:24 99:14 100:7 101:8,10,13 105:25 107:6,9,18,23 115:22

116:7 122:13 123:23 124:9 129:15 130:4 131:3 141:21 143:20 144:1,9 158:19 166:7 170:1,2,7,15 174:11 189:5,24 203:19, 23 214:16
fired 78:1 122:20 190:3
firefighter 7:18 14:15,16 29:7 39:14,17 57:16,19 58:9 59:24 60:6,10 65:19 71:13,14,16 73:18 74:24 81:20,22 83:19 96:8 105:11,12 121:3,7,10,19, 24 141:23 157:11 161:11 165:4,5 202:23,24 203:12
firefighters 28:24 66:25 121:22 157:12 159:9 160:6
firehouse 66:7,16 69:8 77:18 81:13 87:8 89:4,10 90:6 93:23 94:1 128:20 139:21,24 140:13 142:7 209:20 211:14,16
firehouses 90:4 129:16 166:10
fit 56:4 216:16
fitness 9:1
flip 12:20 13:13 26:20 71:5 73:11 97:6 125:16 141:3 187:13
floor 59:12,17
folder 16:7 210:6
follow 43:17 103:14
force 84:3
forget 21:22 93:10 117:17
forgot 104:17 114:6 138:5
form 71:1,2,3 148:16 184:13
formal 48:17 49:16
**Forty** 14:20
forty-eight 66:14
forward 40:10 62:19 73:19 74:9,15 162:4 175:23 178:22
found 60:25 61:22 64:13 88:10 91:15 98:20 139:23
fourth 59:17
frame 88:15 167:23 168:2 206:17
**Frazier** 32:2,4 105:3,14 106:4,12,16 108:22 109:13 111:1,8 112:5 113:9 114:19 120:3,19 136:4,24 187:22 212:16 213:21
free 10:4 12:24 16:19 17:3

19:9 126:2 201:19
**Freeman** 73:7,8 74:13,16
  167:20 168:8
**frequently** 161:2,24
**Friday** 89:9
**friend** 31:13 54:20 152:10
  159:25 191:13
**friend's** 105:10
**friends** 31:10 54:23 81:16
  105:15,21 106:1,4,7
  191:8,20,21 192:5
**front** 10:14 51:22 109:1
  200:10,11,15,18
**full** 41:22 156:13 158:22
  160:25 161:2
**full-time** 15:2 16:5
**furthest** 157:24

## G

**gallbladder** 25:10
**gave** 128:9 137:13
**gear** 158:20,22
**general** 69:1 124:21 170:9,
  11 184:1,14
**get-together** 31:11 94:16
**give** 47:5 55:20 72:19
  86:20 103:24 122:17
  150:5
**giving** 112:23 176:15
  181:11
**good** 56:4,8 67:11 77:19
  80:17 105:10 123:17,19
  155:9 159:12 202:3,4
**Google** 61:1
**Googled** 61:16
**gossip** 151:4,6,18,23 152:2
  153:18 209:15,19,23
**gossipped** 88:8
**Gotcha** 197:6
**graduate** 8:3
**graduated** 88:6 89:9
**Graduating** 65:21
**graduation** 66:1 89:18
  92:23 115:14,15 139:23
**grand** 51:16,22 52:11
**Gray** 198:3
**Green** 46:5 47:13,15,23
  49:15 85:16 124:14
**ground** 5:24
**group** 34:5 190:13,15
**guess** 25:6,16 32:19 34:10
  35:3,8 39:3,7 40:23 43:4,7
  46:8 49:6,21 51:1 54:23
  56:6 60:5,8,13 62:1,8 69:8
  71:11 72:19 76:6,9 82:3

88:8 92:18 93:2,6,17
96:25 97:3 101:14,16
102:11 106:23 108:10
112:12 115:18 123:1,2
126:18 130:19 144:24
146:1 159:19 166:6,8
169:24 171:1 174:13
176:1,4 184:9,14,24 185:8
187:2 189:13 196:4 197:7
203:18 204:7 207:10
211:18 215:8,12
**guesstimate** 208:14
**guilty** 61:22 64:13
**guy** 42:2 137:17,24 157:20
**guy's** 138:13
**guys** 82:7 94:25 159:6
  177:10

## H

**H-A-Y-G-O-O-D** 166:18
**Hains** 71:8 196:21 197:4
**half** 200:1 201:9 211:19
**Hamilton** 127:11
**hand** 191:14
**handle** 48:20 70:9 71:15
  86:19 87:20 99:16 116:25
**handled** 48:21 102:18
  125:4
**hands** 99:8 205:4
**hang** 10:6,7
**hang-ups** 146:11
**happen** 62:2,15 78:7,15
  137:17 138:21 163:8
  207:6 215:4
**happened** 11:23 23:6,10
  36:17 44:15 47:17 48:21
  50:10,16 54:12,14 61:13
  70:8 72:16 73:23 75:14,21
  77:15 81:17 83:15 90:6
  92:2,3 96:3,17 97:20
  98:17,19 99:6 100:15,16,
  18 102:23 103:19 109:19
  120:1 125:14 138:1 139:5
  149:5 156:19 160:17
  161:14 163:22 165:23,25
  180:21 183:25 192:2,9
  194:24 196:12 197:1,5
  199:4,14 215:1,2
**happening** 97:21 210:3
  214:8 215:6
**harassed** 97:23 99:9
  100:11
**harassing** 62:20 70:6
  75:20
**harassment** 30:10,20
  82:17 96:5 132:1,20

134:20 176:10 181:22
**Harold** 23:6,10 29:17
  30:25 31:8,9,16,20 32:5
  34:5,18 36:13 39:19 41:8
  42:1 44:6,10,14 47:7
  49:11,19 51:3,15,21 52:3,
  18 53:4 54:4 56:24 58:19
  59:3,23 60:21 61:14 62:15
  65:3 78:5 85:25 86:3
  88:22 90:23 91:13 92:15
  93:11,12 95:9,25 96:13
  97:24 99:4,7 101:3,15
  102:11 103:9 105:7
  107:10 114:4 115:17
  116:1,9 117:24 119:19
  126:7,15 127:12,24
  141:25 142:21 143:1
  161:17,20 167:14 168:25
  170:10 172:18 182:11,15
  183:3,15 188:4 189:10
  190:18 191:9,12,17 192:3
  195:17 196:13 202:6,19
  205:10 206:19,21 207:3,9
  214:24
**Harold's** 48:20 189:13
**Harris** 156:20 157:20
  160:3,4,11
**Haygood** 166:18
**Hazell** 194:17
**head** 6:1 45:24 76:18
  217:8
**heads-up** 50:25 86:20
  92:13 122:17
**health** 8:25
**Healthy** 8:2
**hear** 38:3 77:14 79:5
  171:2
**heard** 31:19 82:15,20
  93:15 121:5 153:14
  170:23 171:5 195:5
**hearing** 51:16 52:11 152:5
**heat** 5:18
**held** 64:5
**helped** 22:4 43:24 44:14
  190:12 198:8
**helpful** 39:12 74:19
  189:10 193:21
**helping** 135:19 173:10,13
  176:9,19,23 190:4,5,10
**Herbert** 197:19
**hey** 92:12 94:18 106:11
  121:5 179:15
**hide** 187:4,7,10,11
**hiding** 187:8
**high** 8:1 27:15 29:25 30:2
  32:23 46:10 55:6 159:25

higher 100:6
higher-ups 100:21
Hill 66:12
hindsight 34:12
hire 17:14 208:7
hired 203:1
hiring 55:8,9,17
history 10:13
hit 139:22
hole 157:5
holiday 18:13 213:13,17
holidays 213:9
home 55:21 84:4 89:17
    144:3,5 191:7
honestly 42:18 123:13
    175:3 186:12 201:4
hospital 25:18,19
hostile 155:22,25 160:5
    167:2,6,9,17 168:3 170:7,
    25
hot 158:21
hour 80:17,24 93:21
    127:15 134:8,11 177:10
hours 11:9 12:7,12,14
    14:18 15:19,22 79:2,11,20
    117:10 133:22,23,24
    134:6 168:19 179:1,16
    181:2 200:6 211:24
house 31:11,17 32:5 35:19,
    21 36:2,16,19 38:12,13
    41:13,16 42:13,17 43:11,
    13,15 52:19 65:8,10
    66:18,21 67:7,11,13,14,
    18,20,21 68:2 75:11
    105:17 129:6,16,17
    130:21 149:6,7,8,11,25
    150:2 191:12
houses 67:2,7 129:19
how's 165:9
HR 101:19 194:18 195:11
    196:2,3
huge 142:12
Hugh 71:8 196:21 197:3
hundred 136:10
hurt 137:25 138:20

### I

idea 28:22 31:23 56:8
    83:12 106:14
ideas 84:15
identification 5:2
ignores 160:13 165:13,19
II 59:13
III 199:23

Illinois 8:9
illnesses 21:4
immediately 83:15 116:6
impacted 113:17 114:9
important 103:4 112:25
    113:3
impossible 99:25
impression 135:23
inappropriate 72:25 76:11
    109:13 112:1
inappropriately 168:14,16
incident 21:7 81:25
    140:17,23 156:6 192:9,13
    206:24
incidents 12:14 62:14
include 173:16
included 134:8 186:2
includes 34:7
increase 79:8
indebted 43:12 44:6 59:25
indicating 74:14 138:8
    157:23
individual 95:2 138:4
    166:16
individually 94:25 183:24
individuals 106:3 123:25
    150:7 152:7 201:11
    215:24 217:3
Infliction 181:25
inform 120:3
information 29:1 92:8
    103:15,18 105:16 120:8
    128:5 139:13 141:22
    143:18,21 144:16 176:16
    189:9 190:6
informed 80:3
initial 78:16,21 79:3 103:9
    124:18 133:9 187:14
initially 21:21 23:3 34:3
    49:1 65:23 66:11 70:10
    91:19,20 102:1 124:4
    133:1 136:15 152:17
    168:25 205:17
injections 206:12
injured 138:17
injuries 21:3
injury 138:25 148:9,10
inpatient 26:18
inputs 145:5
inspector 58:8
instances 48:25
instructors 58:16,25
insufficient 167:3
intent 181:11

intentional 181:5,25
intentionally 182:4,11,16
intentions 181:15
interact 34:17 129:19
interacted 35:15
interaction 31:7 37:10
    71:15
interactions 34:21 37:13,
    23
interchangeable 204:24
interest 101:14,16
interfere 162:7
internal 77:12 78:12 101:7
    102:16,21 103:1 105:8
    106:17,25 107:3,9,24
    121:21
interrogatory 13:13,17
interrupt 151:8
interview 33:8 49:23 50:1
    103:9 104:16 107:4
    109:10 110:1 118:22
    120:25
interviewed 103:25 104:4
    174:25 175:13 192:23
interviewers 103:11,13,17
interviewing 114:15
interviews 78:13 102:21,
    25 106:5 109:4,14 110:10
    114:19,21 116:21 118:19
    124:16 140:5
intimidated 100:8
intranet 144:2,6 180:6
introduce 94:17
investigated 77:2
investigating 143:5
investigation 51:10 53:3
    77:1,9 78:2,8,10,13 79:14
    80:4,8,14 91:9,17 98:1,23
    100:22,24 101:2,5,7
    102:15,17,22 104:4,20,25
    105:5 106:13,17 107:7
    112:23 113:17 114:5,9
    115:1 117:19 118:12
    119:19,24 120:11 124:3,7
    125:9 126:6,15 127:8,24
    128:7 129:9 131:18
    139:12 140:6 153:23
    168:18 175:24 188:1,10
    189:2,6,16,18 191:10
    192:7 194:2,13 196:4
investigations 50:24 78:4
    102:8 106:22 107:3
    185:23
investigators 176:20,24
involve 147:23

involved 20:5 50:13 54:10, 22 60:1 61:13 77:5 91:17 101:11 102:7 104:12 106:21 107:7,18 116:5 120:10 122:18 176:6
involvement 188:7
irrelevant 112:2 113:4
irritated 158:20
issue 95:9,24 119:13 125:9 193:25 196:8
issued 65:16 155:11
issues 69:19 96:12 142:18 162:3 176:10

**J**

Jack 196:17
Jamil 94:4
Janos 212:21
January 53:22 155:4
Jay 86:9
Jerrell 83:18,22 84:6,12 85:5,6,11 92:4 104:10,13 194:19
Jim 202:5
job 13:21 14:10,23 15:13 21:18 35:6 37:7,9 38:11 40:19 41:2 42:12 43:24 44:9,10,15 61:10 96:22 121:21 163:11 166:5 202:20,21 203:14 204:1,6, 9 205:2,10,12
Joe 180:10 196:6,22
Johnson 46:11 47:1,4,22
joined 81:21
Jr 199:6
Julie's 146:10
July 65:18,21 203:8,9,13
June 15:14 17:14,24 18:22 19:12,19,23 70:4 147:13 207:23 213:3
Juneteenth 213:15
junior 8:8,12
jury 51:16,22 52:11 61:22 64:13
justice 62:2 215:10

**K**

Katey 18:23 70:15 151:8 209:7,10 214:8
Katie 5:8
keeping 140:9 173:6 182:14 183:3,15 210:24
Kelly 131:16 147:20,23 154:20 197:17,23

Kelsey 101:20 104:17,20 106:11 108:24 118:22 119:7 128:11,15 179:5,15 180:8,20,25 181:10,19 188:21
Kenneth 198:19 199:6
Keshia 31:15 35:19 36:5, 15 39:8,13 42:21 43:6,9 54:1,7,9 55:2 103:21 104:1,10,12,13 105:18,20 192:19
Kevin 199:13
kind 5:23 10:13 11:3 15:22 23:17 27:1 28:16,17 29:2 32:18 33:22 35:6 38:5 43:5,7 52:4 56:6 60:8 66:24 68:14 69:1,7,12 72:23 76:14,20 90:9 92:14 93:1 94:16,18 96:14,18,19 102:1 105:19 112:11 121:4 124:10 127:23 135:19,20,24 139:20 152:4,5 159:6,14,22 160:13 162:20 171:6 184:9 187:19 198:1 199:14 215:13
Kirby 58:17,18
kitchen 192:1
KLOENICH 205:15
Klosterman 196:17
knew 32:14 38:21 39:22, 23 58:2 60:9 62:6 68:12, 14 76:10,11 77:10 78:25 79:1 81:13 91:5,12,16,19, 21,25 92:2,4,18 96:2,4,7 105:12,20,25 106:1,10 116:1,2 118:21 130:11 139:22 159:8 161:17 179:22 183:5 185:6,24 186:12,14 193:7
knowing 28:16 115:23 123:4
knowledge 13:7 187:18 209:23
Kolenich 201:25 202:2,5 203:20 208:22 217:8

**L**

labeled 97:7 119:1 141:4
ladder 157:21,24 158:5,8, 9,15
ladder's 157:23
lady 190:9
lady's 101:22
Lair 197:8

late 48:14
Latisha 194:17
Lauren 102:4,5 104:23 106:11 108:24,25 117:2 118:22 119:7 188:23
Lawrence 122:11
lawyer 102:2 104:17,24 188:24,25
lawyers 203:22
leadership 99:13 100:13 106:23 153:18
leading 113:9 114:8,11
learn 60:23
learned 116:9
learning 63:10
leave 48:16 55:22 97:2 115:2,4,5,19 116:11,24 117:15,16,20 119:5,6 134:25 142:6 169:1,19 179:17 180:18,19,20 181:12,13,20 182:22 195:2 212:24
led 28:13
left 90:21,22 123:13 135:6 144:9 173:2 179:21 180:8, 14 181:9
leg 96:24 191:23
legal 178:7 200:22
legally 152:14 203:18 204:3
letter 71:6,25 160:18
letters 154:6,16
letting 80:7
levels 18:20 19:11
Liberty 28:1
lie 44:3
lieutenant 31:24 32:7,11, 15,17 38:16,20,24 54:4 58:19 63:12 73:3,8,17 74:1 86:8 87:1 90:24 101:15 105:6,7 106:17,25 107:2 121:6 126:7 136:8 152:21 183:4,16 193:13 213:19
lieutenants 194:6
life 118:13
likes 123:25
liking 171:7
Lilly 199:12
limitations 211:23
limited 11:21 12:18 17:20 18:7,9,19 68:9 87:17,19 88:2,4 89:1,7,13,20 96:16 115:8,12,14 116:13 117:7 118:11,17 132:21,23,25 133:5,10,17 134:14

135:17 136:3 137:16,24 138:2,16 148:10,24 156:13 161:6,7,14 166:23 199:25 200:1,7 201:8,10, 12,15 209:8,14 210:2 211:6,7,10 212:6,11,24 213:7,20 214:5 215:21,24 216:8,14

**list** 33:15,16,18,21 35:13 187:17 200:4

**listen** 118:6 124:11

**literally** 68:17 165:18

**live** 10:9,10 142:1

**log** 143:17 144:16

**login** 143:24 144:10

**logins** 144:7

**logistics** 38:6

**long** 9:16 16:1 44:22 46:16 50:15 81:24 117:17,18 173:3 188:6 201:11

**longer** 105:11 134:11

**looked** 10:21 17:2 33:17 93:6 104:5,7 172:3

**lost** 199:20

**lot** 26:17 36:25 46:21 60:14 62:3 67:12 69:22,24 70:2 123:14 145:7 151:4, 18 156:18 163:24 166:6 175:8 199:15 200:2 201:4

**loves** 55:12

**Lower** 66:12

**lunch** 127:17,21 134:8

**Lynn** 28:1

---

## M

**machine** 14:7

**made** 32:18 42:16 43:22 48:17 54:18 70:5 76:11, 15,20 82:2 109:13,16 110:5 114:21 117:23 122:14 124:4 130:16 133:25 135:13,15 137:3,5 141:10 142:20 146:2 150:1,15,17,25 169:13 170:21 172:22 174:1 176:19,21,22 177:24 178:8 179:14 182:21 189:24 194:21 214:9

**Mai** 102:4 104:24 188:23

**mail** 155:9,10

**mailed** 155:3

**maintain** 123:7

**major** 8:13

**make** 57:25 87:15 94:15 108:9 128:13 142:3

151:19 157:10,19,23 158:1,2,4,23 173:4 185:14 198:20

**makes** 34:2

**making** 135:24 170:24 185:12 194:23

**male** 41:25 57:12 165:4 193:9,24 206:10

**males** 170:14

**malice** 182:3

**malicious** 172:6 181:11

**man** 56:19 66:22 100:11

**management** 143:14,23 200:4

**manager** 188:9

**manpower** 130:7,13 144:17 150:11,21 214:6

**March** 109:10

**Marcus** 135:18

**Marissa** 198:3

**Mark** 196:16

**marked** 5:2 10:17 18:16 110:14

**married** 7:20

**Marshall** 196:16

**master's** 8:11,21

**match** 17:16

**Matt** 5:10

**matter** 76:16,18 109:22 201:1

**Maurice** 196:14

**Mcquiddy** 92:11 94:6,8 95:7,23 97:14,18 100:20 119:3 170:5 186:8 188:16 196:8 197:2 212:18

**Mcquiddy's** 99:3 175:22

**means** 10:20 19:21,22 100:6 200:14 204:3 212:10

**mediation** 154:2

**medic** 66:20 67:5 75:17 130:3 149:11 165:5

**medical** 20:18,25 146:5 211:5

**medication** 7:2

**meet** 30:25 36:13 50:14 69:14 83:6 178:4

**meeting** 44:13 68:13 81:11 94:22

**meetings** 29:1

**Meghan** 92:11 94:5,8,11 95:7,21,23 96:11 97:14 119:3 170:5 172:22 174:6 175:22 186:8 188:16 196:7 197:2 212:18

**Meghan's** 174:3

**Melissa** 95:12,14

**members** 10:10

**men** 41:22 56:13 100:11 164:25 166:1,3,6,7,12

**mental** 21:4

**mention** 56:16 118:24 119:6 151:3

**mentioned** 55:4 61:12 93:9 94:5 119:5 120:14 161:11

**mess** 22:20 150:21

**mess-up** 151:1

**message** 53:21 54:3 56:12, 13,23 97:10 119:2

**messages** 97:14

**messed** 55:14

**met** 31:1,9 32:8 36:2,4,15, 19 47:15,18 48:1,6,13 69:16 94:13,20,21 103:8, 22 196:18

**Michael** 174:11 189:20

**midway** 71:11 73:13

**Mig** 198:12

**Mignerey** 22:19 198:14

**military** 55:13,19

**mind** 56:20

**mine** 42:4 95:5 111:20 112:16 142:21 161:12 185:16 202:11

**minor** 79:24

**minutes** 206:20

**miscommunicate** 181:7

**miscommunication** 181:6

**mishandling** 187:2 189:15

**misrepresent** 181:1

**misrepresented** 179:1,3

**missing** 33:6 186:4

**misstatement** 181:5

**Mitchell** 68:11,13 69:15 70:5 71:16 72:13 75:21 78:18 156:6 177:24 188:11 189:25

**Mitchell's** 77:2 168:9

**Mollie** 197:8

**mom** 198:21,22 199:1,2

**mom's** 46:24

**moment** 93:19

**money** 15:8

**month** 12:7,9

**months** 9:22 22:6 23:22 135:3,6 149:23 162:23 166:24

**morning** 83:16,23 92:21

Moses 135:18 136:4,24
Mount 8:2
move 33:25 40:10 73:19 74:8,15 129:4 178:22
moved 30:3 129:7 191:16
moving 181:24
multiple 24:7 25:20 33:1 100:5 124:15 152:3
mutual 106:7
MYERS 5:15 7:14 19:3,5 20:8,12,21 110:20 153:9 154:23 177:12 178:6

**N**

N/a 210:20
name's 152:13
names 58:25 68:25 92:1 171:5,14 196:10
necessarily 26:18 199:19
needed 88:1
negative 82:15 173:7 184:11
news 140:17,22 141:8,10
nice 138:6
nickname 122:4
night 42:24
nodding 45:24
Non-work 210:14
non-work-related 133:4,7 134:14 135:11,14 136:5, 19 138:25 148:9 161:12 213:10
nonverbal 6:3,6
normal 11:8,12,17,24 14:20 74:11 131:7 138:20 148:25 160:25
North 8:10
note 211:5,6,10 216:15
nothing's 76:21
notice 160:18
notified 136:18
November 65:12 88:18
number 13:14,17 15:22 33:17 142:2,9 155:23 187:17 199:24 200:6 207:19 212:6
numbers 16:12 141:5 202:11
numeral 187:17 199:23

**O**

Oakley 90:7,10
object 70:21 154:12 183:20

objection 7:14 13:22 20:7, 8,11,12,20,21 52:6 53:11 61:24 63:2,16,25 103:5 107:5 112:8 113:2 114:12 118:1 119:15 122:24 127:1,13 139:2 140:11,18, 24 142:19 143:3 145:12 147:5,17 153:24 156:4 161:4 162:1 163:13 167:7 171:21 172:10 178:1,9 182:8 183:8,21 186:23 190:7 200:12,20 201:3 203:15 205:11
objective 34:2
obligated 202:18
Observations 73:12
observe 108:9
obvious 120:23
occur 109:25
occurred 35:22 41:14 47:16 83:1 109:10
occurring 101:2 115:7
OCRC 160:19
October 50:17,18 85:20 115:13
oddly 32:18 61:11
offended 107:21
offense 107:22
offer 35:4 64:16,20,21,22
offered 29:10 35:3 37:7,8 40:19,22 41:2 42:18 64:23 134:24
office 51:6 59:12 96:15,17 97:3 115:18 116:1 124:4 125:10 127:11
officer 32:14 46:10 49:4,5 56:18 71:17 72:9,13,16 73:2 74:12 75:5,9 76:19, 23 79:24 86:8,23 141:25 150:19 156:19 167:18 168:8 171:15 189:5,8
officer's 76:13
officers 34:8 49:9 144:5
official 35:4 73:20 146:1 170:20 184:23
officially 48:6 91:14 126:18
Ohio 15:10 20:2 146:18 147:3,10 153:22 154:6 155:1 207:21
older 41:22
on-duty 137:13
one-on-one 34:25 35:10,16
ongoing 142:18
open 10:16 58:4,5

operating 11:17
opinion 64:12 69:1 111:25 127:7
opinionated 69:3
opportunity 44:7 154:7
opposed 178:14
opposing 177:20
option 89:2 134:25 135:2 210:1
oral 33:8
original 136:7
originally 41:11 115:22 133:12 134:25 211:18
outcome 51:9 79:13 80:8, 11,14 126:14 153:21 154:1
overlooked 57:9
overtime 11:10 12:5,8,14, 18 67:12 131:6,9 144:17 145:3,4 199:20 200:2,8 211:24 215:21 216:1,3
owed 129:24 200:19

**P**

p.m. 18:3 217:17
paid 115:5,19 116:10,23 117:15 169:19 179:2,7 180:19
pain 25:7,15 26:1
paper 136:22 185:4,5,10
paperwork 40:21 89:7 133:9,12 136:7,15
parades 164:10
paragraph 63:8,9,15 71:12,19 72:4,7,8 73:13 132:14,15 148:17 155:19, 24 166:25 172:14 173:21 177:18 182:2 187:16
paramedic 9:5,13,17 15:12,16 25:24 51:7 59:10,18 88:7,13,16,21 92:23 168:24 169:9
parents 81:13,14
part 34:10 56:6 59:7,10 69:23 77:10 104:4 106:23 139:12 148:15 162:12 169:25 171:2 176:4 204:18 216:13
part-time 15:5
participants 176:12,14
participate 106:5,8 174:23
participated 106:6 174:20 176:15
partner 172:25

party 31:14 32:1 83:2,3,4
pass 29:25 57:23 58:1
past 20:17,22 23:25
  117:22 129:22
patient 15:17 160:9
pay 19:22 180:4,5,14
  200:10,11,15,18
PEAP 21:21 22:2 23:3
  44:20,24 45:2 198:7,8
peers 64:14
pension 123:7
people 14:8 27:11 28:15,
  17,20 32:3 34:6 43:3
  50:12 59:3 64:9 68:17
  69:22,25 70:2 87:10 92:5,
  13,18 93:3,18 99:15,21
  105:25 106:12,15 108:23
  122:17 124:10,15 130:10
  133:2 139:17 142:7
  149:13 152:3,4,9 153:15
  164:2,5 170:24 171:2,5,6
  174:14 184:13 187:17
  189:12 194:18 204:20
  212:23
people's 58:25
percent 136:11
performance 162:8,10
  163:6,10
period 203:9
periods 163:2
permanently 68:2
permitted 129:9
person 32:20 41:21,23
  42:23 67:1 89:14 102:3
  149:18 159:23 173:2,3
  193:16 205:21 206:8
  212:9
person's 131:16
personal 37:24 105:15
  118:13 141:22 177:12
  180:18
personally 163:17,19
  164:21
personnel 143:14,22
  186:17,18 200:4
phone 89:15,16 130:7
  142:1,9
physical 21:4,10 25:3
  29:20 33:4,11 58:6 96:6
  210:21,25 211:22
physically 99:8
pick 11:10 41:10,24,25
  42:3,8
picked 57:13 106:14
picking 57:5

picnic 164:8
place 13:24 26:14 48:10
  140:3 143:15 149:3 161:7
places 143:16
plaintiff 5:4
Plaintiff's 132:17
plan 165:16
played 36:20 56:1
playing 36:22
plenty 21:1
pneumothorax 25:21
point 6:11 25:17 31:4,20
  32:14,21 37:22 38:15
  39:23 40:8,14,19,25
  43:10,12 51:24 54:8 57:22
  59:22 60:1,14 65:11 74:16
  77:19 88:25 91:25 93:23
  94:6 99:17 114:15 117:25
  118:9 128:13,19 138:5
  140:15,21 149:12 153:4
  160:15 166:6 167:13
  169:21 183:7 204:10
  207:6 217:4
pointed 55:23 57:11
police 45:16,17,23 46:2,4,
  9 47:19,22 48:5 49:4,6,8,
  12 50:21 62:9 84:17,23
  85:14 86:12 115:24 124:8
  126:7 127:9 169:25 189:5,
  7
policy 98:24 201:11
  215:21
politically 69:3
polygraph 33:5,11 42:2
  48:11 123:24 124:6 125:3,
  9 126:8,16,23 189:18
polygraphs 189:15
pool 31:12 36:20,22
portion 110:14
position 39:6,11 63:1,13,
  24 64:5,11 122:17 127:5
  172:18,19,24 173:7
  182:10,15,20 183:4,16
Potter 76:2,23
power 127:5 171:7 173:2
  205:13
powerful 64:5,10
practice 28:3,5,8,13 157:5
practicing 159:20
prepare 14:7 27:23
present 29:17 103:11
  104:15 107:4 114:20
president 108:5
pressure 98:9
pretty 90:18 136:13 164:6

prevent 123:10 124:23
  167:4
prevented 97:20
previous 20:5 95:9 150:19
previously 5:20 31:17
  94:20 102:7 112:21 148:7
  193:10
Price 66:12
primarily 58:14 67:8,9
prior 14:14,17 32:4 38:13
  45:12 52:4 55:11 59:19
  68:13 69:20 81:10,25
  94:11 95:7 104:20,25
  105:4 145:25 159:18
  161:1,22 164:4 183:17
  200:1
private 15:18
privileged 147:18
probation 57:20 203:10
  205:1,9
probationary 203:11
problem 192:3 193:9
problems 95:11
procedures 108:3 171:9
  201:11
proceeds 191:22
process 9:16 27:9 29:24
  30:7,8 32:22 34:17 36:24
  37:1 38:6 39:12,15 40:3
  43:21 52:17 56:17 57:5,19
  60:2 65:15 80:6 101:5,17
  102:15 103:14 115:16
  199:10,17
produced 16:11 18:25
  125:21
promoted 83:20,21 193:17
promotion 8:25
promotions 10:25
pronoun 207:10
prop 157:5
proper 149:1
properly 175:16,20
prosecutors' 127:11
protected 177:20,23
  178:3,19
provided 26:9 27:23
provider 26:12
providers 26:16
psychosomatic 26:1
PTO 179:1,4,16 181:1
PTSD 145:19 184:8,10,18
public 35:1 185:12,14
  186:14 187:5
pulling 111:4 112:15
pulmonologist 25:11

pump 166:10
purposely 110:9
pushed 51:2
pushing 84:4
put 14:7 53:10,17 72:14
  94:25 98:9 99:8 129:5,25
  130:20 137:21 141:7
  185:19 191:14 211:5
puts 33:14

## Q

question 6:17,20,23 60:17
  107:12 111:1 114:6,22
  140:19 147:23,25 151:20
  178:7,20 181:8 201:7
questioned 137:11
questioning 111:22 112:1,
  11 113:22 114:2
questions 7:4,12 13:5
  29:13 38:6 92:14 93:4
  103:3 108:8 112:24 113:9,
  16 114:9,11 165:6 201:20,
  24 208:24 215:15,17
quick 127:17
quickly 201:18
quit 14:23 15:4

## R

raise 108:23
raised 108:21
ramped 37:9,18
Ramsey 195:10
ran 51:3 121:2 130:24
  131:3,17,20 169:17,20
random 15:23
rank 28:21
ranking 33:15 100:6
rape 35:22 36:17 37:15,19
  41:14 44:15 46:15 59:20
  82:16 99:7 161:23 162:7
  164:13 169:21 178:18
raped 162:22 183:18
rarely 58:20
RB 97:8 119:1 141:4
reach 42:20 158:7,8,15
  162:13
reached 35:12 93:25
  153:15
reaching 94:12 95:8
react 86:17
read 10:19 14:9 53:7
  104:5,6 110:9 113:12
  114:14

reading 148:14 207:16,18
ready 216:21,25
realize 48:23 81:14 102:23
  205:13
realized 99:20 204:8
reason 23:1 42:11 44:2,10
  76:7 108:13 113:5 125:6
  135:11 137:13 150:5,20
  155:9 205:18 214:23
reasoning 55:18 134:16
  139:4
reasons 157:25 170:17,18
reassign 131:24 132:6,8
reassigning 132:8
Rebecca 5:3,14 121:9,11
  198:21 209:6 217:13
Rebecca's 191:21 192:5
recall 22:14 23:8 29:19
  41:18 45:25 46:15 49:18
  65:5,12 70:25 73:23
  74:14,17 76:8 84:21
  89:19,21 110:2,7 111:21
  119:11 120:9 128:10,18
  171:4 179:8 185:20
  195:23 208:3 213:2,4
receive 9:8 64:21 78:3
  154:5 186:21
received 9:3 20:18,24
  64:16,19 154:17 160:17
  161:11 187:15
recent 23:11 146:10
recently 22:12 122:10
recess 36:9 81:3 177:16
  201:22
recognize 10:18 12:22
  13:1 16:9,22 26:21 53:5
  97:11 125:25 213:14
recollection 17:16 75:1
recommend 77:24 120:5
recommendation 78:17,22
  79:3,8 127:8
record 5:13 127:19 186:14
recorded 50:2 109:5
recorder 50:4
records 98:5 146:5 175:25
  185:8,13,14 186:21
recruit 14:25 27:5 30:4,8
  31:2 32:24 37:7,9 39:15
  40:16,24 41:3 57:15,18
  60:6 64:17 81:18
recruiting 32:15,17 38:16,
  25 58:20 63:13 183:4,17
recruitment 65:15
recruits 29:23 42:24 83:5
rectified 119:14

recurring 21:3
redirect 209:3
refer 27:3 110:13 148:21
reference 173:17
referencing 212:4
referring 53:20 119:10
  168:6 186:5 206:7,24
reflect 146:6
regular 21:9 111:11,14
  156:24
reimbursed 179:9
related 84:11 96:2 186:22
  210:14
relating 170:9
relationship 106:10 188:3
  195:17
relationships 184:13
relatives 61:12
relayed 128:5 139:13
relevant 109:19 113:6
remaining 179:1
remedy 167:4
remember 13:10 14:11,12
  19:25 21:17 24:11 29:11
  33:12,17 41:20 44:22 48:3
  52:8,9,10 60:25 61:2,6,16
  68:25 69:6,16 73:25 74:8,
  10,18,20,21 75:8 77:17,
  21,25 78:24 79:6 84:16
  88:17 89:25 90:1,4,21
  92:4 93:11 101:19,22,24
  103:16 104:14 107:19
  108:12 110:3 111:23
  113:14 114:14 124:9
  128:11 131:4,5 136:20,21
  147:12 150:10 155:6,10
  165:3 166:22 175:3,7
  179:20 190:9,11,15 194:7
  208:4,9 209:9
remembered 46:21
removed 62:25 63:23
  148:8 168:12
repeat 30:16
report 14:8 45:4 48:18,24
  49:16 50:15 53:3 62:9
  70:9,11 71:17 72:12 74:10
  75:4,15 76:5,24 77:11
  78:3 84:22 86:6,7,13 87:7,
  23 90:23,25 91:5 98:3,6,
  18,19,22 100:2 102:20
  151:13 153:17 169:13,14,
  16,23 171:22 173:10,11,
  12 174:8,17,21 175:2,15
  176:9,16 186:4,6,8 188:10
  202:20
reported 11:21,23 12:13
  43:20 44:8 45:18 48:19

69:10 74:24 75:2,3 85:15, 17,19 88:22 89:23 99:10 100:25 115:10 116:7,22 118:21 125:7 140:6 162:22,24 163:6,9 169:6,7 171:18 192:12 196:8,20 214:10,23
**reporter** 6:2 127:18 217:9
**reporting** 45:13 46:19 52:4 59:19 69:20 86:10 161:23 163:21,23 164:4
**reports** 45:22 50:19 78:5, 12 85:23 86:23 102:20 115:13 126:11 128:8,9,16 140:4 169:11 173:14,23 175:16,19 185:24 186:11, 16,19
**representation** 108:17
**represented** 16:24 126:5
**representing** 202:6 208:8
**reps** 108:5 159:20
**reputation** 194:25
**request** 128:14 185:13,15
**requested** 97:25 185:21,22
**required** 115:2 162:19 217:3
**resolved** 61:17 181:17
**respect** 32:19 127:4
**respectable** 32:20
**respected** 108:11
**respectful** 214:20
**respond** 111:19 152:9 202:19
**responded** 107:19 166:4 168:14 180:9
**response** 16:15 111:3,6 117:3 121:10 191:20
**responses** 13:4
**responsibility** 99:13
**restore** 180:20
**restored** 117:21
**restrictions** 210:16,18,22
**Restrictions/notes** 210:11
**result** 76:25 91:8 146:16 182:18
**resulted** 179:2
**results** 77:7 114:4 121:1 123:24 126:23
**retained** 63:11
**retire** 119:25 121:18 122:23 123:17,18 124:20 125:1
**retired** 76:2 120:1 123:20 138:6 197:18
**retirement** 63:13 123:8

**retiring** 124:24
**return** 148:24 211:18 212:25 216:8,16
**returned** 125:5 126:20 156:21 159:1 166:23 216:14
**returning** 93:2 156:8,12 159:2 160:23 161:1 167:23
**reviewed** 175:17,20
**Rice** 138:14
**Richard** 212:15
**RICHARDSON** 13:22 16:10,17,20 18:23 19:2 20:7,11,13,20 36:8 52:6 53:9 61:24 63:2,16,25 70:15,20 71:21 103:5 107:5 110:16 112:8 113:2 114:12 118:1 119:15 122:24 125:19 127:1,13 139:2 140:11,18,24 142:19 143:3 145:12,14 146:9,23 147:5,7,17 151:7,12 153:6,24 154:12 156:4 161:4 162:1 163:13 167:7 171:21 172:10 178:1 182:8 183:8,10,20 186:23,25 190:7 198:20 200:12,20 201:3 203:15, 17 205:11 207:11 209:2,5 215:14 217:11
**rights** 146:18 147:3,11 153:22 154:6 155:2 172:7 207:22
**risk** 169:1
**Robin** 193:3,4
**role** 38:14 59:23 135:21
**Roman** 187:16 199:23
**roof** 157:4,5,9,11,25
**room** 41:21,22 124:16
**rooms** 166:10
**Roper** 212:21
**roster** 142:7
**roughly** 9:24 92:2 200:1 208:4
**rug** 99:24
**rules** 5:24
**rumor** 152:2
**rumors** 151:4,6,19,22 152:2 153:18
**run** 116:1 130:2,14 131:2 137:17,20,21 138:1,17,21 139:5 169:8,12 187:19
**running** 28:4 51:4 130:12 169:1

**runs** 23:4 160:8,15

---

**S**

**S-C-R-U-G-G-S** 56:11
**S-I-R-E** 166:20
**S-Y-R-E** 166:20
**Sabrina** 22:16,18 23:12,21 198:12,15
**Sabrina's** 22:17
**safe** 64:9 142:4 158:1 214:14
**safest** 157:16
**safety** 141:17 142:12 143:6 145:18 157:25
**samples** 14:6
**sat** 46:22
**satisfied** 79:13,15
**scans** 25:12
**schedule** 11:7,13,17,24 18:8 66:13,21 129:10 131:25 132:18,24 133:11 134:15 148:6,11,20 149:3, 4
**scheduled** 18:11
**school** 8:1 9:10,13,17 15:7 25:15 46:10 55:6 57:21, 23,25 58:2,11,15,23 59:4, 8,10 60:11 83:6 94:15 152:18 159:21,25 169:9 204:7,10,12,13,15,21,22 205:2,25
**Schooley** 197:11
**science** 8:14
**score** 27:15 29:25 32:23 33:14,24 34:14
**scored** 30:2
**scores** 34:4
**Scott** 138:7,9,10,12,14
**Scruggs** 56:11
**Sean** 197:21
**search** 143:19 198:9
**section** 42:4
**secure** 205:2,3
**secured** 202:20,21 203:14 204:1,6
**selected** 30:1 35:4,12 43:14
**send** 28:17 95:3 185:19
**sending** 153:3
**senior** 149:14,18 150:8
**seniority** 145:3
**sense** 34:2
**sensitive** 6:9
**sentence** 71:12 72:7 74:22

separate 87:1 166:9
serve 55:20
session 29:12,19
sessions 24:8 28:11 29:4, 16
sets 159:19
sex 155:22 156:1,7,10 177:20 178:14
sexual 23:17 24:23 30:10, 20,21 46:17 82:16,17 84:7,19 91:3 92:15 96:4 132:1,19 134:19,20 137:20 139:1 162:7,24 178:15,17 181:21
sexually 47:6 54:10 62:19 70:5 82:23 97:23 99:9 100:11 109:20 112:3 190:13
shaking 6:1 217:8
sheet 208:11,15
Sherman 195:24 196:23 197:3
Sheryl 188:6
shift 68:5 82:7 213:12
shifts 11:10 131:11
shirt 112:15
shirts 100:5
short 39:7
shortly 193:17
shoulder 191:15
show 18:15 132:11 149:6 176:2
showed 87:22 91:5 149:6
shows 127:3,4 187:1,3,6
siblings 199:13
sic 84:10
sick 19:22,23 213:2
side 25:8 103:18
Signature 217:9
signed 133:12 136:6,17
Sillis 193:4,5
Silus 193:3
similar 95:17
simply 108:9
single 158:22
singled 161:15
sister 199:12
sit 100:7 124:11 172:2
site 157:2,3
sitting 72:17
situation 125:4 141:10 173:25 181:16
situations 121:22
six-hour 79:3

sixth 66:22 67:1
Siyr 166:19
size 109:18 110:6 112:6
skill 157:6
slap 79:19
sleep 211:14,16
slide 19:16
Slovin 5:10
small 9:6 40:20 97:8 110:14 111:20 112:16
Smith 195:24
social 164:7,23 166:5
sort 27:22 150:24
sought 174:8
sound 17:1 64:18 65:20 79:2,10 85:21 147:13 155:5 157:25
sounded 56:8
sounds 59:4 79:5 102:5 145:8
source 151:24
space 137:22
speak 5:15 76:1 160:7,10, 11
speaking 159:13 166:7
speaks 63:17
specific 32:12 61:5 76:7 95:21 141:14 171:14 184:7
specifically 22:23 24:22 25:5 41:19 47:3 61:3 68:23 83:24 84:17,22 86:5 109:15 110:4,7 113:11 139:16 142:23 144:22 156:16 163:25 166:12 167:16 183:25 185:20 186:15 190:5
specifics 38:23 125:13 171:5 188:5 195:19
spoke 23:4,5,16 42:9 46:2, 4,7 48:25 57:4 75:24 76:3 101:25 188:8 190:10 198:6
spoken 35:9 193:19
sponsored 83:11 94:24
spontaneous 25:21
sports 56:1 111:12
spot 194:16
spread 91:20,22 92:7
spreading 92:8 151:5,22 153:19 209:15,23
Springdale 49:6,10,19 50:5
St 8:10,16
staffing 18:20 19:11 214:5

stage 40:14
stairs 28:4
stamp 147:14
stamped 18:24 53:12 70:17 125:22
stand 97:19
standard 64:6
standing 123:17,19 130:10
start 7:11 14:10,11 15:13 21:14 24:16 38:4 87:10 88:17 113:25 161:16 206:7 211:4
started 9:19 14:13 17:17 21:21,23 38:9 40:17 41:5 64:23 88:8 92:21 95:22 115:15 140:1 151:25 153:13 158:19 169:4 190:2 203:4
starting 40:18
starts 73:14 97:17 148:18
state 5:12 200:10
stated 71:14 175:15
statement 43:18,22 168:9 176:19,21,23
statements 77:2
states 176:9
station 28:2 148:5,19
status 19:17,18 161:10
stay 48:15 162:11,14 201:12
stayed 69:22
staying 165:16
step 27:15
step-ups 11:1
steps 33:1 119:23 123:9 141:14,18 145:17 149:1 157:10
Steve 71:7,8
stop 73:1 158:3 164:3 209:22
stopped 130:6
stopping 130:13
stored 186:11
stories 194:23
straight 101:10 201:14
straightforward 84:18
straw 215:13
street 75:19
stress 118:6 199:18
stressful 211:12
struggling 118:17
stub 180:5
stubs 180:4,14
study 28:11 29:4,12,16,18

**stuff** 10:25 28:5,7 31:12 33:5 37:25 54:23 78:24 108:6 126:16 135:22 142:6 145:7 159:20 160:14 162:13 171:15 187:10 194:15 195:11 196:5
**subjected** 155:21 161:3,24
**subjective** 34:1
**submitted** 86:22 87:24 169:22 175:1
**subpoena** 16:15
**Subsequent** 63:9
**substantiate** 128:2
**substantiated** 119:20,24 120:4,21
**sue** 154:6,16 160:18
**suffer** 184:8
**suffered** 184:5
**summer** 208:5
**super** 199:3
**superiors** 98:4
**supervision** 172:25
**supervisors** 98:7 214:2,4
**support** 138:24 156:2 172:8 182:6
**supported** 103:18 211:7
**supporting** 122:21
**supportive** 199:5
**supports** 126:23,24
**supposed** 99:13,14,15 123:3 130:15,17 144:20 149:16 152:15
**supposedly** 108:13
**surprised** 61:20 62:1 93:14 165:20
**survey** 175:1 176:15
**surveys** 175:4,12
**suspended** 79:11
**suspension** 79:1,4
**switch** 131:11
**switched** 90:13
**sworn** 5:4
**SWP** 19:20,21
**system** 143:14,23 144:13, 21

---
**T**

**tab** 53:18,19 56:14
**table** 73:17
**tabs** 10:15 53:18
**takes** 158:14
**taking** 145:17 158:19 168:24

**talk** 6:13 21:13 27:2 30:9 48:4 49:3,5,8 68:10 69:8 77:13 81:6 86:25 89:12 96:10 107:15 116:17 124:11 138:20 165:13,14 171:6 173:9 185:12 201:17
**talked** 25:24 29:3,16 35:21 48:5 49:10,11,19 50:9,10 51:12 56:3 62:14 74:16 77:16 80:2 85:13 89:4 93:18 96:11 99:2 105:13 117:8 147:21 148:7 151:17 160:20 174:4 177:7 187:21,23 188:12, 16 189:2 190:18,22 191:1 192:19 194:19 198:1 199:16 209:7 214:7
**talking** 11:16 49:23 55:14 61:6,10 72:9,11 73:1 74:3, 11,12 76:22,23 81:15 87:11 92:5,14 93:3 95:19, 22 96:1,19 104:8 119:11 132:11 138:11 148:12 151:9 153:2,7 165:8 209:6
**Tallent** 197:15
**tank** 111:5
**tasked** 106:13
**tasks** 33:14
**taught** 29:11
**taxing** 184:16
**teacher** 25:25
**teams** 56:6
**technically** 14:25 25:6 66:24
**telling** 44:4 47:22,23 84:4 100:10 122:22 139:17 152:1 181:12
**tells** 43:13
**ten** 20:17,24 23:25
**term** 200:22 205:1
**terminated** 120:22 123:11, 15,21 124:25 125:2
**termination** 120:5
**Terry** 31:15 192:19
**test** 14:6 27:10,11,13,14, 17,21,24 28:8 32:24 33:2, 3,4 97:8
**tested** 13:24 25:9
**testified** 51:22 207:2 209:13
**testify** 206:20
**tests** 58:4,5,6
**text** 52:19,22 53:21 54:3 56:12,13,23 97:10,13 119:2

**texted** 92:12,24 94:6
**texting** 92:11 94:12
**texts** 37:16
**therapist** 21:22 22:2 23:8, 12,23 24:24 44:20 45:6 46:20 145:25 184:25 185:7 198:3,8,9 211:6 216:22,23,24
**therapists** 23:25 45:14 198:1
**therapy** 21:8,13,15,16 26:18 85:14 185:1
**thing** 42:19 53:7 55:25 61:6 78:6 83:9 95:2,21 96:20 100:1,17 113:13 141:20 143:25 145:6 191:8
**things** 9:7 21:10,11 23:19 25:3,13 26:16 27:22 28:14 33:9 38:4,22 40:21 44:8 57:11 58:7 59:15 69:8 72:18 73:24 74:1 79:22 87:11 88:7 98:13 99:16,21 103:22 118:8,10,16 144:18 145:5 153:13 156:9,18 161:13 162:4,18 163:8 164:10 166:3,11 171:3 175:7,9 184:22 185:6,24 187:4,7,8,11 194:21 214:8
**thinking** 54:21 140:16,22
**thought** 32:19 34:3,4 39:2 56:5,19 85:7 89:2 138:13 159:8 174:12 189:9 195:12 212:5
**thoughts** 184:11
**threat** 142:12
**ticket** 129:5
**Tiffany** 46:5,13 47:11,13, 15,23 48:6 49:15,23 50:1, 12,14 85:16 124:14,18
**time** 10:4 11:15 16:1,25 17:7 25:17,20 27:20 28:19 30:6 31:9 32:8 35:9,11,14, 20,22 36:2,4,5 41:15,17 44:18 46:6,16 48:23 59:16 68:21 73:14,15,16 77:16, 17 80:6,18,19,21 83:20 85:18,24 87:16,20,23 88:15 89:21 96:16 105:8, 18 106:18 107:13 108:18 115:17 116:3,14 117:1 118:20 122:11,16 124:17 130:20 131:18 159:14 162:17 163:2 167:23 168:2 172:21 175:8 179:22,25 180:8,16

184:18 193:12 201:15 205:14 206:16 208:10 211:20 213:9 214:25
**timed** 33:4
**timeline** 11:3 36:12
**times** 21:2 25:20,22 134:15 159:13,17
**timestamps** 17:9
**timing** 9:25
**tired** 159:16 215:8
**title** 32:11 106:19
**titles** 197:4
**today** 6:6 7:4,7 19:3,5 97:9 143:10 172:2 202:9 208:8, 25
**told** 25:25 33:19 34:5,9 35:12 36:6 37:6 38:1 39:18,21,24 40:9 41:12,19 42:14 43:16 44:14,18,21, 23 45:17,21 46:8,12 47:1, 6,17,18,19 48:15 49:1 50:23 51:18 52:14 54:9 55:2,3,7,10 57:3 60:12 64:23 75:14 77:4,21 78:7 79:12 83:18 84:1,2,13 85:11,14 86:8,10,11,13, 15,17,18,23 87:4,11,21 89:3,6 91:2,4,24 94:8 95:10,15 96:19 98:3,7,8, 11,17 101:4,6,9 103:21 107:6,17,23,24 108:1 116:21 117:2,4 118:9,15 120:20 121:1,19,20,24 124:2,6,8,13 133:1 135:16 137:12 142:10 149:7,10 152:24 153:1 159:2 160:1 161:17,19 164:25 165:2, 18 170:4 176:23 179:13 180:2,9,13 181:19 182:21 189:11 192:4 193:12 195:6,16,20,21 196:12 205:17 212:24 213:5,8 216:7,11
**top** 17:14 18:21 200:5
**topics** 6:10
**total** 33:14
**touch** 191:22
**touched** 96:23 162:20 168:22
**tour** 149:9
**tours** 67:4
**towers** 28:4
**track** 17:10 18:19 149:2
**trade** 11:10 129:24,25 130:24 131:9,10
**trained** 144:12,13,18

**training** 9:3 26:6,16,18 28:1,13 58:15 59:4,15 157:3 197:1
**trainings** 27:22 29:2,15
**transcript** 109:9
**transferred** 128:22,25
**transition** 135:24 206:11, 15
**transitioned** 206:9 207:6,8
**transports** 15:18
**treated** 117:24 137:15 156:9 162:9
**treating** 21:19 23:20 198:10
**treatment** 20:18,25
**trial** 61:23
**truck** 67:4 152:23 157:6 159:10 165:11,17
**true** 42:7 77:22 140:15,21
**trust** 39:2,9 54:2,7 99:16
**trusted** 39:4 43:7 44:3 56:17
**truth** 44:4 171:19
**truthful** 13:8
**Tuesday** 17:24 18:5
**turn** 5:18 86:7 87:6 157:17,18 202:1
**Turner** 94:4
**Turning** 202:10
**TV** 10:6
**Twenty-four** 66:14
**Twitty** 122:1,2,9,12
**type** 79:1 96:4 198:25
**typed** 148:15
**types** 113:16 114:8
**typical** 11:6
**typically** 12:4,11,15 37:13, 14 201:12

### U

**UC** 8:11
**ultimately** 116:17 119:18 153:21
**umbrella** 186:2
**unable** 128:2
**unaware** 167:13
**uncomfortable** 6:12 96:25 103:3 112:25 151:19 160:5
**undergrad** 8:10
**understand** 6:21,24 32:10 59:23 97:22 106:19 107:11 135:9 165:19

**understanding** 29:22 45:1,3 57:14 78:10 80:5 95:24 96:12 98:21 99:3 101:12 106:24 113:16 114:8,20 119:22 124:22 126:14 174:7,10,16 175:18 186:10 211:3,9 215:20
**understands** 166:1
**unfair** 116:22
**unfold** 86:16
**unilaterally** 123:23
**union** 108:4,5,16 164:8 179:23
**unit** 66:20 67:5 82:9 129:23 130:3 131:14
**unpaid** 179:17
**unsafe** 42:19
**unsubstantiated** 52:4
**update** 13:11
**upset** 73:19,25 74:4,5,6 79:6 93:7 161:17 191:25
**upsetting** 110:11
**urgent** 115:22

### V

**vacation** 145:5
**verbalize** 6:5
**verbatim** 189:14
**version** 70:18
**victim** 80:7 98:22
**violence** 60:22,24 61:18 62:6,13,25 63:11,23 64:7
**Virginia** 197:15
**visibly** 74:5
**vouch** 43:24
**vouching** 40:11 41:9

### W

**wait** 45:21 50:22,23 76:4 115:25 133:20
**wake-up** 215:3
**walk** 27:2
**Wallace** 136:9,13
**wanted** 39:11 55:19 70:9 73:19 74:8 80:11 88:1 100:24 195:1 215:9,10
**wanting** 49:7 55:19 89:13
**wanton** 172:5
**Ware** 197:21
**warn** 93:2
**warned** 139:11
**Washington** 77:17 174:11 189:20 194:14

watch 10:6 158:13
wearing 109:19,23
Web 144:1
week 14:18 15:19
weekdays 18:9
weekends 15:2
weeks 12:11 52:14 58:10, 12 66:4 74:23 75:2 76:4 179:2,6,17
welcoming 214:17
well-being 141:17 145:18
Wessel 75:8,9
West 48:7
white 41:22,25 57:12 100:5
wife 195:2
willful 172:5
win 51:19
wire 111:17
wished 71:15
withdraw 148:2 178:23
witnessed 168:8
Woerner 197:13
woman 57:8 62:19 95:16 100:10 158:23 159:3,4 193:11,15
women 94:14,17,23 95:11 100:1,16 166:9 173:10,13 174:1,5 175:8 176:8,9,18, 19,22,23 177:2 190:4,5, 10,13 214:18,21 215:7
word 108:12 162:11
words 74:18
work 10:5 11:3,6,8 12:4,9 14:19 15:1,20 16:1 18:12 23:4,17,18 51:4 65:24 70:3 79:22 82:7 89:24 93:3 116:16 117:1 118:6, 15,18 125:6 126:20 129:9 130:17,19 133:3,6,8,24 144:5 155:22,25 159:4,6, 23 160:6 162:8,10,12 163:2,5 164:1,2,5,17,20, 25 165:8,16 166:2,13 167:3,17 168:3 170:25 180:5 193:14 200:8 203:23,24 211:1,19 212:25 213:2,6 214:9,14 216:3,8,25 217:3
work-related 26:5 34:25 37:23 133:1,4,5,11 134:1, 2,3,6,7,13 135:10,14 136:5 138:3,22,25 139:4 145:10 148:9 161:12 213:11

work-wise 163:16,19
worked 13:19 16:25 18:2, 9 67:12 81:24 90:2,20 94:21 122:10 133:2 180:20 200:2 216:2
working 12:1,8 14:1 15:4 17:7 20:1 68:21 69:18 72:10,13 82:12 101:19 128:20 129:14,23 130:24 131:5 133:15 137:25 146:10 150:10 163:7 165:4 167:18 182:20 211:23
workplace 168:21
works 34:13 141:23 159:4
workweek 14:20 66:6
worried 205:9
worries 146:13
worry 202:9
Wright 29:17 30:25 31:20 32:7 36:14 39:19 40:9 49:11,19 53:4 54:4 56:24 62:15,25 63:10,12,24 86:3 88:22 91:13 95:9,25 96:13 99:4,7 101:3 103:9 105:14 106:3 113:10 115:3 116:10 117:24 119:20 120:3,20 123:7,17,22 124:20 126:8,15,22 127:12,24 167:14 168:25 177:25 180:19 182:15 183:3,16 186:4 190:18 202:6,19 205:10 206:19, 21 207:3,9 214:24
Wright's 31:16 32:5 52:3, 18 59:23 60:22 90:24
wrist 79:19
write 77:11 171:11
written 27:10 33:3,10 85:10 171:23
wrong 76:19 84:7,19 85:8 93:7 109:24 181:20 209:13
wrote 50:18 159:15

---

**X**

---

x-rays 25:12

---

**Y**

---

year 8:3 9:18,24 22:7 24:16 55:17 203:12,13 208:17,20 216:12,13
years 8:9 20:17,24 23:25 24:19 44:24 82:2 162:21 172:20 200:1 201:9,14

yells 158:3
yes-and-no 6:4